**2016-2531, -2532**

# United States Court of Appeals
# for the Federal Circuit

TWO-WAY MEDIA LTD,

*Plaintiff-Appellant,*

*v.*

COMCAST CABLE COMMUNICATIONS, LLC, COMCAST INTERACTIVE
MEDIA LLC, VERIZON SERVICES CORP., VERIZON ONLINE LLC,

*Defendants-Appellees.*

*Appeals from the United States District Court for the District of Delaware in
Case Nos. 1:14-cv-01006-RGA and 1:14-cv-01212-RGA, Judge Richard G. Andrews*

## BRIEF FOR PLAINTIFF-APPELLANT
## TWO-WAY MEDIA LTD

PARKER C. FOLSE, III
RACHEL S. BLACK
JENNA G. FARLEIGH
SUSMAN GODFREY, L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA  98101
(206) 516-3880

JOSEPH S. GRINSTEIN
SHAWN BLACKBURN
SUSMAN GODFREY, L.L.P.
1000 Louisiana, Suite 5100
Houston, TX  77002
(713) 651-9366

MICHAEL F. HEIM
LESLIE V. PAYNE
MICAH J. HOWE
R. ALLAN BULLWINKEL
HEIM, PAYNE & CHORUSH, L.L.P.
1111 Bagby, Suite 2100
Houston, TX  77002
(713) 221-2000

*ATTORNEYS FOR PLAINTIFF-APPELLANT*

NOVEMBER 4, 2016

# CERTIFICATE OF INTEREST

Counsel for Two-Way Media Ltd certifies the following:

I.    The full name of every party or *amicus* represented by us is:

    Two-Way Media Ltd

II.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

    Two-Way Media Ltd

III.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:

    None.

IV.    The names of all law firms and the partners or associates who appeared for the party now represented by us in the trial court or are expected to appear in this Court are:

    **Farnan, LLP:** Joseph J. Farnan, III, Brian E. Farnan, Michael J. Farnan

    **Susman Godfrey LLP**: Parker C. Folse, III, Rachel S. Black, Brooke A.M. Taylor, Jenna Farleigh, Joseph S. Grinstein, Shawn Blackburn

    **Heim, Payne & Chorush LLP**: Michael F. Heim, Leslie V. Payne, Micah J. Howe, R. Allan Bullwinkel

Dated: November 4, 2016        /s/ Michael F. Heim
                               Counsel for Plaintiff-Appellant

# TABLE OF CONTENTS

*Page*

Certificate of Interest ................................................................. i

Table of Contents ..................................................................... ii

Table of Authorities................................................................. iiv

Statement of Related Cases ................................................... viii

Jurisdictional Statement .......................................................... viii

Statement of the Issues .......................................................... viii

I.   Statement of the Case ........................................................ 1

   A. Procedural Background ................................................... 1

   B. The TWM Patents ........................................................ 2

      1. TWM Patent History.................................................. 2

      2. Streaming Media Background...................................... 3

      3. The Specification .................................................... 6

      4. The Claims.......................................................... 14

   C. The District Court's Opinion ........................................ 16

II.  Summary of Argument ...................................................... 19

III. Argument...................................................................... 19

   A. Standard of Review...................................................... 19

   B. Legal Framework of Patent Eligibility .............................. 21

      1. Supreme Court Precedent Regarding Computer-Related Inventions ........ 21

      2. The Proper Application of the *Alice/Mayo* Framework for Computer-Related Inventions............................................ 24

      3. Federal Circuit Precedent Applying *Alice*............................ 26

      4. Cases Finding Claims Ineligible Due to Result-Oriented or "Functional" Claiming ................................................ 28

C.  Step 1: The District Court Incorrectly Found the '187/'005 Claims Were Directed to an Abstract Idea ............................................................ 30

   1.  The District Court Oversimplified '187 Claim 1 ........................................... 31

   2.  '187 Claim 1 Encompasses Patent-Eligible Subject Matter that Is Firmly Tied to the Architecture ........................................................ 34

   3.  Step 1 Is Not Limited Only to Technological Improvements .................... 36

   4.  The '187 and '005 Claims Represent a Technological Improvement ......... 37

D.  Step 2: The '187/'005 Patents Claim an Inventive Concept .............................. 40

   1.  The Claims Provide Inventive Solutions to Existing Problems ................. 40

   2.  The District Court's "Mechanism" Conclusion Ignores the Claim Language and Specification ................................................................ 43

   3.  There Are No Preemption Concerns ............................................................ 43

   4.  The District Court Improperly Excluded TWM's Evidence ...................... 44

E.  Step 1: The '622 Claims Are Not Directed to an Abstract Idea ...................... 46

   1.  The '622 Claims, Which the District Court Oversimplified, Are Tied Directly to the Patent-Eligible Distribution Architecture ............................ 47

   2.  The '622 Claims Represent a Technological Improvement ........................ 48

F.  Step 2: The '622 Patent Claims an Inventive Concept ...................................... 50

G.  Step 1: The '686 Claims Also Are Not Directed to an Abstract Idea .............. 53

   1.  The District Court Oversimplified the '686 Claims, Which Recite Patent-Eligible Subject Matter ........................................................ 53

   2.  The Claims Represent a Technological Improvement ................................. 55

H.  Step 2: The '686 Patent Claims an Inventive Concept ...................................... 56

IV.  Conclusion ........................................................................................................ 58

ADDENDUM .......................................................................................... Appx1

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                                          *Page(s)*

*Affinity Labs of Tex. v. Amazon.com, Inc.,*
    2016 U.S. App. LEXIS 17370 (Fed. Cir. Sept. 23, 2016) ............................................35

*Alice Corp. v. CLS,*
    134 S. Ct. 2347 (2014) .....................................................................................*passim*

*Allstate Prop. & Cas. Ins. Co. v. Squires,*
    667 F.3d 388 (3d Cir. 2012) ..................................................................................20

*Amdocs (Israel) Ltd. v. Openet Telecom,*
    No. 2015-1180, slip op. (Fed. Cir. Nov. 1, 2016) ....................................................*passim*

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.,*
    788 F.3d 1371 (Fed. Cir. 2015) ..............................................................................25

*BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC,*
    827 F.3d 1341 (Fed. Cir. 2016) .........................................................................*passim*

*Bilski v. Kappos,*
    561 U.S. 593 (2010) ............................................................. 21, 22, 23, 24, 29, 36

*CLS Bank Int'l v. Alice Corp. Pty.,*
    717 F.3d 1269 (Fed. Cir. 2013) ..............................................................................20

*DDR Holdings, LLC v. Hotels.com, L.P.,*
    773 F.3d 1245 (Fed. Cir. 2014) .........................................................24, 27, 28, 41, 57

*Diamond v. Diehr,*
    450 U.S. 175 (1981) ............................................................. 21, 24, 29, 34, 37, 42

*Elec. Power Group, LLC v. Alstom S.A.,*
    830 F.3d 1350 (Fed. Cir. 2016) ..........................................................26, 42, 49, 50, 55

*Enfish, LLC v. Microsoft Corp.,*
    822 F.3d 1327 (Fed. Cir. 2016) ...........................................................................30, 31, 40

*Gottschalk v. Benson,*
    409 U.S. 63 (1972) ............................................................................. 21, 23, 24, 34

*In re Bilski*,
545 F.3d 943 (Fed. Cir. 2008) (*en banc*) ............................................................22

*In re Schreiber*,
128 F.3d 1473 (Fed. Cir. 1997) ................................................................ 29, 30

*In re Swinehart*,
439 F.2d 210 (C.C.P.A. 1971)............................................................................29

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015) ................................................................ 26, 27

*Internet Patents Corp. v. Active Networks, Inc.*,
790 F.3d 1343 (Fed. Cir. 2015) .................................................. 28, 29, 35, 43

*LendingTree, LLC v. Zillow, Inc.*, No. 2014-1435,
2016 U.S. App. LEXIS 13462 (Fed. Cir. July 25, 2016) ................................26

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 (2012) ...........................................21, 24, 34, 35, 36, 45, 51

*McRO, Inc. v. Bandai Namco Games Am. Inc.*, No. 2015-1180,
2016 U.S. App. LEXIS 16703 (Fed. Cir. Sept. 13, 2016)............. 20, 31, 44, 54, 55, 56

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011) ............................................................................................20

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
848 F.2d 414 (3d Cir. 1988) ............................................................................20

*Oshiver v. Levin, Fishbein, Sedran & Berman*,
38 F.3d 1380 (3d Cir. 1994) ............................................................................20

*Parker v. Flook*,
437 U.S. 584 (1978) ...............................................................................i, 21, 58

*Rapid Litig. Mgmt. v. CellzDirect, Inc.*,
827 F.3d 1042 (Fed. Cir. 2016) ......................................................................25

*The Telephone Cases*,
126 U.S. 1 (1888) ..............................................................................................29

*Two-Way Media LLC v. AT&T, Inc.*,
782 F.3d 1311 (Fed. Cir. 2015) ........................................................................3

*Ultramercial, Inc. v. Hulu, LLC,*
    772 F.3d 709 (Fed. Cir. 2014) ...............................................................55

*Versata Dev. Group, Inc. v. SAP Am., Inc.,*
    793 F.3d 1306 (Fed. Cir. 2015) ..............................................................20

## Statutes

28 U.S.C. § 1295 ......................................................................................vii

28 U.S.C. § 1331 ......................................................................................vii

28 U.S.C. § 1338(a) ..................................................................................vii

35 U.S.C. § 101 ...................................................................................*passim*

35 U.S.C. § 102 ...............................................................17, 19, 29, 30, 45

35 U.S.C. § 103 ...............................................................17, 19, 29, 30, 45

35 U.S.C. § 112 .................................................................................29, 30

35 U.S.C. § 282 ..................................................................................20, 2

## Rules

Fed. R. Civ. P. 12(c) ................................................................................1, 20

Federal Circuit Rule 47.5(a) ......................................................................vi

Federal Circuit Rule 47.5(b) ......................................................................vi

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), Appellant states that two appeals are pending in this Court, 16-2531 and 16-2532 (consolidated in 16-2531). There have been no other appeals in this action before this or another appellate court.

Pursuant to Federal Circuit Rule 47.5(b), Appellant states that no cases known to counsel are pending in this or another court that will directly affect or be directly affected by this Court's decision.

## JURISDICTIONAL STATEMENT

This appeal arises from a final decision of the U.S. District Court for Delaware. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). It granted Defendants' motion for judgment on the pleadings on August 15, 2016, and entered judgment on August 16, 2016. Plaintiff appealed on August 22. This Court has jurisdiction under 28 U.S.C. § 1295.

## STATEMENT OF THE ISSUES

Whether the district court erred in granting Defendants' motion for judgment on the pleadings under 35 U.S.C. § 101.

# I.    STATEMENT OF THE CASE

## A.    Procedural Background

Plaintiff-Appellant Two-Way Media Ltd ("TWM") filed a patent infringement action against various Comcast and NBCUniversal entities on August 1, 2014. Appx51, Appx253-268. TWM filed a separate patent infringement action against various Verizon entities on September 19, 2014. Appx68, Appx1505-1520.[1]

On September 4, 2015, Defendants moved under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings, alleging that the patents-in-suit were invalid under 35 U.S.C. § 101. Appx269-299. During the hearing, the district court asked TWM to submit claim constructions relevant to the § 101 issues, which TWM did. Appx571-572, Appx599-602. The district court subsequently requested explanations for how those constructions impacted the § 101 analysis, which TWM also provided. Appx605-614. Defendants' motion was granted, and judgment was entered against TWM on August 16, 2016. Appx1-46.

---

[1] The district court cases maintained separate dockets but, with the exception of the complaints, the pleadings and orders in the appendix share a joint caption and are identical except for the docket number. For these identical documents, TWM has cited to the docket items from the case against Comcast Cable Communications (1:14-cv-1006) and included only those documents in the joint appendix. The parallel docket numbers for the Verizon case (1:14-cv-1212) are listed in the docket sheet for that case and in the index to the joint appendix. Appx66-78.

**B.    The TWM Patents**

**1.  TWM Patent History**

The patents-in-suit, U.S. Patent Nos. 5,778,187 (the "'187 patent"), 5,983,005 (the "'005 patent"), 6,434,622 (the "'622 patent"), and 7,266,686 (the "'686 patent") (collectively, the "TWM Patents"), cover an end-to-end audio/video streaming system for a packet-switched network. The original patent application, filed May 9, 1996, issued as the '187 patent. Appx79-122. The other patents-in-suit are continuations of the '187 patent, and share the same specification.[2] The original assignee, Netcast Communications Corp. ("Netcast"), was a streaming company that inventor Jim Butterworth[3] founded in 1995 to provide radio-like services over the Internet. Appx257. Butterworth and co-inventor Antonio Monteiro developed the Netcast architectural platform and protocols used to stream live radio channels to large numbers of users, which are described and claimed in the TWM Patents.[4] *Id.* The TWM Patents disclose and claim that architecture. Appx257-259.

Much of the end-to-end streaming system (*i.e.*, from stream generation to stream delivery) that the TWM Patents describe originated in Netcast's design

---

[2]  Because the specifications are the same, TWM's citations refer to the specification of the '187 patent.

[3]  Mr. Butterworth is now the managing partner of TWM.

[4]  Monteiro was part of a research group called the Center for Applied Large-Scale Computing that was part of Polytechnic University, and is now part of New York University. Monteiro later joined Netcast as Chief Technical Officer.

documents. For example, the Netcast "Preliminary System Design Specification" discusses the Primary Servers, Media Servers, Control Servers, and Administration Server that are discussed throughout the TWM specification. Appx532-534, Appx529-531. These documents reflect the architecture that Netcast developed to stream radio channels over the Internet. Appx535-537. *See also* Appx327-330.

The '187, '005, and '622 patents were litigated through claim construction to a jury trial on two occasions, in suits against AOL and AT&T. Appx495-496, Appx497-501. These patents also survived nine reexaminations involving hundreds of prior art references. Appx331-362. The *AT&T* jury found all three patents not invalid and awarded $27.5 million for infringement.[5] Appx499-500. *See also Two-Way Media LLC v. AT&T, Inc.*, 782 F.3d 1311 (Fed. Cir. 2015) (affirming denial of relief under Rules 4(a)(5) and (6)).

## 2. Streaming Media Background

Netcast's system transmits media data using a technique called "streaming." Streaming over a network is useful with media content having a temporal or linear component, such as audio and video. For example, data for a song have a beginning and an end, with each data piece corresponding to a point in the song's temporal/linear sequence.

---

[5] The *AOL* lawsuit settled during trial.

Traditionally, media files were not streamed over the Internet but instead were downloaded in their entirety to a computer's local storage and then (after fully downloading) subsequently played back. Appx365. Depending on the user's network speed and the server load, the downloading process could be very slow. *Id.*

Streaming avoids downloading delays by transmitting data in the order in which it will be played at the receiving computer. Instead of requiring an entire song to download, data for the song's first few seconds can be transmitted and immediately played, during which transmission of the next few seconds occurs, and so on. Appx365-366. Streaming also allows for transmission of live media, such as Netcast's radio programming, because the data are transmitted in continuous, sequential segments corresponding to the temporal/linear aspect of a live transmission. Appx367.

While streaming removes the downloading delay, the immediate playback introduces technical problems. For example, network congestion and packet delay become more problematic. When downloading, a packet transmission delayed by network congestion only increases the download time. When streaming, by contrast, a delayed packet can disrupt playback (*e.g.*, a frozen image or a skip) of the audio/video content, which is unacceptable to users.

Packet-based networks such as the Internet were not designed for such real-time data transmission, and thus add further complications to the transmission of time-sensitive streaming media. In packet-based networks, the stream's data segments are transmitted in addressed "packets." Appx103 (1:18-25). Packets are routed through the network from a source to their destination by routers based on the recipient's

4

destination address. *Id.* While the source server specifies the packets' destination, it cannot specify the route that each packet takes through the network. Appx373-374. These systems are commonly referred to as "point-to-point" distribution systems. *See* Appx103 (1:17-20).

Because the path a packet takes is not controlled, two consecutive packets sent over the Internet to the same destination from the same source may take different routes, and therefore may arrive out of order. Appx367, Appx374. For example, the figure below shows 6 yellow "packets." Packets 1-4 take one route from the source server (grey), while packets 5 and 6 take different routes. If packets 5 or 6 encounter congestion, they may arrive late or not at all, causing the playback to skip or even stop.



Appx367-368.

### 3. The Specification

The TWM Patents disclose a scalable architecture[6] for delivering real-time audio/visual streams over packet-switched networks, like the Internet. Appx8, Appx103 (2:3-5). A stream is "real-time" if "for a given channel of information, approximately the same information is being sent at approximately the same time to everyone who is enabled to receive the information." Appx103 (2:13-16), Appx600. This specification definition covers real-time, as opposed to on-demand, streams.

The system includes both a *distribution* architecture that delivers packetized real-time media streams to many users, and a *control* architecture that manages their delivery. Appx104 (3:55-62, 4:2-8), Appx106 (8:28-36). The integrated distribution and control architecture supports the simultaneous delivery of multiple channels, with each channel consisting of an independent audio/video stream. Appx79, Appx103 (2:8-11, 2:17-19). A user can join a particular channel and receive the stream, but unlike an on-demand system, the user does not choose when the channel is distributed. Appx79, Appx103 (2:20-22).

To stream multiple channels of audio/video to many users over the Internet, Netcast had to solve numerous technical problems. The TWM Patents note that typical Internet point-to-point schemes cannot handle the load required to send live streams simultaneously to large numbers of users:

---

[6] "Scalable" means it can be efficiently expanded to accommodate increasing numbers of users and streams.

> Systems such as the Internet typically are point-to-point (or unicast) systems in which a message is converted into a series of addressed packets that are routed from a source node through a plurality of routers to a destination node.
>
> …
>
> In general, these systems do not have the capability of broadcasting a message from a source node to all the other nodes in the network because such a capability is rarely of much use and could easily overload the network.

Appx103 (1:18-29) (emphasis added).

Network "overload" takes several forms. First, overloading can occur at a source server due to the load of transmitting many streams to many users. Second, overloading can occur due to traffic on the routing path between the source server and recipient. If a path becomes congested, incoming packets may need to be re-routed to avoid delayed delivery. Additionally, some routing path segments may have more limited bandwidth than others, causing those segments to form bottlenecks. Contemporaneous Netcast design documents recognized the limited bandwidth capabilities of the Internet's point-to-point distribution architecture. Appx534 ("The [Netcast] system must be capable of delivering dense, continuous streams of information to a large number of destinations simultaneously. *A point-to-point solution is infeasible due to the tremendous bandwidth that would be required*." (emphasis added)). Even other companies, such as AT&T, acknowledged these challenges: "Netcast's multicasting technique provides a *unique innovation* in delivering music *without the typical bottlenecks* faced by the end users." Appx528 (emphasis added). These problems manifest themselves in a lack of reliability when transmitting packets over packet-based networks like the Internet. Appx531 ("*The*

7

*Internet [] is fairly uncontrollable and throughput is almost completely variable.* Offering reliable service almost becomes a game of Russian Roulette." (emphasis added)).

Variable packet delivery times due to overloaded networks are especially problematic for real-time media streams because, as the TWM Patents explain, "the resulting playback of audio information is sensitive to packet loss and network congestion." Appx106 (7:15-16). Because of these problems, Butterworth and Monteiro realized they needed a different architectural platform to successfully provide live audio/video streams to many users. They also needed an architecture that could easily scale as the number of users and/or streams increased. Appx104 (3:57-62, 4:5-8), Appx105 (5:48-49), Appx106 (8:34-36).

The TWM Patents also describe another existing transmission protocol called IP multicasting, in which:

> [P]ackets destined for several recipients have been encapsulated in a unicast packet and forwarded from a source to a point in a network where the packets have been replicated and forwarded on to all desired recipients. *This technique is known as IP Multicasting and the network over which such packets are routed is referred to as the Multicast Backbone or MBONE*.

Appx103 (1:36-42) (emphasis added).

But multicasting, like point-to-point transmission, was inadequate. As Butterworth explained in prior trial testimony, multicasting as it existed in 1995 was unworkable for Netcast's needs because the protocol "wasn't ready for prime time" and the MBONE was still an experimental network. Appx483-484, Appx491-492.

8

The TWM Patents similarly note IP multicast deficiencies, explaining that "[u]nless and until all routers within the Internet understand multicasting in this way, it is necessary to supplement it with IP tunneling in which multicast packets are encapsulated in unicast packets and routed by unicast routers to multicast routers." Appx105 (6:35-39). In other words, users that wanted to receive multicast content first had to manually "tunnel" to another multicast router/server. Only after establishing a tunnel could the user receive content. Once established, these tunnels were static and did not change based on user requests. Contemporaneous Netcast documentation also reflects the inadequacies of this type of multicasting. Appx534 ("A multicasting solution is not desirable since it is primarily an experimental technique on the Internet at this time. Therefore, Netcast requires an innovative architecture and strategic network topology to meet its goals."). The limited availability of multicast routers and the lack of control over the stream delivery made multicasting, as it existed, unworkable.

The TWM Patents describe in detail Netcast's solution to providing real-time streaming despite (1) the existing Internet problems of server overload, network congestion, and unreliability, and (2) the infeasibility of the multicasting alternative. Appx104 (3:17-29), Appx106 (7:15-32), Appx418-421, Appx528. The heart of this solution is the scalable architectural platform depicted in Figure 1 (reproduced below):



*See also* Appx80, Appx103 (2:3-7), Appx466, Appx474-475.

As shown, the TWM Patents disclose a distribution architecture in which "Primary Servers" send streams such as radio or TV channels received from the Network Control Center to intermediate computers (*e.g.*, specialized "Media Servers") located at strategically chosen network junctures between the source computers and the users. The Primary Servers and intermediate Media Servers are "interconnected by a communications network, which in the preferred embodiment is the … Internet." Appx103 (2:61-63), Appx105 (5:31-46).

The intermediate Media Servers fan out the distribution of the streams, reducing load on the Primary Servers. Appx104 (3:9-28). A Media Server receives a single stream for each channel it carries and then redistributes that stream over the

network, once a user requests it.[7] Appx104 (3:9-16), Appx105 (5:31-46), Appx110 (16:24-27). Users select the streams they want, and can start and stop listening/viewing at any time. Appx105 (5:56-63). The patents explain that "[t]he topology of the Internet dictates the ideal placement of Media Servers, the fan-out of each Media Server and the number of levels of Media Servers between the Primary Server and Users," such as "major points of presence (POPs) of each of the large Internet service providers," "high bandwidth exchange points between major carriers," or "close to networks which have a large number of subscribers." Appx104 (3:9-17, 3:17-29). *See also* Appx440-450, Appx468-470.

The TWM Patents also describe a "control architecture" that controls the way streams are routed from intermediate Media Servers to users. Appx104 (3:60-62), Appx106 (8:34-36), Appx380-381. In the preferred embodiment, "Control Servers" (shown in Figure 1) connect users with Media Servers using a series of message exchanges. Figures 8A and 8B (reproduced below) illustrate the control protocol that occurs when a user initiates a play sequence, including the exchange of server lists and, ultimately, the selection of a particular Media Server to deliver the user's selected stream:

---

[7] A Media Server may also distribute the stream to other Media Servers. Appx104 (3:9-16), Appx110 (16:24-27).



*See also* Appx87-88, Appx109 (14:13-63), Appx375-377, Appx444-447.

By directing streams to users through selected intermediate computers, the TWM invention controls a portion of the stream routing path transmitted over an otherwise uncontrolled, unreliable and potentially congested packet-based network. Appx104 (3:9-16), Appx105 (6:21-24). Not only do the intermediate computers provide a point of control through which streams are directed, they introduce scalability, shifting user connections away from the stream source and closer to users, while simultaneously spreading user load across a wider group of stream distribution points. Appx104 (3:55-59), Appx105 (5:48-55). This architecture facilitates easy expansion of the system as the user load increases. Appx105 (5:48-51) ("It should be appreciated that the distribution architecture of the present invention provides for scalability. Using such a structure, any number of Users, and as widely distributed as

12

necessary, can be accommodated."). *See also* Appx106 (8:55-67), Appx110 (16:13-27). The system further mitigates network congestion because intermediate computers receive only a single stream for each channel and retransmit only those streams selected by users, rather than transmitting all streams to all users as occurs in conventional broadcasts. Appx109 (14:13-53), Appx522 (demonstrating AT&T's implementation of the claimed technology).

The TWM Patents describe additional beneficial features. For example, the system architecture monitors network conditions, as well as users' reception of streams. This can improve the system in several ways, such as rerouting streams to avoid network problems, varying the packet size, or terminating stream delivery to a user in certain circumstances. Appx106 (7:11-20), Appx109 (14:57–63), Appx381, Appx418-421.

Another feature involves generating precise records about the real-time streams and the activity of users receiving the streams. Appx104 (3:44-54). Traditional methods of broadcasting radio or TV signals either over-the-air or through cable TV systems were "error prone" and had no mechanism to measure user activity directly. Appx525 (¶0004). Generating granular records of user listening/viewing activity as part of the integrated architecture is beneficial to an advertisement-based platform. These records also can be used for routing decisions and directing users to intermediate computers based on the distributed system load. For example, the specification describes a "Statistics Object" to be used with "load-balancing algorithms and for statistical purposes":

13

Statistics Object
_____

Contains system-related information that can be used by load-
balancing algorithms and for statistical purposes.

| Token | Security Token Object | |
|---|---|---|
| Load | Int | load on the system |
| Threads | Int | number of threads running |
| Users | Int | number of Users being |
| Uptime | Int | serviced |
| NumberManaged | Int | amount of time running |
| NumberAssociated | Int | number of managed servers |
| | | number of associated servers |

Appx107 (10:29-41).

### 4. The Claims

As explained more fully *infra*, the features discussed above are the focus of the TWM claims. Claim 1 of the '187 patent, for example, is representative of all '187 and '005 claims and recites:

> 1. A method for transmitting message packets over a communications network comprising the steps of:
>
> converting a plurality of streams of audio and/or visual information into a plurality of streams of addressed digital packets complying with the specifications of a network communication protocol,
>
> for each stream, routing such stream to one or more users,
>
> controlling the routing of the stream of packets in response to selection signals received from the users, and
>
> monitoring the reception of packets by the users and
>
> accumulating records that indicate which streams of packets were received by which users, wherein at least one stream of packets comprises an audio and/or visual selection and the records that are accumulated indicate the time that a user starts receiving the audio and/or visual se-

14

lection and the time that the user stops receiving the audio and/or visual selection.

Appx111.

The claimed process covers an end-to-end architecture for transmitting packetized audio/visual streams. The "controlling the routing" limitation has been construed by several district courts as "directing a portion of the routing path taken by the stream of packets from one of a designated group of intermediate computers to the user in response to one or more signals from the user selecting the stream." Appx510-512, Appx1131-1136. This control mechanism solves the network distribution and reliability problems described above.

The '622 claims are also directed to features described in the specification, but are claimed more broadly. Claim 29, for example, recites:

> 29. A method for forwarding real-time information to one or more users having access to a communications network comprising:
>
> processing one or more streams of audio or visual information into one or more streams of packets for forwarding over the communications network, wherein at least one stream of packets comprises audio or video information,
>
> forwarding the digital packets to the users in response to information selection signals received from the users,
>
> verifying the operational status of the users' access to the communications network during delivery of the real-time information, and
>
> updating a database with indications of: (i) which streams of packets were received by which users, (ii) the time when delivery of each stream to each user commenced, and (iii) the time when delivery of each stream to each user terminated.

Appx202.

Although '622 claim 29 does not include the "controlling the routing" limitation, it does require "forwarding" the stream to users in response to users' selection signals. The adopted construction for "forwarding" captures the operation of the "intermediate computer" in the TWM architecture by receiving and retransmitting streams toward individual users. Appx600.

Finally, '686 claim 30 also includes certain architectural requirements:

30. A method for metering real-time streaming media for commercial purposes, said method comprising:

selecting an intermediate server from multiple intermediate servers;

forwarding at least one copy of a real-time media stream from said intermediate server toward a user device;

detecting a termination of said forwarding;

after said termination, determining an extent of said real-time media stream forwarded toward said user device; and

logging said extent for commercial purposes.

Appx248, Appx251.

Consistent with the architecture disclosed in the TWM Patents, this claim also requires "forwarding … a real-time media stream from said intermediate server," as well as "selecting" such intermediate server from a group, which describes the system's control mechanism.

## C.    The District Court's Opinion

Pursuant to the district court's request, TWM proposed constructions for claim terms impacting the § 101 analysis and provided an explanation of their significance.

Appx599-602, Appx608-614. In its Order, the district court "adopted" TWM's constructions for purposes of Defendants' motion. Appx11-12. But apart from several passing references, the district court's Order fails to address the adopted constructions.

TWM also submitted voluminous evidence demonstrating TWM's technological innovations relative to conventional distribution of media streams over the Internet. For example, TWM provided the contemporaneous documents discussed above explaining that "[a] point-to-point solution is infeasible due to the tremendous bandwidth that would be required." Appx534. *See also* Appx527-528 ("Netcast's multicasting technique provides a unique innovation in delivering music without the typical bottlenecks faced by the end users."). Similarly, TWM submitted expert report excerpts from prior litigation describing TWM's solution to existing technological problems. Appx439, Appx442-443. TWM also submitted a Technology Tutorial from prior litigation explaining how the TWM architecture overcame existing Internet problems. Appx371-374. Without discussing the substance of any exhibit, the district court dismissed TWM's evidence as "irrelevant," stating that "[t]he novelty and nonobviousness of the claims under §§ 102 and 103 does not bear on § 101." Appx13.

The district court's Step 1 analysis of '187 claim 1 is brief and consists of the following conclusions:

> The '187 and '005 patents are directed to the abstract idea of (1) sending information, (2) directing the sent information, (3) monitoring receipt of the sent information, and (4) accumulating records about receipt of the sent information. … The claims are thus directed to a method of send-

ing and monitoring the delivery of audio/visual information. Although the claims are limited to the context of audio/visual streaming in a packet-switched communications network, they are not directed to an invention that improves streaming audio/visual content in a packet-switched network. … Thus, the '187 and '005 patents claim abstract ideas.

Appx16 (citations omitted). In simplifying the claims twice—first to a four-step abstraction, and then to a single summarizing phrase—the court recharacterized the claims as directed to delivering information over a network and monitoring receipt.

Turning to Step 2, the district court acknowledged that "[t]he patent specifications do, in fact, point to the architecture of the system as the technological innovation." Appx16-17. But, despite adopting TWM's proposed constructions, it subsequently found that "[n]one of the claims, however, recite or refer to anything that could be described as an architecture." Appx17. In a footnote, the district court provides its only discussion of TWM's constructions, explaining that "[t]he claims cannot fairly be read to recite computer architecture even in light of Two-Way's proposed claim constructions, some of which explicitly incorporate the words 'intermediate computers.'" Appx17 n.3. The district court concluded: "Even if I accept that the architecture described in the patent specification is designed to solve the technological problems of load, bottlenecking, and inadequate records, the fact remains that the claims do not recite the mechanism by which those problems are solved."[8] Appx17.

---

[8] TWM's proposed constructions, some of which incorporate specific "mechanisms" of the TWM architecture, are included at Appx599-602.

18

## II.     SUMMARY OF ARGUMENT

The TWM Patents disclose and claim an innovative architectural platform for delivering real-time audio/video streams to large numbers of users. TWM's integrated distribution and control architecture overcame problems that existed with conventional Internet point-to-point architectures, which included overloaded servers, network congestion, uncontrolled and variable packet delivery, while providing scalability and granular user records. Neither the Supreme Court nor this Court has ever ruled that an invention of this type is patent-ineligible, and the district court was wrong to do so here.

Although acknowledging that the patent specifications "do, in fact, point to the architecture of the system as the technological innovation," the district court erred in concluding that the claims do not cover that architecture and do not recite the mechanism by which the technological problems were solved. By improperly abstracting the claims to an excessive degree and ignoring the adopted claim constructions, the district court effectively removed all technologically innovative features. Further compounding its error, the district court ruled that TWM's evidence was "irrelevant" as relating only to §§ 102 and 103 issues, even though that evidence also identified existing problems in the art and the manner in which TWM's patented architecture solved those problems.

## III.     ARGUMENT

### A.     Standard of Review

The Court reviews procedural aspects of the grant of judgment on the pleadings under the regional circuit's law. The Third Circuit exercises plenary review

19

of Rule 12(c) motions. *Allstate Prop. & Cas. Ins. Co. v. Squires*, 667 F.3d 388, 390 (3d Cir. 2012). In a § 12(c) motion, "a court must accept all of the allegations in the pleadings of the party against whom the motion is addressed as true and draw all reasonable inferences in favor of the non-moving party." *Id.* A court may consider matters of public record and may also take judicial notice of the factual record of a prior proceeding. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 416 n.3 (3d Cir. 1988).

Patent eligibility under § 101 is a question of law, which is reviewed *de novo*. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, No. 2015-1180, 2016 U.S. App. LEXIS 16703, at *20 (Fed. Cir. Sept. 13, 2016). Contesting § 101 eligibility is an invalidity challenge. *Versata Dev. Group, Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1330 (Fed. Cir. 2015). "[Section] 282 provides that '[a] patent shall be presumed valid' and '[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.'" *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 (2011). The defendant bears "a heavy burden of persuasion," which must be met by "clear and convincing evidence." *Id.* at 101-03; *see also CLS Bank Int'l v. Alice Corp. Pty.*, 717 F.3d 1269, 1304-05 (Fed. Cir. 2013) (Rader, J., Linn, J., Moore, J., and O'Malley, J., concurring-in-part and dissenting-in-part) (explaining that challenges to eligibility must be proven by clear and convincing evidence).

**B.    Legal Framework of Patent Eligibility**

**1.  Supreme Court Precedent Regarding Computer-Related Inventions**

Patentable subject matter under § 101 broadly encompasses processes, machines, manufactures, and compositions of matter but is subject to exceptions for "laws of nature, physical phenomena, and abstract ideas." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). These exceptions are applied narrowly because "too broad an interpretation of this exclusionary principle could eviscerate patent law." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012).

In *Gottschalk v. Benson*, the Supreme Court held that a patentee cannot claim the execution of a purely mathematical formula on a general-purpose computer (in that case, a formula for converting numbers in a binary-coded decimal format into a pure binary format). 409 U.S. 63, 71-72 (1972). Later that decade, the Supreme Court extended the principle underlying *Gottschalk*, holding that a method claim is ineligible if "[t]he only novel feature of the method is a mathematical formula." *Parker v. Flook*, 437 U.S. 584, 585 (1978). The Court explained that an abstract idea must be "treated as though it were a familiar part of the prior art," and when the claims were viewed in that light, nothing even allegedly innovative remained. *Id.* at 592, 594-95.

Subsequently, in *Diamond v. Diehr*, the Supreme Court cautioned against taking *Gottschalk* and *Flook* too far, while upholding the patentability of claims directed to using a mathematical equation as part of a method for "solving a practical problem which had arisen in the molding of rubber products." 450 U.S. 175, 181 (1981). In contrast to *Gottschalk*, where the applicant attempted to claim "[t]he sole practical application of [an] algorithm," and *Flook*, where the claims "sought to protect a

formula for computing [a] number," the applicants in *Diehr* sought "patent protection for a process of curing synthetic rubber" rather than "seek[ing] to patent a mathematical formula." *Id.* at 185-87. The applicants "d[id] not seek to pre-empt the use of [the mathematical] equation" except "in conjunction with all of the other steps in their claimed process." *Id.* at 187. The Court rejected a point-of-novelty approach, noting that a § 101 analysis required claims to be considered as a whole, rather than dissecting them into old and new elements and then ignoring the old elements. *Id.* at 188.

More recently, in *Bilski*, the Court held that the "machine-or-transformation test" was "an important and useful clue" but "not the sole test for deciding whether an invention is a patent-eligible process." 561 U.S. at 604. The Court explained that "[a] categorical rule denying patent protection for inventions in areas not contemplated by Congress … would frustrate the purposes of the patent law." *Id.* at 605 (quotation marks omitted). The patent in *Bilski* covered "both the concept of hedging risk and the application of that concept to energy markets." *Id.* at 609. Notably, the method claims in *Bilski* did not require a computer or any other device. *In re Bilski*, 545 F.3d 943, 965 (Fed. Cir. 2008) (*en banc*). Citing financial and accounting textbooks that made clear that the claimed hedging was a "fundamental economic practice," the Court found the asserted claims were directed solely to an abstract idea. 561 U.S. at 611-12. The Court noted that "limiting an abstract idea to one field of use or adding token postsolution components" does not render otherwise ineligible claims patentable. *Id.* at 612.

The Supreme Court's most recent § 101 case, *Alice Corp. v. CLS Bank International*, addressed patent eligibility of claims directed to an abstract idea implemented on a computer. 134 S. Ct. 2347, 2352 (2014). The Court applied the now familiar two-step test. First, citing evidence showing that the claimed intermediated settlement concept had been in use since at least 1896, it held that the claims were directed to an abstract idea. *Id.* at 2356. Second, the Court "consider[ed] the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* at 2355 (quotation marks omitted). Because the claims required only intermediated settlement plus a directive to "apply it with a computer," they failed to present eligible subject matter. *Id.* at 2358. The Court emphasized that the claims "do not, for example, purport to improve the functioning of the computer itself … [n]or do they effect an improvement in any other technology or technical field." *Id.* at 2359.

Supreme Court precedent over the last four decades thus establishes a limited set of § 101 prohibitions concerning claims to computer-implemented inventions: (1) patentees cannot claim the computer implementation of a mathematical formula (*Gottschalk*); (2) a method claim reciting additional steps remains ineligible where it is undisputed that novelty rests solely on the use of a mathematical formula (*Flook*); (3) a method for performing an abstract idea (without more) is ineligible (*Bilski*); and (4) performing an abstract idea by applying it on a generic computer will also be ineligible unless the claim includes an advancement in technology beyond merely using the generic computer to implement the abstract idea (*Alice*). As explained *infra*, none of these prohibitions applies to TWM's claims.

### 2. The Proper Application of the *Alice/Mayo* Framework for Computer-Related Inventions

In Step 1 of the *Alice/Mayo* analysis, the court determines "whether the claims at issue are directed to one of th[e] patent-ineligible concepts." 134 S. Ct. at 2355. The claim must be viewed as a whole, and all claim limitations (and pertinent claim constructions) must be considered. *See Diehr*, 450 U.S. at 188. The Supreme Court has not identified the precise boundaries of the "abstract idea" exception, but its precedent speaks of mathematical equations, "fundamental economic practice[s]," "scientific truths," and "longstanding commercial practice[s]." *See Alice*, 134 S. Ct. at 2356; *Mayo*, 132 S. Ct. at 1294.

Before expanding the scope of judicially recognized abstract ideas, a court should consider how factors found pertinent in prior cases apply to the newly alleged abstract idea. For example, the court should consider whether the invention is tied to a particular machine or transforms an article. *Bilski*, 561 U.S. at 603 (the machine-or-transformation test is a "useful clue"). For a claimed machine to weigh in favor of eligibility, the claims must amount to more than just an instruction to "apply [the abstract idea] with a computer." *Alice*, 134 S. Ct. at 2358. The court should also consider whether the claims are drawn to activity that could be performed by the human mind alone or on pen and paper without a computer. *See Gottschalk*, 486 U.S. at 67. Conversely, technological solutions to problems arising in the realm of computers should not be considered abstract. *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). Because the policy underlying the judicially created exceptions to § 101 are driven by preemption concerns, a court should further consider whether the claims when considered as a whole threaten to "'wholly pre-

24

empt' the public's access to the 'basic tools of scientific and technological work'" (even if this preemption would occur only in particular fields). *Bilski*, 561 U.S. at 658 (Breyer, J., concurring) (quoting *Gottschalk*, 409 U.S. at 67).

If the court finds an abstract idea at Step 1, it proceeds to Step 2, where it examines whether the claim contains an "inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357 (quotation marks omitted). This inquiry differs from novelty and non-obviousness in that it focuses on whether the claims "purport" to set forth a technological solution/improvement. *Id.* at 2359. The claim limitations must be considered both individually and "as an ordered combination." *Id.*

If the claims "purport to improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field" using non-conventional elements or a non-conventional arrangement of conventional elements, the claim passes Step 2 and is patent-eligible.[9] *Id.*; *see also BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349-50 (Fed. Cir. 2016). Under Supreme Court precedent, the patent owner need not prove that its invention is

---

[9] What is or is not "conventional" in the context of a particular claim should be determined based on evidence showing the state of relevant art as of the priority date. *See Rapid Litig. Mgmt. v. CellzDirect, Inc.*, 827 F.3d 1042, 1051 (Fed. Cir. 2016) (considering reexamination examiner's description of prior art for determining what was conventional); *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1377 (Fed. Cir. 2015) (considering evidence regarding the state-of-the-art proximate to the patent filing date).

superior to the state of the art to survive a § 101 challenge. *See Flook*, 437 U.S. at 593 ("The obligation to determine what type of discovery is sought to be patented must precede the determination of whether that discovery is, in fact, new or obvious."). If the patent "purports" to describe and claim a technological improvement, its subject matter is patent-eligible. *Alice*, 134 S. Ct. at 2359.

### 3. Federal Circuit Precedent Applying *Alice*

Most of this Court's cases finding claims ineligible apply the *Alice* prohibition against claims that recite no more than basic steps necessary to perform an abstract idea on a generic computer. *See, e.g.*, *Elec. Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016) (receiving, analyzing, and displaying energy grid information on a generic computer); *LendingTree, LLC v. Zillow, Inc.*, No. 2014-1435, 2016 U.S. App. LEXIS 13462 (Fed. Cir. July 25, 2016) (unpublished) (loan clearing house implemented on a generic computer); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363 (Fed. Cir. 2015) (tracking financial transactions against a budget and displaying customized content based on user characteristics and time of day implemented on a generic computer).

The claims in these cases did not purport to use the recited computers to solve any ***technological*** problems. *See, e.g.*, *Elec. Power Group*, 830 F.3d at 1354 ("The advance [the claims] purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions."); *LendingTree*, 2016 U.S. App. LEXIS 13462, at *15 ("The claims here, however, are not designed to solve a technological problem."). Instead, the claims in these cases simply "spell[ed] out

what it means to 'apply [the abstract idea] on a computer," which "cannot confer patent-eligibility." *Intellectual Ventures I*, 792 F.3d at 1370 (quoting *Alice*, 134 S. Ct. at 2359).

In contrast, computer-implemented claims that "purport to improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field" remain patent-eligible. *Alice*, 134 S. Ct. at 2359. This is true even when the claims make use of generic or conventional computer components. For example, *BASCOM* held that claims directed to performing an allegedly abstract idea ("filtering content") *and* consisting entirely of limitations that, "taken individually, recite generic computer, network and Internet components, none of which is inventive by itself," were patent-eligible because "the patent describes how its particular arrangement of elements is a technical improvement over prior art ways of filtering such content." 827 F.3d at 1349-50.

Similarly, in *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, the claim term "enhance" was construed as being dependent upon the invention's distributed architecture, which the patent explained was an advancement over the prior art. No. 2015-1180, slip op. at 21-22 (Fed. Cir. Nov. 1, 2016). As a result, the *Amdocs* Court found that the claims entail "an unconventional technological solution (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases)" both in terms of the individual enhancing limitation, and when considered as part of an ordered combination. *Id.* at 22-23.

Likewise, in *DDR*, this Court affirmed eligibility of claims reciting conventional computer elements arranged to deliver composite web pages because the invention

27

was "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." 773 F.3d at 1257. While a "store within a store" concept was well known, that practice "did not have to account for the ephemeral nature of an Internet 'location' or the near-instantaneous transport between these locations" that occurs using standard Internet communication protocols. *Id.* at 1258.

### 4. Cases Finding Claims Ineligible Due to Result-Oriented or "Functional" Claiming

In addition to the two lines of cases discussed above (abstract ideas applied to a generic computer *versus* technical enhancements to computer-related systems), other Federal Circuit decisions addressing § 101 have suggested that claims broadly covering a result or an effect constitute an abstract idea, unless the patent provides the mechanism or process by which the result or effect is achieved. *See, e.g., Amdocs*, No. 2015-1180, slip op at 6-7 (Reyna, J. dissenting). The reasoning in these opinions does not apply to the TWM Patents, however, because the specification includes a detailed technical description of an improved architectural platform (*supra* at I.B.3) and the claims recite specific technical requirements that—when properly construed-—are specifically tied to their technological improvements. This notwithstanding, TWM addresses these cases to preserve its objection to their approach.

The district court's Order cited *Internet Patents Corp. v. Active Networks, Inc.* as holding that a claim did not supply an inventive concept because it failed to recite a "mechanism" for obtaining the claimed result. Appx17. The claims in that case were directed to improving the operation of a web browser by preserving data entered into

28

forms while the user navigates between webpages. 790 F.3d 1343, 1344-45 (Fed. Cir. 2015). Although the claims arguably covered a technological improvement, the Court found them ineligible because they recited a result to be obtained ("maintaining state") without any description in the specification or claims of a mechanism for accomplishing that result. *Id.* at 1348.

TWM respectfully submits that issues of improper functional or result-oriented claiming are not properly considered during a § 101 analysis. Instead, whether a claim improperly relies on limitations recited in result-oriented or functional terms is an issue related to §§ 102, 103 and 112, not § 101. *See Bilski*, 561 U.S. at 620-21 (Stevens, J., concurring). The Supreme Court has never held that § 101 excludes new technological applications of computer technology simply because the claims recite conventional components or functions that, taken individually, have broad scope. To the contrary, in *Diehr* claims were found patent-eligible that included functional limitations not tied to any particular mechanism. 450 U.S. at 179 n.5. ("constantly determining the temperature (Z) of the mold at a location closely adjacent to the mold cavity in the press during molding"); *see also, e.g., The Telephone Cases*, 126 U.S. 1, 531-32 (1888) (approving Bell's claim on "transmitting vocal or other sounds telegraphically").

This Court's precedent also permits claiming an invention based on how it works. *In re Swinehart*, 439 F.2d 210, 212 (C.C.P.A. 1971) (holding that "there is nothing intrinsically wrong with" "defin[ing] something (in this case, a composition) by what it does rather than by what it is (as evidenced by specific structure or material, for example)"); *see also In re Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1997) ("A patent

applicant is free to recite features of an apparatus either structurally or functionally."). The freedom to use functional limitations is particularly important to protecting innovation in computer-based arts, as "[m]uch of the advancement made in computer technology consists of improvements to software that, by their very nature, may not be defined by particular physical features but rather by logical structures and processes." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016). There is nothing unfair about this approach to claiming because, unless the patentee was truly the first in the field and the specification adequately describes and enables the claimed invention, broad functional or generic claims will be invalidated under §§ 102, 103, or 112. *See, e.g.*, *Schreiber*, 128 F.3d at 1478-80 ("choosing to define an element functionally, *i.e.*, by what it does, carries with it a risk" of invalidating a claim based on prior art); *Amdocs*, No. 2015-1180, slip op. at 35.

## C.     Step 1: The District Court Incorrectly Found the '187/'005 Claims Were Directed to an Abstract Idea

The process of '187 claim 1, which is representative of all '187/'005 claims, is firmly tied to a non-abstract end-to-end architecture for transmitting packetized audio/visual streams. Despite acknowledging that the claim is "limited to the context of audio/visual streaming in a packet-switched communications network," the district court ignored the claim language and constructions. Appx16-17. As a result, the court simplified the claims to an excessive degree, leading to its conclusion that the claims do not "recite or refer to anything that could be described as an architecture" and "are not directed to an invention that improves streaming audio/visual content …." Appx16. Contrary to the district court's conclusion, the '187/'005 claims recite

30

architectural requirements that historically have constituted patent-eligible subject matter and that represent technical improvements.

### 1. The District Court Oversimplified '187 Claim 1

The district court erred by overgeneralizing the '187/'005 claimed subject matter. In doing so, the district court violated this Court's admonishments that describing claims at an excessively high level of abstraction, untethered from the claim language, all but ensures that the exceptions to § 101 will swallow the rule. *Enfish,* 822 F.3d at 1337; *McRO,* 2016 U.S. App. LEXIS 16703, at \*24-25. While it initially described the TWM Patents as "directed to a 'scalable architecture … for delivery of real-time information over a communications network," Appx8, the court incorrectly concluded that '187 claim 1 was "directed to the abstract idea of (1) sending information, (2) directing the sent information; (3) monitoring receipt of the sent information, and (4) accumulating records about receipt of the sent information," Appx16. Compounding its error, the court further abstracted the claimed invention to "methods of sending and monitoring the delivery of audio/visual information." Appx16.

The following table shows '187 claim 1 with the adopted constructions for the underlined terms in italicized/bracketed language compared to the district court's initial four-step abstraction:

| '187 Claim 1 (with constructions) | District Court Characterization |
| --- | --- |
| A method for transmitting message packets over a communications network comprising the steps of: | |

| | |
|---|---|
| converting a plurality of <u>streams of audio and/or visual information</u> *[a continuously transmitted sequence of audio and/or visual information]* into a plurality of <u>streams of addressed digital packets</u> *[a continuously transmitted sequence of bundles of digital data, including a destination address]* complying with the specifications of a <u>network communication protocol</u> *[a set of rules of standards designed to enable computers to connect with one another and to exchange information]*,[10] | |
| for each stream, routing such stream to one or more users, | sending information |
| <u>controlling the routing of the stream of packets in response to selection signals received from the users</u> *[directing a portion of the routing path taken by the stream of packets from one of a designated group of intermediate computers to the user in response to one or more signals from the user selecting the stream]*, and | directing the sent information |
| monitoring the reception of packets by the users and | monitoring receipt of the sent information |
| accumulating records that indicate which streams of packets were received by which users, wherein at least one stream of packets comprises an <u>audio and/or visual selection</u> *[audio and/or visual content of a stream made available to user(s)]* and the records that are accumulated indicate the time that a user starts receiving the | accumulating records about receipt of the sent information |

---

[10] TWM's proposed construction for "streams of audio and/or visual information" and "streams of addressed digital packets" was slightly modified during the claim construction process from "a continuously transmitted sequence of" to "a continuous sequence of transmitted." Appx621.

| audio and/or visual selection and the time that the user stops receiving the audio and/or visual selection. | |

Appx599-600 (TWM's adopted claim constructions), Appx16 (district court's characterization).

As shown, the district court's abstraction ignores numerous limitations and constructions. First, it ignores the preamble context of a packet-based "network" that necessarily includes multiple computers. Second, the abstraction ignores the "converting" step and associated constructions, including the requirement of converting streams of information into *a plurality of packetized audio/video streams*. This conversion step serves as the source of the packetized media streams in the distribution architecture. Third, the abstraction disregards the construction of "controlling the routing," which requires *a designated group of intermediate computers* in the network. Along with the "converting" step, the "controlling the routing" construction specifies the end-to-end distribution architecture, which includes a stream source, a designated group of intermediate computers, and a network of users. Fourth, the abstraction ignores that "controlling the routing" also requires *directing users to an intermediate computer* in the network, defining the *portion of the routing path* from the intermediate computer to the user, *in response to a signal from the user selecting a stream*.

The district court's abstraction collapses all of these requirements into simply "sending information" and "directing the sent information." But claim 1 does more than merely sending and directing information, along with the requirement to perform it on the Internet or with a set of generic components. *See BASCOM*, 827

33

F.3d at 1350-51. Instead, the claim recites a specific architecture for distributing multiple media streams to users, from a source in a network through a designated group of intermediate computers to users, and controlling the routing path by directing users to a specific intermediate computer once they select a specific stream. These are concrete, technical concepts that are far afield from any of the Supreme Court prohibitions.

## 2. '187 Claim 1 Encompasses Patent-Eligible Subject Matter that Is Firmly Tied to the Architecture

The *Mayo/Alice* first step asks whether the claims are directed to a narrow exception to patentable subject matter. *Alice*, 134 S. Ct. at 2355-56. The "abstract idea" exception reflects the rule that "an idea of itself is not patentable." *Gottschalk,* 409 U.S. at 67.

Claim 1, when viewed in its entirety as it must be, *Diehr*, 450 U.S. at 188, is not directed to an abstract idea. Instead, it is a process claim directed to concrete aspects of a streaming platform. The end-to-end distribution architecture in claim 1 includes: (i) a source converting audio/visual streams into packets for transmission over a network; and (ii) a designated group of intermediate computers added to a computer network through which streams are routed based on (iii) user requests for those streams. Claim 1 controls the routing of the stream to the users by: (i) directing the portion of the routing path from a selected intermediate computer in the designated group to the user; (ii) in response to the user's selection signal, as required by TWM's adopted construction. Appx600. Claim 1 additionally includes monitoring and record accumulation requirements that depend on the distribution and control architectures,

and that can be used to improve routing decisions and provide precise user activity records.

As this Court recently explained, there is "no such single, succinct, usable definition or test" for identifying an abstract idea and thus "the decisional mechanism" is comparison with prior cases. *Amdocs*, No. 2015-1180, slip op. at 9. Unlike prior cases in which claims were "directed to the idea itself," *Internet Patents*, 790 F.3d at 1348, claim 1 is directed to a specific streaming platform described in the specification. Claim 1 is not directed to one of the categories identified by the Supreme Court as abstract ideas, such as scientific or fundamental truths, mathematical formulas, "longstanding commercial practice[s]," and other methods of organizing human activity. *See Mayo*, 132 S. Ct. at 1293-94; *Alice*, 134 S. Ct. at 2355-57. Claim 1 also does not "describe[] the effect or result dissociated from any method" of "sending and monitoring the delivery of audio/visual information." *Internet Patents*, 790 F.3d at 1348; Appx16. Nor is this a case in which "neither the claim nor the specification reveals any way of" performing the claimed process. *Affinity Labs of Tex. v. Amazon.com, Inc.*, 2016 U.S. App. LEXIS 17370, at *14 (Fed. Cir. Sept. 23, 2016). Instead, much like the claims in *Amdocs*, claim 1 depends on specific limitations that "necessarily incorporate[]" the invention's architecture, *Amdocs*, slip op. at 24, and describes "a particular inventive *manner*" of sending and monitoring the delivery of audio/visual information, *id.* at 17 (Reyna, J., dissenting). This is sufficient for purposes of § 101.

### 3.  Step 1 Is Not Limited Only to Technological Improvements

In addition to oversimplifying claim 1, the district court committed further error in Step 1 by ruling that unless the claims are "directed to an invention that improves streaming" in a packet-switched network, they are ineligible. Appx16. *Alice/Mayo* step 1 does not require a technological improvement to be patent-eligible. The Supreme Court has distinguished abstract ideas from inventions that improve computer functionality or that effect an improvement in any other technology or technical field. *Alice*, 134 S. Ct. at 2359. But it has never indicated that the ***only*** test for satisfying Step 1 is to show a claim is directed to a technological improvement. *Id.* To the contrary, the Supreme Court has noted that "Section 101 is a dynamic provision" and "[a] categorical rule denying patent protection for inventions in areas not contemplated by Congress … would frustrate the purposes of the patent law." *Bilski*, 561 U.S. at 604-05.

The presence of an improvement, or "inventive concept," applies to Step 2, only after finding that the claims are directed to a patent-ineligible category in Step 1. Requiring an improvement under Step 1 improperly conflates Steps 1 and 2, effectively eliminating Step 1. *See Amdocs*, 2015-1180, slip op. at 8 ("Recent cases … suggest that there is considerable overlap between step one and step two"); *BASCOM*, 827 F.3d at 1349. Furthermore, establishing a technological improvement in Step 1 is especially problematic where the court's characterization strips out innovative features from the claims, as occurred here.

### 4. The '187 and '005 Claims Represent a Technological Improvement

Even if a technological improvement were the only way to show an invention is not abstract under Step 1, the '187/'005 claims cover such improvements. The district court cited no evidence that supports its erroneous conclusion to the contrary. Appx16-17. At the same time, it acknowledged that "[t]he patent specifications do, in fact, point to the architecture of the system as the *technological innovation*." Appx17 (emphasis added). As explained above, the district court ignored this innovation through multiple steps of abstraction, allowing it to conclude that the claims "are not directed to an invention that improves streaming audio/visual content …." Appx16.

When giving weight to each limitation and construction, the TWM claims are directed to innovative technological aspects that solved existing problems.[11] *See supra* at sections I.B.3, III.C.1. To determine whether claims constitute technological improvements, the prevailing state-of-the-art must be considered. As discussed above in section I.B.3, server overload, network congestion, unreliable packet delivery, and lack of scalability were problematic in Internet point-to-point systems in 1995, making this conventional distribution platform inadequate for audio/video streaming. *See, e.g.,* Appx103 (1:26-29) (broadcasting from the source node "could easily overload

---

[11] There is little guidance on what constitutes a "technological improvement," but the Supreme Court in *Diehr* held that novelty and nonobviousness concepts do not apply to a §101 analysis, 450 U.S. at 188-89. Thus, any technical improvement, no matter the degree, should suffice.

the network."), Appx531 ("Offering reliable service almost becomes a game of Russian Roulette."), Appx534. Similarly, the experimental IP multicasting platform would not work for the TWM invention. Appx105 (6:35-39), Appx534. For example, IP multicasting in 1995 lacked any capability to control the manner in which users acquired streams, and required advanced networking capabilities to establish "tunnels" between users and multicast routers. *See supra* at 8-9, Appx103 (1:35-39, 1:45-50), Appx105 (6:35-41).

The TWM invention, including the integrated distribution and control architectures, is discussed in detail in Section I.B.3, *supra*, and will not be repeated. In sum, the record shows that TWM's invention represents technical solutions to problems including: (1) excessive loading of the source server in a point-to-point system; (2) network congestion and bottlenecks within routing paths, which caused excessive re-routing and delayed packet delivery; (3) the "uncontrolled" manner of delivering packets over the Internet, resulting in variations in packet delivery times; (4) the inability of existing networks to scale as users increased; and (5) the lack of precise records of user activity regarding listening/viewing of the streams.

Representative claim 1 implements TWM's solutions, including the architectural aspects discussed extensively above (*supra* section III.C.1). As shown, the limitations and constructions cover a method requiring an end-to-end architecture, where the media streams are "convert[ed]" into packetized streams at the network source. Appx111 (18:19-23). Rather than delivering every stream directly from the source server to the users (causing problems (1) and (2) above), claim 1 requires a designated group of intermediate computers that fan out stream delivery, moving distribution

away from the source server to the strategically placed intermediate computers. Appx104 (3:9-16). An intermediate computer receives only a single incoming stream for each channel it carries. Appx104 (3:9-16), Appx110 (16:24-27). The control mechanism then redistributes only the specified stream from the intermediate computers to each user in response to the user's selection of that stream. Appx105 (5:56-64).

So rather than voluminous streams travelling from a source server to many users in the point-to-point system, the TWM architecture provides a single stream for each channel to the intermediate computers, which then redistribute only a single stream to a user when dynamically requested. Relocating the distribution points from the source server to the designated group of intermediate computers, while also significantly reducing the number of streams passing through the network, effectively eliminates problems (1) and (2) listed above. Additionally, the control mechanism's capability of directing users to a specific intermediate computer helps balance the load among the intermediate computers and further relieves network congestion. Appx109 (14:13-39), Appx110 (16:29-34). *See also* Appx107 (10:29-49).

Directing streams through specific intermediate computers (*i.e.*, directing a portion of the routing path) also reduces the variability in packet delivery times (problem (3) above). Because a single stream is delivered for a channel to each intermediate computer, Appx110 (16:24-27), little packet variability exists for that portion of the routing path. And because each user normally receives the entirety of the selected stream from the same intermediate computer, the degree of variability is further reduced.

TWM's integrated distribution and control architectures also scale efficiently, addressing problem (4). Appx103 (2:3-5), Appx104 (3:57-62, 4:5-8), Appx105 (5:48-49), Appx106 (8:34-36). As the number of users/streams increases, the control architecture includes protocols to activate additional intermediate computers as necessary. Appx110 (16:14-28). The combination of the group of intermediate computers and the manner of controlling the routing path by directing users to a particular intermediate computer adds scalability, allowing additional intermediate computers to be added as needed to carry streams for redistribution to users. Finally, problem (5) is addressed because the reception of the streams is "monitor[ed]" and specific records about those streams are "accumulate[ed]." This part of the claimed end-to-end system avoids the existing "error prone" methods (*e.g.*, surveys) by automatically generating precise, granular records.

## D.    Step 2: The '187/'005 Patents Claim an Inventive Concept

This Court need not reach Step 2 because the '187/'005 claims are not directed to an abstract idea for the above reasons. Regardless, these claims also are patent-eligible because they provide an "inventive concept" that adds significantly more than just the idea of sending and monitoring the delivery of audio/visual information.

### 1.  The Claims Provide Inventive Solutions to Existing Problems

As explained in *Enfish*, technological improvements may demonstrate patent eligibility under Steps 1 or 2. *Enfish*, 822 F.3d at 1335; *see also BASCOM*, 827 F.3d at 1348. Accordingly, much of the discussion above regarding the streaming improvements found in the '187/'005 claims applies equally to the "inventive

concept" inquiry, as the improvements enumerated above add significantly more than just sending and monitoring the delivery of audio/visual information. *See supra* at III.C.4. Those technological improvements to the distribution and control architectures satisfy Step 2.

The above-described existing problems on the Internet uniquely affected media streaming because of its "sensitiv[ity] to packet loss and network congestion." *See supra* at 4-5, 6-8 (describing the existing problems), Appx106 (7:15-20). Other Internet transmissions, such as downloads of content or requests for static webpages, are not as sensitive to congestion and lost/delayed packets because they do not rely on a continuous sequence of data transmissions like media streams. *See supra* at 4-5.

As explained, *supra* at 38, the '187/'005 claims solved at least five existing problems, resulting in improvements that were departures from the standard functioning of the Internet and other networks, whether point-to-point or the experimental IP multicast networks. As such, these claims cover an "inventive concept" because they "effect an improvement in … [a] technical field." *Alice*, 134 S. Ct. at 2359. The '187/'005 claims do not merely require using the Internet—they require the modification of it and, in doing so, provide an inventive concept. *See DDR*, 773 F.3d at 1259 ("[T]he claims recite an invention that is not merely the routine or conventional use of the Internet."); *Amdocs*, No. 2015-1180, slip op. at 24 ("[C]laim 1 … depends upon a specific enhancing limitation that necessarily incorporates the invention's distributed architecture—an architecture providing a technological solution to a technological problem."). Likewise, they require a

41

"particular, practical application" for "sending and monitoring the delivery of audio/visual information." *See BASCOM*, 827 F.3d at 1352.

Appellees' arguments below largely avoided the converting, routing, and controlling the routing claim steps and instead focused just on the monitoring and recordkeeping steps so that they could argue the claims were directed "solely to the abstract idea of monitoring the delivery of information." Appx15. This Court's precedent treats "collecting information … as within the realm of abstract ideas." *Elec. Power Group*, 830 F.3d at 1353. But the monitoring and recordkeeping steps are just discrete steps in the ordered combination and it is error to treat those steps at such a high level of abstraction, especially without giving weight to the other claimed steps. *Diehr*, 450 U.S. at 187.

Additionally, monitoring and recordkeeping are important to a full appreciation of the inventive concept of the '187/'005 claims. The architecture developed to solve the bandwidth and congestion problems that existed for live media streams also provided a capability to collect precise data about those streams; data that would not otherwise be possible and the absence of which is a recognized shortcoming. *See* Appx525 (¶¶0004-0005), *Amdocs*, No. 2015-1180, slip op. at 30 ("The written description in both patents describes the collection, filtering, and aggregation in terms of the invention's distributed architecture."). *Cf. Elec. Power Group*, 830 F.3d at 1355 (noting that the claims "do not require an arguably inventive set of components or methods, such as measurement devices or techniques, that would generate new data").

## 2. The District Court's "Mechanism" Conclusion Ignores the Claim Language and Specification

Citing *Internet Patents,* the district court stated that "[e]ven if I accept that the architecture described in the patent specification is designed to solve the technological problems of load, bottlenecking, and inadequate records, the fact remains that the claims do not recite the mechanism by which those problems are solved." Appx17. The court's reliance on *Internet Patents* is misplaced.

As an initial matter, no Supreme Court precedent supports the proposition that a claim must recite a specific "mechanism" to be patent-eligible. Additionally, while TWM respectfully submits that issues of functional or result-oriented claiming are not properly considered during a § 101 analysis (*see supra* III.B.4), this Court's cases that reference a "mechanism" have no application here. As shown above and in contrast to these cases, TWM's claim language and constructions, read in light of the written description, require a concrete way of transmitting media streams through an end-to-end system. *See supra* at III.C.1, III.C.2; *see also Amdocs*, No. 2015-1180, slip op. at 27 ("An understanding of how this is accomplished is only possible through an examination of the claims in light of the written description."). Claim 1 is directed to an end-to-end distribution and control architecture. The specification provides a detailed description of an embodiment of the claim. Accordingly, *Internet Patents* and similar cases are inapposite.

## 3. There Are No Preemption Concerns

While the risk of preemption underlies both steps, it is a key concern under Step 2. *Alice*, 134 S. Ct. at 2354 ("We have described the concern that drives this

exclusionary principal as one of pre-emption"). The district court recognized that the "purpose of these [exception] carve outs is to avoid preemption," but never considered whether preemption was a concern. Appx9.

Preemption is not a concern here because the '187/'005 claims are not directed to the "basic tools of scientific and technological work" described in *Alice*. 134 S. Ct. at 2354. First, as shown *supra* in section III.C.2, the '187/'005 claims are tied to a specific distribution architecture with particular components and control mechanisms. These claims do not preempt any and all "methods of sending and monitoring the delivery of audio/visual information." Rather, this case is similar to *McRO*, 2016 U.S. App. LEXIS 16703, at *33, and *Amdocs*, No. 2015-1180, slip op. at 24, two instances where this Court found that preemption was not a concern due to specific limitations of the claims.

Second, the TWM Patents themselves describe alternatives to the invention available at the time—a point-to-point distribution system—without directing the routing path through a designated group of intermediate servers in response to a user selection signal. Appx103 (1:18-29). Similarly, a standard IP multicast system without the other '187/'005 claim limitations such as routing control would not be preempted. Appx103 (1:31-54). Nor would an on-demand streaming system be preempted. Appx103 (2:17-26). In short, many methods of sending and monitoring the delivery of audio/visual information are not preempted by Claim 1.

### 4. The District Court Improperly Excluded TWM's Evidence

Defendants had the burden to establish that the claims are directed to an abstract idea and do not contain an inventive concept, with all presumptions and

44

inferences in TWM's favor. To supplement the record regarding the state of the art and the improvements of the claimed inventions, TWM provided record evidence from prior cases (*e.g.*, expert report excerpts, expert trial testimony, and inventor trial testimony) and reexaminations demonstrating the technological innovations of its invention. The district court dismissed the entirety of TWM's evidence as "irrelevant," concluding that it pertains only to §§ 102 and 103.[12] Appx13.

Much of TWM's evidence (discussed *supra* in Section I.C), however, goes directly to the state of the art and how TWM solved existing problems, which is clearly part of the § 101 evaluation. TWM's evidence demonstrates that this case should not have been resolved against TWM on the pleadings. Patents are not required to describe the technological improvements or inventive concepts that they effect, nor are those details normally required in pleadings. Where a patent and complaint are silent on those details (and TWM's patents are not), a motion on the pleadings should be denied simply because patents are presumed valid. If additional evidence showing improvement and inventive concept is provided, however, it should not be disregarded out of preference for a silent record based on the pleadings alone.

For example, TWM's evidence included contemporaneous documentation that identifies the technical problems that the TWM Patents solve, especially with respect to architectural improvements. The evidence even included a statement by an AT&T

---

[12] The Supreme Court has indicated that inquiries under §101 "might sometimes overlap" with §102. *Mayo*, 132 S. Ct. at 1304.

executive noting Netcast's "unique innovation" in solving bottleneck problems. Appx528. *See also* Appx534 ("A point-to-point solution is infeasible due to the tremendous bandwidth that would be required."), Appx531. Expert report excerpts also discuss the state of the relevant art, noting challenges that existed with providing streaming audio and video services. Appx439. TWM's Technology Tutorial from the *AT&T* litigation also shows how the TWM architecture overcame "network congestion" challenges on the Internet, specifically tying the solution to the claimed "controlling the routing." Appx374. *See also* Appx369-374.

Despite TWM's extensive evidence to the contrary, and without any evidence in support, the district court assumed these same facts *against* TWM, finding that TWM failed to claim a technological improvement or inventive concept. The district court cited the specification's very limited and vague discussion of existing art in connection with the '622 patent, Appx19-20, but misunderstood the import of those passages, namely, that the existing art *did not work*. *See supra* at 6-9. TWM's evidence reinforces that point and should not have been excluded.

## E.    Step 1: The '622 Claims Are Not Directed to an Abstract Idea

The processes of '622 claims 1 and 29 (the two '622 claims at issue) are broader in several respects than '187 claim 1, but they are still tied to the same non-abstract architecture for transmitting packetized audio/visual streams. As with '187 claim 1, the district court ignored the claim limitations and constructions and, as a result, oversimplified the claims as "directed to monitoring the delivery of real-time information to a user or users." Appx19. The district court then held that "[n]othing in the claims requires anything other than conventional computer and network

components operating according to their ordinary functions." Appx19. To the contrary, the '622 claims recite both functional and architectural requirements that represent technological improvements.

### 1. The '622 Claims, Which the District Court Oversimplified, Are Tied Directly to the Patent-Eligible Distribution Architecture

Claim 29, reproduced above on page 15 and on Appx248, claims various aspects of an end-to-end streaming platform, including the distribution and control architecture. It is rooted in the same specific, concrete network configuration discussed above in connection with the '187 and '005 patents.

The district court erred by overgeneralizing the claims of the '622 patent. Claim 29 is not merely "directed to monitoring the delivery of real-time information to a user or users." Appx19. In fact, the district court's abstraction is little more than a restatement of the preamble, and ignores the "processing" and "forwarding" limitations, as well as the adopted constructions for "forwarding the digital packets." Appx600. These claim limitations, together with the adopted constructions, define features of the distribution and control architecture described in the TWM Patents.

The distribution architecture in claim 29 covers: (i) the source where the audio/video information streams are "processed" into packetized streams for transmission over a "communications network"; (ii) an "intermediate computer" in the network (required by the construction for the "forwarding the digital packets"

limitation), Appx600-601, where the packetized streams are received and forwarded;[13] and (iii) a group of users that receives streams from the intermediate computers. Additionally, claim 29 incorporates the control architecture by requiring the streams of packets to be forwarded only "in response to information selection signals received from the users." Claim 29 further includes requirements regarding verifying and recordkeeping.[14]

These limitations "necessarily incorporate[]" the distribution and control architecture described in the TWM Patents, *Amdocs*, No. 2015-1180, slip op. at 24, and furthermore describe "a particular inventive *manner*" of "monitoring the delivery of real-time information to a user or users" over a particular distribution network, *id.* at 17 (Reyna, J., dissenting). While '622 claim 1 is broader than claim 29, it recites many of the same specific features of the distribution architecture, along with specific records. Claim 1 recites concrete, technical networking concepts that are patent-eligible for the same reasons as claim 29.

### 2.  The '622 Claims Represent a Technological Improvement

The record also establishes that the '622 claims, although drafted more broadly than the '187/'005 claims, still provide technological solutions to the basic problems that existed with conventional distribution systems (listed above on page 38). Rather

---

[13]  This is also a requirement of '622 claim 1 under the "forwarding" construction. Appx600.

[14]  These are also requirements of '622 claim 1.

than routing streams from a source to the user, both '622 claims require "forwarding" the streams from at least one intermediate computer. Adding intermediate computers that forward streams to users, rather than sending the streams directly from source to user as occurs in conventional point-to-point networks such as the Internet, modifies those networks and is a technological improvement. As explained above, this architecture reduces load at the source server and reduces network congestion by distributing users among the intermediate computers (problems 1 and 2). *Supra* at 12-13, 38-39. Additionally, per claim 29, streams are forwarded only in response to a user request, which further minimizes network congestion. *Supra* at 13, 38-39. Relaying streams through a fixed intermediate point (a requirement of both claims 1 and 29) also reduces the variations in packet delivery times that can occur due to packets taking different routes through the network (problem (3)), *supra* at 39, and improves scalability (problem 4), *supra* at 12-13, 39-40. Finally, user reception of the streams is "verifi[ed]" and specific records are generated (problem (5)).

In step 1, the district court did not analyze whether the claims of the '622 patent are directed to a technological improvement that solved existing problems. Instead, the district court simply compared the claims to two prior cases (*BASCOM* and *Elec. Power Group*), Appx19, and incorrectly concluded that they were "similar," without explanation. *Id.* Regarding *BASCOM*, there are no "similarities" between filtering content on the Internet and the '622 claims, and the suggestion that there are demonstrates the district court's misunderstanding of the '622 claims. The district court was also wrong in stating that the Court in *BASCOM* found filtering content to be an abstract idea. It did no such thing—instead, the Court expressly "deferred"

judgment on step 1 in *BASCOM*. 827 F.3d at 1349. Regarding *Electric Power*, the district court's reference to data collection is a classic example of improperly singling out limitations and not considering the claims as a whole. Here, the district court erred by only considering similarities between individual limitations, rather than considering whether the claims as a whole contribute a technological improvement. As explained above, the claims of the '622 patent do provide a technological improvement that solves a number of problems with streaming media over packet-based networks, and "necessarily incorporates the invention's … architecture—an architecture providing a technological solution to a technological problem." *Amdocs*, No. 2015-1180, slip op. at 24. For at least this reason, the claims are patent-eligible.

## F.    Step 2: The '622 Patent Claims an Inventive Concept

The district court's Step 2 analysis similarly misses the mark. As explained in the previous section, the '622 claims solved existing problems in a way that improved media streaming. The district court's Step 2 analysis begins: "[l]imiting the claims to the particular technological environment of 'real-time stream delivery over packet-based networks' is insufficient to transform them into patent-eligible applications of the abstract idea to which they are directed." Appx19.

This statement overlooks a central aspect of the TWM invention—the architecture. The problems addressed by the '622 claims exist because of the uncontrolled environment of packet-based networks and the overloading and congestion problems in conventional point-to-point packet-based networks like the Internet. TWM's claimed solution, therefore, is necessarily limited to the particular technological environment of packet-based networks—not because of any "drafting

effort" by TWM, but because that environment is where the problem exists. *Cf. Alice*, 134 S.Ct. at 2357 (quoting *Mayo*, 132 S. Ct. at 1297); *see also* Appx103 (1:18-29), Appx106 (7:15-19), Appx531, Appx534. *Alice*, relied on by the district court, recognizes that claims that "effect an improvement in any other technology or technical field" are patent-eligible. *Alice*, 134 S. Ct. at 2359-60. By forwarding real-time media streams from intermediate computers to users, the '622 claims address the problems of network congestion and packet loss that existed on packet-switched networks and satisfy this criteria.

The district court's further commentary that "[n]othing in the claims requires anything other than conventional computer and network components operating according to their ordinary functions" is incorrect. Putting aside the court's failure to provide any basis for its conclusion, the use of conventional network components does not end the inquiry. As this Court has recognized, "[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM*, 827 F.3d at 1350; *see also Amdocs*, No. 2015-1180, slip op. at 23-24 ("[T]he claim's enhancing limitation necessarily requires that these generic components operate in an unconventional manner to achieve an improvement in computer functionality."). The district court did not, however, consider the arrangement, or "ordered combination of limitations," when analyzing the inventive concept. *See id.* at 1349. Instead, it pointed only to specific limitations (*e.g.*, "verifying that information is being received," "noting when information delivery has ceased," "forwarding a stream from an intermediate computer only when the user selects it"),

and determined that these limitations were not "sufficient to supply an inventive concept rendering the claims patent eligible." Appx20.

The proper inquiry here isn't whether a computer is conventional, but rather whether it was conventional to introduce intermediate computers for forwarding real-time information (along with other claim requirements) over traditional point-to-point networks such as the Internet. According to the TWM Patents, it was not. Appx103 (1:18-25) ("Systems such as the Internet typically are point-to-point (or unicast) systems in which a message is converted into a series of addressed packets that are routed from a source node through a plurality of routers to a destination node."). Thus, the inclusion of forwarding intermediate computers in the '622 claims was a non-conventional arrangement, consistent with the distribution architecture disclosed in the TWM Patents. Claim 29 further requires that the intermediate computer only forward the stream to the user in response to a user request. Conventional point-to-point systems specify a destination address at the source computer, and the network nodes route the message packets based on the destination address, not in response to any signal from the user. *Id.* By introducing intermediate "forwarding" computers, the '622 claims "necessarily incorporate[] the invention's … architecture—an architecture providing a technological solution to a technological problem." *Amdocs,* 2015-1180, slip op. at 24.

The inventive concept of the '622 claims is not found in an isolated limitation, but rather in the ordered combination of limitations. Addressing the detrimental effect of bandwidth congestion and packet delay, the solution in the '622 claims is to add intermediate computers to create a scalable, hierarchical network for relaying real-

time media streams and, in the case of claim 29, to forward the real-time streams from those intermediate computers to users only when requested. *See supra* at 12-13. Additional features, such as verifying that the real-time information is delivered and generating usage data, depend on the same scalable, hierarchical network. *Amdocs*, No. 2015-1180, slip op. at 32. The district court should have considered these ordered combinations, but did not.

## G.    Step 1: The '686 Claims Also Are Not Directed to an Abstract Idea

The processes of '686 claims 1, 22, 26 and 30 (the four '686 claims at issue) are also broader in several respects than '187 claim 1, but they are still tied to the same specific streaming architecture. Consistent with its treatment of the '187/'005 and '622 claims, the district court ignored '686 limitations when it abstracted the claimed inventions "to measuring the delivery of real-time information for commercial purposes." Appx21. The court erred in failing to find that the '686 claims recite both functional and architectural requirements that represent technological improvements.

### 1.  The District Court Oversimplified the '686 Claims, Which Recite Patent-Eligible Subject Matter

The claims of the '686 patent are directed to the same streaming platform discussed in the preceding sections, including the distribution and control architectures. The claims are, therefore, also rooted in a specific, concrete network configuration. Using claim 30 as an example (reproduced above on page 16), it

requires: (1) a group of "multiple intermediate servers"; and (2) an "intermediate server" that receives a real-time media stream and forwards it to users.[15] Claim 30 also incorporates the control architecture by requiring "selecting" an intermediate server from the group and "forwarding" the real-time streaming media from that server.[16] Claim 30 further requires detecting termination of the forwarding and recordkeeping.[17]

The district court's analysis again overgeneralizes the claims to a restatement of the preamble: "measuring the delivery of real-time information for commercial purposes." Appx21. The failure to consider all limitations, or any limitations for that matter, is error. *McRO*, 2016 U.S. App. LEXIS 16703, at *25. As explained above, these limitations "necessarily incorporate[]" the distribution and control architecture described in the TWM Patents, *Amdocs*, No. 2015-1180, slip op. at 24, and describe "a particular inventive *manner*" of "measuring the delivery of real-time information for commercial purposes" over a particular distribution network, *id.* at 17 (Reyna, J.,

---

[15] The latter requirement (2) is found also in '686 claims 1, 22 and 26. Appx247-248. As part of the claimed distribution architecture, '686 claim 26 also includes a source in the network for "encoding a media source feed into a real-time media stream" and for "transmitting said real-time media stream toward an intermediate server." Appx248. Hence, claim 26 is also an end-to-end distribution system.

[16] Claim 22 also incorporates the control architecture disclosed in the TWM Patents by forwarding the stream from an intermediate server to the user only upon "receiving a request for said real-time media stream." Appx248.

[17] These are also requirements of '686 claims 1, 22 and 26.

dissenting). The claims of the '686 patent include specific architectural requirements and are patent-eligible.

### 2.  The Claims Represent a Technological Improvement

By incorporating the distribution and control architecture described in the TWM specification, the '686 claims provide a technological improvement to network routing. For the same reasons discussed at length above, the hierarchical distribution architecture improves routing by reducing bandwidth and congestion problems when transmitting to large numbers of users. *See supra* at 12-13, 38-39. The multiple intermediate servers modify conventional point-to-point networks by relocating distribution points away from the stream source, reducing load on the source server and redistributing the load across multiple intermediate servers. Distributing users across multiple intermediate servers also reduces congestion. *Id.* The combination of multiple intermediate servers and the controlled selection of a particular server adds scalability to the system, allowing additional intermediate servers to be added as needed to carry existing streams for redistribution to users. *Supra* at 12-13, 39-40. As a technological improvement, and one that particularly improves the widespread distribution of real-time streams, the '686 claims are patent-eligible. *McRO*, 2016 U.S. App. LEXIS 16703, at *33.

Similar to its analysis of the '622 patent, the district court did not consider whether the '686 claims provide a technological improvement as part of its Step 1 analysis. Instead, the district court reasoned by analogy to "intermediated settlement" (*Alice*), "advertising" on the Internet (*Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014)), "collecting information" (*Electric Power*), and "filtering content on the

Internet" (*BASCOM*), that the claims were directed to an abstract idea. Moreover, by not considering the ordered combination of the claims, the district court did not consider the contribution of those claims to the technological field or the problems that they solved. By simply comparing individual limitations to prior cases, the district court's analogies are inapposite. Appx21-22. Nor do the analogies to intermediated settlement, advertising and filtering content have anything to do with any of the limitations in the '686 claims.

## H.    Step 2: The '686 Patent Claims an Inventive Concept

Because the district court's Step 2 analysis also ignored the '686 architectural limitations, the district court similarly missed the inventive concept. The court mistakenly concluded that "the claims do not specify a technological improvement to measuring information delivery using [a computer] network" and that the "components merely perform their conventional functions." Appx22. But, as shown, "measuring information delivery" is just one aspect of the '686 claims—they also contain additional architectural limitations that the district court failed to consider. As explained, the court also erred by not considering the ordered combination of the claims, which also resulted in a failure to appreciate the inventive concept. *McRO*, 2016 U.S. App. LEXIS 16703, at *24; *Amdocs*, No. 2015-1180, slip op. at 28 ("While some individual limitations arguably may be generic, others are unconventional and the ordered combination of these limitations yields an inventive concept sufficient to confer eligibility without undue preemption.").

The district court noted that the key aspect of *BASCOM* was its "installation of a filtering tool *at a specific location, remote from the end users*, with

56

customizable filtering features specific to each end user….” Appx22 (emphasis added). But because the court considered only the claim limitations individually, rather than as a whole, it failed to appreciate the parallel between *BASCOM* and the claims in this case. *See also Amdocs*, No. 2015-1180, slip op. at 25 (“[W]hen all limitations are considered individually and as an ordered combination, they provide an inventive concept through the use of distributed architecture.”).

TWM’s modification of conventional networks to include a layer of “intermediate servers” between a source server and the user, and to further include a control mechanism that selects the appropriate intermediate server for forwarding of the streams, is no different than *BASCOM* and *Amdocs*. Like those cases, the ’686 claims introduce a new tool—a set of intermediate servers—to produce a technological solution to a technological problem. Introducing intermediate computers is a departure from conventional packet-based networks that not only solves the problems of server overload, network congestion, and variability in packet delivery that existed with the point-to-point architectures, but opens up new capabilities in “measuring the delivery of real-time information” that “depend on the system’s distributed architecture.” *Amdocs*, No. 2015-1180, slip op. at 32. In this way, the ’686 claims and their “intermediate servers” “overcome a problem specifically arising in the realm of computer networks” and include an inventive concept. *DDR*, 773 F.3d at 1257.

## IV.    CONCLUSION

For the foregoing reasons, the district court's Order under § 101 should be reversed and the judgment against TWM should be vacated.


Dated:    November 4, 2016                    Respectfully submitted,


                                             /s/ Michael F. Heim

                                             PARKER C. FOLSE, III
                                             RACHEL S. BLACK
                                             JENNA G. FARLEIGH
                                             SUSMAN GODFREY L.L.P.
                                             1201 Third Avenue, Suite 3800
                                             Seattle, WA  98101
                                             (206) 516-3880

                                             JOSEPH S. GRINSTEIN
                                             SHAWN BLACKBURN
                                             SUSMAN GODFREY L.L.P.
                                             1000 Louisiana, Suite 5100
                                             Houston, TX  77002-5096
                                             (713) 651-9366

                                             MICHAEL HEIM
                                             LESLIE PAYNE
                                             MICAH J. HOWE
                                             R. ALLAN BULLWINKEL
                                             HEIM, PAYNE & CHORUSH LLP
                                             1111 Bagby, Suite 2100
                                             Houston, TX  77002
                                             (713) 221-2000

                                             *Counsel for Plaintiff-Appellant*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

*Page*

Judgment 1:14-cv-1006, Dkt. No. 160, filed August 16, 2016..................................Appx1

Judgment 1:14-cv-1212, Dkt. No. 108, filed August 16, 2016..................................Appx3

Memorandum Opinion regarding Defendants' Motion for Judgment
on the Pleadings 1:14-cv-1006,  Dkt. No. 158, filed August 15, 2016 ...................Appx5

Memorandum Opinion regarding Defendants' Motion for Judgment
on the Pleadings 1:14-cv-1212, Dkt. No. 106, filed August 15, 2016 ..................Appx24

Order Granting-in-part Defendants' Motion for Judgment on the Pleadings
1:14-cv-1006, Dkt. No. 159, filed August 15, 2016..................................Appx43

Order Granting-in-part Defendants' Motion for Judgment on the Pleadings
1:14-cv-1212, Dkt. No. 107, filed August 15, 2016..................................Appx45

U.S. Patent No. 5,778,187 ..........................................................Appx79

U.S. Patent No. 5,983,005 .........................................................Appx123

U.S. Patent No. 6,434,622 .........................................................Appx168

U.S. Patent No. 7,266,686 .........................................................Appx211

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

TWO-WAY MEDIA LTD.,                    :
                                       :
                    Plaintiff,         :
                                       :
          v.                           :      Civil Action No. 14-1006-RGA
                                       :
COMCAST CABLE                          :
COMMUNICATIONS LLC, et al.,            :
                                       :
                    Defendants.        :

_____

TWO-WAY MEDIA LTD.,                    :
                                       :
                    Plaintiff,         :
                                       :
          v.                           :      Civil Action No. 14-1212-RGA
                                       :
VERIZON SERVICES CORP., et al.,        :
                                       :
                    Defendants.        :

**<u>JUDGMENT</u>**

For reasons set forth in the Court's Memorandum Opinion and Order dated August 15,

2016 (D.I. 158 and 159 in C.A. 14-1006-RGA, and D.I. 106 and 107 in C.A. 14-1212-RGA);

IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of

Defendants Comcast Cable Communications LLC, Comcast Interactive Media LLC, Verizon

Appx1

Services Corp., and Verizon Online LLC and against Plaintiff Two-Way Media Ltd..

_____
United States District Judge

Dated: 8-16-2016

_____
(By) Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

TWO-WAY MEDIA LTD., : 
: 
              Plaintiff, : 
: 
           v. :     Civil Action No. 14-1006-RGA
: 
COMCAST CABLE : 
COMMUNICATIONS LLC, et al., : 
: 
           Defendants. : 

---

TWO-WAY MEDIA LTD., : 
: 
              Plaintiff, : 
: 
           v. :     Civil Action No. 14-1212-RGA
: 
VERIZON SERVICES CORP., et al., : 
: 
           Defendants. : 

## JUDGMENT

For reasons set forth in the Court's Memorandum Opinion and Order dated August 15,

2016 (D.I. 158 and 159 in C.A. 14-1006-RGA, and D.I. 106 and 107 in C.A. 14-1212-RGA);

IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of

Defendants Comcast Cable Communications LLC, Comcast Interactive Media LLC, Verizon

Appx3

Services Corp., and Verizon Online LLC and against Plaintiff Two-Way Media Ltd..

United States District Judge

Dated: 8-16-2016

(By) Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TWO-WAY MEDIA LTD.,

Plaintiff;

v.

COMCAST CABLE COMMUNICATIONS,
LLC, COMCAST INTERACTIVE MEDIA,
LLC, NBCUNIVERSAL MEDIA LLC, and
NBCUNIVERSAL, LLC,

Defendants.

Civil Action No. 14-1006-RGA

TWO-WAY MEDIA, LTD.,

Plaintiff;

v.

VERIZON SERVICES CORP. and VERIZON
ONLINE LLC,

Defendants.

Civil Action No. 14-1212-RGA

## MEMORANDUM OPINION

Joseph J. Farnan, III, Esq., Brian E. Farnan, Esq., Michael J. Farnan, Esq., FARNAN LLP, Wilmington, DE; Parker C. Folse, III, Esq. (argued), Rachel S. Black, Esq., Brooke A.M. Taylor, Esq., Jenna G. Farleigh, Esq., SUSMAN GODFREY L.L.P., Seattle, WA; Michael F. Heim, Esq., Leslie V. Payne, Esq., Micah J. Howe, Esq., R. Allan Bullwinkel, Esq., HEIM, PAYNE & CHORUSH L.L.P., Houston, TX, attorneys for Plaintiff.

Jack B. Blumenfeld, Esq., Paul Saindon, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE, attorneys for Defendants Comcast Cable Communications, LLC, Comcast Interactive Media, LLC, NBCUniversal Media LLC, and NBCUniversal, LLC.

Brian Ferrall, Esq. (argued), Paven Malhotra, Esq., David J. Rosen, Esq., KEKER & VAN NEST LLP, San Francisco, CA, attorneys for Defendants Comcast Cable Communications, LLC and Comcast Interactive Media, LLC.

Steven Lieberman, Esq. (argued), Derek Dahlgren, Esq., ROTHWELL, FIGG, ERNST & MANBECK, P.C., Washington, D.C., attorneys for Defendants NBCUniversal Media LLC and NBC Universal, LLC.

Benjamin J. Schladweiler, Esq., ROSS ARONSTAM & MORITZ LLP, Wilmington, DE; Thomas M. Dunham, Esq., WINSTON & STRAWN LLP, Washington, D.C.; Kurt A. Mathas, Esq., Sarah J. Kalemeris, Esq., WINSTON & STRAWN LLP, Chicago, IL, attorneys for Defendants Verizon Services Corp. and Verizon Online LLC.

August 15 , 2016

*Richard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

Pending before the Court is Defendants' joint Motion for Judgment on the Pleadings

pursuant to Federal Rule of Civil Procedure 12(c).  (D.I. 37; C.A. No. 14-1212 D.I. 28).[1]  The

matter has been fully briefed.  (D.I. 38, 43, 45; C.A. No. 14-1212 D.I. 29, 34, 36).  The Court

heard oral argument on October 29, 2015.  (D.I. 54).  For the reasons stated below, the Court will

grant in part Defendants' motion with respect to the asserted claims of the '187, '005, '622, and

'686 patents and dismiss in part as moot Defendants' motion with respect to the asserted claims

of the '237 patent.

## I.    BACKGROUND

Plaintiff Two-Way Media Ltd. ("Two-Way") filed these patent infringement actions

against Comcast Cable Communications, LLC, Comcast Interactive Media, LLC (collectively,

"Comcast"), NBCUniversal Media LLC, and NBCUniversal, LLC (collectively,

"NBCUniversal") on August 1, 2014, (D.I. 1), and against Verizon Services Corp. and Verizon

Online LLC (collectively, "Verizon") on September 19, 2014, (C.A. No. 14-1212 D.I. 1).  Two-

Way alleged that Comcast, NBCUniversal, and Verizon infringed U.S. Patent Nos. 5,778,187

("the '187 patent"); 5,983,005 ("the '005 patent"); 6,434,622 ("the '622 patent"); 7,266,686 ("the

'686 patent"); and 8,539, 237 ("the '237 patent").  On August 1, 2016, the Court granted a

stipulation of dismissal without prejudice of the claims between Two-Way and NBCUniversal.

(D.I. 151).  On August 4, 2016, the Court granted a stipulation of partial dismissal with prejudice

of Two-Way's '237 patent infringement claims against Comcast and Verizon (collectively,

"Defendants").  (D.I. 150).  The § 101 motion presently under consideration is therefore

dismissed as moot with respect to the '237 patent claims.

---

[1] Citations to "D.I. __" are citations to the docket in C.A. No. 14-1006 unless otherwise noted.

1

The '187, '005, '622, and '686 patents (the "asserted patents") are each entitled

"Multicasting Method and Apparatus." ('187 patent, (54); '005 patent, (54); '622 patent, (54);

'686 patent, (54)).  The asserted patents have a common parent application and are directed to a

"scalable architecture . . . for delivery of real-time information over a communications network."

('187 patent, (Abstract); '005 patent, (Abstract); '622 patent, (Abstract); '686 patent, (Abstract)).

## II.    LEGAL STANDARD

### A. Motion for Judgment on the Pleadings

A Rule 12(c) motion for judgment on the pleadings is reviewed under the same standard

as a Rule 12(b)(6) motion to dismiss when the Rule 12(c) motion alleges that the plaintiff failed

to state a claim upon which relief can be granted.  *See Turbe v. Gov't of the Virgin Islands*, 938

F.2d 427, 428 (3d Cir. 1991); *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010).  The court

must accept the factual allegations in the complaint and take them in the light most favorable to

the non-moving party. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*,

536 U.S. 403, 406 (2002).  "When there are well-ple[d] factual allegations, a court should

assume their veracity and then determine whether they plausibly give rise to an entitlement to

relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The Court may also consider matters of

public record and authentic documents upon which the complaint relies if those documents are

attached to the complaint or as an exhibit to the motion. *See Oshiver v. Levin, Fishbein, Sedran*

*& Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994).  Additionally, the Court may take judicial

notice of the factual record of a prior proceeding. *See Oneida Motor Freight, Inc. v. United*

*Jersey Bank*, 848 F.2d 414, 416 n.3 (3d Cir. 1988).  The court must "draw on its judicial

experience and common sense" to make the determination whether plaintiff failed to state a

claim upon which relief can be granted. *See id.*

2

Appx8

**B. Patent-Eligible Subject Matter**

Section 101 of the Patent Act defines patent-eligible subject matter. It provides:

"Whoever invents or discovers any new and useful process, machine, manufacture, or

composition of matter, or any new and useful improvement thereof, may obtain a patent therefor,

subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court

has recognized an implicit exception for three categories of subject matter not eligible for patent

protection: laws of nature, natural phenomena, and abstract ideas. *Alice Corp. Pty. Ltd. v. CLS*

*Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). The purpose of these carve outs is to avoid preemption

of the "basic tools of scientific and technological work." *Mayo Collaborative Servs. v.*

*Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012) (internal quotation marks omitted); *Alice*

*Corp.*, 134 S. Ct. at 2354. Still, "a process is not unpatentable simply because it contains a law

of nature or a mathematical algorithm," as "an application of a law of nature or mathematical

formula to a known structure or process may well be deserving of patent protection." *Mayo*

*Collaborative Servs.*, 132 S. Ct. at 1293–94 (emphasis and internal quotation marks omitted).

In *Alice*, the Supreme Court reaffirmed the framework laid out in *Mayo* for

distinguishing "patents that claim laws of nature, natural phenomena, and abstract ideas from

those that claim patent-eligible applications of those concepts." 134 S. Ct. at 2355. Under the

first step of the *Alice* framework, the court must determine whether the claims are directed to a

patent-ineligible concept. *Id.* "The dispositive inquiry is whether the concept to which a claim is

drawn has 'no particular concrete or tangible form.'" *Morsa v. Facebook, Inc.*, 77 F. Supp. 3d

1007, 1014 (C.D. Cal. 2014) (quoting *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed.

Cir. 2014), *cert. denied sub nom. Ultramercial, LLC v. WildTangent, Inc.*, 135 S. Ct. 2907

(2015)), *aff'd*, 622 F. App'x 915 (Fed. Cir. 2015); *see also Accenture Global Servs., GmbH v.*

3

*Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) ("[T]he court must first identify and define whatever fundamental concept appears wrapped up in the claim." (internal quotation marks omitted)). To evaluate whether an invention is directed to an "abstract idea," courts "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016). "[F]undamental economic and conventional business practices are often found to be abstract ideas, even if performed on a computer." *Id.* at 1335. Not "all improvements in computer-related technology are inherently abstract," however. *Id.* Nor are "claims directed to software, as opposed to hardware, . . . inherently abstract and therefore only properly analyzed at the second step of the *Alice* analysis." *Id.* Thus, in analyzing claims directed to computer-related technology under the first step of the *Alice* framework, a relevant question is "whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Id.* at 1335–36.

If the court concludes that the claims are drawn to a patent-ineligible concept under the first step of the *Alice* framework, it must next look to "the elements of each claim both individually and as an 'ordered combination,'" *id.* at 1334, to see if there is an "'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice Corp.*, 134 S. Ct. at 2355 (alteration and internal quotation marks omitted). "[T]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the formula to a particular technological environment or adding insignificant postsolution activity." *Bilski v. Kappos*, 561 U.S. 593, 610–11 (2010) (internal quotation marks omitted). Similarly,

"[s]imply appending conventional steps, specified at a high level of generality, . . . [i]s not enough to supply an inventive concept." *Alice Corp.*, 134 S. Ct. at 2357 (internal quotation marks and emphasis omitted). Further, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 2358.

## III.   ANALYSIS

### A.  Claim Construction

Two-Way argues that Defendants' motion is premature because claim construction is necessary to determine patent eligibility under § 101. (D.I. 43 at 14–15). In accordance with an order of the Court (D.I. 54 at 34–35; D.I. 64), Two-Way identified the claim terms it contends need construction and offered its proposed constructions. (D.I. 61, 70). Defendants do not dispute that the Court should consider this motion in light of Two-Way's proposed claim constructions. Defendants maintain that Two-Way's proposed constructions do not alter the § 101 analysis. (*See* D.I. 71-1 at 1).

The validity of asserted claims under § 101 is a "threshold inquiry" for the court to decide as a matter of law. *In re Bilski*, 545 F.3d 943, 950 (Fed. Cir. 2008), *aff'd*, *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). At the pleading stage, to the extent the § 101 question of law is informed by subsidiary factual issues, those facts are to be construed in the light most favorable to Plaintiff. *See TriPlay, Inc. v. WhatsApp Inc.*, 2015 WL 1927696, at *5 n.5 (D. Del. Apr. 28, 2015), *adopted in part, rejected in part*, 2015 WL 4730907 (D. Del. Aug. 10, 2015); *Shortridge v. Found. Constr. Payroll Serv., LLC*, 2015 WL 1739256, at *7 (N.D. Cal. Apr. 14, 2015), *aff'd*, 2016 WL 3742816 (Fed. Cir. July 13, 2016). Because "the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter," it is often necessary to resolve claim construction disputes prior to a § 101 analysis. *Bancorp Servs., LLC*

5

*v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1273–74 (Fed. Cir. 2012). Still, the

Federal Circuit has "never set forth a bright line rule requiring district courts to construe claims

before determining subject matter eligibility." *Ultramercial, LLC v. Hulu, LLC*, 657 F.3d 1323,

1325 (Fed.Cir.2011), *vacated on other grounds sub nom. WildTangent, Inc. v. Ultramercial,*

*LLC*, 132 S. Ct. 2431 (2012). Early resolution of § 101 issues, where appropriate, is desirable.

*I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982, 996 (Fed. Cir. 2014) (Mayer, J., concurring),

*cert. denied*, 136 S. Ct. 54 (2015); *see also BASCOM Global Internet Servs., Inc. v. AT&T*

*Mobility LLC*, 2016 WL 3514158, at *4 (Fed. Cir. June 27, 2016) ("Courts may therefore dispose

of patent-infringement claims under § 101 whenever procedurally appropriate."). *But see*

*BASCOM Global*, 2016 WL 3514158, at *8 (Newman, J., concurring) ("[I]nitial determination of

eligibility often does not resolve patentability, whereas initial determination of patentability

issues always resolves or moots eligibility."). Thus, resolution of a § 101 dispute at the pleading

stage is proper if claim construction is unnecessary, *see Cyberfone Sys., LLC v. CNN Interactive*

*Grp., Inc.*, 558 F. App'x 988, 991 n.1 (Fed. Cir. 2014), or if there is "no reasonable construction

that would bring [the asserted claims] within patentable subject matter." *Ultramercial, Inc. v.*

*Hulu, LLC*, 772 F.3d 709, 719 (Fed. Cir. 2014) (Mayer, J., concurring) (internal quotation marks

omitted), *cert. denied sub nom. Ultramercial, LLC v. WildTangent, Inc.*, 135 S. Ct. 2907 (2015);

*see also Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d

1343, 1349 (Fed. Cir. 2014) (construing claims in the manner most favorable to patentee on

§ 101 motion decided before formal claim construction), *cert. denied*, 136 S. Ct. 119 (2015).

      For the reasons stated above, I adopt Two-Way's proposed constructions for purposes of

this motion.  (*See* D.I. 61, 70).

<div align="center">6</div>

**B. Prior §§ 102 and 103 Analyses**

Two-Way urges the Court to consider materials that relate to the asserted patents from prior proceedings before the PTO and in federal courts. (D.I. 43 at 14 & n.6). Two-Way argues that the proffered materials "demonstrate[] how [its] invention[s] solved specific technical problems and added significant inventive concepts over the prior art." (*Id.* at 14). Two-Way encourages the Court to take judicial notice of the proffered materials because patentability under § 101 is a question of law that may be informed by subsidiary factual issues and because the Court must accept all factual allegations in Two-Way's complaint as true and view them in the light most favorable to Two-Way. (*Id.* at 10, 14). If the Court decides not to consider the proffered factual materials in deciding the § 101 motion for judgment on the pleadings, Two-Way requests in the alternative that the Court either convert the motion to a motion for summary judgment or grant Two-Way leave to file a Fourth Amended Complaint attaching the proffered materials. (*Id.* at 15 & n.7).

The proffered materials are irrelevant to the § 101 motion for judgment on the pleadings. None of the materials addresses a § 101 challenge to claims of the asserted patents. (*See* D.I. 44-1–D.I. 44-24). The novelty and nonobviousness of the claims under §§ 102 and 103 does not bear on whether the claims are directed to patent-eligible subject matter under § 101. *See Diamond v. Diehr*, 450 U.S. 175, 188–92 (1981); *see also Genetic Techs. Ltd. v. Bristol-Myers Squibb Co.*, 72 F. Supp. 3d 521, 529 n.7 (D. Del. 2014) (not considering reexaminations, which evaluate invalidity based only on prior art, in deciding § 101 motion), *aff'd sub nom. Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369 (Fed. Cir. 2016). The history of conception of the invention and commercial embodiments of the invention are also irrelevant to the issues to be decided under § 101. *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355–60

7

(2014) (examining "the claims at issue" and "the elements of the claims" in deciding patent eligibility under § 101). Because the proffered materials are irrelevant to the instant § 101 issue, I have not considered them.

Further, I will not convert the motion to a motion for summary judgment. Conversion to summary judgment is generally not appropriate where, as here, only the nonmoving party has introduced evidentiary exhibits in response to a motion to dismiss or a motion for judgment on the pleadings. *See Kenexa BrassRing, Inc. v. HireAbility.com, LLC*, 2015 WL 1943826, at *4 (D. Mass. Apr. 28, 2015) (declining to convert a motion for judgment on the pleadings to a motion for summary judgment where only the nonmovant submitted documents outside the pleadings); *Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP*, 401 F. Supp. 2d 1120, 1122 (D. Nev. 2005) (declining to convert a motion to dismiss for the same reason). Additionally, Two-Way's request to file a Fourth Amended Complaint is denied without prejudice. Two-Way's request is premised on the view that, if it were part of the record under consideration, the proffered evidence would be relevant to the instant decision. (*See* D.I. 43 at 15 n.7). Because the proffered evidence is irrelevant to the § 101 determination, however, I see no reason to grant Two-Way's request for leave to file an amended complaint.

## C. '187 and '005 Patents

Claim 1 of the '187 patent is representative of the '187 and '005 patent claims and reads:[2]

1. A method for transmitting message packets over a communications network comprising the steps of:

---

[2] The Federal Circuit has held that the district court is not required to individually address claims not asserted or identified by the non-moving party, as long as the court identifies a representative claim and "all the claims are substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348 (internal quotation marks omitted). Two-Way acknowledges that claim 1 of the '187 patent is representative of the claims of the '187 and '005 patents. (D.I. 43 at 15).

converting a plurality of streams of audio and/or visual information into a plurality of
    streams of addressed digital packets complying with the specifications of a network
    communication protocol,
for each stream, routing such stream to one or more users,
controlling the routing of the stream of packets in response to selection signals received
    from the users,
    and
monitoring the reception of packets by the users and accumulating records that indicate
    which streams of packets were received by which users, wherein at least one stream of
    packets comprises an audio and/or visual selection and the records that are accumulated
    indicate the time that a user starts receiving the audio and/or visual selection and the
    time that the user stops receiving the audio and/or visual selection.

('187 patent, 18:17–34; D.I. 26 at 53; *see also* '005 patent, 18:44–59 (replacing "a plurality of

streams" with "at least one stream" in the "converting" step)).

Defendants argue that the '187 and '005 patents "are directed solely to the abstract idea

of monitoring the delivery of information." (D.I. 38 at 17). In Defendants' view, that idea

represents a fundamental business practice "similar to the idea of tracking a user's spending,

which this Court has deemed abstract." (*Id.* at 10–11). Regarding step two, Defendants contend

that the claimed "converting," "routing," "controlling," "monitoring," and "recording" steps do

not, separately or as an ordered combination, amount to significantly more than an instruction to

apply the abstract idea using a generic computer. (*Id.* at 18–19).

Two-Way contends that the '187 and '005 patents are directed to the concrete task of

"audio/visual streaming in a packet-switched architecture that facilitates efficient and reliable

transmission, while also implementing specific forms of monitoring and recordkeeping." (D.I.

43 at 15). Two-Way argues that the claimed steps recite "a specific and concrete (*i.e.*, non-

abstract) way of processing the streams [of audio/visual information]." (*Id.* at 15–17).

Regarding step two, Two-Way argues that the patents supply an inventive concept because they

9

claim elements that are directed to solving the technological problems of load, bottlenecking, and inadequate records. (*Id.* at 17–18).

The '187 and '005 patents are directed to the abstract idea of (1) sending information, (2) directing the sent information, (3) monitoring receipt of the sent information, and (4) accumulating records about receipt of the sent information. (*See* '187 patent, 18:17–34; '005 patent, 18:44–59; *see also* D.I. 61 at 2 (describing "controlling the routing" as "directing a portion of the routing path")). The claims are thus directed to methods of sending and monitoring the delivery of audio/visual information. Although the claims are limited to the context of audio/visual streaming in a packet-switched communications network, they are not directed to an invention that improves streaming audio/visual content in a packet-switched network. (*See, e.g.*, '187 patent, 18:17–34; '005 patent, 18:44–59; *see also* (D.I. 43 at 17)); *Electric Power Group, LLC v. Alstom S.A.*, No. 2015-1778, slip op. at pp. 8, 11–12 (Fed. Cir. Aug. 1, 2016) (holding that the claims at issue were directed to an abstract idea because "the focus of the claims [wa]s not on . . . an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools" and distinguishing between "ends sought and particular means of achieving them, between desired results (functions) and particular ways of achieving (performing) them"); *cf. Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016) (finding that the claims at issue were not directed to an abstract idea because "the plain focus of the claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity"). Thus, the '187 and '005 patents claim abstract ideas.

Two-Way argues that the inventive concept supplied by the '187 and '005 patents is the disclosed computer architecture, which solves the technological problems of load, bottlenecking,

and inadequate records. (D.I. 43 at 17–18). The patent specifications do, in fact, point to the architecture of the system as the technological innovation. (*See, e.g.*, '187 patent, 2:3–5, 3:55–59 (describing the patented invention as "a scalable architecture for delivery of real-time information over a communications network," which is described further as "a distribution architecture integrated with a control architecture"); '005 patent, 2:6–9, 3:58–60 (same)). None of the claims, however, recite or refer to anything that could be described as an architecture.[3] (*See, e.g.*, '187 patent, 18:17–34; '005 patent, 18:44–59). Even if I accept that the architecture described in the patent specification is designed to solve the technological problems of load, bottlenecking, and inadequate records, the fact remains that the claims do not recite the mechanism by which those problems are solved. *See Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) (holding that a claim directed to the abstract idea of "retaining information in the navigation of online forms" did not supply an inventive concept because the claim "contain[e]d no restriction on how the result is accomplished[, that is, t]he mechanism for maintaining the state [of data on a web page] is not described, although this is stated to be the essential innovation"). The claims therefore do not supply the inventive concept of a particular computer architecture. Further, the limitation regarding accumulating records about the receipt of sent information does not supply an inventive concept. (*See* '187 patent, 18:28–34; '005 patent, 18:55–59); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363–64 (Fed. Cir. 2015) (holding that "gathering statistics" regarding customer responses was "routine, conventional data-gathering" that did not supply an inventive concept).

---

[3] The claims cannot fairly be read to recite computer architecture even in light of Two-Way's proposed claim constructions, some of which explicitly incorporate the words "intermediate computers." (*See* D.I. 61 at 1–2; D.I. 70).

11

Because the '187 and '005 patents claim an abstract idea and the claims are not limited to a specific application of that abstract idea, the '187 and '005 patent claims are patent ineligible under § 101.

## D. '622 Patent

Claim 1 of the '622 patent reads:[4]

1. A method for monitoring the forwarding of real-time information to at least one user having access to a communications network comprising:

> generating delivery-commencement indications of real-time information forwarded to the user by means of the communications network, wherein the real-time information comprises a plurality of packets forwarded over the communications network to the user,
> verifying the operational status of the user's access to the communications network during delivery of the real-time information, and
> generating delivery-termination indications of the real-time information forwarded to the user.

('622 patent, 18:38–49; D.I. 1-1 at 44).

Defendants contend that the '622 patent, like the '187 and '005 patents, is directed to the abstract idea of "monitoring the delivery of information." (D.I. 38 at 10, 17). Regarding step two, Defendants assert that the claims at issue add only "routine and conventional computer functions." (*Id.* at 13). Further, Defendants argue that the limitations are general, high-level functional descriptions that do not constitute inventive solutions. (*Id.*).

Two-Way contends that the '622 patent claims are patent eligible at step one because they are "limited to a specific implementation for streaming real-time information over a packet-switched network." (D.I. 43 at 19). Regarding step two, Two-Way asserts that the '622 patent

---

[4] Two-Way does not concede that claim 1 of the '622 patent is representative for purposes of this § 101 motion. (D.I. 43 at 18–19). In particular, Two-Way points to claim 29 as adding "further network-based limitations" that confirm that "the '622 invention is limited to a specific implementation for streaming real-time information over a packet-switched network." (*Id.* at 19).

provides an inventive concept because it "overcomes the challenges of providing real-time streaming media over traditional packet-based networks." (*Id.* at 20).

On their faces, claims 1 and 29 of the '622 patent are directed to monitoring the delivery of real-time information to a user or users. ('622 patent, 18:38–49, 20:19–37). Monitoring the delivery of real-time information to a user or users is similar to concepts previously found to be abstract. For example, the Federal Circuit in *BASCOM Global* held that "filtering content on the Internet" is an abstract idea. 2016 WL 3514158, at *5. The Federal Circuit has also held that claims focused "on collecting information, analyzing it, and displaying certain results of the collection and analysis" were directed to an abstract idea. *Electric Power Group, LLC*, No. 2015-1778, slip op. at p. 6.

The claims do not disclose an inventive concept sufficient to render them patent eligible. Limiting the claims to the particular technological environment of "real-time stream delivery over packet-based networks" is insufficient to transform them into patent-eligible applications of the abstract idea to which they are directed. (D.I. 43 at 21); *see Alice Corp.*, 134 S. Ct. at 2358; *Electric Power Group, LLC*, No. 2015-1778, slip op. at pp. 9–10. Further, the claim 1 limitations that require verifying that information is being received by its intended recipient and noting when information delivery has ceased do not add anything to routine methods of delivering information. (*See* '622 patent, 18:46–49; D.I. 43 at 20). Similarly, the claim 29 limitation requiring forwarding a stream from an intermediate computer only when the user selects it does not add anything inventive to the idea of sending information only to one who requests it. (*See* '622 patent, 20:27–28; D.I. 43 at 20). Nothing in the claims requires anything other than conventional computer and network components operating according to their ordinary functions. (*See* '622 patent, 1:26–65, 18:38–49, 20:19–37); *Electric Power Group, LLC*, No.

2015-1778, slip op. at p. 11 (holding that the claims "do not state an arguably inventive concept in the realm of application of the information-based abstract ideas" because the claims "do not include any requirement for performing the claimed functions of gathering, analyzing, and displaying in real time by use of anything but entirely conventional, generic technology"). Nor is the limitation to "real-time" information sufficient to supply an inventive concept rendering the claims patent eligible. (*See* D.I. 70 at 4). In *LendingTree, LLC v. Zillow, Inc.*, the court held that "simultaneous competition" for loans over the internet did not supply an inventive concept sufficient to render claims to the abstract idea of a loan-application clearinghouse patent eligible. 2016 WL 3974203, at *5; *see also Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1318 (Fed. Cir. 2016) (holding that claims to a computer system that made it possible for multiple lenders to compete simultaneously for a potential borrower's business did not amount to an inventive concept). Thus, the claims of the '622 concept do not supply an inventive concept sufficient to render them patent eligible.

The '622 patent claims at issue therefore fail to meet the standard for patent eligibility under § 101.

### E.   '686 Patent

Claim 1 of the '686 patent reads:[5]

1.   A method for metering real-time streaming media for commercial purposes, said method comprising:
> forwarding a real-time media stream from an intermediate server toward a user device, wherein said forwarding of said real-time media stream from said intermediate server to said user device is via unicast, multicast, broadcast or any combination of the aforementioned;
> detecting a termination of said forwarding;

---

[5] Two-Way does not concede that claim 1 of the '686 patent is representative for purposes of this § 101 motion. (D.I. 43 at 22–23). Specifically, Two-Way points to claims 22, 26, 30, and 38 as confirming that the '686 patent invention is a patent-eligible computer network implementation. (*Id.*).

14

after said termination, determining an extent of said real-time media stream forwarded
toward said user device; and

logging said extent for commercial purposes.

('686 patent, 18:16–27; D.I. 1-2 at 42).

Defendants contend that, like the '187, '005, and '622 patents, the '686 patent is directed

to the abstract idea of "monitoring the delivery of information." (D.I. 38 at 10–12). Regarding

step two, Defendants assert that the claims at issue merely recite generic, conventional

technology and generic concepts "that are inherent in the very idea of monitoring transmitted

information in any technological context." (*Id.* at 14–15).

According to Two-Way, the claims are patent eligible at step one because they are

directed to "specific computer architectures for metering the forwarding of real-time streaming

media over a network." (D.I. 43 at 21). Regarding step two, Two-Way asserts that the claims at

issue supply an inventive concept in that they transform known media streaming by

incorporating an intermediate server and using a specific network transmission mode in real-

time, one-to-many media streams on a computer network. (*Id.* at 23–24).

Claim 1 of the '686 patent is directed to measuring the delivery of real-time information

for commercial purposes. ('686 patent, 18:16–17). Claims 22, 26, 30, and 38 are likewise

directed to measuring the delivery of real-time information for commercial purposes. (*Id.* at

19:20–22, 19:39–52, 20:6–17, 21:16–30; *see* D.I. 43 at 22–23). Measuring the delivery of real-

time information for commercial purposes is a commercial practice akin to those previously

found to be abstract. *See, e.g., Alice Corp.*, 134 S. Ct. at 2357 (holding that claims directed to

intermediated settlement were abstract); *Ultramercial, Inc.*, 772 F.3d at 715–16 (holding that the

claims at issue recited the abstract idea of using advertising as currency on the Internet). Further,

measuring the delivery of information is analogous to the abstract idea of collecting and

15

analyzing information. *See Electric Power Group, LLC*, No. 2015-1778, slip op. at p. 6 (holding claimed focused on "collecting information, analyzing it, and displaying certain results of the collection and analysis" to be directed to an abstract idea); *BASCOM Global*, 2016 WL 3514158, at *5 (holding that claims to "filtering content on the Internet" "do not readily lend themselves to a step-one finding that they are directed to a nonabstract idea"); *see also supra* Part III.D (discussion of '622 patent).

The '686 patent claims do not disclose an inventive concept sufficient to render them patent eligible. Limiting the claims to the "realm of a computer network" is insufficient, on its own, to render the claims patent eligible. *Alice Corp.*, 134 S. Ct. at 2358; *Electric Power Group, LLC*, No. 2015-1778, slip op. at pp. 9–10. That the patent discusses the invention in the context of a specific network transmission mode in real-time, one-to-many media streams on a computer network does not supply an inventive concept because the claims do not specify a technological improvement to measuring information delivery using such a network. (*See* D.I. 43 at 23); *cf. BASCOM Global*, 2016 WL 3514158, at *6 (finding inventive concept in "the installation of a filtering tool at a specific location, remote from the end users, with customizable filtering features specific to each end user[,]" because it "gives the filtering tool both the benefits of a filter on a local computer and the benefits of a filter on the ISP server"). Further, although the steps recite computer components—for example, the intermediate server in the "forwarding" limitation of claim 1—those components merely perform their conventional functions. (*See* '686 patent, 1:45–65, 18:16–27; D.I. 43 at 22; D.I. 54 at 21–23); *see also Electric Power Group, LLC*, No. 2015-1778, slip op. at p. 10 ("Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information."); *cf. DDR Holdings,*

16

*LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–58 (Fed. Cir. 2014) (holding claims patent

eligible because they modified conventional website display mechanics to produce hybrid

website display).  The additional limitations recited in claims 22, 26, 30, and 38 also include

merely generic computer components and conventional steps, and therefore do not supply

inventive concepts.  (*See* '686 patent, 19:20–22, 19:39–52, 20:6–17, 21:16–30).

   For the reasons stated above, the '686 patent claims fail to meet the standard for patent

eligibility under § 101.

## IV.   CONCLUSION

   For the reasons stated above, the asserted claims of the '187, '005, '622, and '686 patents

are directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Defendants' Motion for

Judgment on the Pleadings (D.I. 37) is **GRANTED IN PART** with respect to the asserted claims

of the '187, '005, '622, and '686 patents and **DISMISSED IN PART** as moot with respect to the

asserted claims of the '237 patent.  An appropriate order will be entered.

17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TWO-WAY MEDIA LTD.,

               Plaintiff;

   v.

COMCAST CABLE COMMUNICATIONS,
LLC, COMCAST INTERACTIVE MEDIA,
LLC, NBCUNIVERSAL MEDIA LLC, and
NBCUNIVERSAL, LLC,

               Defendants.

Civil Action No. 14-1006-RGA


TWO-WAY MEDIA, LTD.,

               Plaintiff;

   v.

VERIZON SERVICES CORP. and VERIZON
ONLINE LLC,

               Defendants.

Civil Action No. 14-1212-RGA


## MEMORANDUM OPINION

Joseph J. Farnan, III, Esq., Brian E. Farnan, Esq., Michael J. Farnan, Esq., FARNAN LLP, Wilmington, DE; Parker C. Folse, III, Esq. (argued), Rachel S. Black, Esq., Brooke A.M. Taylor, Esq., Jenna G. Farleigh, Esq., SUSMAN GODFREY L.L.P., Seattle, WA; Michael F. Heim, Esq., Leslie V. Payne, Esq., Micah J. Howe, Esq., R. Allan Bullwinkel, Esq., HEIM, PAYNE & CHORUSH L.L.P., Houston, TX, attorneys for Plaintiff.

Jack B. Blumenfeld, Esq., Paul Saindon, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE, attorneys for Defendants Comcast Cable Communications, LLC, Comcast Interactive Media, LLC, NBCUniversal Media LLC, and NBCUniversal, LLC.

Brian Ferrall, Esq. (argued), Paven Malhotra, Esq., David J. Rosen, Esq., KEKER & VAN NEST LLP, San Francisco, CA, attorneys for Defendants Comcast Cable Communications, LLC and Comcast Interactive Media, LLC.

Steven Lieberman, Esq. (argued), Derek Dahlgren, Esq., ROTHWELL, FIGG, ERNST & MANBECK, P.C., Washington, D.C., attorneys for Defendants NBCUniversal Media LLC and NBC Universal, LLC.

Benjamin J. Schladweiler, Esq., ROSS ARONSTAM & MORITZ LLP, Wilmington, DE; Thomas M. Dunham, Esq., WINSTON & STRAWN LLP, Washington, D.C.; Kurt A. Mathas, Esq., Sarah J. Kalemeris, Esq., WINSTON & STRAWN LLP, Chicago, IL, attorneys for Defendants Verizon Services Corp. and Verizon Online LLC.

August 15, 2016

*Richard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

Pending before the Court is Defendants' joint Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c).  (D.I. 37; C.A. No. 14-1212 D.I. 28).[1]  The matter has been fully briefed.  (D.I. 38, 43, 45; C.A. No. 14-1212 D.I. 29, 34, 36).  The Court heard oral argument on October 29, 2015.  (D.I. 54).  For the reasons stated below, the Court will grant in part Defendants' motion with respect to the asserted claims of the '187, '005, '622, and '686 patents and dismiss in part as moot Defendants' motion with respect to the asserted claims of the '237 patent.

## I.   BACKGROUND

Plaintiff Two-Way Media Ltd. ("Two-Way") filed these patent infringement actions against Comcast Cable Communications, LLC, Comcast Interactive Media, LLC (collectively, "Comcast"), NBCUniversal Media LLC, and NBCUniversal, LLC (collectively, "NBCUniversal") on August 1, 2014, (D.I. 1), and against Verizon Services Corp. and Verizon Online LLC (collectively, "Verizon") on September 19, 2014, (C.A. No. 14-1212 D.I. 1).  Two-Way alleged that Comcast, NBCUniversal, and Verizon infringed U.S. Patent Nos. 5,778,187 ("the '187 patent"); 5,983,005 ("the '005 patent"); 6,434,622 ("the '622 patent"); 7,266,686 ("the '686 patent"); and 8,539,237 ("the '237 patent").  On August 1, 2016, the Court granted a stipulation of dismissal without prejudice of the claims between Two-Way and NBCUniversal.  (D.I. 151).  On August 4, 2016, the Court granted a stipulation of partial dismissal with prejudice of Two-Way's '237 patent infringement claims against Comcast and Verizon (collectively, "Defendants").  (D.I. 150).  The § 101 motion presently under consideration is therefore dismissed as moot with respect to the '237 patent claims.

---

[1] Citations to "D.I. __" are citations to the docket in C.A. No. 14-1006 unless otherwise noted.

1

The '187, '005, '622, and '686 patents (the "asserted patents") are each entitled "Multicasting Method and Apparatus." ('187 patent, (54); '005 patent, (54); '622 patent, (54); '686 patent, (54)). The asserted patents have a common parent application and are directed to a "scalable architecture . . . for delivery of real-time information over a communications network." ('187 patent, (Abstract); '005 patent, (Abstract); '622 patent, (Abstract); '686 patent, (Abstract)).

## II.    LEGAL STANDARD

### A. Motion for Judgment on the Pleadings

A Rule 12(c) motion for judgment on the pleadings is reviewed under the same standard as a Rule 12(b)(6) motion to dismiss when the Rule 12(c) motion alleges that the plaintiff failed to state a claim upon which relief can be granted. *See Turbe v. Gov't of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991); *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010). The court must accept the factual allegations in the complaint and take them in the light most favorable to the non-moving party. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). "When there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Court may also consider matters of public record and authentic documents upon which the complaint relies if those documents are attached to the complaint or as an exhibit to the motion. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994). Additionally, the Court may take judicial notice of the factual record of a prior proceeding. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 416 n.3 (3d Cir. 1988). The court must "draw on its judicial experience and common sense" to make the determination whether plaintiff failed to state a claim upon which relief can be granted. *See id.*

2

Appx27

**B. Patent-Eligible Subject Matter**

Section 101 of the Patent Act defines patent-eligible subject matter. It provides:

"Whoever invents or discovers any new and useful process, machine, manufacture, or

composition of matter, or any new and useful improvement thereof, may obtain a patent therefor,

subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court

has recognized an implicit exception for three categories of subject matter not eligible for patent

protection: laws of nature, natural phenomena, and abstract ideas. *Alice Corp. Pty. Ltd. v. CLS

Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). The purpose of these carve outs is to avoid preemption

of the "basic tools of scientific and technological work." *Mayo Collaborative Servs. v.

Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012) (internal quotation marks omitted); *Alice

Corp.*, 134 S. Ct. at 2354. Still, "a process is not unpatentable simply because it contains a law

of nature or a mathematical algorithm," as "an application of a law of nature or mathematical

formula to a known structure or process may well be deserving of patent protection." *Mayo

Collaborative Servs.*, 132 S. Ct. at 1293–94 (emphasis and internal quotation marks omitted).

In *Alice*, the Supreme Court reaffirmed the framework laid out in *Mayo* for

distinguishing "patents that claim laws of nature, natural phenomena, and abstract ideas from

those that claim patent-eligible applications of those concepts." 134 S. Ct. at 2355. Under the

first step of the *Alice* framework, the court must determine whether the claims are directed to a

patent-ineligible concept. *Id.* "The dispositive inquiry is whether the concept to which a claim is

drawn has 'no particular concrete or tangible form.'" *Morsa v. Facebook, Inc.*, 77 F. Supp. 3d

1007, 1014 (C.D. Cal. 2014) (quoting *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed.

Cir. 2014), *cert. denied sub nom. Ultramercial, LLC v. WildTangent, Inc.*, 135 S. Ct. 2907

(2015)), *aff'd*, 622 F. App'x 915 (Fed. Cir. 2015); *see also Accenture Global Servs., GmbH v.*

3

*Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) ("[T]he court must first identify and define whatever fundamental concept appears wrapped up in the claim." (internal quotation marks omitted)).  To evaluate whether an invention is directed to an "abstract idea," courts "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016). "[F]undamental economic and conventional business practices are often found to be abstract ideas, even if performed on a computer." *Id.* at 1335.  Not "all improvements in computer-related technology are inherently abstract," however. *Id.*  Nor are "claims directed to software, as opposed to hardware, . . . inherently abstract and therefore only properly analyzed at the second step of the *Alice* analysis." *Id.*  Thus, in analyzing claims directed to computer-related technology under the first step of the *Alice* framework, a relevant question is "whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Id.* at 1335–36.

        If the court concludes that the claims are drawn to a patent-ineligible concept under the first step of the *Alice* framework, it must next look to "the elements of each claim both individually and as an 'ordered combination,'" *id.* at 1334, to see if there is an "'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice Corp.*, 134 S. Ct. at 2355 (alteration and internal quotation marks omitted).  "[T]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the formula to a particular technological environment or adding insignificant postsolution activity." *Bilski v. Kappos*, 561 U.S. 593, 610–11 (2010) (internal quotation marks omitted).  Similarly,

"[s]imply appending conventional steps, specified at a high level of generality, . . . [i]s not enough to supply an inventive concept." *Alice Corp.*, 134 S. Ct. at 2357 (internal quotation marks and emphasis omitted). Further, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 2358.

## III.    ANALYSIS

### A. Claim Construction

Two-Way argues that Defendants' motion is premature because claim construction is necessary to determine patent eligibility under § 101. (D.I. 43 at 14–15). In accordance with an order of the Court (D.I. 54 at 34–35; D.I. 64), Two-Way identified the claim terms it contends need construction and offered its proposed constructions. (D.I. 61, 70). Defendants do not dispute that the Court should consider this motion in light of Two-Way's proposed claim constructions. Defendants maintain that Two-Way's proposed constructions do not alter the § 101 analysis. (*See* D.I. 71-1 at 1).

The validity of asserted claims under § 101 is a "threshold inquiry" for the court to decide as a matter of law. *In re Bilski*, 545 F.3d 943, 950 (Fed. Cir. 2008), *aff'd*, *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). At the pleading stage, to the extent the § 101 question of law is informed by subsidiary factual issues, those facts are to be construed in the light most favorable to Plaintiff. *See TriPlay, Inc. v. WhatsApp Inc.*, 2015 WL 1927696, at *5 n.5 (D. Del. Apr. 28, 2015), *adopted in part, rejected in part*, 2015 WL 4730907 (D. Del. Aug. 10, 2015); *Shortridge v. Found. Constr. Payroll Serv., LLC*, 2015 WL 1739256, at *7 (N.D. Cal. Apr. 14, 2015), *aff'd*, 2016 WL 3742816 (Fed. Cir. July 13, 2016). Because "the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter," it is often necessary to resolve claim construction disputes prior to a § 101 analysis. *Bancorp Servs., LLC*

*v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1273–74 (Fed. Cir. 2012). Still, the

Federal Circuit has "never set forth a bright line rule requiring district courts to construe claims

before determining subject matter eligibility." *Ultramercial, LLC v. Hulu, LLC*, 657 F.3d 1323,

1325 (Fed.Cir.2011), *vacated on other grounds sub nom. WildTangent, Inc. v. Ultramercial,*

*LLC*, 132 S. Ct. 2431 (2012). Early resolution of § 101 issues, where appropriate, is desirable.

*I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982, 996 (Fed. Cir. 2014) (Mayer, J., concurring),

*cert. denied*, 136 S. Ct. 54 (2015); *see also BASCOM Global Internet Servs., Inc. v. AT&T*

*Mobility LLC*, 2016 WL 3514158, at *4 (Fed. Cir. June 27, 2016) ("Courts may therefore dispose

of patent-infringement claims under § 101 whenever procedurally appropriate."). *But see*

*BASCOM Global*, 2016 WL 3514158, at *8 (Newman, J., concurring) ("[I]nitial determination of

eligibility often does not resolve patentability, whereas initial determination of patentability

issues always resolves or moots eligibility."). Thus, resolution of a § 101 dispute at the pleading

stage is proper if claim construction is unnecessary, *see Cyberfone Sys., LLC v. CNN Interactive*

*Grp., Inc.*, 558 F. App'x 988, 991 n.1 (Fed. Cir. 2014), or if there is "no reasonable construction

that would bring [the asserted claims] within patentable subject matter." *Ultramercial, Inc. v.*

*Hulu, LLC*, 772 F.3d 709, 719 (Fed. Cir. 2014) (Mayer, J., concurring) (internal quotation marks

omitted), *cert. denied sub nom. Ultramercial, LLC v. WildTangent, Inc.*, 135 S. Ct. 2907 (2015);

*see also Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d

1343, 1349 (Fed. Cir. 2014) (construing claims in the manner most favorable to patentee on

§ 101 motion decided before formal claim construction), *cert. denied*, 136 S. Ct. 119 (2015).

     For the reasons stated above, I adopt Two-Way's proposed constructions for purposes of

this motion. (*See* D.I. 61, 70).

## B. Prior §§ 102 and 103 Analyses

Two-Way urges the Court to consider materials that relate to the asserted patents from prior proceedings before the PTO and in federal courts. (D.I. 43 at 14 & n.6). Two-Way argues that the proffered materials "demonstrate[] how [its] invention[s] solved specific technical problems and added significant inventive concepts over the prior art." (*Id.* at 14). Two-Way encourages the Court to take judicial notice of the proffered materials because patentability under § 101 is a question of law that may be informed by subsidiary factual issues and because the Court must accept all factual allegations in Two-Way's complaint as true and view them in the light most favorable to Two-Way. (*Id.* at 10, 14). If the Court decides not to consider the proffered factual materials in deciding the § 101 motion for judgment on the pleadings, Two-Way requests in the alternative that the Court either convert the motion to a motion for summary judgment or grant Two-Way leave to file a Fourth Amended Complaint attaching the proffered materials. (*Id.* at 15 & n.7).

The proffered materials are irrelevant to the § 101 motion for judgment on the pleadings. None of the materials addresses a § 101 challenge to claims of the asserted patents. (*See* D.I. 44-1–D.I. 44-24). The novelty and nonobviousness of the claims under §§ 102 and 103 does not bear on whether the claims are directed to patent-eligible subject matter under § 101. *See Diamond v. Diehr*, 450 U.S. 175, 188–92 (1981); *see also Genetic Techs. Ltd. v. Bristol-Myers Squibb Co.*, 72 F. Supp. 3d 521, 529 n.7 (D. Del. 2014) (not considering reexaminations, which evaluate invalidity based only on prior art, in deciding § 101 motion), *aff'd sub nom. Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369 (Fed. Cir. 2016). The history of conception of the invention and commercial embodiments of the invention are also irrelevant to the issues to be decided under § 101. *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355–60

7

(2014) (examining "the claims at issue" and "the elements of the claims" in deciding patent eligibility under § 101). Because the proffered materials are irrelevant to the instant § 101 issue, I have not considered them.

Further, I will not convert the motion to a motion for summary judgment. Conversion to summary judgment is generally not appropriate where, as here, only the nonmoving party has introduced evidentiary exhibits in response to a motion to dismiss or a motion for judgment on the pleadings. *See Kenexa BrassRing, Inc. v. HireAbility.com, LLC*, 2015 WL 1943826, at *4 (D. Mass. Apr. 28, 2015) (declining to convert a motion for judgment on the pleadings to a motion for summary judgment where only the nonmovant submitted documents outside the pleadings); *Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP*, 401 F. Supp. 2d 1120, 1122 (D. Nev. 2005) (declining to convert a motion to dismiss for the same reason). Additionally, Two-Way's request to file a Fourth Amended Complaint is denied without prejudice. Two-Way's request is premised on the view that, if it were part of the record under consideration, the proffered evidence would be relevant to the instant decision. (*See* D.I. 43 at 15 n.7). Because the proffered evidence is irrelevant to the § 101 determination, however, I see no reason to grant Two-Way's request for leave to file an amended complaint.

**C. '187 and '005 Patents**

Claim 1 of the '187 patent is representative of the '187 and '005 patent claims and reads:[2]

1. A method for transmitting message packets over a communications network comprising the steps of:

---

[2] The Federal Circuit has held that the district court is not required to individually address claims not asserted or identified by the non-moving party, as long as the court identifies a representative claim and "all the claims are substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348 (internal quotation marks omitted). Two-Way acknowledges that claim 1 of the '187 patent is representative of the claims of the '187 and '005 patents. (D.I. 43 at 15).

8

> converting a plurality of streams of audio and/or visual information into a plurality of
> streams of addressed digital packets complying with the specifications of a network
> communication protocol,
>
> for each stream, routing such stream to one or more users,
>
> controlling the routing of the stream of packets in response to selection signals received
> from the users,
>
> and
>
> monitoring the reception of packets by the users and accumulating records that indicate
> which streams of packets were received by which users, wherein at least one stream of
> packets comprises an audio and/or visual selection and the records that are accumulated
> indicate the time that a user starts receiving the audio and/or visual selection and the
> time that the user stops receiving the audio and/or visual selection.

('187 patent, 18:17–34; D.I. 26 at 53; *see also* '005 patent, 18:44–59 (replacing "a plurality of

streams" with "at least one stream" in the "converting" step)).

Defendants argue that the '187 and '005 patents "are directed solely to the abstract idea

of monitoring the delivery of information." (D.I. 38 at 17). In Defendants' view, that idea

represents a fundamental business practice "similar to the idea of tracking a user's spending,

which this Court has deemed abstract." (*Id.* at 10–11). Regarding step two, Defendants contend

that the claimed "converting," "routing," "controlling," "monitoring," and "recording" steps do

not, separately or as an ordered combination, amount to significantly more than an instruction to

apply the abstract idea using a generic computer. (*Id.* at 18–19).

Two-Way contends that the '187 and '005 patents are directed to the concrete task of

"audio/visual streaming in a packet-switched architecture that facilitates efficient and reliable

transmission, while also implementing specific forms of monitoring and recordkeeping." (D.I.

43 at 15). Two-Way argues that the claimed steps recite "a specific and concrete (*i.e.*, non-

abstract) way of processing the streams [of audio/visual information]." (*Id.* at 15–17).

Regarding step two, Two-Way argues that the patents supply an inventive concept because they

claim elements that are directed to solving the technological problems of load, bottlenecking, and inadequate records. (*Id.* at 17–18).

The '187 and '005 patents are directed to the abstract idea of (1) sending information, (2) directing the sent information, (3) monitoring receipt of the sent information, and (4) accumulating records about receipt of the sent information. (*See* '187 patent, 18:17–34; '005 patent, 18:44–59; *see also* D.I. 61 at 2 (describing "controlling the routing" as "directing a portion of the routing path")). The claims are thus directed to methods of sending and monitoring the delivery of audio/visual information. Although the claims are limited to the context of audio/visual streaming in a packet-switched communications network, they are not directed to an invention that improves streaming audio/visual content in a packet-switched network. (*See, e.g.,* '187 patent, 18:17–34; '005 patent, 18:44–59; *see also* (D.I. 43 at 17)); *Electric Power Group, LLC v. Alstom S.A.*, No. 2015-1778, slip op. at pp. 8, 11–12 (Fed. Cir. Aug. 1, 2016) (holding that the claims at issue were directed to an abstract idea because "the focus of the claims [wa]s not on . . . an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools" and distinguishing between "ends sought and particular means of achieving them, between desired results (functions) and particular ways of achieving (performing) them"); *cf. Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016) (finding that the claims at issue were not directed to an abstract idea because "the plain focus of the claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity"). Thus, the '187 and '005 patents claim abstract ideas.

Two-Way argues that the inventive concept supplied by the '187 and '005 patents is the disclosed computer architecture, which solves the technological problems of load, bottlenecking,

and inadequate records. (D.I. 43 at 17–18). The patent specifications do, in fact, point to the

architecture of the system as the technological innovation. (*See, e.g.*, '187 patent, 2:3–5, 3:55–

59 (describing the patented invention as "a scalable architecture for delivery of real-time

information over a communications network," which is described further as "a distribution

architecture integrated with a control architecture"); '005 patent, 2:6–9, 3:58–60 (same)). None

of the claims, however, recite or refer to anything that could be described as an architecture.[3]

(*See, e.g.*, '187 patent, 18:17–34; '005 patent, 18:44–59). Even if I accept that the architecture

described in the patent specification is designed to solve the technological problems of load,

bottlenecking, and inadequate records, the fact remains that the claims do not recite the

mechanism by which those problems are solved. *See Internet Patents Corp. v. Active Network,

Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) (holding that a claim directed to the abstract idea of

"retaining information in the navigation of online forms" did not supply an inventive concept

because the claim "contain[e]d no restriction on how the result is accomplished[, that is, t]he

mechanism for maintaining the state [of data on a web page] is not described, although this is

stated to be the essential innovation"). The claims therefore do not supply the inventive concept

of a particular computer architecture. Further, the limitation regarding accumulating records

about the receipt of sent information does not supply an inventive concept. (*See* '187 patent,

18:28–34; '005 patent, 18:55–59); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363–

64 (Fed. Cir. 2015) (holding that "gathering statistics" regarding customer responses was

"routine, conventional data-gathering" that did not supply an inventive concept).

---

[3] The claims cannot fairly be read to recite computer architecture even in light of Two-Way's proposed claim constructions, some of which explicitly incorporate the words "intermediate computers." (*See* D.I. 61 at 1–2; D.I. 70).

11

Because the '187 and '005 patents claim an abstract idea and the claims are not limited to

a specific application of that abstract idea, the '187 and '005 patent claims are patent ineligible

under § 101.

## D. '622 Patent

Claim 1 of the '622 patent reads:[4]

1. A method for monitoring the forwarding of real-time information to at least one user having
access to a communications network comprising:
> generating delivery-commencement indications of real-time information forwarded to the
> user by means of the communications network, wherein the real-time information
> comprises a plurality of packets forwarded over the communications network to the
> user,
> verifying the operational status of the user's access to the communications network during
> delivery of the real-time information, and
> generating delivery-termination indications of the real-time information forwarded to the
> user.

('622 patent, 18:38–49; D.I. 1-1 at 44).

Defendants contend that the '622 patent, like the '187 and '005 patents, is directed to the

abstract idea of "monitoring the delivery of information." (D.I. 38 at 10, 17). Regarding step

two, Defendants assert that the claims at issue add only "routine and conventional computer

functions." (*Id.* at 13). Further, Defendants argue that the limitations are general, high-level

functional descriptions that do not constitute inventive solutions. (*Id.*).

Two-Way contends that the '622 patent claims are patent eligible at step one because

they are "limited to a specific implementation for streaming real-time information over a packet-

switched network." (D.I. 43 at 19). Regarding step two, Two-Way asserts that the '622 patent

---

[4] Two-Way does not concede that claim 1 of the '622 patent is representative for purposes of this § 101 motion.
(D.I. 43 at 18–19). In particular, Two-Way points to claim 29 as adding "further network-based limitations" that
confirm that "the '622 invention is limited to a specific implementation for streaming real-time information over a
packet-switched network." (*Id.* at 19).

provides an inventive concept because it "overcomes the challenges of providing real-time streaming media over traditional packet-based networks." (*Id.* at 20).

On their faces, claims 1 and 29 of the '622 patent are directed to monitoring the delivery of real-time information to a user or users. ('622 patent, 18:38–49, 20:19–37). Monitoring the delivery of real-time information to a user or users is similar to concepts previously found to be abstract. For example, the Federal Circuit in *BASCOM Global* held that "filtering content on the Internet" is an abstract idea. 2016 WL 3514158, at *5. The Federal Circuit has also held that claims focused "on collecting information, analyzing it, and displaying certain results of the collection and analysis" were directed to an abstract idea. *Electric Power Group, LLC*, No. 2015-1778, slip op. at p. 6.

The claims do not disclose an inventive concept sufficient to render them patent eligible. Limiting the claims to the particular technological environment of "real-time stream delivery over packet-based networks" is insufficient to transform them into patent-eligible applications of the abstract idea to which they are directed. (D.I. 43 at 21); *see Alice Corp.*, 134 S. Ct. at 2358; *Electric Power Group, LLC*, No. 2015-1778, slip op. at pp. 9–10. Further, the claim 1 limitations that require verifying that information is being received by its intended recipient and noting when information delivery has ceased do not add anything to routine methods of delivering information. (*See* '622 patent, 18:46–49; D.I. 43 at 20). Similarly, the claim 29 limitation requiring forwarding a stream from an intermediate computer only when the user selects it does not add anything inventive to the idea of sending information only to one who requests it. (*See* '622 patent, 20:27–28; D.I. 43 at 20). Nothing in the claims requires anything other than conventional computer and network components operating according to their ordinary functions. (*See* '622 patent, 1:26–65, 18:38–49, 20:19–37); *Electric Power Group, LLC*, No.

13

2015-1778, slip op. at p. 11 (holding that the claims "do not state an arguably inventive concept in the realm of application of the information-based abstract ideas" because the claims "do not include any requirement for performing the claimed functions of gathering, analyzing, and displaying in real time by use of anything but entirely conventional, generic technology").  Nor is the limitation to "real-time" information sufficient to supply an inventive concept rendering the claims patent eligible.  (*See* D.I. 70 at 4).  In *LendingTree, LLC v. Zillow, Inc.*, the court held that "simultaneous competition" for loans over the internet did not supply an inventive concept sufficient to render claims to the abstract idea of a loan-application clearinghouse patent eligible. 2016 WL 3974203, at *5; *see also Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1318 (Fed. Cir. 2016) (holding that claims to a computer system that made it possible for multiple lenders to compete simultaneously for a potential borrower's business did not amount to an inventive concept).  Thus, the claims of the '622 concept do not supply an inventive concept sufficient to render them patent eligible.

The '622 patent claims at issue therefore fail to meet the standard for patent eligibility under § 101.

## E.  '686 Patent

Claim 1 of the '686 patent reads:[5]

1.  A method for metering real-time streaming media for commercial purposes, said method comprising:
> forwarding a real-time media stream from an intermediate server toward a user device, wherein said forwarding of said real-time media stream from said intermediate server to said user device is via unicast, multicast, broadcast or any combination of the aforementioned;
> detecting a termination of said forwarding;

---

[5] Two-Way does not concede that claim 1 of the '686 patent is representative for purposes of this § 101 motion. (D.I. 43 at 22–23).  Specifically, Two-Way points to claims 22, 26, 30, and 38 as confirming that the '686 patent invention is a patent-eligible computer network implementation.  (*Id.*).

14

> after said termination, determining an extent of said real-time media stream forwarded
> toward said user device; and
>
> logging said extent for commercial purposes.

('686 patent, 18:16–27; D.I. 1-2 at 42).

Defendants contend that, like the '187, '005, and '622 patents, the '686 patent is directed

to the abstract idea of "monitoring the delivery of information." (D.I. 38 at 10–12). Regarding

step two, Defendants assert that the claims at issue merely recite generic, conventional

technology and generic concepts "that are inherent in the very idea of monitoring transmitted

information in any technological context." (*Id.* at 14–15).

According to Two-Way, the claims are patent eligible at step one because they are

directed to "specific computer architectures for metering the forwarding of real-time streaming

media over a network." (D.I. 43 at 21). Regarding step two, Two-Way asserts that the claims at

issue supply an inventive concept in that they transform known media streaming by

incorporating an intermediate server and using a specific network transmission mode in real-

time, one-to-many media streams on a computer network. (*Id.* at 23–24).

Claim 1 of the '686 patent is directed to measuring the delivery of real-time information

for commercial purposes. ('686 patent, 18:16–17). Claims 22, 26, 30, and 38 are likewise

directed to measuring the delivery of real-time information for commercial purposes. (*Id.* at

19:20–22, 19:39–52, 20:6–17, 21:16–30; *see* D.I. 43 at 22–23). Measuring the delivery of real-

time information for commercial purposes is a commercial practice akin to those previously

found to be abstract. *See, e.g., Alice Corp.*, 134 S. Ct. at 2357 (holding that claims directed to

intermediated settlement were abstract); *Ultramercial, Inc.*, 772 F.3d at 715–16 (holding that the

claims at issue recited the abstract idea of using advertising as currency on the Internet). Further,

measuring the delivery of information is analogous to the abstract idea of collecting and

15

analyzing information. *See Electric Power Group, LLC*, No. 2015-1778, slip op. at p. 6 (holding claimed focused on "collecting information, analyzing it, and displaying certain results of the collection and analysis" to be directed to an abstract idea); *BASCOM Global*, 2016 WL 3514158, at *5 (holding that claims to "filtering content on the Internet" "do not readily lend themselves to a step-one finding that they are directed to a nonabstract idea"); *see also supra* Part III.D (discussion of '622 patent).

The '686 patent claims do not disclose an inventive concept sufficient to render them patent eligible. Limiting the claims to the "realm of a computer network" is insufficient, on its own, to render the claims patent eligible. *Alice Corp.*, 134 S. Ct. at 2358; *Electric Power Group, LLC*, No. 2015-1778, slip op. at pp. 9–10. That the patent discusses the invention in the context of a specific network transmission mode in real-time, one-to-many media streams on a computer network does not supply an inventive concept because the claims do not specify a technological improvement to measuring information delivery using such a network. (*See* D.I. 43 at 23); *cf. BASCOM Global*, 2016 WL 3514158, at *6 (finding inventive concept in "the installation of a filtering tool at a specific location, remote from the end users, with customizable filtering features specific to each end user[,]" because it "gives the filtering tool both the benefits of a filter on a local computer and the benefits of a filter on the ISP server"). Further, although the steps recite computer components—for example, the intermediate server in the "forwarding" limitation of claim 1—those components merely perform their conventional functions. (*See* '686 patent, 1:45–65, 18:16–27; D.I. 43 at 22; D.I. 54 at 21–23); *see also Electric Power Group, LLC*, No. 2015-1778, slip op. at p. 10 ("Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information."); *cf. DDR Holdings,*

16

*LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–58 (Fed. Cir. 2014) (holding claims patent eligible because they modified conventional website display mechanics to produce hybrid website display). The additional limitations recited in claims 22, 26, 30, and 38 also include merely generic computer components and conventional steps, and therefore do not supply inventive concepts. (*See* '686 patent, 19:20–22, 19:39–52, 20:6–17, 21:16–30).

For the reasons stated above, the '686 patent claims fail to meet the standard for patent eligibility under § 101.

## IV.   CONCLUSION

For the reasons stated above, the asserted claims of the '187, '005, '622, and '686 patents are directed to patent-ineligible subject matter under 35 U.S.C. § 101. Defendants' Motion for Judgment on the Pleadings (D.I. 37) is **GRANTED IN PART** with respect to the asserted claims of the '187, '005, '622, and '686 patents and **DISMISSED IN PART** as moot with respect to the asserted claims of the '237 patent. An appropriate order will be entered.

17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TWO-WAY MEDIA LTD.,

                Plaintiff;

    v.

COMCAST CABLE COMMUNICATIONS,
LLC, COMCAST INTERACTIVE MEDIA,
LLC, NBCUNIVERSAL MEDIA LLC, and
NBCUNIVERSAL, LLC,

                Defendants.

Civil Action No. 14-1006-RGA

TWO-WAY MEDIA, LTD.,

                Plaintiff;

    v.

VERIZON SERVICES CORP. and VERIZON
ONLINE LLC,

                Defendants.

Civil Action No. 14-1212-RGA

ORDER

For the reasons stated in the accompanying Memorandum Opinion, IT IS HEREBY

ORDERED:

Defendants' Motion for Judgment on the Pleadings (C.A. No. 14-1006 D.I. 37; C.A. No.

14-1212 D.I. 28) is **GRANTED IN PART** with respect to the asserted claims of the '187, '005,

'622, and '686 patents and **DISMISSED IN PART** as moot with respect to the asserted claims

of the '237 patent.

Entered this 15 day of August, 2016.

_Richard G. Andrews_

United States District Judge

2

Appx44

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TWO-WAY MEDIA LTD.,

                    Plaintiff;

          v.

COMCAST CABLE COMMUNICATIONS,          Civil Action No. 14-1006-RGA
LLC, COMCAST INTERACTIVE MEDIA,
LLC, NBCUNIVERSAL MEDIA LLC, and
NBCUNIVERSAL, LLC,

                    Defendants.


TWO-WAY MEDIA, LTD.,

                    Plaintiff;                Civil Action No. 14-1212-RGA

          v.

VERIZON SERVICES CORP. and VERIZON
ONLINE LLC,

                    Defendants.


ORDER

For the reasons stated in the accompanying Memorandum Opinion, IT IS HEREBY

ORDERED:

Defendants' Motion for Judgment on the Pleadings (C.A. No. 14-1006 D.I. 37; C.A. No.

14-1212 D.I. 28) is **GRANTED IN PART** with respect to the asserted claims of the '187, '005,

'622, and '686 patents and **DISMISSED IN PART** as moot with respect to the asserted claims of the '237 patent.

Entered this ___15___ day of August, 2016.

Richard G. Andrews

United States District Judge

2

US005778187A

# United States Patent [19]

## Monteiro et al.

[11] **Patent Number:** **5,778,187**

[45] **Date of Patent:** **Jul. 7, 1998**

[54] **MULTICASTING METHOD AND APPARATUS**

[75] Inventors: **Antonio M. Monteiro; James F. Butterworth**, both of New York, N.Y.

[73] Assignee: **Netcast Communications Corp.**, New York, N.Y.

[21] Appl. No.: **644,072**

[22] Filed: **May 9, 1996**

[51] Int. Cl.$^6$ ................................. **H04L 12/00**

[52] U.S. Cl. ...................... **395/200.61**; 370/351

[58] Field of Search ...................... 395/200.15, 285, 395/200.61; 348/7, 10, 12, 16, 17; 370/351, 355

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,105,184 | 4/1992 | Pirani et al. | 345/115 |
| 5,220,501 | 6/1993 | Lawlor et al. | 364/408 |
| 5,283,731 | 2/1994 | Lalonde et al. | 364/401 |
| 5,305,195 | 4/1994 | Murphy | 364/401 |
| 5,319,455 | 6/1994 | Hoarty et al. | 348/7 |
| 5,347,632 | 9/1994 | Filepp et al. | 395/200 |
| 5,361,256 | 11/1994 | Doeringer et al. | 370/60 |
| 5,414,773 | 5/1995 | Handelman | 380/49 |
| 5,446,919 | 8/1995 | Wilkins | 455/52 |
| 5,493,514 | 2/1996 | Keith et al. | 364/514 R |
| 5,604,542 | 2/1997 | Dedrick | 348/552 |
| 5,617,565 | 4/1997 | Augenbraun et al. | 395/604 |

OTHER PUBLICATIONS

K. Savetz et al. MBONE Multicasting Tomorrow's Internet (IDG Books WorldWise Inc., 1996), Chapters 1–3; Appendixes A and B.

D.P. Brutzman et al., "MBONE Provides Audio and Video Across the Internet," IEEE Computer, vol. 27, No. 4, pp. 30–36 (Apr. 1994).

PCT International Search Report, International Application No. PCT/US97/07893.

*Primary Examiner*—Emanuel Todd Voeltz
*Assistant Examiner*—Thomas Peeso
*Attorney, Agent, or Firm*—Pennie & Edmonds LLP

[57] **ABSTRACT**

A scalable architecture is disclosed for delivery of real-time information over a communications network. Embedded into the architecture is a control mechanism that provides for the management and administration of users who are to receive the real-time information. In the preferred embodiment, the information being delivered is high-quality audio. However, it could also be video, graphics, text or any other type of information that can be transmitted over a digital network. Preferably, there are multiple channels of information available simultaneously to be delivered to users, each channel consisting of an independent stream of information. A user chooses to tune in or tune out a particular channel, but does not choose the time at which the channel distributes its information. Advantageously, interactive (two-way) information can be incorporated into the system. multiple streams of information can be integrated for delivery to a user, and certain portions of the information being delivered can be tailored to the individual user.

**51 Claims, 23 Drawing Sheets**



FIGURE 1



**U.S. Patent**          Jul. 7, 1998          Sheet 2 of 23          5,778,187

FIGURE 2



SATELLITE,
CABLE,
BROADCAST,
OR HARD DISK
FEED

10

RECEIVER/
DECODER
110

PRODUCTION
WORKSTATION
160

AUDIOVAULT -
NFS SERVER
170

ROUTING SWITCHER
120

DELAY
RECORDING
WORKSTATION
140

PLAYBACK/
CONTROL
WORKSTATION
130

PLAYBACK/
CONTROL
WORKSTATION
130

SUPERVISORY
WORKSTATION
150

TO PRIMARY
SERVERS

Appx81

**FIGURE 3**



**U.S. Patent**          Jul. 7, 1998          Sheet 4 of 23          **5,778,187**

FIGURE 4



**FIGURE 5**



USER

INSTALL SOFTWARE
FILL OUT FORM
ENTER NAME & PASSWORD
SELECT SUBMIT

CHECK VERSION NUMBER

SAVE SECURITY TOKEN

DISPLAY CHANNEL GUIDE

OPEN TCP CONNECTION

VERSION OBJECT

VERSION OBJECT

USER OBJECT

RESULT MESSAGE OBJECT

CHANNEL GUIDE REQUEST OBJECT

CHANNEL GUIDE OBJECT

CLOSE TCP CONNECTION

ADMINISTRATION SERVER

CHECK VERSION NUMBER

VERIFY INFORMATION
CHECK NAME IS UNIQUE
GENERATE SECURITY TOKEN
UPDATE USER DATABASE

RETRIEVE CHANNEL GUIDE

FIGURE 6



FIGURE 7

**USER**
- ENTER NAME & PASSWORD
- CHECK VERSION NUMBER
- SAVE SECURITY TOKEN
- DISPLAY CHANNEL GUIDE

- OPEN TCP CONNECTION
- VERSION OBJECT
- VERSION OBJECT
- LOGIN INFO OBJECT
- RESULT MESSAGE OBJECT
- CHANNEL GUIDE REQUEST OBJECT
- CHANNEL GUIDE OBJECT
- CLOSE TCP CONNECTION

**ADMINISTRATION SERVER**
- CHECK VERSION NUMBER
- QUERY USER DATABASE
- RETRIEVE SECURITY TOKEN
- RETRIEVE CHANNEL GUIDE

Appx86

FIGURE 8A

USER
ADMINISTRATION SERVER
SELECT CHANNEL TO PLAY
OPEN TCP CONNECTION
VERSION OBJECT
VERSION OBJECT
CHECK VERSION NUMBER
CHECK VERSION NUMBER
RETRIEVE SECURITY TOKEN
SERVER LIST REQUEST OBJECT
VALIDATE SECURITY TOKEN
GENERATE SERVER LIST
(ACTIVATE CHANNEL)
PROTOCOL LIST OBJECT
SAVE CONTROL SERVER LIST
CLOSE TCP CONNECTION
CONTROL SERVER
GET FIRST CONTROL SERVER
OPEN TCP CONNECTION
VERSION OBJECT
VERSION OBJECT
CHECK VERSION NUMBER
CHECK VERSION NUMBER
RETRIEVE SECURITY TOKEN
SERVER LIST REQUEST OBJECT
VALIDATE SECURITY TOKEN
GENERATE SERVER LIST
(ACTIVATE CHANNEL)
PROTOCOL LIST OBJECT
SAVE MEDIA SERVER LIST
CLOSE TCP CONNECTION
(CONTINUED)



FIGURE 8B



FIGURE 8C

USER
(CONTINUED)

SELECT CHANNEL STOP

CLOSE TCP CONNECTION

RESULT MESSAGE OBJECT

MCI REQUEST OBJECT (CLOSE)

RESULT MESSAGE OBJECT

MCI REQUEST OBJECT (STOP)

MEDIA SERVER
(CONTINUED)

SEND LOG MESSAGE
STOP AUDIO PACKETS



FIGURE 9A

Appx90

FIGURE 9B

| | REQUEST FROM | REQUEST TO | VALIDATION WITH |
|---|---|---|---|
| (SHOWN ABOVE) | USER | CONTROL SERVER | ADMINISTRATION SERVER |
| | USER | MEDIA SERVER | CONTROL SERVER |
| | MEDIA SERVER | MEDIA SERVER | CONTROL SERVER |
| | MEDIA SERVER | PRIMARY SERVER | ADMINISTRATION SERVER |
| | MEDIA SERVER | CONTROL SERVER | ADMINISTRATION SERVER |
| | CONTROL SERVER | MEDIA SERVER | ADMINISTRATION SERVER |

FIGURE 10





FIGURE 11



**FIGURE 12**

Appx94

FIGURE 13





FIGURE 14

Appx96

CONTROL SERVER
(ESTABLISHED TCP CONNECTION)
PREPARE INFORMATION ON WHICH MEDIA OR PRIMARY SERVER FEEDS CHANNEL
(ESTABLISHED TCP CONNECTION)
CHANNEL ACTIVATION OBJECT
RESULT MESSAGE OBJECT
MEDIA SERVER
(ESTABLISHED TCP CONNECTION)
SAVE CHANNEL INFORMATION
(ESTABLISHED TCP CONNECTION)

FIGURE 15



FIGURE 16A

MEDIA SERVER
MEDIA OR PRIMARY SERVER
(INCOMING PLAY RECEIVED)
GET APPROPRIATE MEDIA OR PRIMARY SERVER
OPEN TCP CONNECTION
VERSION OBJECT
VERSION OBJECT
CHECK VERSION NUMBER
CHECK VERSION NUMBER
RETRIEVE SECURITY TOKEN
MCI REQUEST OBJECT (OPEN)
VALIDATE SECURITY TOKEN
ALLOCATE RESOURCES
RESULT MESSAGE OBJECT
MCI REQUEST OBJECT (PLAY)
RESULT MESSAGE OBJECT
START AUDIO PACKETS
FORWARD AUDIO PACKETS TO OTHER SERVER(S) OR USER(S)
UDP PORT
AUDIO PACKETS
PING OBJECT
PING OBJECT
UDP PORT
AUDIO PACKETS
PING OBJECT
PING OBJECT
(CONTINUED)
(CONTINUED)

MEDIA SERVER
(CONTINUED)

(NO MORE CONNECTIONS
WITH CHANNEL OPEN)

MCI REQUEST OBJECT (STOP)

RESULT MESSAGE OBJECT

MCI REQUEST OBJECT (CLOSE)

RESULT MESSAGE OBJECT

CLOSE TCP CONNECTION

PRIMARY SERVER
(CONTINUED)

STOP AUDIO PACKETS

FIGURE 16B

Appx99

FIGURE 17

ADMINISTRATION SERVER

CHECK VERSION NUMBER

OPEN TCP CONNECTION

VERSION OBJECT

VERSION OBJECT

STATISTICS REQUEST OBJECT

STATISTICS OBJECT

CLOSE TCP CONNECTION

CONTROL OR MEDIA SERVER

CHECK VERSION NUMBER

VALIDATE IP ADDRESS
RETRIEVE STATISTICS

Appx100

*FIG. 18*        MAIN USER SCREEN



**Figure 19**
**Key Pull-Down Menus on Main User Screen**



5,778,187

## 1

### MULTICASTING METHOD AND APPARATUS

#### FIELD OF THE INVENTION

This relates to a method and apparatus for providing audio and/or visual communication services, in real-time to a multiplicity of identifiable users on a communications network, such as the Internet. In a preferred embodiment, the invention monitors which users are receiving signals on which one of a plurality of channels and modifies the content of at least some signals in response thereto. A particular application is to provide services akin to multi-channel radio or television with commercial programming content adjusted in accordance with the identity of the individual user.

#### BACKGROUND OF THE INVENTION

Systems such as the Internet typically are pointto-point (or unicast) systems in which a message is converted into a series of addressed packets which are routed from a source node through a plurality of routers to a destination node. In most communication protocols the packet includes a header which contains the addresses of the source and the destination nodes as well as a sequence number which specifies the packet's order in the message.

In general, these systems do not have the capability of broadcasting a message from a source node to all the other nodes in the network because such a capability is rarely of much use and could easily overload the network. However, there are situations where it is desirable for one node to communicate with some subset of all the nodes. For example, multi-party conferencing capability analogous to that found in the public telephone system and broadcasting to a limited number of nodes are of considerable interest to users of packet-switched networks. To satisfy such demands, packets destined for several recipients have been encapsulated in a unicast packet and forwarded from a source to a point in a network where the packets have been replicated and forwarded on to all desired recipients. This technique is known as IP Multicasting and the network over which such packets are routed is referred to as the Multicast Backbone or MBONE. More recently, routers have become available which can route the multicast addresses (class D addresses) provided for in communication protocols such as TCP/IP and UDP/IP. A multicast address is essentially an address for a group of host computers who have indicated their desire to participate in that group. Thus, a multicast packet can be routed from a source node through a plurality of multicast routers (or mrouters) to one or more devices receiving the multicast packets. From there the packet is distributed to all the host computers that are members of the multicast group.

These techniques have been used to provide on the Internet audio and video conferencing as well as radio-like broadcasting to groups of interested parties. See, for example, K. Savetz et al. *MBONE Multicasting Tomorrow's Internet* (IDG Books WorldWide Inc., 1996).

Further details concerning technical aspects of multicasting may be found in the Internet documents Request for Comments (RFC) 1112 and 1458 which are reproduced at Appendices A and B of the Savetz book and in D.P. Brutaman et al., "MBONE provides Audio and Video Across the Internet," *IEEE Computer,* Vol. 27, No. 4, pp. 30–36 (April 1994), all of which are incorporated herein by reference.

Citation of the foregoing documents is not to be construed as an admission that any of such documents is a prior art publication relative to the present invention.

## 2

#### SUMMARY OF THE INVENTION

The present invention is a scalable architecture for delivery of real-time information over a communications network. Embedded into the architecture is a control mechanism that provides for the management and administration of users who are to receive the real-time information.

In the preferred embodiment, the information being delivered is high-quality audio. However, it could also be video, graphics, text or any other type of information that can be transmitted over a digital network. This information is delivered in real-time to any number of widely distributed users. It is real-time in that for a given channel of information, approximately the same information is being sent at approximately the same time to everyone who is enabled to receive the information.

Preferably, there are multiple channels of information available simultaneously to be delivered to users, each channel consisting of an independent stream of information. A user chooses to tune in or tune out a particular channel, but does not choose the time at which the channel distributes its information. Advantageously, interactive (two-way) information can be incorporated into the system, multiple streams of information can be integrated for delivery to a user, and certain portions of the information being delivered can be tailored to the individual user.

#### BRIEF DESCRIPTION OF THE DRAWINGS

These and other objects, features and advantages of our invention will be more readily apparent from the following Detailed Description of a Preferred Embodiment of our invention in which

FIG. 1 is a schematic diagram depicting an overview of the system of the present invention;

FIG. 2 is a schematic diagram depicting the network control center for the system of FIG. 1;

FIG. 3 is a schematic diagram depicting a unicast distribution structure;

FIG. 4 is a schematic diagram depicting a multicast distribution structure;

FIG. 5 is a schematic diagram depicting the connection between the media server and the user in the system of FIG. 1;

FIGS. 6, 7, 8A–8C, 9A, 9B, 10–15, 16A, 16B, 17 are timing diagrams which depict various aspects of the operation of the system of FIG. 1; and

FIGS. 18 and 19 depict the user interface for control of the system of FIG. 1.

Where the same reference numerals appear in multiple drawings, the numerals refer to the same or corresponding structure in such drawings.

#### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. 1, the system of the present invention comprises a Network Control Center 10, a plurality of Primary Servers 20, Media Servers 30, Users 40 and Control Servers 50 and an Administration Server 60. The servers are interconnected by a communications network, which in the preferred embodiment is the global connected internetwork known as the Internet. The Network Control Center 10 is the source of the information being distributed. It receives audio feeds from satellite, over the air broadcast or in other ways and processes this information for delivery over the network on multiple channels of information. This processing con-

5,778,187

| 3 | 4 |

sists of optionally recording the information for future broadcast and dynamically inserting paid commercial advertisements.

For each channel of information, there is a Primary Server **20** that receives the stream of information from the Network Control Center **10** and compresses the information stream to allow for more efficient transmission. The Primary Servers **20** are directly connected to the network.

The Primary Servers forward information via the network to a number of Media Servers **30**. There may be a large number of Media Servers and in fact there may be many levels of Media Servers. For example, a Media Server which receives a stream of information from a Primary Server may forward that stream via the network to another Media Server which then forwards it to a User **40**. This multilevel hierarchical structure is described in more detail below.

The topology of the Internet dictates the ideal placement of Media Servers, the fan-out of each Media Server and the number of levels of Media Servers between the Primary Server and Users. For example, the Media Servers which feed from a Primary Server might be placed at a major points of presence (POPs) of each of the large Internet service providers. These Media Servers might also be placed near clouds which serve as high bandwidth exchange points between the major carriers. Similarly, Media Servers which feed to Users might be placed on or close to networks which have a large number of subscribers to minimize the distance and number of data streams being transmitted.

Control Servers **50** are responsible for keeping track of which Users are listening to which channels and for directing the Media Servers to start and stop streams of information to those Users. The Control Servers are also responsible for handling other interactions among the various components of the system as will be described in more detail below. Each Control Server is responsible for managing a cluster of Media Servers; and each Media Server is managed by a single Control Server at any given time. As a result, the Control Servers are distributed throughout the Internet, preferably located close to the Media Servers.

The Administration Server **60** is responsible for registering new Users, authenticating Users who want to log onto the system, and maintaining audit logs for how many Users are listening to which channels and at which times. Maintaining audit logs and gathering statistics are features critical to monitoring the delivery of paid commercial messages as well as for other purposes. For example, for purposes of assessing copyright royalties, the audit logs can record the number of listeners for each musical or video selection that is distributed by the system. Another application is to determine the percentage of listeners who are interested in listening to a particular musical selection by determining how many listen to the entire selection and how many turn it off.

The system of the present invention can be considered a distribution architecture integrated with a control architecture. The distribution architecture handles scalable real-time delivery of information to any number of Users on a packet switched network, such as the Internet.

The control architecture represents a second scalable system integrated with the distribution architecture for managing and administering the delivery of that information.

The remainder of this description is divided into three sections. In the next section the distribution architecture will be described in more detail. Following that, the control architecture will be described. In the third section the User interface will be illustrated.

I. Distribution Architecture

The distribution architecture provides for the delivery of real-time information to any number of Users distributed throughout a network. As will be described in detail below, the distribution architecture is scalable to allow for efficient delivery of multiple simultaneous information channels in real-time to a large number of Users.

In the preferred embodiment, the information which is being distributed consists of high-quality audio in addition to other information. It should be appreciated that the basic architecture and other general principles set forth herein would also apply to the delivery of video, graphics, text or any other type of information that can be delivered over a digital network. In addition, it should be appreciated that an information stream can consist of audio with supplemental information such as text and graphic images and commands to control software running on the User's computer.

The source of information in the preferred embodiment is the Network Control Center **10**, depicted in the schematic diagram of FIG. 2. Control Centers of this type of design are available from Broadcast Electronics, Inc. and are similar to what would be found in a conventional radio station serving multiple frequencies.

Referring to FIG. 2, the incoming signal can be received in a variety of ways such as from a satellite, over-the-air broadcast, cable or hard disk. It is then processed by Receiver/Decoder **110**, which decodes the signal and provides an incoming audio stream. Routing Switcher **120** is responsible for routing the incoming audio feed from the Receiver to either Delay Recording Workstation **140** or to one of the Playback/Control Workstations **130**. Real-time insertion of paid commercial advertising takes place at the Playback/Control Workstations and the resulting integrated audio stream is delivered to the Primary Servers. The Delay Recording Workstation is responsible for recording an incoming broadcast so that it can be played back at a later time.

Supervisory Workstation **150** is responsible for managing and controlling the Playback/Control Workstations, Delay Recording Workstations and other computers as may be connected to the local area network within the Network Control Center. Production Workstation **160** and Audio-VAULTNFS Server **170** are used to manipulate audio samples, such as commercial messages for use by the Playback/Control Workstations. The audio being delivered can consist of syndicated TV or radio programs, such as would be received over satellite or cable and delivered as described above. These can be delivered live and/or played back at a later time. It is also possible for the delivery of information, such as music, to take place from information that is all stored locally such as on a hard disk. A new play list and its associated music data can then be downloaded periodically to update the channel. Additionally, it is possible to deliver commercial-free programming, for example public service announcements or label-specific music.

In the preferred embodiment the Primary Servers are responsible for compressing the audio stream using an advanced perceptual technique developed and licensed by AT&T Corp. and Lucent Technologies, Inc. This highly sophisticated algorithm is used to maximize the benefit of the bandwidth available. Advantageously, two bitrates are available, a first rate of approximately 20Kbps and a second rate of approximately 56Kbps. Using the perceptual technique, the quality of the first rate is similar to FM monaural (with a sampling rate of approximately 22,000 16-bit samples per second) and the second rate is close to

5,778,187

5

CD quality stereo (with a sampling rate of approximately 32,000 16-bit samples in stereo each second). The signals at the two different bitrates comprise two different audio channels and thus require two different compression processes.

The computational requirements of compressing an audio stream in real time using techniques such as the advanced perceptual technique are approximately 100% of a Pentium-Pro 200Mhz computer and the computational requirements of decompressing an audio stream in real time are approximately 30% of a Pentium 75Mhz computer. Future improvements and/or changes to the algorithm could significantly change these requirements. For the present, a dedicated computer is required within the Primary Server to compress the audio stream. The decompression process takes place on end Users' computers and preferably would use only a portion of the computers' computational requirements, allowing the computers to be used for other tasks while they are processing the audio stream.

It is important to appreciate that the compression and decompression techniques employed by the present invention are not critical to the overall operation of the system and the advantages obtained therefrom could be obtained with other compression methodologies. Advantageously, the identity of the compression technique used can be encoded into the audio stream in the packet header. This makes it possible to identify to the receiver the nature of the decompression algorithm to use; and thereby make it possible for the computer within the Primary Server to select an optimum compression algorithm depending on the nature of the audio stream to be compressed.

The remainder of the distribution architecture comprises the multilevel hierarchy of data transmission originating at the Primary Server 20 and terminating at the Users 40 as shown in FIG. 3. In the preferred embodiment, the network is the global connected Internet. It can also include private networks which are connected to the Internet and it could be implemented on any packet switched network. cable-modem-based or satellite-based cable system. It is possible that certain links within the overall system, for example, the link between the Primary Server and the first level of Media Servers, are private data links which carry only data associated with this system. This could also be true of other data transmission paths in the distribution architecture. The User receiving the information preferably can be anyone who has access to the Internet with sufficient bandwidth to receive the resulting audio data.

It should be appreciated that the distribution architecture of the present invention provides for scalability. Using such a structure, any number of Users, and as widely distributed as necessary, can be accommodated. In the preferred embodiment, the fan-out at each level of Media Server (given the state of technology today) is on the order of ten, but the same structure could be applied with other fan-outs. The location and fan-out of the Media Servers is chosen to minimize overall network bandwidth consumed.

The flow of information from Primary Server 20 through network to User 40 is based on the delivery of a continuous sequence of individual pieces of information, or packets. Thus the distribution architecture implements a form of multicast packet delivery to a group. The group in this case is the set of all Users who are listening to a given channel at a given time. Group membership is dynamic. Users can start and stop listening to a channel at any time.

Multicasting can be implemented in a variety of ways, any or all of which can be used in the present invention. In the preferred embodiment, the Media Servers receive unicast

6

packet streams and they then duplicate these streams into more unicast streams to other Media Servers which are in the membership group for that stream. The lowest level Media Servers use hardware broadcast, multicast and/or unicast to reach all Users served by that Media Server.

If the Media Server is directly connected to the same physical network as the User, hardware broadcast or multicast can be used to transmit the packet stream to all Users listening at that time on that network. In this case the Media Servers can translate the incoming packets into broadcast or multicast packets for transmission on the local network. Only a single packet is transmitted at-a-time on the local network and any computer directly connected to the local network can receive that packet. Hardware multicast is built into most networks and it is lower in overall overhead than hardware broadcast since computers not interested in a transmission do not have to process the packets. In the case that a Media Server is serving a User who is not on the same physical network, a unicast transmission is used to reach that User, which requires a separate packet transmission for each User so connected. In the preferred embodiment, the assignment of Users to Media Servers is done using control transactions among the User 40, Control Servers 50, and Administration Server 60. This system will be described more fully in the following section. Multicasting can also be implemented within the Internet at the IP level using IP class D addresses and the IGMP group control protocol. FIG. 4 illustrates how the multilevel hierarchical distribution architecture would operate using IP multicast delivery. Under this system, a packet is transmitted with a multicast address for a destination and each router maintains group membership lists for each interface that it is connected to and will forward packets across the Internet to other routers such that all Users within the global group eventually receive a copy of the packet. Unless and until all routers within the Internet understand multicasting in this way, it is necessary to supplement it with IP tunneling in which multicast packets are encapsulated in unicast packets and routed by unicast routers to a multicast routers. The present invention can and will be able to take advantage of IP multicasting as it becomes widely available. Each channel of information would be given its own class D address and the Media Server would then simply transmit packets using the appropriate IP destination address. In this case no Media Servers would be used as this function would be accomplished by the routers in use to store and forward other IP packets. Thus it can be appreciated that the implementation of the multicast delivery structure can be implemented using a combination of IP unicast, IP multicast and hardware multicast or any other system which provides for distributed delivery of information to a specific group of destinations. It is expected that special relationships with Internet providers will be established so that delivery of the audio steams can take place with a guaranteed bandwidth and in the most efficient way possible.

In the preferred embodiment, packets of information for distribution use the UDP protocol under IP rather than the TCP protocol. TCP provides for reliable stream delivery but at the cost of retransmission and delays. For real-time information, it is usually more appropriate to use UDP since the information is time critical and low latency is more important than reliability. Since TCP is a point-to-point protocol, it is incompatible with IP multicasting. However, TCP could be used on the IP unicast links between Media Servers which are expected to have very low packet loss. In order to handle out of order, lost, duplicate and corrupted packets, the UDP packets are serialized.

5,778,187

7

In the preferred embodiment the size of the audio packets being transmitted is variable and can change on a packet by packet basis. It is expected that when using compression schemes that have a fixed bit rate, such as ADPCM, all packets for that stream would be the same size. Alternatively when using a variable bit rate compression algorithm, it is expected that packet size would vary so as to establish approximately the same amount of time for each sample. For example, if each packet corresponds to a 20 millisecond segment of speech, this could correspond to 100 bytes during one time period and 200 bytes during another.

Additionally, the Media Server may choose to dynamically vary the packet size to accommodate changes in network conditions.

Since the resulting playback of audio information is sensitive to packet loss and network congestion, software running on the various computers which make up this system monitor the ongoing situation and adapt to it in the best possible way. This may involve using different Media Servers and/or lowering the data rate to the User. For example, similar to analog dynamic signal quality negotiation present in many analog radio receivers, the User software may request a lower bitrate until the situation is improved. Also, note that the audio information being delivered to the User is preferably interleaved so that a contiguous segment of the audiostream is distributed for transmission over several packets. As a result, the loss of one packet is spread out over multiple audio samples and causes minimal degradation in audio. Advantageously, a small degree of redundancy may be incorporated within the audio stream to further guard against packet loss.

Preferably, there are two bitrate options available to the User for audio delivery. These are approximately 20Kbps for standard audio and approximately 56Kbps for high quality audio. Thus, a 28.8Kbps modem connection over an analog phone line is sufficient to listen to standard audio broadcasts. To listen to high quality audio, an ISDN connection to the Internet is required, or some other connection with greater than 56Kbps bandwidth. It should be appreciated that higher bandwidths are currently becoming available to end Users. In particular the use of cable modems and residential fiber networks are enhancing the bandwidths available to Users and thus making broadcasts of higher bitrates more practical. In addition to the content of the audio channel being delivered, it is also possible to deliver out of band of side-bar information such as graphics, images and text.

This side-bar information is synchronized with the audio channel. This may involve small increases in bandwidth requirements, such as 1–2Kbps. For example a music program could include images of an album cover, the text of song lyrics, or URLs for use by a Web browser. The User can preferably choose to have the side-bar information show up automatically or be hidden. It is also possible to incorporate two-way interaction with the system, such that for example Users can participate in a global chat session during the audio broadcast. These and other details are explained in more detail below under the description of the User interface.

The delivery of paid commercial advertising information is an important aspect of the present invention. Advertising may be incorporated into the audio stream within the Network Control Center as described above. It may also be incorporated into the audio stream at the User level, or at some intermediate point in the distribution architecture. In addition, the side-bar information discussed above can also include advertising content. FIG. 5 illustrates the provision

8

to the User of two separate streams 32, 34 of packets, one of which may be used for advertising. In this case the insertion of the stream of commercial advertising into the non-commercial stream occurs on the User's computer. FIG. 5 also illustrates packet stream 36 which identifies the User to the system. This enables the system to monitor which Users are listening to which channels and also allows the system to vary, for example, the advertising content delivered to a User.

One advantage of this alternative is to allow targeted commercial delivery based on the individual User.

That is, an individual User would receive the main audio feed plus a particular advertising stream unique to his demographic group. Note that the advertising stream typically is lower in overall bitrate and generally does not require real-time delivery, thus lowering the overall load on the network. For example, the advertising stream could be delivered to the User in advance of the regular programming, stored in a buffer in the User's computer and inserted into the stream of regular programming upon receipt of a cueing signal embedded in the stream of regular programming. Thus, a substantial number of targeted groups, perhaps 10 or 100 or even more could be accommodated without an impractical increase in network load.

## II. Control Architecture

The control architecture described in this section is responsible for managing and administering the Users who are receiving the information being delivered by the distribution architecture described in the previous section. The control architecture handles new User registration, User login, the starting and stopping of audio streams and the monitoring of ongoing transmissions. The control architecture is scalable just as is the distribution architecture so that any number of Users can be managed.

This section describes the control protocol, which consists of the format and sequence of control messages that are exchanged among Users, Control Servers, Media Servers, Primary Servers and the Administration Server. These messages are in the form of objects, which have specific data formats. Objects are exchanged preferably using the TCP protocol although other options are possible. Below we describe the sequence of objects passed among the various computers and detail the internal structure of each object.

The major objects used in the present embodiment of the invention are set forth in Table 1. For each object, Table 1 provides a brief description of its function, identification of the names of the fields in the object, their types and a brief description of their function.

TABLE 1

| Field Name | Field Type | Remarks |
|---|---|---|
| Channel Activation Object | | |
| Contains information used for channel activation/deactivation. It is sent to Media and Primary Servers to tell them to carry or stop carrying a specific channel. Media Servers get the channel from another server in the system hierarchy and Primary Servers get and encode the feed from the actual input source. | | |
| Token | Security Token Object | |
| Moniker | Moniker Object | unique channel identifier |
| Activate | Int | action flag (activate/ deactivate) |
| CompressType | Int | type of compression to use |
| Host | Host Object | host carrying the channel |

5,778,187

| 9 | 10 |

## TABLE 1-continued

| Field Name | Field Type | Remarks |
|---|---|---|
| Channel Guide Object | | |

Contains analytical and descriptive information for an item requested that is uniquely identified by a moniker. It is usually the reply to a Channel Guide Request object.

| Token | Security Token Object | |
| Type | Int | type of content |
| Result | | the content data itself |
| Channel Guide Request Object | | |

Conveys a request for analytical and descriptive information about an item uniquely identified by the contained moniker. The reply is in the form of a Channel Guide object.

| Token | Security Token Object | inherited from base class |
| Type | Int | type of content |
| Moniker | Moniker Object | unique identifier |
| Host Object | | |

Encapsulates the attributes of a networked computer related to the operation or services it offers or requests.

| Token | Security Token Object | |
| HostName | String | computer name and domain |
| PortNumber | Int | port number for service |
| DisplayName | String | descriptive computer name |
| Login Information Object | | |

Encapsulates the name and password by which a User is known to the system.

| Token | Security Token Object | |
| Login | String | User's system login name |
| Password | String | User's system password (possibly encrypted) |
| Media Control Interface (MCI) Request Object | | |

Encapsulates a multimedia control command, such as play and stop, and any extra information that may be necessary to perform the requested service.

| Token | Security Token Object | |
| Command | Int | multimedia command |
| String | String | command-specific extra info |
| Moniker Object | | |

A moniker encapsulates the name of an object or process with the intelligence necessary to work with that name. In other words, it provides naming and binding services. The Moniker Object is used in the system for unique identification of various components, parts or features, such as a channel, a directory, or a computer list.

| Token | Security Token Object | |
| ID | String | unique string identifier |
| DisplayName | String | User-readable name |
| Ping Object | | |

Ping is the name given to the "Are-You-Alive?" operation useful in determining if a specific computer is up and running. This object is used in the system when a server has to be queried for its operational status. It can also provide timing information for statistical purposes and quality of service evaluations.

| Token | Security Token Object | |
| Date | Date | system date |
| Time | Time | system time |
| Protocol List Object | | |

Encapsulates a general purpose collection object.

| Token | Security Token Object | |
| Type | Int | type of object list |
| Result Message Object | | |

Acts as the acknowledgment for a requested service successfully carried out or reports errors that occur in the system during a client/server transaction.

| Token | Security Token Object | |
| Code | Int | result code |
| Message | String | message corresponding |

| Field Name | Field Type | Remarks |
|---|---|---|
| | | to code |
| Security Token Object | | |

Contains the authorization key for a transaction. The key must be validated before any service is performed.

| ID | String | authorization key/ transaction ID. |
| Server Activation Object | | |

Contains information used in the server activation/deactivation process. Used for announcement as well as command purposes (e.g., a server can notify the administration database that is now activated or a server can be instructed to manage someone else).

| Token | Security Token Object | |
| Active | Int | action flag (activate/ deactivate) |
| Manage | Int | control flag (manage/ associate) |
| Type | Int | server type |
| Host | Host Object | host to be controlled |
| Server List Request Object | | |

Encapsulates a request for a list of available server resources for an identified service (e.g., a request for a list of Control Servers for a specified channel).

| Token | Security Token Object | |
| Type | Int | type of service |
| Moniker | Moniker Object | content/channel unique identifier |
| Host | Host Object | local host information |
| Statistics Object | | |

Contains system-related information that can be used by load-balancing algorithms and for statistical purposes.

| Token | Security Token Object | |
| Load | Int | load on the system |
| Threads | Int | number of threads running |
| Users | Int | number of Users being serviced |
| Uptime | Int | amount of time running |
| NumberManaged | Int | number of managed servers |
| NumberAssociated | Int | number of associated servers |
| Statistics Request Object | | |

Encapsulates a request for system-related information that can be used by load-balancing algorithms and statistical purposes.

| Token | Security Token Object | |
| Load | Int | request flag (on/off) |
| Threads | Int | request flag (on/off) |
| Users | Int | request flag (on/off) |
| Uptime | Int | request flag (on/off) |
| NumberManaged | Int | request flag (on/off) |
| NumberAssociated | Int | request flag (on/off) |
| User Object | | |

Users and Servers use this object to register themselves with the administration database. They provide the information for subsequent logins (name, password) and other system-related info. The end-Users provide personal, demographic, and system-related information.

| Token | Security Token Object | |
| Login | Login Information Object | login information(name, password) |
| FirstName | String | User's first name |
| LastName | String | User's last name |
| Title | String | User's job title |
| Company | String | User's employer |
| Address1 | String | User's home street address |
| Address2 | String | User's address extra |
| City | String | city, village |
| State | String | state, province or foreign country |
| ZipCode | String | zip or postal code |
| Age | String | User's age |

5,778,187

**11**

TABLE 1-continued

| Field Name | Field Type | Remarks |
|---|---|---|
| Gender | String | User's gender |
| PhoneNumber | String | telephone number |
| FaxNumber | String | fax number |
| Email | String | email address |
| Demographics | Dictionary | market-targeting extra User info |
| SystemInfo | Dictionary | system-related information |

Version Object

All components of the system use this object to report their versioning information to the party they transact with in order to use a protocol they both understand. They are also given the chance to update themselves if a newer version exists.

| | | |
|---|---|---|
| Token | Security Token Object | |
| Major | Int | major protocol version number |
| Minor | Int | minor protocol version number |
| Type | Int | sender type |
| Client | Version | client version information |

Unlike traditional protocols based on state computers, the control protocol of the present invention is a light-weight, stateless protocol comprising simple sequences of objects. It is light-weight in that in most sequences only two objects are involved in the transaction and after a sequence is completed the connection can be reused. It is also stateless in that the server maintains no information about the client. Every transaction is handled independently of the previous ones. States exist in the lower levels, for example within the TCP layer, to express logical states of a network connection but they are not actually part of the control protocol.

In the preferred embodiment, the software running on the Control Servers, Media Servers and Primary Servers is programmed for Windows NT and UNIX environment using the OLE environment. In addition, COM interfaces are used between components. The Rogue Wave system is used to transfer objects between the applications running on the various computers. The software running on the User computer is preferably programmed for a Windows 32-bit environment, so it will run on a Windows 95 or Windows NT computer. Alternatively, Macintosh and UNIX environments can be accommodated by other User software.

The basic process of a control transaction consists of a version sequence followed by one or more protocol sequences. The version sequence starts after the computer initiating the transaction, the client, has established a connection with the computer completing the transaction, the server. The client sends a Version Object (defined in Table 1) and in response the server then sends back its own Version Object. This version sequence is used so that both client and server are aware of the version numbers of the software they are using. If a version number is older than expected, either client or server can choose to conform to the previous version or abort the transaction, depending on its needs and capabilities. If a version number is newer than expected, in most cases the current transaction can be completed since the software systems are designed to be fully backward compatible with previous versions. Additionally, in the case that the server of the transaction is the Administration Server, the client receives information about what the latest version number is and thus the client can be informed that a software update is needed. The process of handling automatic updating of User software is described more fully below.

**12**

After the version sequence, one or more protocol sequences occur in which other objects are exchanged between client and server. When a particular protocol sequence is completed, another independent protocol sequence can be serviced. The protocol sequences that are part of the control architecture of the present invention are summarized in Table 2 and described below in conjunction with FIGS. 6–17.

TABLE 2

Summary of Protocol Sequences

| Control Sequence | Client | Server | Main Objects Exchanged |
|---|---|---|---|
| User Registration and Login (see Fig. 6) | User | Administration | Version Object User Object Channel Guide Object |
| User Login (see Fig. 7) | User | Administration | Version Object Login Information Object Channel Guide Object |
| Channel Play (see Figs 8a, 8B, 8C) | User | Administration | Version Object Server List Object |
| | | Control | Version Object Server List Object |
| | | Media | Version Object MCI Objects - OPEN/PLAY/ STOP/CLOSE Ping Objects (TCP connection stays open) |
| Token Validation (see Figs. 9A, 9B) | Control or Media or Primary | Administration or Control | Version Object Security Token Object |
| Server Registration and Login (see Fig. 10) | Media or Control | Administration | Version Object Server Activation Object |
| Server Login (see Fig. 11) | Media or Control | Administration | Version Object Login Object Server Activation Object |
| Control Server Activation (see Fig. 12) | Administration | Control | Version Object Server Activation Object |
| Media Server Activation (see Fig. 13) | Control | Media | Version Object Server Activation Object Ping Objects (TCP connection stays open) |
| Control Channel Activation (see Fig. 14) | Administration | Control | Version Object Channel Activation Object |
| Media Channel Activation (see Fig. 15) | Control | Media | (open TCP connection) Channel Activation Objects |
| Distribution Activation (see Fig. 16) | Media | Media or Primary | Version Object MCI Objects - OPEN/PLAY/ STOP/CLOSE Ping Objects (TCP connection stays open) |
| Statistics Request (see Fig. 17) | Administration | Control or Media | Version Object Statistics Object |

The User registration and login sequences are the processes by which a new User registers with the system, logs in and retrieves programming information. The channel play sequence takes place when a User asks to listen to a particular channel. The token validation sequence is used to verify that a computer requesting a service is authorized to

5,778,187

13

do so. The Server registration, login and activation sequences are used by Control and Media Servers when they become active. The Control Server and Media Server activation sequences are used to manage the Control and Media Servers. The control channel, media channel and distribution activation sequences are used to cause a channel to be distributed to a Media Server. Finally, the statistics request is used for administrative purposes.

FIG. 6 illustrates the User registration and login sequence in more detail. This sequence takes place after the User has installed the User software on his/her computer. It is expected that the User will download the software from the Internet and then invoke it which in the preferred embodiment will use the Windows Wizard interface. This will guide the User through the installation process including filling out the registration form, which we will describe more fully in the next section. After the User has selected a name and password and selected the option to register, the User computer opens a TCP connection to the Administration Server. Advantageously, the full domain name of the Administration Server is embedded into the User software, although it could be discovered in other ways. The User and Administration Server then exchange version objects with the Administration Server as described above. If the version numbers meet expectations, the User sends a User Object to the Administration Server. The format of the User Object is shown in Table 1. Once the Administration Server receives the User Object, it verifies that the information is filled in properly and that the selected User name is unique. If the User Object is invalid for any reason, the Administration Server returns a Result Message Object with a code indicating the reason. The format of the Result Message Object is shown in Table 1. If the User information is valid, the Administration Server updates the global database of User names and passwords and then generates a security token for that User. This security token is then returned to the User in a Result Message Object. Upon receiving the Result Message Object, the User saves the security token for future use. This token is an identifier that allows the User to request services from the Administration Server and other computers within the overall system. The security token is not saved permanently or registered on the User computer. Normally, the User software then immediately sends a Channel Guide Request Object to the Administration Server and a Channel Guide Object is returned.

The format of these objects is also shown in Table 1. Note that in principle, this is a separate transaction and could take place in a separate TCP connection to the Administration Server. In particular, once the User has registered and logged in, he/she can request the Channel Guide Object again since it may have been updated since the previous request.

At this point the TCP connection to the Administration server is closed.

The process of User registration only needs to take place once for each User. However anyone can re-register at any time, even after the software has been installed. In particular, it is expected that if multiple persons use a computer, each person will register and obtain his/her own User name and password. If the registration process is not completed successfully, the User software saves the registration information and ask the User if they would like to try again the next time the software is invoked.

Since the security token is not permanently saved by the User software, it is lost when the User software is closed, and the security token must again be retrieved from the Administration Server the next time the User wants to use

14

the system. This process is the purpose of the login sequence illustrated in FIG. 7. This sequence is used if a User has already registered and needs only to retrieve a valid security token. In this case the sequence consists of the User's sending a Login Information Object to the Administration Server. The Administration Server then queries the User database to validate the login name and password. If the login name and password are correct, then a security token is returned to the User. Normally the receipt of the security token will immediately be followed by a channel information request sequence, just as in the registration sequence described previously.

The control sequence that takes place when a User initiates a channel play operation is illustrated in FIGS. 8A, 8B and 8C. First the User software requests a Control Server List from the Administration Server. Note that the Server List Request Object, illustrated in Table 1 contains a channel identifier. The Administration Server generates a sorted list of Control Servers based on overall system load and the location of the User on the network and returns this list to the User using a Protocol List Object. Once the Control Server List is returned to the User, the Administration Server is no longer needed and the TCP connection is closed.

The User software then searches the list of Control Servers and opens a TCP connection to the first host listed.

If that host computer does not respond, then the next Control Server on the list is tested and so forth in succession.

Upon obtaining a response from a Control Server, the User software uses a Server List Request Object to requests a Media Server List from the Control Server. If the Control Server is too busy to service the User, it returns a Result Message Object so indicating and the User software tries the next Control Server on the list. However, in the likely scenario that the Control Server is able to handle the User's request, a sorted list of Media Servers is generated and returned to the User computer using a Protocol List Object. The TCP connection to the Control Server is then closed by the User software.

At this point the User software initiates a TCP connection to the first Media Server on the list provided by the Control Server. As in the previous case, it attempts to connect to the first host on the list and if unsuccessful tries the next hosts in succession. Once the Version Objects are exchanged, the User software sends an MCI Request Object to the Media Server. An MCI Request Object can be used for four basic commands: OPEN, PLAY, STOP and CLOSE. The User software must first send an OPEN command for the desired channel. If the returned Result Message Object indicates success, the User software then sends a PLAY command. When the Media Server receives a valid PLAY command, it initiates the delivery of audio information to the User as described in the previous section. Note that this could be in the form of broadcast, multicast or unicast packets to a specific UDP port. The TCP connection through which the MCI Request Objects were sent stays open during the audio play operation. In addition, Ping Objects are sent to the User on a periodic basis to verify that the computer is still working and active. When the User software receives a Ping Object, it simply returns it. The Media Server uses the Ping Objects to measure round trip time and also to determine when a User's computer has terminated abnormally. In that case the audio stream is terminated.

In the case of normal termination of the audio stream, the User makes an explicit selection to stop and this causes a STOP command to be sent to the Media Server in an MCI Request Object. The Media Server then terminates the audio

5,778,187

15

stream to that User. When the User closes the application software or selects another channel to play. the User software will send a CLOSE command to the Media Server in an MCI Request Object and the TCP connection is closed.

The initiation of the audio stream by the Media Server causes a log entry to be generated and sent to the Administration Server. This information is important so that the Administration Server can update its database to indicate which Users are listening to which channels. The security token is used to identify the User initiating the audio stream. Additionally. when the audio stream is terminated to any User. another log message is generated and sent to the Administration Server.

FIG. 9A illustrates the process by which security tokens are validated. The Administration Server is the only server that can validate a security token. Thus. when a User requests services from a Control Server or from a Media Server. that server must go back to the Administration Server with a token validation sequence. However, Control Servers and Media Servers are allowed to cache validations of security tokens so that they do not have to validate tokens repeatedly once they have validated it the first time. In the case where a Media Server receives a request. the token will be validated with the Control Server that is managing that Media Server. FIG. 9B identifies the various token validation scenarios.

FIG. 10 illustrates the process by which a new Server is registered. This process is similar to new User registration. It is expected, however. that the server installation will be through a Web interface rather than a Wizard. The Administration Server. upon receiving a User Object from a Media Server or Control Server validates the User name and password and generate a security token just as in the case of User registration. Normally the Server then immediately sends back a Server Activation Object indicating that it is ready to be used as a system resource. Once this process has been completed. the TCP connection to the Administration Server is closed.

If a Media Server or Control Server that has sent a Server Activation Object to the Administration Server becomes inactive. it will send another Server Activation Object indicating this condition. In the case of a Media Server. this object is sent to the managing Control Server. In the case of a Control Server. this object sent to the Administration Server. As in the case of User registration. Media Server and Control Server registration needs only take place once per computer. However, if the computer is restarted, the server must login and again retrieve a security token. This is the server login and activation sequence shown in FIG. 11.

Once a Control Server has indicated to the Administration Server that it is ready, the Administration Server can activate that Control Server by sending the Control Server a Server Activation Object as illustrated in FIG. 12. This is a separate transaction and is used to tell the Control Server which Media Servers it is supposed to manage. Recall that a Control Server and a number of Media Servers form a cluster of Media Servers. The single Control Server that manages that cluster must be given a list of host computers corresponding to the Media Servers in that cluster.

The process by which a Control Server activates the Media Servers that it manages is illustrated in FIG. 13. The Control Server sends a Server Activation Object to the Media Server indicating that it is responsible for channel management. This TCP connection between the Control Server and the Media Server stays open during the time that both servers are active. The Control Server periodically

16

sends Ping Objects to the Media Server across this open TCP connection to verify that the Media Server is still running.

FIG. 14 illustrates the process by which a given channel is activated by the Administration Server. The Administration Server opens a connection to a Control Server that its wishes to have carry a given channel and provide a Channel Activation Object. This object indicates to the Control Server which Media or Primary Server the Control Server should direct its Media Servers to get the feed from. At this point the Control Server is said to be carrying that channel and it will be a valid host on a list of Control Servers requested by a Channel Play sequence.

FIG. 15 illustrates what happens when a Control Server needs to provide a channel. First it sends a Channel Activation Object to one of the Media Servers that it manages across the open TCP connection described previously. This object indicates to the Media Server that it should start receiving the channel identified and from where it should receive it.

In FIGS. 16A and 16B depict how the Media Server requests distribution of an audio channel from another Media Server or from a Primary Server. This sequence is much the same as that in which a User requests the distribution of audio information from a Media Server. Note that a Media Server receives a single incoming stream for each channel that it is carrying and will then redistributes this stream to all Users or other Media Servers that request it.

Finally. FIG. 17 illustrates the statistics request sequence. This sequence is used by the Administration Server to gather information from the Media Servers and Control Servers in order to manage the overall system. It can use this information to detect failures and to balance load as the dynamic conditions change. As indicated above. it can also use this information to monitor which Users are listening to which channel or whether Users stop listening to a channel at any time. such as during the play of a particular song. It can also use this information to control the advertising content that is downloaded to a particular User in advance of receipt of regular audio programming and/or monitor the delivery of advertising to the Users.

The control architecture described in this section is scalable to handle any number of Users. Note that the User registration process only happens once for each subscriber and the login process only happens once per session. These interactions, which require the Administration Server are expected to constitute a very small percentage of the overall system bandwidth. If the Administration Server were to become a bottleneck, however. it would be possible to duplicate it and to have the database it maintains distributed and automatically updated to guarantee consistency.

The Control Servers are distributed throughout the network and can handle the lower level interactions with the Users and the Media Servers. A single Control Server can handle preferably on the order of ten Media Servers up to several hundred Users. The bitrate among the Users. the Control Servers and the Media Servers is expected to be small in comparison to the audio transmission bitrate. The Ping Objects normally only involve the User and the nearest Media Server. They are also low in overhead since they are small and only get transmitted infrequently.

### III. User Interface

The User interface is provided by the client application running on an individual computer and its associated graphical interface. In the preferred embodiment the User interface is available for 32-bit Windows (95 and NT). Macintosh and

5,778,187

17

UNIX platforms. Preferably anyone on the Internet can freely download a copy of the client software and install it in their computer.

FIG. 18 illustrates the main User screen in the preferred embodiment. The screen is composed of three sections: channel guide (upper left frame), program guide (upper right frame), and multimedia frame (lower half of screen). The channel guide lists, as a tree hierarchy, the channels that are available from the system. The User selects a channel from the list of those displayed on the channel guide. The program guide provides information pertaining to the channel selected. This information can be a detailed schedule of the programming that has played or will be playing on the channel selected. Additionally, other relevant information will be displayed in this frame, for example, a notice regarding an upcoming special event on another channel. The multimedia frame provides an integrated web browser that displays information via a series of tabbed sections.

The information contained in the channel guide, program guide, and the tabs of the multimedia frame is dynamically transmitted to the client. For example, if a new channel begins operation, the client application can immediately display it as being available. Furthermore, the tabs displayed can be specifically relevant depending on what song is playing. For example, tabs displaying the album cover, information on the artist, song lyrics, tour dates can be displayed. Additionally, as shown in the example in FIG. 18, a tab can be available allowing the User to place an order for the CD or allowing the User to participate in a chat session related to the channel.

FIG. 19 illustrates the key pull-down menus available in the main User screen in the preferred embodiment. Table 3 provides a description of each of the functions available through the pull down menus, as shown in FIG. 19.

As will be apparent to those skilled in the art, numerous modifications may be made within the spirit and scope of the invention.

TABLE 3

Pull-Down Menu Functions

| Menu Choice | Menu Sub-Choice | Description |
|---|---|---|
| File | Login | Allows the User to login to the system. |
| | Logout | Allows the User to logout from the system. |
| | Register | Brings up a dialog so that the User can register with the system for the first time. |
| | Close | Minimizes the screen. |
| Edit | Copy | Allows the User to copy the selection on to the clipboard. |
| | Properties | Allows the User to set various properties. |
| Audio | Play | Begins playing the selected channel. |
| | Stop | Stops playing the selected channel. |
| | Mute | Stops the playing of audio |
| View | Tool Bar | Display or hide the tool bar (providing access to pull-down menu functions). |
| | Status Bar | Display or hide the status bar normally situated at bottom of the screen. |
| | Web Bar | Display or hide the tool bar |

18

TABLE 3-continued

Pull-Down Menu Functions

| Menu Choice | Menu Sub-Choice | Description |
|---|---|---|
| | | section that provides access to the web browser functions. |
| Help | Help Topics | Brings up a list of available online help topics. |
| | About... | Displays summary information regarding this application, such as version number, copyright information, and so on. |

What is claimed is:

1. A method for transmitting message packets over a communications network comprising the steps of:

converting a plurality of streams of audio and/or visual information into a plurality of streams of addressed digital packets complying with the specifications of a network communication protocol.

for each stream, routing such stream to one or more users.

controlling the routing of the stream of packets in response to selection signals received from the users, and

monitoring the reception of packets by the users and accumulating records that indicate which streams of packets were received by which users, wherein at least one stream of Rackets comprises an audio and/or visual selection and the records that are accumulated indicate the time that a user starts receiving the audio and/or visual selection and the time that the user stops receiving the audio and/or visual selection.

2. The method of claim 1 further comprising the step of including in at least one stream of packets at least some advertising information.

3. The method of claim 2 further comprising the step of varying the content of the advertising information with the identity of the user to whom the advertising information is provided.

4. The method of claim 2 wherein the advertising information is inserted into the stream of audio and/or visual information before such stream is converted into a stream of packets.

5. The method of claim 2 wherein the records that are accumulated indicate how many users received specific advertising information.

6. The method of claim 2 wherein the records that are accumulated indicate which users received specific advertising information.

7. The method of claim 1 further comprising the step of generating an audio output and/or a visual display from the stream of packets received by the user.

8. The method of claim 1 further comprising the steps of:

storing a first stream of packets received by the user at a first time and at a later time, inserting the first stream of packets into a second stream of packets received at the user.

9. The method of claim 8 further comprising the step of converting the combined first and second streams of packets into an audio output and/or visual display.

10. The method of claim 8 wherein the first stream of packets contains advertising information.

11. The method of claim 8 wherein the content of the advertising information is varied depending on the identity of the user.

5,778,187

19

12. The method of claim 1 wherein at least one stream of packets comprises copyrighted music selections and the records that are accumulated indicate how many users received specific music selections.

13. The method of claim 1 wherein at least one stream of packets comprises music selections and the records that are accumulated indicate how many users did or did not listen to the entire selection.

14. The method of claim 1 further comprising the steps of:

compressing the stream of packets in their passage from source to user, and

decompressing the stream of packets near the user.

15. The method of claim 14 wherein the compressing step uses a compression algorithm that is selected in accordance with the content of the information being communicated in the stream of packets.

16. The method of claim 15 wherein the compressing step inserts into each packet an identification of the compression algorithm used and the decompressing step monitors each packet to read such identification and to vary its decompression algorithm in response thereto.

17. The method of claim 1 wherein at least one stream of packets comprises copyrighted music selections and the records that are accumulated indicate which users received specific music selections.

18. The method of claim 1 further comprising the steps of:

storing a first stream of packets received by the user at a first time and

inserting the first stream of packets into a plurality of streams of packets received at the user at a plurality of later times.

19. A method for transmitting at least one stream of audio and/or visual information over a communications network to a plurality of users comprising the steps of:

controlling the routing of the stream of information through the network in response to selection signals received from the users, and

monitoring the reception of the stream of information by the users and accumulating records relating to the reception of the stream of information by the users wherein at least one stream of information comprises an audio and/or visual information and the records that are accumulated indicate the time that a user starts receiving the audio and/or visual selection and the time that the user stops receiving the audio and/or visual selection.

20. The method of claim 19 further comprising the step of including in at least one stream of information at least some advertising information.

21. The method of claim 20 further comprising the step of varying the content of the advertising information with the identity of the user to whom the advertising information is provided.

22. The method of claim 20 wherein the records that are accumulated indicate how many users received specific advertising information.

23. The method of claim 20 wherein at least one stream of information comprises copyrighted music selections and the records that are accumulated indicate how many users received specific music selections.

24. The method of claim 20 wherein at least one stream of information comprises music selections and the records that are accumulated indicate how many users did or did not listen to he entire selection.

20

25. The method of claim 20 further comprising the steps of:

compressing the stream of information in its passage from source to user, and

decompressing the stream of information near the user.

26. The method of claim 25 wherein the compressing step uses a compression algorithm that is selected in accordance with the content of the information being communicated in the stream of information.

27. The method of claim 20 wherein the records that are accumulated indicate which users received specific advertising information.

28. The method of claim 19 further comprising the steps of:

storing a first stream of information received by the user at a first time and

at a later time, inserting the first stream of information into a second stream of information received by the user.

29. The method of claim 28 wherein the first stream of information contains advertising information.

30. The method of claim 19 wherein multiple streams of audio and/or visual information are transmitted over the communications network and the user can select which stream to receive.

31. The method of claim 19 wherein at least one stream of information comprises copyrighted music selections and the records that are accumulated indicate which users received specific music selections.

32. The method of claim 19 further comprising the steps of:

storing a first stream of information received by the user at a first time and

inserting the first stream of information into a plurality of streams of information received at the user at a plurality of later times.

33. A communication system comprising:

means for converting at least one stream of audio and/or visual information into a stream of addressed digital packets complying with the specifications of a network communication protocol,

means for routing such stream via a communication network to selected users,

means for controlling the routing of the stream of packets in response to selection signals received from the users, and means for monitoring the reception of packets by the user and for accumulating records that indicate which streams of packets were received by which users, wherein at least one stream of Rackets comprises an audio and/or visual selection, and the means for monitoring further includes means for accumulating records that indicate the time that a user starts receiving the audio and/or visual selection and the time that the user stops receiving the audio and/or visual selection.

34. The communication system of claim 33 further comprising means for including in the stream of packets at least some advertising information.

35. The communication system of claim 34 further comprising means for varying the content of the advertising information with the identity of the user to whom the advertising information is provided.

36. The communication system of claim 34 wherein the means for monitoring further accumulates records that indicate which users received specific advertising information.

37. The communication system of claim 33 wherein at least one stream of packets comprises copyrighted music

5,778,187

21

selections and the means for monitoring further accumulates records that indicate which users received specific music selections.

**38.** The method of claim 33 further comprising means for storing packets received at the user during a first time period and means for inserting such packets into other packets received at the user at a plurality of later time periods.

**39.** The communication system of claim 33 further comprising means for generating from the stream of packets received at the user an audio output and/or a visual display.

**40.** The communication system of claim 33 further comprising means for storing packets received at the user during a first time period and means for inserting such packets into other packets received at the user at a later time period.

**41.** The communication system of claim 40 wherein the stream of packets received during the first time period contains advertising information.

**42.** The communication system of claim 41 wherein the cntent of the advertising information is varied depending on the identity of the user.

**43.** The communication system of claim 33 further comprising:

means for compressing the stream of packets in their passage from source to user, and

downstream of the compressing means, means for decompressing the stream of packets.

**44.** The communication system of claim 43 wherein the compressing means is located near the converting means and the decompressing means is located at the user.

**45.** The communication system of claim 43 wherein the compressing means uses a compression algorithm that is selected in accordance with the content of the information being communicated in the stream of packets.

**46.** The communication system of claim 43 wherein the compressing means inserts into each packet an identification of the compression algorithm used and the decompressing means monitors each packet to read such identification and to vary its decompression algorithm in response thereto.

**47.** A method for transmitting message packets over a communications network comprising the steps of:

converting a plurality of streams of audio and/or visual information into a plurality of streams of addressed digital packets complying with the specifications of a network communication protocol,

for each stream, routing such stream to one or more users,

controlling the routing of the stream of packets in response to selection signals received from the users, and

monitoring the reception of packets by the users and accumulating records that indicate which streams of packets were received by which users, wherein at least one stream of packets comprises music selections and the records that are accumulated indicate how many users did or did not listen to the entire selection.

**48.** A method for transmitting at least one stream of audio and/or visual information over a communications network to a plurality of users comprising the steps of:

controlling the routing of the stream of information through the network in response to selection signals received from the users, and

22

monitoring the reception of the stream of information by the users and accumulating records relating to the reception of the stream of information by the users, wherein at least one stream of information comprises music selections and the records that are accumulated indicate how many users did or did not listen to the entire selection.

**49.** A method for transmitting message packets over a communications network comprising the steps of:

converting a plurality of streams of audio and/or visual information into a plurality of streams of addressed digital packets complying with the specifications of a network communication protocol,

for each stream, routing such stream to one or more users,

controlling the routing of the stream of packets in response to selection signals received from the users, and

monitoring the reception of the stream of packets by the users and accumulating records that indicate which streams of packets were received by which users, wherein at least one stream of packets comprises an audio and/or visual selection and the records that are accumulated indicate the elapsed time that a user received the audio and/or visual selection.

**50.** A method for transmitting at least one stream of audio and/or visual information over a communications network to a plurality of users comprising the steps of:

controlling the routing of the stream of information through the network in response to selection signals received from the users, and

monitoring the reception of the stream of information by the users and accumulating records relating to the reception of the stream of information by the users, wherein at least one stream of information comprises an audio and/or visual selection and the records that are accumulated indicate the elapsed time that a user received the audio and/or visual selection.

**51.** A communication system comprising:

means for converting at least one stream of audio and/or visual information into a stream of addressed digital packets complying with the specifications of a network communication protocol,

means for routing such stream via a communication network to selected users,

means for controlling the routing of the stream of packets in response to selection signals received from the users, and

means for monitoring the reception of packets by the user and for accumulating records that indicate which streams of packets were received by which users, wherein at least one stream of packets comprises an audio and/or visual selection, and the means for monitoring further includes means for accumulating records that indicate the elapsed time that a user received the audio and/or visual selection.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

**PATENT NO.** :    5,778,187

**DATED** :    July 7, 1998

**INVENTOR(S)** :    Monteiro et al.

It is certified that errors appear in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 1, line 18: change "pointto-point" to --point-to-point--.

Column 4, line 44: change "VAULTNFS" to --VAULT-NFS--.

Claim 1, line 30: change "Rackets" to -packets-.

Claim 24, line 67: change "he" to -the-.

Claim 33, line 50: change "Rackets" to -packets-.

Claim 42, line 19: "cntent" to -content-.

Signed and Sealed this

Eighteenth Day of May, 1999

*Attest:*

**Q. TODD DICKINSON**

*Attesting Officer*        *Acting Commissioner of Patents and Trademarks*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 5,778,187                                    Page 1 of  2
DATED         : July 7, 1998
INVENTOR(S)   : Monteiro et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 1,
Lines 20, 23, 24 and 43, "which", each occurrence, should read -- that --;
Line 32, "capability analogous" should read -- capability, analogous --;
Line 34, "nodes are" should read -- nodes, is --;
Line 59, "1458 which" should read -- 1458, which --.

Column 2,
Lines 32 and 47, "which", each occurrence, should read -- which: --

Column 3,
Lines 12, 15, 20, 24, 25 and 26, "which", each occurrence, should read -- that --;
Line 21, "at a major points" should read -- at major points --.

Column 4,
Line 8, "which" should read -- that --.

Column 5,
Lines 36 and 41, "which", each occurrence, should read -- that --;
Line 63, change "dynamic, Users" to -- dynamic; Users --.

Column 6,
Line 2, "which" should read -- that --.
Line 25, begin new paragraph at the sentence beginning with "Multicasting".
Line 39, "to a multicast" should read -- to multicast --.
Line 46, begin new paragraph at the sentence beginning with "Thus".
Lines 50 and 65, "which", each occurrence, should read -- that --.

Column 7,
Line 17, "which" should read -- that --;
Line 18, "monitor" should read -- monitors --;
Line 26, "audiostream" should read -- audio stream --.

Column 8,
Line 5, "36 which" should read -- 36, which --.

Column 13,
Line 13, "invoke it which" should read -- invoke it, which --;
Line 62, "ask" should read -- asks --.

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 5,778,187                                      Page 2 of  2
DATED        : July 7, 1998
INVENTOR(S)  : Monteiro et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 15,
Line 33, "Server validates" should read -- Server, validates --;
Line 34, "generate" should read -- generates --.

Column 16,
Line 26, "and will then" should read -- and then --;
Line 46, "Server are" should read -- Server, are --.

Column 18,
Line 11, Table 3, "infirmation" should read -- information --.

Signed and Sealed this

Sixth Day of May, 2003

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*



US005778187C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (5425th)

# United States Patent

Monteiro et al.

(10) **Number:** US 5,778,187 C1

(45) **Certificate Issued:** Jun. 27, 2006

(54) **MULTICASTING METHOD AND APPARATUS**

(75) Inventors: **Antonio M. Monteiro**, New York, NY (US); **James F. Butterworth**, New York, NY (US)

(73) Assignee: **Netcast Innovations Ltd.**, Boulder, CO (US)

Reexamination Request:
No. 90/007,054, May 28, 2004
No. 90/007,445, Mar. 4, 2005

Reexamination Certificate for:
Patent No.: 5,778,187
Issued: Jul. 7, 1998
Appl. No.: 08/644,072
Filed: May 9, 1996

Certificate of Correction issued May 18, 1999.

Certificate of Correction issued May 6, 2003.

(51) **Int. Cl.**
**G06F 15/16** (2006.01)

(52) **U.S. Cl.** ...................................... **709/231**; 370/351

(58) **Field of Classification Search** ................. 709/204, 709/206, 231
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,674,512 A | 4/1954 | Bogert et al. |
| 2,957,046 A | 10/1960 | Freeman et al. |
| 3,126,513 A | 3/1964 | Kamen |
| 3,230,302 A | 1/1966 | Bruck et al. |
| 3,368,031 A | 2/1968 | Eisele et al. |
| 3,733,430 A | 5/1973 | Thompson et al. |
| 4,245,245 A | 1/1981 | Matsumoto et al. |
| 4,264,924 A | 4/1981 | Freeman |
| RE31,639 E | 7/1984 | Nicholson |
| 4,546,382 A | 10/1985 | McKenna et al. |
| 4,558,358 A | 12/1985 | Onda |

| | | | |
|---|---|---|---|
| 4,602,279 A | 7/1986 | Freeman |
| 4,816,904 A | 3/1989 | McKenna et al. |
| 4,829,569 A | 5/1989 | Seth-Smith et al. |
| 4,850,007 A | 7/1989 | Marino et al. |
| 5,027,400 A | 6/1991 | Baji et al. |
| 5,081,680 A | 1/1992 | Bennett |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 97 92 4648 | 6/2004 |
| WO | WO 95/15658 | 8/1995 |

OTHER PUBLICATIONS

Vashaspathi et al., "Multicast Routing for Multimedia Communication", IEEE/ACM Transactions on Networking vol. 1. No. 3 Jun., 1993, pp. 286–292.*

Almeroth et al., "Collecting and Modeling the Join/Leave Behavior of Multicast Group Members in the MBONE", IEEE Preceedings of HPDC–5'96, May 1996, pp. 209–216.*

(Continued)

*Primary Examiner*—Bunjob Jaroenchonwanit

(57) **ABSTRACT**

A scalable architecture is disclosed for delivery of real-time information over a communications network. Embedded into the architecture is a control mechanism that provides for the management and administration of users who are to receive the real-time information. In the preferred embodiment, the information being delivered is high-quality audio. However, it could also be video, graphics, text or any other type of information that can be transmitted over a digital network. Preferably, there are multiple channels of information available simultaneously to be delivered to users, each channel consisting of an independent stream of information. A user chooses to tune in or tune out a particular channel, but does not choose the time at which the channel distributes its information. Advantageously, interactive (two-way) information can be incorporated into the system, multiple streams of information can be integrated for delivery to a user, and certain portions of the information being delivered can be tailored to the individual user.



**US 5,778,187 C1**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,105,184 A | | 4/1992 | Pirani et al. |
| 5,132,992 A | | 7/1992 | Yurt et al. |
| 5,155,591 A | | 10/1992 | Wachob |
| 5,155,762 A | | 10/1992 | Croquet et al. |
| 5,195,086 A | | 3/1993 | Baumgartner et al. |
| 5,220,420 A | | 6/1993 | Hoarty et al. |
| 5,220,501 A | | 6/1993 | Lawlor et al. |
| 5,231,494 A | | 7/1993 | Wachob |
| 5,245,429 A | | 9/1993 | Virginio et al. |
| 5,251,324 A | | 10/1993 | McMullan, Jr. |
| 5,267,032 A | | 11/1993 | Van Cang |
| 5,283,639 A | | 2/1994 | Esch et al. |
| 5,283,731 A | | 2/1994 | Lalonde et al. |
| 5,289,271 A | | 2/1994 | Watson |
| 5,305,195 A | | 4/1994 | Murphy |
| 5,309,433 A | | 5/1994 | Cidon et al. |
| 5,319,455 A | | 6/1994 | Hoarty et al. |
| 5,347,304 A | | 9/1994 | Moura et al. |
| 5,347,632 A | | 9/1994 | Filepp et al. |
| 5,353,218 A | | 10/1994 | De Lapa et al. |
| 5,355,371 A | | 10/1994 | Auerback et al. |
| 5,361,091 A | | 11/1994 | Hoarty et al. |
| 5,361,256 A | | 11/1994 | Doeringer et al. |
| 5,371,532 A | | 12/1994 | Gelman et al. |
| 5,387,927 A | | 2/1995 | Look et al. |
| 5,410,698 A | | 4/1995 | Danneels et al. |
| 5,412,416 A | | 5/1995 | Nemirofsky |
| 5,414,773 A | | 5/1995 | Handelman |
| 5,418,559 A | | 5/1995 | Blahut |
| 5,421,024 A | | 5/1995 | Faulk, Jr. et al. |
| 5,422,674 A | * | 6/1995 | Hooper et al. .......... 375/240.15 |
| 5,424,770 A | | 6/1995 | Schmelzer et al. |
| 5,426,637 A | | 6/1995 | Derby et al. |
| 5,428,606 A | | 6/1995 | Moskowitz |
| 5,430,716 A | | 7/1995 | Pawelski |
| 5,432,542 A | | 7/1995 | Thibadeau et al. |
| 5,440,548 A | | 8/1995 | Denissen |
| 5,442,390 A | * | 8/1995 | Hooper et al. ............... 725/90 |
| 5,446,489 A | | 8/1995 | Egendorf |
| 5,446,490 A | | 8/1995 | Blahut et al. |
| 5,446,919 A | | 8/1995 | Wilkins |
| 5,453,779 A | * | 9/1995 | Dan et al. .................... 725/88 |
| 5,455,619 A | | 10/1995 | Truckenmiller et al. |
| 5,459,725 A | | 10/1995 | Bodner et al. |
| 5,481,297 A | * | 1/1996 | Cash et al. .............. 348/14.12 |
| 5,485,464 A | | 1/1996 | Strodtbeck et al. |
| 5,488,408 A | | 1/1996 | Maduzia et al. |
| 5,493,514 A | | 2/1996 | Keith et al. |
| 5,497,502 A | | 3/1996 | Castille |
| 5,508,732 A | * | 4/1996 | Bottomley et al. ........ 725/93 |
| 5,515,098 A | | 5/1996 | Carles |
| 5,517,494 A | * | 5/1996 | Green ...................... 370/408 |
| 5,521,927 A | * | 5/1996 | Kim et al. ................. 370/474 |
| 5,555,244 A | * | 9/1996 | Gupta et al. ............. 370/397 |
| 5,559,549 A | | 9/1996 | Hendricks et al. |
| 5,559,999 A | * | 9/1996 | Maturi et al. ............. 713/400 |
| 5,588,029 A | * | 12/1996 | Maturi et al. ............. 375/364 |
| 5,592,486 A | * | 1/1997 | Lo et al. ................... 370/389 |
| 5,594,732 A | * | 1/1997 | Bell et al. ................. 370/401 |
| 5,600,364 A | | 2/1997 | Hendricks et al. |
| 5,604,542 A | | 2/1997 | Dedrick |
| 5,610,920 A | * | 3/1997 | Doll et al. ................. 370/389 |
| 5,617,565 A | | 4/1997 | Augenbraum et al. |
| 5,634,334 A | * | 6/1997 | Hehl ............................ 60/328 |
| 5,636,346 A | | 6/1997 | Saxe |
| 5,649,013 A | | 7/1997 | Stuckey et al. |
| 5,652,615 A | * | 7/1997 | Bryant et al. ............. 725/35 |
| 5,652,749 A | * | 7/1997 | Davenport et al. ........ 370/466 |
| 5,666,487 A | * | 9/1997 | Goodman et al. ........ 709/246 |
| 5,671,226 A | * | 9/1997 | Murakami et al. ........ 370/474 |
| 5,673,254 A | * | 9/1997 | Crayford ................... 370/231 |
| 5,675,510 A | | 10/1997 | Coffey et al. |
| 5,694,334 A | | 12/1997 | Donahue et al. |
| 5,706,290 A | | 1/1998 | Shaw et al. |
| 5,715,336 A | * | 2/1998 | Tanaka ...................... 382/301 |
| 5,717,923 A | | 2/1998 | Dedrick |
| 5,727,002 A | * | 3/1998 | Miller et al. ............... 714/748 |
| 5,734,719 A | | 3/1998 | Tsevdos et al. |
| 5,745,837 A | * | 4/1998 | Fuhrmann ................. 725/114 |
| 5,751,336 A | | 5/1998 | Aggarwal et al. |
| 5,760,838 A | * | 6/1998 | Adams et al. ............. 348/460 |
| 5,771,073 A | * | 6/1998 | Lim ....................... 348/390.1 |
| 5,774,664 A | * | 6/1998 | Hidary et al. ............. 725/110 |
| 5,778,182 A | | 7/1998 | Cathey et al. |
| 5,778,187 A | | 7/1998 | Monteiro et al. |
| 5,790,541 A | * | 8/1998 | Patrick et al. ............. 370/392 |
| 5,793,980 A | | 8/1998 | Glaser et al. |
| 5,812,545 A | * | 9/1998 | Liebowitz et al. .......... 370/337 |
| 5,838,683 A | * | 11/1998 | Corley et al. ............. 370/408 |
| 5,848,396 A | | 12/1998 | Gerace |
| 5,862,329 A | | 1/1999 | Aras et al. |
| 5,872,588 A | | 2/1999 | Aras et al. |
| 5,878,384 A | | 3/1999 | Johnson et al. |
| 5,892,535 A | * | 4/1999 | Allen et al. ................. 725/36 |
| 5,894,480 A | * | 4/1999 | Hoffert et al. ............. 370/389 |
| 5,923,853 A | * | 7/1999 | Danneels ................... 709/238 |
| 5,928,331 A | | 7/1999 | Bushmitch |
| 5,930,254 A | | 7/1999 | Liron et al. |
| 5,930,493 A | | 7/1999 | Ottesen et al. |
| 5,931,961 A | | 8/1999 | Ranganathan et al. |
| 5,936,940 A | | 8/1999 | Marin et al. |
| 5,953,350 A | * | 9/1999 | Higgins .................... 370/524 |
| 5,960,006 A | * | 9/1999 | Maturi et al. ............. 370/509 |
| 5,983,005 A | | 11/1999 | Monteiro et al. |
| 6,002,393 A | | 12/1999 | Hite et al. |
| 6,005,560 A | * | 12/1999 | Gill et al. ................ 715/500.1 |
| 6,009,096 A | * | 12/1999 | Jaisingh et al. .......... 370/310.1 |
| 6,115,750 A | * | 9/2000 | Dillon et al. ............. 709/235 |
| 6,119,163 A | | 9/2000 | Monteiro et al. |
| 6,122,668 A | * | 9/2000 | Teng et al. ................ 709/231 |
| 6,208,656 B1 | * | 3/2001 | Hrastar et al. ............. 370/401 |
| 6,434,622 B1 | | 8/2002 | Monteiro et al. |
| 6,539,022 B1 | * | 3/2003 | Virgile .................... 370/401 |
| 6,560,707 B1 | * | 5/2003 | Curtis et al. ............. 713/163 |
| 2003/0140159 A1 | * | 7/2003 | Campbell et al. ........ 709/231 |
| 2004/0255148 A1 | | 12/2004 | Monteiro et al. |

## OTHER PUBLICATIONS

Park et al., "Fault–tolerant Real–Time Synchronous collaboration environment using WWW*", IEEE, 1996, pp. 226–231.*

Pullen, "Synchronous Distance Education Via the Internat", FIE'96 Preceedings, IEEE, 1996, pp. 285–288.*

Munzner, "Visualizing the Global Topology of the MBONE", IEEE, 1996, pp. 85–92 and 129.*

Shin, "Internet Multimedia Application Technologies Current Practice and Future Directions", IEEE 1996, p. 225.*

Chaddha et al., "A Frame–work for Live Multicast of Video Streams OVer the Internet", IEEE 1996, pp. 1–4.*

Macedonia et al., "MBone Provides Audio and Video Across the Internet", computer, Apr. 1994, pp. 30–35.*

*Two–Way Media LLC v. America Online, Inc.,* Civil Action No. C–04–089, S.D. Texas, Complaint, Mar. 9, 2004.

*Two–Way Media LLC v America Online, Inc.,* America Online, Inc.'s Answer to the Complaint and Counterclaim, Civil Action No. C–04–089, S.D. Texas, May 20, 2004.

*Two–Way Media LLC v America Online, Inc.,* Order, Civil Action No. C–04–089, S.D. Texas, Jun. 9, 2004.

**US 5,778,187 C1**

Page 3

"Framework for Interactive Video–on–Demand Service", Singru, A., et al., *Computers and Communications 1995, Conference Proceedings of the 1995 IEEE Fourteenth Annual International Phoenix Conference on Scottsdale, AZ*, Mar. 28, 1995, pp. 636–642.

Control No. 90/007,055, Order Granting/Denying Request for Ex Parte Reexamination, U.S. Patent and Trademark Office, mailed Jun. 23, 2004.

Control No. 90/007,056, Order Granting/Denying Request for Ex Parte Reexamination, U.S. Patent and Trademark Office, mailed Jun. 24, 2004.

P. Grillo et al., "Host Resources MIB", Network Working Group, RFC 1514, Sep. 1993.

S. Kille et al., "Network Services Monitoring MIB", Network Working Group RFC 1565, Jan. 1994.

K. McCloghrie et al., "Management Information Base for Network Management of TCP/IP–based Internets", Network Working Group, RFC 1156, May 1990.

J. Case et al., "A Simple Network Management Protocol (SNMP)", Network Working Group RFC 1157, May 1990.

Peter H. Lewis, "Peering out a 'Real Time' Window", *New York Times*, Feb. 8, 1995, pp. D1, D7.

David Lawrence, "Real–Time Audio, Hi–Fi, it Aint't", *Web Developer*, vol. 1, No. 1, Oct. 1995.

Harry A. Jessell, "EZ sees money in the Net", *Broadcasting & Cable*, Jul. 31, 1995, p. 31.

Brett Atwood, "Global 'Desktop B'casting' Catches On", *Billboard*, Jun. 10, 1995.

Brett Atwood, "KPIG First 24–Hour Online Radio", *Billboard*, Sep. 2, 1995.

Donna Petrazzella, "ABC Radio enters WWW", *Broadcasting & Cable*, Aug. 21, 1995, p. 38.

"DAVIC 1.0 Specification Part 1: Description of DAVIC Functionalities", Digital Audio–Visual Council (DAVIC), Rev. 3.1. The face of this document lists the following date: Jun. 22, 1995.

"DAVIC 1.0 Specification Part 02: System reference models and scenarios", Digital Audio–Visual Council (DAVIC), Rev. 3. The face of this document lists the following dates: Jun. 20, 1995 and Aug. 29, 1995.

"DAVIC 1.0 Specification Part 3: Server Architecture and APIs", Digital Audio–Visual Council (DAVIC), Rev. 3.0. The face of this document lists the following date: Jun. 7, 1995 and Aug. 29, 1995.

"DAVIC 1.0 Specification Part 04: Delivery system architectures and APIs", Digital Audio–Visual Council (DAVIC), Rev. 3.1. The face of this document lists the following dates: Jun. 8, 1995 and Aug. 29, 1995.

"DAVIC 1.0 Specification Part 5: STU Architechture and API", Digital Audio–Visual Council (DAVIC), Rev. 3.1. The face of this documents lists the following date: Jun. 26, 1995.

"DAVIC 1.0 Specification Part 6: High Layer Protocol", Digital Audio–Visual Council (DAVIC) Rev. 2.1. The face of this document lists the following dates: Jun. 8, 1995 and Aug. 29, 1995.

"DAVIC 1.0 Specification Part 7: Mid–Layer Protocols", Digital Audio–Visual Council (DAVIC) Rev. 3.0. The face of this document lists the following dates: Jun. 8, 1995, Jun. 19, 1995, Jun. 26, 1995, and Aug. 29, 1995.

"DAVIC 1.0 Specification Part 8: Lower Layer Protocols and Physical Interfaces", Digital Audio–Visual Council (DAVIC), Rev. 3.1, 1995. No other date is listed on the face of this document.

"DAVIC 1.0 Specification Part 9: Information Representation", Digital Audio–Visual Council (DAVIC), Rev. 3.2. The face of this document lists the following date: Jul. 6, 1995.

"DAVIC 1.0 Specification Part 10: Security", Digital Audio–Visual Council (DAVIC), Rev. 3.0 The face of this document lists the following dates: Jun. 8, 1995 and Aug. 29, 1995.

"DAVIC 1.0 Specification Part 11: Usage Information Protocols", Digital Audio–Visual Council (DAVIC), Rev. 3.1, 1995. No other date is listed on the face of the document.

"DAVIC 1.0 Specification Part 12: Reference Points, Interfaces and Dynamics", Digital Audio–Visual Council (DAVIC), Rev. 3.1, 1995. No other date is listed on the face of the document.

U.S. Appl. No. 90/007,445, filed Mar. 4, 2005, Request for Exparte Reexamination of U.S. Pat. No. 5,778,187.

U.S. Appl. No. 90/007,446, filed Mar. 4, 2005, Request for Exparte Reexamination of U.S. Pat. No. 6,434,622.

U.S. Appl. No. 90/007,447, filed Mar. 4, 2005, Request for Exparte Reexamination of U.S. Pat. No. 5,983,005.

"Structured Video", GCL's Proposal for DAVIC, Graphics Communications Laboratories, Dec. 1994.

"Multimedia Retrieval Services: Teletel Architecture as an example and a basis for future evolutions", Joint Proposal for the First DAVIC CFP, The Digital Audio–Visual Council, DAVIC Meeting, Tokyo, Japan, Dec. 4–7, 1994.

CableLabs® Response to DAVIC's CFP, Nov. 23, 2994.

Fong, Dr. Chung–Bin, et al., "Karaoke–On–Demand Service & System to DAVIC", Dec. 4, 1994.

Robinson, David et al., "Network Management Video Server System MIB", The Digital Audio–Visual Council (DAVIC), Dec. 8, 1994.

Thompson, John et al., "Response British Telecommunications Plc to: DAVICS's First Call for Proposals", BT Response to DAVICS/100, Issue 2.0, Oct. 14, 1994.

U.S. Appl. No. 10/180,590, filed Jun. 26, 2002, Monteiro et al.

U.S. Appl. No. 90/007,055, filed May 28, 2004, Ex Parte Reexamination of Monteiro et al. U.S. Pat. No. 5,983,005.

U.S. Appl. No. 90/007,056, filed May 28, 2004, Ex Parte Reexamination of Monteiro et al. U.S. Pat. No. 6,434,622.

Netradio Corp. to offer customized broadcasts with ads, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

News to the desktop: Vendors deliver personalized news to users via the Net, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

Netcast Pairs Audio with Advertising, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

Xing Takes on Progressive Networks in Internet Audio, Video Transmission with Streamworks, Tries Radio First, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

RealAudio Server, Administrator's Guide, Release 2.0. Progressive Networks, Inc.

RealAudio Signs Deal with Netscape—Apr. 12, 1995.

Progressive Networks ships RealAudio—Jul. 25, 1995.

Microsoft, Spry and Spryglass to include RealAudio—Apr. 12, 1995.

Apple Bundles Real Audio Player—Aug. 7, 1995.

24–Hour ABC News on the Net—Aug. 15, 1995.

Ziff–Davis Adds RealAudio to ZD Net—Aug. 16, 1995.

Progressive Network's Real Audio has exclusive with Microsoft's Internet Explorer—Aug. 17, 1995.

US 5,778,187 C1
Page 4

Progressive Network's Announces "Live RealAudio" System—Aug. 30, 1995.
ABC RadioNet first to fully integrate live RealAudio—Sep. 7, 1995.
RTIIK pioneers the use of LIVE RealAudio technology, Sep. 14, 1995.
Progressive Networks Announces RealAudio Personal Server—Oct. 9, 1995.
Progressive Networks Receives Second Round of External Financing $5.7 Million Led by Accel partners—Oct. 30, 1995.
CheckPoint Software Breaks the Sound Barrier with Integrated Support for RealAudio—Dec. 5, 1995.
Progressive Networks Introduces Version 2.0 of the RealAudio System—Oct. 30, 1995.
Atlantic Records, CDnow, Electra Records, In Touch Group Inc., MCA Records, Muzak and Warner Bros. Records among first users of Progressive Networks' Real Audio version 2.0—Dec. 4, 1995.
Progressive Networks to broadcast the Live and In Concert—Jan. 4, 1996.
Microsoft and Progressive Networks demonstrate first OLE–enabled Internet browser to incorporate RealAudio—Dec. 7, 1995.
Progressive Networks Announces RealAudio Server Products for Macintosh—Jan. 10, 1996.
Trusted Information Systems Enhances Industry Leading Gauntlet Internet Firewall—Jan. 23, 1996.
Border Network Technologies Provides Secure Support for Real Audio—Jan. 24, 1996.
Progressive Networks Announces Open RealAudio Architechture—Jan. 31, 1996.
RealAudio™ Server Software to be Bundled with newest Line of Apple Internet Servers—Feb. 27, 1996.
Bruce Jacobsen named President and Chief Operating Officer of Progressive Networks—Feb. 21, 1996.
GTA Announces RealAudio Support for the GFX Internet Firewall System—Mar. 1, 1996.
Morning Star's SecureConnect Technology Provides Internet Users of Real Audio with Sound Security—Mar. 4, 1996.
Progressive Networks and Microsoft Announce Streaming Media Agreement—Mar. 12, 1996.
Progressive Networks Announces RealAudio Firewall Proxy Kit—Apr. 2, 1996.
Progressive Networks Launches RealAudio 2.0 Intranet Offerings with Corporate Licensing Program and Intranet Server Pricing—Apr. 2, 1996.
Progressive Network Ships Final Version of RealAudio System 2.0 with Open Architecture Enhancements and Ability to Deliver Synchronized Multimedia Capabilities, Apr. 2, 1996.
Progressive Networks Launches Timecast: The RealAudio Guide—Apr. 29, 1996.
RealAudio Wins Internet World magazine Outstanding Software Product of the Year Aware—Apr. 30, 1996.
S. Casner & S. Deering, "First IETF Internet Audiocast," ACM SIGCOMM Computer Communications Review, vol. 22, No. 3 (Jul. 1992).
S. Casner, "Getting on the MBone, Videoconferencing Over the Internet," University of Southern California, Information Sciences Institute, NLUUG Spring Conference (Apr. 13, 1995).
S. Deering, "IP Multicast and the MBone: Enabling Live, Multiparty, Multimedia Communication on the Internet," Xerox Palo Alto Research Center (Dec. 1995).
H. Eriksson, "MBONE: The Multicast Backbone," Communications of the ACM, vol. 37, No. 8, pp. 54–60 (Aug. 1994).
V. Jacobson, "The MBone—Interactive Multimedia on the Internet," University of California at Berkeley Seminar (Feb. 17, 1995).
K. Jonas & R. Wetekam, "Multicast Protocols for Multimedia Applications," 3rd International Workshop on Protocols for Multimedia Systems (PROMS'96), Madrid, Spain (Oct. 15–18, 1996).
J. Pasqual et al., "The multimedia multicast channel," Internetworking: Research and Experience, Wiley Publishers, vol. 5, No. 4, pp. 151–162 (Dec. 1994).
H. Schulzrinne et al., "RTP: A Transport Protocol for Real–Time Applications," Network Working Group, Audio–Video Transport Working Group, Request for Comments (Proposed Standard) 1889, Internet Engineering Task Force (Jan. 1996).
H. Schulzrinne, "When can we unplug the radio and telephone?," Network and Operating System Support for Digital Audio and Video, 5th International Workshop, NOSSDAV '95, Durham, New Hampshire, USA, Proceedings, Session V: Audio and Video Systems, pp. 174–177 (Apr. 19–21, 1995).
Robinson and Hopper, "A MIB for Video Server System Management," Proceedings of the 2nd International Workshop on Community Networkin Integrated Multipmedia Services in the Home (Cat. No. TH8097; pp. 109–115) IEEE. Princeton, N.J., Jun. 20–22, 1995.
Stevens, R., "TCP/IP Illustrated, Vol. 1: The Protocols," SNMP, pp. 309, 360–361, 385–386.
RealAudio, Administrator's Guide, Release 1.01.
A MIB For Video Server System Management("DAVIC MIB").
RealAudio Server Administrator's Guide Release 1.01 and press release establishing availability as of Apr. 10, 1995("Real 1.01").
RealAudio Server Administrator's Guide Release 2.0 and press releases announcing Real 2.0 on Oct. 30, 1995("Real 2.0").
TCP/IP Illustrated, vol. 1—The Protocols.
Office Action dated Jul. 15, 1997 for the '072 Application.
Invalidity Claim Chart for U.S. Pat. Nos. 5,778,187; 5,983,005; and 6,434,622.
Appendix A: U.S. Pat. No. 5,778,187, filed Jul. 1998, Monteiro et al.
Appendix B: U.S. Pat. No. 5,983,005, filed Nov. 1999, Monteiro et al.
Appendix C: U.S. Pat. No. 6,434,622, filed Aug. 2002, Monteiro et al.
Appendix D: Network Management Video Server System MIB, Response to Call for Proposals, Dec. 8, 1994, David Robinson and Donald Hooper ("Robinson II"), prepared for DAVIC ("Digital Audio–Visual Council").
Appendix E: Karaoke–On–Demand Service & System to DAVIC, Dec. 4, 1994, Dr. Chung–Bin Fong et al. ("Fong"), prepared for DAVIC.
Appendix F: Structured Video, Dec. 1994, Graphics Communications Laboratory ("GCL"), prepared for DAVIC.
Appendix G: RealAudio Server Administrator's Guide Release 1.01 and press releases establishing availability as of Apr. 10, 1995 ("Real 1.01").

**US 5,778,187 C1**
Page 5

Appendix H: Response From British Telecommunications PLC to: DAVIC's First Call For Proposal, Oct. 14, 1994, John Thompson et al. ("Thompson"), prepared for DAVIC.

Appendix I: TCP/IP Illustrated vol. 1, (1994 19th Printing 2001) ("TCP/IP").

Appendix J: Multimedia Retrieval Services: Teletel Architecture as an example and a basis for future evolutions, France Telecom ("France"), prepared for DAVIC's meeting in Tokyo, Dec. 4–7, 1994.

Appendix K: Response to DAVIC's CFP ("Call for Proposals"), Nov. 23, 1994, CableLabs ("CableLabs").

Appendix L: PTO–1449.

Appendix M: Office Action dated Jul. 15, 1997.

Appendix N: RFC 1155 (Structure of Management Information Base (1990)) and RFC 1157 (Simple Network Management Protocol (1990)).

* cited by examiner

US 5,778,187 C1

1

**EX PARTE
REEXAMINATION CERTIFICATE
ISSUED UNDER 35 U.S.C. 307**

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

2

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1**–**51** is confirmed.

*  *  *  *  *

US005983005A

# United States Patent [19]

## Monteiro et al.

[11] **Patent Number:** 5,983,005

[45] **Date of Patent:** Nov. 9, 1999

[54] **MULTICASTING METHOD AND APPARATUS**

[75] Inventors: **Antonio M Monteiro; James F Butterworth**, both of New York, N.Y.

[73] Assignee: **Netcast Communications Corp.**, New York, N.Y.

[21] Appl. No.: **09/110,369**

[22] Filed: **Jul. 6, 1998**

### Related U.S. Application Data

[63] Continuation of application No. 08/644,072, May 9, 1996, Pat. No. 5,778,187.

[51] **Int. Cl.**[6] .................................................. **H04L 12/00**
[52] **U.S. Cl.** ...................................................... **395/200.61**
[58] **Field of Search** ........................ 395/200.61, 200.47, 395/200.49, 200.54, 200.57

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,105,184 | 4/1992 | Pirani et al. | 345/115 |
| 5,220,501 | 6/1993 | Lawlor et al. | 364/408 |
| 5,283,731 | 2/1994 | Lalonde et al. | 364/401 |
| 5,305,195 | 4/1994 | Murphy | 364/401 |
| 5,319,455 | 6/1994 | Hoarty et al. | 348/7 |
| 5,347,632 | 9/1994 | Filepp et al. | 395/200 |
| 5,361,256 | 11/1994 | Doeringer et al. | 370/60 |
| 5,414,773 | 5/1995 | Handelman | 380/49 |
| 5,446,919 | 8/1995 | Wilkins | 455/5.2 |
| 5,493,514 | 2/1996 | Keith et al. | 364/514 R |
| 5,604,562 | 2/1997 | Dedrisk | 348/552 |
| 5,617,565 | 4/1997 | Augenbraun et al. | 395/604 |
| 5,778,187 | 7/1998 | Monteiro et al. | 395/200.61 |

#### OTHER PUBLICATIONS

K. Savetz et al. MBONE Multicasting Tomorrow's Internet (IDG Books WorldWide Inc., 1996), Chapters 1–3; Appendixes A and B.

D.P. Brutzman et al., "MBONE Provides Audio and Video Across the Internet," IEEE Computer, vol. 27, No. 4, pp. 30–36 (Apr. 1994).

PCT International Search Report, International Application No. PCT/US97/07893.
RealAudio Server, Administrator's Guide, Release 2.0, Progressive Networks, Inc.
RealAudio Server, Administrator's Guide, Release 1.1.
RealAudio Signs Deal with Netscape—Apr. 12, 1995.
Progressive Networks Ships RealAudio System—Jul. 25, 1995.
Microsoft, Spry and Spryglass to Include RealAudio—Apr. 12, 1995.
April Bundles RealAudio Player—Aug. 7, 1995.
24–Hour ABC News on the Net—Aug. 15, 1995.
Ziff–Davis Adds RealAudio to ZD Net—Aug. 16, 1995.
Progressive Networks' RealAudio Player has exclusive with Microsoft's Internet Explorer—Aug. 17, 1995.
Progressive Networks Announces "Live RealAudio" System—Aug. 30, 1995.
ABC RadioNet first to fully integrate live RealAudio—Sep. 7, 1995.

(List continued on next page.)

*Primary Examiner*—Thomas R. Peeso
*Attorney, Agent, or Firm*—Pennie & Edmonds LLP

[57] **ABSTRACT**

A scalable architecture is disclosed for delivery of real-time information over a communications network. Embedded into the architecture is a control mechanism that provides for the management and administration of users who are to receive the real-time information. In the preferred embodiment, the information being delivered is high-quality audio. However, it could also be video, graphics, text or any other type of information that can be transmitted over a digital network. Preferably, there are multiple channels of information available simultaneously to be delivered to users, each channel consisting of an independent stream of information. A user chooses to tune in or tune out a particular channel, but does not choose the time at which the channel distributes its information. Advantageously, interactive (two-way) information can be incorporated into the system, multiple streams of information can be integrated for delivery to a user, and certain portions of the information being delivered can be tailored to the individual user.

**68 Claims, 23 Drawing Sheets**



**5,983,005**

Page 2

## OTHER PUBLICATIONS

RTHK pioneers the use of LIVE RealAudio technology, Sep. 14, 1995.

Progressive Networks Announces RealAudio Personal Server—Oct. 9, 1995.

Progressive Networks Receives Second Round of External Financing $5.7 Million Led by Accel Partners—Oct. 30, 1995.

CheckPoint Software Breaks the Sound Barrier with Integrated Support for RealAudio—Dec. 5, 1995.

Progressive Networks Introduces Version 2.0 of the RealAudio System—Oct. 30,1995.

Atlantic Records, CDnow, Elektra Records, InTouch, Group INc. MCA Records, Muzak and Warner Bros. Records among first users of Progressive Networks' RealAudio version 2.0—Dec. 4, 1995.

Progressive Networks to broadcast the Live and In Concert—Jan. 4, 1996.

Microsoft and Progressive Networks demonstrate first OLE– enabled Internet browser to incorporate RealAudio—Dec. 7, 1995.

Progressive Networks Announces RealAudio Server Products for Macintosh—Jan. 10, 1996.

Trusted Information Systems Enhances Industry–Leading Gauntlet Internet Firewall—Jan. 23, 1996.

Border Network Technologies Provides Secure Support for RealAudio—Jan. 24, 1996.

Progressive Networks Announces Open RealAudio Architecture—Jan. 31, 1996.

RealAudio™ Server Software to be Bundled with Newest Line of Apple Internet Servers—Feb. 27, 1996.

Bruce Jacobsen named President and Chief Operating Officer of Progressive Networks—Feb. 21, 1996.

GTA Announces RealAudio Support for the GFX Internet Firewall System—Mar. 1, 1996.

Morning Star's SecureConnect Technology Provides Internet Users of RealAudio With Sound Security—Mar. 4, 1996.

Progressive Networks and Microsoft Announce Streaming Media Agreement—Mar. 12, 1996.

Progressive Networks Announces RealAudio Firewall Proxy Kit—Apr. 2, 1996.

Progressive Networks Launches RealAudio 2.0 Intranet Offerings with Corporate Licensing Program and Intranet Server Pricing—Apr. 2, 1996.

Progressive Networks Ships Final Version of RealAudio System 2.0 with Open Architecture Enhancements and Ability to Deliver Synchronized Multimedia Capabilities—Apr. 2, 1996.

Progressive Networks Launches Timecast: The RealAudio Guide—Apr. 29, 1996.

RealAudio Wins Internet World Magazine Outstanding Software Product of the Year Aware—Apr. 30, 1996.

FIGURE 1



FIGURE 2



SATELLITE,
CABLE,
BROADCAST,
OR HARD DISK
FEED

10

RECEIVER/
DECODER
110

PRODUCTION
WORKSTATION
160

AUDIOVAULT -
NFS SERVER
170

ROUTING SWITCHER
120

DELAY
RECORDING
WORKSTATION
140

PLAYBACK/
CONTROL
WORKSTATION
130

PLAYBACK/
CONTROL
WORKSTATION
130

SUPERVISORY
WORKSTATION
150

TO PRIMARY
SERVERS

FIGURE 3



FIGURE 4



### FIGURE 5



**USER**

INSTALL SOFTWARE
FILL OUT FORM
ENTER NAME & PASSWORD
SELECT SUBMIT

CHECK VERSION NUMBER

SAVE SECURITY TOKEN

DISPLAY CHANNEL GUIDE

OPEN TCP CONNECTION

VERSION OBJECT

VERSION OBJECT

USER OBJECT

RESULT MESSAGE OBJECT

CHANNEL GUIDE REQUEST OBJECT

CHANNEL GUIDE OBJECT

CLOSE TCP CONNECTION

**FIGURE 6**

**ADMINISTRATION SERVER**

CHECK VERSION NUMBER

VERIFY INFORMATION
CHECK NAME IS UNIQUE
GENERATE SECURITY TOKEN
UPDATE USER DATABASE

RETRIEVE CHANNEL GUIDE

Appx130



FIGURE 7

**USER**

DISPLAY CHANNEL GUIDE

SAVE SECURITY TOKEN

CHECK VERSION NUMBER

ENTER NAME & PASSWORD

CLOSE TCP CONNECTION

CHANNEL GUIDE OBJECT

CHANNEL GUIDE REQUEST OBJECT

RESULT MESSAGE OBJECT

LOGIN INFO OBJECT

VERSION OBJECT

VERSION OBJECT

OPEN TCP CONNECTION

**ADMINISTRATION SERVER**

RETRIEVE CHANNEL GUIDE

QUERY USER DATABASE
RETRIEVE SECURITY TOKEN

CHECK VERSION NUMBER

FIGURE 8A

USER
ADMINISTRATION SERVER
SELECT CHANNEL TO PLAY
OPEN TCP CONNECTION
VERSION OBJECT
VERSION OBJECT
CHECK VERSION NUMBER
CHECK VERSION NUMBER
RETRIEVE SECURITY TOKEN
SERVER LIST REQUEST OBJECT
VALIDATE SECURITY TOKEN
GENERATE SERVER LIST
(ACTIVATE CHANNEL)
PROTOCOL LIST OBJECT
SAVE CONTROL SERVER LIST
CLOSE TCP CONNECTION
CONTROL SERVER
GET FIRST CONTROL SERVER
OPEN TCP CONNECTION
VERSION OBJECT
VERSION OBJECT
CHECK VERSION NUMBER
CHECK VERSION NUMBER
RETRIEVE SECURITY TOKEN
SERVER LIST REQUEST OBJECT
VALIDATE SECURITY TOKEN
GENERATE SERVER LIST
(ACTIVATE CHANNEL)
PROTOCOL LIST OBJECT
SAVE MEDIA SERVER LIST
CLOSE TCP CONNECTION
(CONTINUED)



FIGURE 8B



FIGURE 8C

USER
(CONTINUED)

SELECT CHANNEL STOP

MCI REQUEST OBJECT (STOP)

RESULT MESSAGE OBJECT

MCI REQUEST OBJECT (CLOSE)

RESULT MESSAGE OBJECT

CLOSE TCP CONNECTION

MEDIA SERVER
(CONTINUED)

SEND LOG MESSAGE
STOP AUDIO PACKETS



FIGURE 9A

Appx135

FIGURE 9B

| REQUEST FROM | REQUEST TO | VALIDATION WITH |
|---|---|---|
| (SHOWN ABOVE)    USER | CONTROL SERVER | ADMINISTRATION SERVER |
| USER | MEDIA SERVER | CONTROL SERVER |
| MEDIA SERVER | MEDIA SERVER | CONTROL SERVER |
| MEDIA SERVER | PRIMARY SERVER | ADMINISTRATION SERVER |
| MEDIA SERVER | CONTROL SERVER | ADMINISTRATION SERVER |
| CONTROL SERVER | MEDIA SERVER | ADMINISTRATION SERVER |

FIGURE 10





FIGURE 11

Appx138



FIGURE 12

FIGURE 13





FIGURE 14

FIGURE 15

CONTROL SERVER
(ESTABLISHED TCP CONNECTION)

PREPARE INFORMATION ON WHICH MEDIA OR PRIMARY SERVER FEEDS CHANNEL

(ESTABLISHED TCP CONNECTION)

RESULT MESSAGE OBJECT

CHANNEL ACTIVATION OBJECT

MEDIA SERVER
(ESTABLISHED TCP CONNECTION)

SAVE CHANNEL INFORMATION

(ESTABLISHED TCP CONNECTION)

Appx142



FIGURE 16A

MEDIA SERVER
MEDIA OR PRIMARY SERVER
(INCOMING PLAY RECEIVED)
GET APPROPRIATE MEDIA OR PRIMARY SERVER
OPEN TCP CONNECTION
VERSION OBJECT
VERSION OBJECT
CHECK VERSION NUMBER
CHECK VERSION NUMBER
RETRIEVE SECURITY TOKEN
MCI REQUEST OBJECT (OPEN)
VALIDATE SECURITY TOKEN
ALLOCATE RESOURCES
RESULT MESSAGE OBJECT
MCI REQUEST OBJECT (PLAY)
RESULT MESSAGE OBJECT
START AUDIO PACKETS
FORWARD AUDIO PACKETS TO OTHER SERVER(S) OR USER(S)
UDP PORT
AUDIO PACKETS
PING OBJECT
PING OBJECT
UDP PORT
AUDIO PACKETS
PING OBJECT
PING OBJECT
(CONTINUED)
(CONTINUED)

FIGURE 16B

MEDIA SERVER
(CONTINUED)

(NO MORE CONNECTIONS
WITH CHANNEL OPEN)

CLOSE TCP CONNECTION

RESULT MESSAGE OBJECT

MCI REQUEST OBJECT (CLOSE)

RESULT MESSAGE OBJECT

MCI REQUEST OBJECT (STOP)

PRIMARY SERVER
(CONTINUED)

STOP AUDIO PACKETS

Appx144

FIGURE 17

Appx145

*FIG. 18*    MAIN USER SCREEN



**Figure 19**
**Key Pull-Down Menus on Main User Screen**

| File |
| --- |
| Login |
| Logout |
| Register |
| Close |
| Exit |

| Edit |
| --- |
| Copy |
| Properties |

| Audio |
| --- |
| Play |
| Stop |
| Mute |

| View |
| --- |
| Tool Bar |
| Status Bar |
| Web Bar |

| Help |
| --- |
| Help Topics |
| About... |

5,983,005

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# MULTICASTING METHOD AND APPARATUS

This is a continuation of application Ser. No. 08/644,072, filed May 9, 1996, now U.S. Pat. No. 5,778,187 and such application is hereby incorporated by reference.

## FIELD OF THE INVENTION

This relates to a method and apparatus for providing audio and/or visual communication services, in real-time to a multiplicity of identifiable users on a communications network, such as the Internet. In a preferred embodiment, the invention monitors which users are receiving signals on which one of a plurality of channels and modifies the content of at least some signals in response thereto. A particular application is to provide services akin to multi-channel radio or television with commercial programming content adjusted in accordance with the identity of the individual user.

## BACKGROUND OF THE INVENTION

Systems such as the Internet typically are point-to-point (or unicast) systems in which a message is converted into a series of addressed packets which are routed from a source node through a plurality of routers to a destination node. In most communication protocols the packet includes a header which contains the addresses of the source and the destination nodes as well as a sequence number which specifies the packet's order in the message.

In general, these systems do not have the capability of broadcasting a message from a source node to all the other nodes in the network because such a capability is rarely of much use and could easily overload the network. However, there are situations where it is desirable for one node to communicate with some subset of all the nodes. For example, multi-party conferencing capability analogous to that found in the public telephone system and broadcasting to a limited number of nodes are of considerable interest to users of packet-switched networks. To satisfy such demands, packets destined for several recipients have been encapsulated in a unicast packet and forwarded from a source to a point in a network where the packets have been replicated and forwarded on to all desired recipients. This technique is known as IP Multicasting and the network over which such packets are routed is referred to as the Multicast Backbone or MBONE. More recently, routers have become available which can route the multicast addresses (class D addresses) provided for in communication protocols such as TCP/IP and UDP/IP. A multicast address is essentially an address for a group of host computers who have indicated their desire to participate in that group. Thus, a multicast packet can be routed from a source node through a plurality of multicast routers (or mrouters) to one or more devices receiving the multicast packets. From there the packet is distributed to all the host computers that are members of the multicast group.

These techniques have been used to provide on the Internet audio and video conferencing as well as radio-like broadcasting to groups of interested parties. See, for example, K. Savetz et al. *MBONE Multicasting Tomorrow's Internet* (IDG Books WorldWide Inc., 1996).

Further details concerning technical aspects of multicasting may be found in the Internet documents Request for Comments (RFC) 1112 and 1458 which are reproduced at Appendices A and B of the Savetz book and in D. P. Brutaman et al., "MBONE provides Audio and Video Across the Internet," *IEEE Computer,* Vol. 27, No. 4, pp. 30–36 (April 1994), all of which are incorporated herein by reference.

Citation of the foregoing documents is not to be construed as an admission that any of such documents is a prior art publication relative to the present invention.

## SUMMARY OF THE INVENTION

The present invention is a scalable architecture for delivery of real-time information over a communications network. Embedded into the architecture is a control mechanism that provides for the management and administration of users who are to receive the real-time information.

In the preferred embodiment, the information being delivered is high-quality audio. However, it could also be video, graphics, text or any other type of information that can be transmitted over a digital network. This information is delivered in real-time to any number of widely distributed users. It is real-time in that for a given channel of information, approximately the same information is being sent at approximately the same time to everyone who is enabled to receive the information.

Preferably, there are multiple channels of information available simultaneously to be delivered to users, each channel consisting of an independent stream of information. A user chooses to tune in or tune out a particular channel, but does not choose the time at which the channel distributes its information. Advantageously, interactive (two-way) information can be incorporated into the system, multiple streams of information can be integrated for delivery to a user, and certain portions of the information being delivered can be tailored to the individual user.

## BRIEF DESCRIPTION OF THE DRAWING

These and other objects, features and advantages of our invention will be more readily apparent from the following Detailed Description of a Preferred Embodiment of our invention in which

FIG. **1** is a schematic diagram depicting an overview of the system of the present invention;

FIG. **2** is a schematic diagram depicting the network control center for the system of FIG. **1**;

FIG. **3** is a schematic diagram depicting a unicast distribution structure;

FIG. **4** is a schematic diagram depicting a multicast distribution structure;

FIG. **5** is a schematic diagram depicting the connection between the media server and the user in the system of FIG. **1**;

FIGS. **6–17** are timing diagrams which depict various aspects of the operation of the system of FIG. **1**; and

FIGS. **18** and **19** depict the user interface for control of the system of FIG. **1**.

Where the same reference numerals appear in multiple drawings, the numerals refer to the same or corresponding structure in such drawings.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. **1**, the system of the present invention comprises a Network Control Center **10**, a plurality of Primary Servers **20**, Media Servers **30**, Users **40** and Control Servers **50** and an Administration Server **60**. The servers are interconnected by a communications network, which in the preferred embodiment is the global connected internetwork known as the Internet. The Network Control Center **10** is the source of the information being distributed. It receives audio

5,983,005

3

feeds from satellite, over the air broadcast or in other ways and processes this information for delivery over the network on multiple channels of information. This processing consists of optionally recording the information for future broadcast and dynamically inserting paid commercial advertisements.

For each channel of information, there is a Primary Server **20** that receives the stream of information from the Network Control Center **10** and compresses the information stream to allow for more efficient transmission. The Primary Servers **20** are directly connected to the network.

The Primary Servers forward information via the network to a number of Media Servers **30**. There may be a large number of Media Servers and in fact there may be many levels of Media Servers. For example, a Media Server which receives a stream of information from a Primary Server may forward that stream via the network to another Media Server which then forwards it to a User **40**. This multilevel hierarchical structure is described in more detail below.

The topology of the Internet dictates the ideal placement of Media Servers, the fan-out of each Media Server and the number of levels of Media Servers between the Primary Server and Users. For example, the Media Servers which feed from a Primary Server might be placed at a major points of presence (POPs) of each of the large Internet service providers. These Media Servers might also be placed near clouds which serve as high bandwidth exchange points between the major carriers. Similarly, Media Servers which feed to Users might be placed on or close to networks which have a large number of subscribers to minimize the distance and number of data streams being transmitted.

Control Servers **50** are responsible for keeping track of which Users are listening to which channels and for directing the Media Servers to start and stop streams of information to those Users. The Control Servers are also responsible for handling other interactions among the various components of the system as will be described in more detail below. Each Control Server is responsible for managing a cluster of Media Servers; and each Media Server is managed by a single Control Server at any given time. As a result, the Control Servers are distributed throughout the Internet, preferably located close to the Media Servers.

The Administration Server **60** is responsible for registering new Users, authenticating Users who want to log onto the system, and maintaining audit logs for how many Users are listening to which channels and at which times. Maintaining audit logs and gathering statistics are features critical to monitoring the delivery of paid commercial messages as well as for other purposes. For example, for purposes of assessing copyright royalties, the audit logs can record the number of listeners for each musical or video selection that is distributed by the system. Another application is to determine the percentage of listeners who are interested in listening to a particular musical selection by determining how many listen to the entire selection and how many turn it off.

The system of the present invention can be considered a distribution architecture integrated with a control architecture. The distribution architecture handles scalable real-time delivery of information to any number of Users on a packet switched network, such as the Internet. The control architecture represents a second scalable system integrated with the distribution architecture for managing and administering the delivery of that information.

The remainder of this description is divided into three sections. In the next section the distribution architecture will

4

be described in more detail. Following that, the control architecture will be described. In the third section the User interface will be illustrated.

Distribution Architecture

The distribution architecture provides for the delivery of real-time information to any number of Users distributed throughout a network. As will be described in detail below, the distribution architecture is scalable to allow for efficient delivery of multiple simultaneous information channels in real-time to a large number of Users.

In the preferred embodiment, the information which is being distributed consists of high-quality audio in addition to other information. It should be appreciated that the basic architecture and other general principles set forth herein would also apply to the delivery of video, graphics, text or any other type of information that can be delivered over a digital network. In addition, it should be appreciated that an information stream can consist of audio with supplemental information such as text and graphic images and commands to control software running on the User's computer.

The source of information in the preferred embodiment is the Network Control Center **10**, depicted in the schematic diagram of FIG. **2**. Control Centers of this type of design are available from Broadcast Electronics, Inc. and are similar to what would be found in a conventional radio station serving multiple frequencies.

Referring to FIG. **2**, the incoming signal can be received in a variety of ways such as from a satellite, over-the-air broadcast, cable or hard disk. It is then processed by Receiver/Decoder **110**, which decodes the signal and provides an incoming audio stream. Routing Switcher **120** is responsible for routing the incoming audio feed from the Receiver to either Delay Recording Workstation **140** or to one of the Playback/Control Workstations **130**. Real-time insertion of paid commercial advertising takes place at the Playback/Control Workstations and the resulting integrated audio stream is delivered to the Primary Servers. The Delay Recording Workstation is responsible for recording an incoming broadcast so that it can be played back at a later time.

Supervisory Workstation **150** is responsible for managing and controlling the Playback/Control Workstations, Delay Recording Workstations and other computers as may be connected to the local area network within the Network Control Center. Production Workstation **160** and AudioVAULT-NFS Server **170** are used to manipulate audio samples, such as commercial messages for use by the Playback/Control Workstations. The audio being delivered can consist of syndicated TV or radio programs, such as would be received over satellite or cable and delivered as described above. These can be delivered live and/or played back at a later time. It is also possible for the delivery of information, such as music, to take place from information that is all stored locally such as on a hard disk. A new play list and its associated music data can then be downloaded periodically to update the channel. Additionally, it is possible to deliver commercial-free programming, for example public service announcements or label-specific music.

In the preferred embodiment the Primary Servers are responsible for compressing the audio stream using an advanced perceptual technique developed and licensed by AT&T Corp. and Lucent Technologies, Inc. This highly sophisticated algorithm is used to maximize the benefit of the bandwidth available. Advantageously, two bitrates are available, a first rate of approximately 20 Kbps and a second

5,983,005

5

rate of approximately 56 Kbps. Using the perceptual technique, the quality of the first rate is similar to FM monaural (with a sampling rate of approximately 22,000 16-bit samples per second) and the second rate is close to CD quality stereo (with a sampling rate of approximately 32,000 16-bit samples in stereo each second). The signals at the two different bitrates comprise two different audio channels and thus require two different compression processes.

The computational requirements of compressing an audio stream in real time using techniques such as the advanced perceptual technique are approximately 100% of a Pentium-Pro 200 Mhz computer and the computational requirements of decompressing an audio stream in real time are approximately 30% of a Pentium 75 Mhz computer. Future improvements and/or changes to the algorithm could significantly change these requirements. For the present, a dedicated computer is required within the Primary Server to compress the audio stream. The decompression process takes place on end Users' computers and preferably would use only a portion of the computers' computational requirements, allowing the computers to be used for other tasks while they are processing the audio stream.

It is important to appreciate that the compression and decompression techniques employed by the present invention are not critical to the overall operation of the system and the advantages obtained therefrom could be obtained with other compression methodologies. Advantageously, the identity of the compression technique used can be encoded into the audio stream in the packet header. This makes it possible to identify to the receiver the nature of the decompression algorithm to use; and thereby make it possible for the computer within the Primary Server to select an optimum compression algorithm depending on the nature of the audio stream to be compressed.

The remainder of the distribution architecture comprises the multilevel hierarchy of data transmission originating at the Primary Server **20** and terminating at the Users **40** as shown in FIG. **3**. In the preferred embodiment, the network is the global connected Internet. It can also include private networks which are connected to the Internet and it could be implemented on any packet switched network, cable-modem-based or satellite-based cable system. It is possible that certain links within the overall system, for example, the link between the Primary Server and the first level of Media Servers, are private data links which carry only data associated with this system. This could also be true of other data transmission paths in the distribution architecture. The User receiving the information preferably can be anyone who has access to the Internet with sufficient bandwidth to receive the resulting audio data.

It should be appreciated that the distribution architecture of the present invention provides for scalability. Using such a structure, any number of Users, and as widely distributed as necessary, can be accommodated. In the preferred embodiment, the fan-out at each level of Media Server (given the state of technology today) is on the order of ten, but the same structure could be applied with other fan-outs. The location and fan-out of the Media Servers is chosen to minimize overall network bandwidth consumed.

The flow of information from Primary Server **20** through network to User **40** is based on the delivery of a continuous sequence of individual pieces of information., or packets. Thus the distribution architecture implements a form of multicast packet delivery to a group. The group in this case is the set of all Users who are listening to a given channel at a given time. Group membership is dynamic, Users can start and stop listening to a channel at any time.

6

Multicasting can be implemented in a variety of ways, any or all of which can be used in the present invention. In the preferred embodiment, the Media Servers receive unicast packet streams and they then duplicate these streams into more unicast streams to other Media Servers which are in the membership group for that stream. The lowest level Media Servers use hardware broadcast, multicast and/or unicast to reach all Users served by that Media Server.

If the Media Server is directly connected to the same physical network as the User, hardware broadcast or multicast can be used to transmit the packet stream to all Users listening at that time on that network. In this case the Media Servers can translate the incoming packets into broadcast or multicast packets for transmission on the local network. Only a single packet is transmitted at-a-time on the local network and any computer directly connected to the local network can receive that packet. Hardware multicast is built into most networks and it is lower in overall overhead than hardware broadcast since computers not interested in a transmission do not have to process the packets. In the case that a Media Server is serving a User who is not on the same physical network, a unicast transmission is used to reach that User, which requires a separate packet transmission for each User so connected. In the preferred embodiment, the assignment of Users to Media Servers is done using control transactions among the User **40**, Control Servers **50**, and Administration Server **60**. This system will be described more fully in the following section.

Multicasting can also be implemented within the Internet at the IP level using IP class D addresses and the IGMP group control protocol. FIG. **4** illustrates how the multilevel hierarchical distribution architecture would operate using IP multicast delivery. Under this system, a packet is transmitted with a multicast address for a destination and each router maintains group membership lists for each interface that it is connected to and will forward packets across the Internet to other routers such that all Users within the global group eventually receive a copy of this packet. Unless and until all routers within the Internet understand multicasting in this way, it is necessary to supplement it with IP tunneling in which multicast packets are encapsulated in unicast packets and routed by unicast routers to a multicast routers. The present invention can and will be able to take advantage of IP multicasting as it becomes widely available. Each channel of information would be given its own class D address and the Media Server would then simply transmit packets using the appropriate IP destination address. In this case no Media Servers would be used as this function would be accomplished by the routers in use to store and forward other IP packets.

Thus it can be appreciated that the implementation of the multicast delivery structure can be implemented using a combination of IP unicast, IP multicast and hardware multicast or any other system which provides for distributed delivery of information to a specific group of destinations. It is expected that special relationships with Internet providers will be established so that delivery of the audio steams can take place with a guaranteed bandwidth and in the most efficient way possible.

In the preferred embodiment, packets of information for distribution use the UDP protocol under IP rather than the TCP protocol. TCP provides for reliable stream delivery but at the cost of retransmission and delays. For real-time information, it is usually more appropriate to use UDP since the information is time critical and low latency is more important that reliability. Since TCP is a point-to-point protocol, it is incompatible with IP multicasting. However,

5,983,005

7

TCP could be used on the IP unicast links between Media. Servers which are expected to have very low packet loss. In order to handle out of order, lost, duplicate and corrupted packets, the UDP packets are serialized.

In the preferred embodiment the size of the audio packets being transmitted is variable and can change on a packet by packet basis. It is expected that when using compression schemes that have a fixed bit rate, such as ADPCM, all packets for that stream would be the same size. Alternatively when using a variable bit rate compression algorithm, it is expected that packet size would vary so as to establish approximately the same amount of time for each sample. For example, if each packet corresponds to a 20 millisecond segment of speech, this could correspond to 100 bytes during one time period and 200 bytes during another. Additionally, the Media Server may choose to dynamically vary the packet size to accommodate changes in network conditions.

Since the resulting playback of audio information is sensitive to packet loss and network congestion, software running on the various computers which make up this system monitor the ongoing situation and adapt to it in the best possible way. This may involve using different Media Servers and/or lowering the data rate to the User. For example, similar to analog dynamic signal quality negotiation present in many analog radio receivers, the User software may request a lower bitrate until the situation is improved. Also, note that the audio information being delivered to the User is preferably interleaved so that a contiguous segment of the audiostream is distributed for transmission over several packets. As a result, the loss of one packet is spread out over multiple audio samples and causes minimal degradation in audio. Advantageously, a small degree of redundancy may be incorporated within the audio stream to further guard against packet loss.

Preferably, there are two bitrate options available to the User for audio delivery. These are approximately 20 Kbps for standard audio and approximately 56 Kbps for high quality audio. Thus, a 28.8 Kbps modem connection over an analog phone line is sufficient to listen to standard audio broadcasts. To listen to high quality audio, an ISDN connection to the Internet is required, or some other connection with greater than 56 Kbps bandwidth. It should be appreciated that higher bandwidths are currently becoming available to end Users. In particular the use of cable modems and residential fiber networks are enhancing the bandwidths available to Users and thus making broadcasts of higher bitrates more practical.

In addition to the content of the audio channel being delivered, it is also possible to deliver out of band of side-bar information such as graphics, images and text. This side-bar information is synchronized with the audio channel. This may only involve small increases in bandwidth requirements, such as 1–2 Kbps. For example a music program could deliver images of an album cover, the text of song lyrics, or URLs for use by a Web browser. The User can preferably choose to have the side-bar information show up automatically or be hidden. It is also possible to incorporate two-way interaction into the system, such that for example Users can participate in a global chat session during the audio broadcast. These and other details are explained in more detail below under the description of the User interface.

The delivery of paid commercial advertising information is an important aspect of the present invention. Advertising may be incorporated into the audio stream within the Network Control Center as described above. It may also be

8

incorporated into the audio stream at the User level, or at some intermediate point in the distribution architecture. In addition, the side-bar information discussed above can also include advertising content. FIG. 5 illustrates the provision to the User of two separate streams 32, 34 of packets, one of which may be used for advertising. In this case the insertion of the stream of commercial advertising into the non-commercial stream occurs on the User's computer. FIG. 5 also illustrates packet stream 36 which identifies the User to the system. This enables the system to monitor which Users are listening to which channels and also allows the system to vary, for example, the advertising content delivered to a User.

One advantage of this alternative is to allow targeted commercial delivery based on the individual User. That is, an individual User would receive the main audio feed plus a particular advertising stream unique to his demographic group. Note that the advertising stream typically is lower in overall bitrate and generally does not require real-time delivery, thus lowering the overall load on the network. For example, the advertising stream could be delivered to the User in advance of the regular programming, stored in a buffer in the User's computer and inserted into the stream of regular programming upon receipt of a cueing signal embedded in the stream of regular programming. Thus, a substantial number of targeted groups, perhaps 10 or 100 or even more could be accommodated without an impractical increase in network load.

Control Architecture

The control architecture described in this section is responsible for managing and administering the Users who are receiving the information being delivered by the distribution architecture described in the previous section. The control architecture handles new User registration, User login, the starting and stopping of audio streams and the monitoring of ongoing transmissions. The control architecture is scalable just as is the distribution architecture so that any number of Users can be managed.

This section describes the control protocol, which consists of the format and sequence of control messages that are exchanged among Users, Control Servers, Media Servers, Primary Servers and the Administration Server. These messages are in the form of objects, which have specific data formats. Objects are exchanged preferably using the TCP protocol although other options are possible. Below we describe the sequence of objects passed among the various computers and detail the internal structure of each object.

The major objects used in the present embodiment of the invention are set forth in Table 1. For each object, Table 1 provides a brief description of its function, identification of the names of the fields in the object, their types and a brief description of their function.

TABLE 1

Channel Activation Object
Contains information used for channel activation/deactivation. It is sent to Media and Primary Servers to tell them to carry or stop carrying a specific channel. Media Servers get the channel from another server in the system hierarchy and Primary Servers get and encode the feed from the actual input source.

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | |
| Moniker | Moniker Object | unique channel identifier |
| Activate | Int | action flag (activate/deactivate) |

5,983,005

**9**

TABLE 1-continued

| | | |
|---|---|---|
| CompressType | Int | type of compression to use |
| Host | Host Object | host carrying the channel |

Channel Guide Object
Contains analytical and descriptive information for an item requested that is uniquely identified by a moniker. It is usually the reply to a Channel Guide Request object.

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | |
| Type | Int | type of content |
| Result | | the content data itself |

Channel Guide Request Object
Conveys a request for analytical and descriptive information about an item uniquely identified by the contained moniker. The reply is in the form of a Channel Guide object.

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | inherited from base class |
| Type | Int | type of content |
| Moniker | Moniker Object | unique identifier |

Host Object
Encapsulates the attributes of a networked computer related to the operation or services it offers or requests.

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | |
| HostName | String | computer name and domain |
| PortNumber | Int | port number for service |
| DisplayName | String | descriptive computer name |

Login Information Object
Encapsulates the name and password by which a User is known to the system.

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | |
| Login | String | User's system login name |
| Password | String | User's system password (possibly encrypted) |

Media Control Interface (MCI) Request Object
Encapsulates a multimedia control command, such as play and stop, and any extra information that may be necessary to perform the requested service.

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | |
| Command | Int | multimedia command |
| String | String | command-specific extra info |

Moniker Object
A moniker encapsulates the name of an object or process with the intelligence necessary to work with that name. In other words, it provides naming and binding services. The Moniker Object is used in the system for unique identification of various components, parts or features, such as a channel, a directory, or a computer list.

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | |
| ID | String | unique string identifier |
| DisplayName | String | User-readable name |

**10**

TABLE 1-continued

Ping Object
Ping is the name given to the "Are-You-Alive?" operation useful in determining if a specific computer is up and running. This object is used in the system when a server has to be queried for its operational status. It can also provide timing information for statistical purposes and quality of service evaluations.

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | |
| Date | Date | system date |
| Time | Time | system time |

Protocol List Object
Encapsulates a general purpose collection object.

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | |
| Type | Int | type of object list |

Result Message Object
Acts as the acknowledgment for a requested service successfully carried that out or reports errors that occur in the system during a client/server transaction.

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | |
| Code | Int | result code |
| Message | String | message corresponding to code |

Security Token Object
Contains the authorization key for a transaction. The key must be validated before any service is performed.

| Field Name | Field Type | Remarks |
|---|---|---|
| ID | String | authorization key/transaction ID. |

Server Activation Object
Contains information used in the server activation/deactivation process. Used for announcement as well as command purposes (e.g., a server can notify the administration database that is now activated or a server can be instructed to manage someone else).

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | |
| Active | Int | action flag (activate/deactivate) |
| Manage | Int | control flag (manage/associate) |
| Type | Int | server type |
| Host | Host Object | host to be controlled |

Service List Request Object
Encapsulates a request for a list of available server resources for an identified service (e.g., a request for a list of Control Servers for a specified channel).

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | |
| Type | Int | type of service |
| Moniker | Moniker Object | content/channel unique identifier |
| Host | Host Object | local host information |

Statistics Object
Contains system-related information that can be used by load-balancing algorithms and for statistical purposes.

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | |
| Load | Int | load on the system |
| Threads | Int | number of threads |

5,983,005

**11**

TABLE 1-continued

| | | |
|---|---|---|
| | | running |
| Users | Int | number of Users being |
| Uptime | Int | serviced |
| NumberManaged | Int | amount of time running |
| NumberAssociated | Int | number of managed |
| | | servers |
| | | number of associated |
| | | servers |

Statistics Request Object
Encapsulates a request for system-related information that can be used
by load-balancing algorithms and statistical purposes.

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | |
| Load | Int | request flag (on/off) |
| Threads | Int | request flag (on/off) |
| Users | Int | request flag (on/off) |
| Uptime | Int | request flag (on/off) |
| NumberManaged | Int | request flag (on/off) |
| NumberAssociated | Int | request flag (on/off) |

User Object
Users and Servers use this object to register themselves with the
administration database. They provide the information for subsequent
logins (name, password) and other system-related info. The end-Users
provide personal, demographic, and system-related information.

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | |
| Login | Login Information Object | login information (name, password) |
| FirstName | String | User's first name |
| LastName | String | User's last name |
| Title | String | User's job title |
| Company | String | User's employer |
| Address1 | String | User's home street address |
| Address2 | String | User's address extra |
| City | String | city, village |
| State | String | state, province or foreign country |
| ZipCode | String | zip or postal code |
| Age | String | User's age |
| Gender | String | User's gender |
| PhoneNumber | String | telephone number |
| FaxNumber | String | fax number |
| Email | String | email address |
| Demographics | Dictionary | market-targeting extra User info |
| SystemInfo | Dictionary | system-related information |

Version Object
All components of the system use this object to report their versioning
information to the party they transact with in order to use a protocol
they both understand. They are also given the chance to update
themselves if a newer version exists.

| Field Name | Field Type | Remarks |
|---|---|---|
| Token | Security Token Object | |
| Major | Int | major protocol version number |
| Minor | Int | minor protocol version number |
| Type | Int | sender type |
| Client | Version | client version information |

Unlike traditional protocols based on state computers, the control protocol of the present invention is a light-weight, stateless protocol comprising simple sequences of objects. It is light-weight in that in most sequences only two objects are involved in the transaction and after a sequence is completed the connection can be reused. It is also stateless in that the

**12**

server maintains no information about the client. Every transaction is handled independently of the previous ones. States exist in the lower levels, for example within the TCP layer, to express logical states of a network connection but they are not actually part of the control protocol.

In the preferred embodiment, the software running on the Control Servers, Media Servers and Primary Servers is programmed for Windows NT and UNIX environment using the OLE environment. In addition, COM interfaces are used between components. The Rogue Wave system is used to transfer objects between the applications running on the various computers. The software running on the User computer is preferably programmed for a Windows 32-bit environment, so it will run on a Windows 95 or Windows NT computer. Alternatively, Macintosh and UNIX environments can be accommodated by other User software.

The basic process of a control transaction consists of a version sequence followed by one or more protocol sequences. The version sequence starts after the computer initiating the transaction, the client, has established a connection with the computer completing the transaction, the server. The client sends a Version Object (defined in Table 1) and in response the server then sends back its own Version Object. This version sequence is used so that both client and server are aware of the version numbers of the software they are using. If a version number is older than expected, either client or server can choose to conform to the previous version or abort the transaction, depending on its needs and capabilities. If a version number is newer than expected, in most cases the current transaction can be completed since the software systems are designed to be fully backward compatible with previous versions. Additionally, in the case that the server of the transaction is the Administration Server, the client receives information about what the latest version number is and thus the client can be informed that a software update is needed. The process of handling automatic updating of User software is described more fully below.

After the version sequence, one or more protocol sequences occur in which other objects are exchanged between client and server. When a particular protocol sequence is completed, another independent protocol sequence can be serviced. The protocol sequences that are part of the control architecture of the present invention are summarized in Table 2 and described below in conjunction with FIGS. **6–17**.

TABLE 2

Summary of Protocol Sequences

| Control Sequence | Client | Server | Main Objects Exchanged |
|---|---|---|---|
| User Registration and Login (see FIG. 6) | User | Adminis-tration | Version Object User Object Channel Guide Object |
| User Login (see FIG. 7) | User | Adminis-tration | Version Object Login Information Object Channel Guide Object |
| Channel Play (see FIGS. 8a, 8B, 8C) | User | Adminis-tration | Version Object Server List Object |
| | | Control | Version Object Server List Object |
| | | Media | Version Object MCI Objects - OPEN/PLAY/STOP/CLOSE Ping Objects (TCP connection stays open) |
| Token Validation | Control or | Adminis- | Version Object |

5,983,005

| 13 | | 14 |

### TABLE 2-continued

#### Summary of Protocol Sequences

| Control Sequence | Client | Server | Main Objects Exchanged |
|---|---|---|---|
| (see FIGS. 9A, 9B) | Media or Primary | tration or Control | Security Token Object |
| Server Registration and Login (see FIG. 10) | Media or Control | Adminis-tration | Version Object User Object Server Activation Object |
| Server Login (see FIG. 11) | Media or Control | Adminis-tration | Version Object Login Object Server Activation Object |
| Control Server Activation (see FIG. 12) | Adminis-tration | Control | Version Object Server Activation Object |
| Media Server Activation (see FIG. 13) | Control | Media | Version Object Server Activation Object Ping Objects (TCP connection stays open) |
| Control Channel Activation (see FIG. 14) | Adminis-tration | Control | Version Object Channel Activation Object |
| Media Channel Activation (see FIG. 15) | Control | Media | (open TCP connection) Channel Activation Objects |
| Distribution Activation (see FIG. 16) | Media | Media or Primary | Version Object MCI Objects - OPEN/PLAY/STOP/CLOSE Ping Objects (TCP connection stays open) |
| Statistics Request (see FIG. 17) | Adminis-tration | Control or Media | Version Object Statistics Object |

The User registration and login sequences are the processes by which a new User registers with the system, logs in and retrieves programming information. The channel play sequence takes place when a User asks to listen to a particular channel. The token validation sequence is used to verify that a computer requesting a service is authorized to do so. The Server registration, login and activation sequences are used by Control and Media Servers when they become active. The Control Server and Media Server activation sequences are used to manage the Control and. Media Servers. The control channel, media channel and distribution activation sequences are used to cause a channel to be distributed to a Media Server. Finally, the statistics request is used for administrative purposes.

FIG. 6 illustrates the User registration and login sequence in more detail. This sequence takes place after the User has installed the User software on his/her computer. It is expected that the User will download the software from the Internet and then invoke it which in the preferred embodiment will use the Windows Wizard interface. This will guide the User through the installation process including filling out the registration form, which we will describe more fully in the next section. After the User has selected a name and password and selected the option to register, the User computer opens a TCP connection to the Administration Server. Advantageously, the full domain name of the Administration Server is embedded into the User software, although it could be discovered in other ways. The User and Administration Server then exchange version objects with the Administration Server as described above. If the version numbers match expectations, the User sends a User Object to the Administration Server. The format of the User Object is shown in Table 1. Once the Administration Server receives the User Object, it verifies that the information is filled in properly and that the selected User name is unique. If the User Object is invalid for any reason, the Administration

Server returns a Result Message Object with a code indicating the reason. The format of the Result Message Object is shown in Table 1. If the User information is valid, the Administration Server updates the global database of User names and passwords and then generates a security token for that User. This security token is then returned to the User in a Result Message Object.

Upon receiving the Result Message Object, the User saves the security token for future use. This token is an identifier that allows the User to request services from the Administration Server and other computers within the overall system. The security token is not saved permanently or registered on the User computer. Normally, the User software then immediately sends a Channel Guide Request Object to the Administration Server and a Channel Guide Object is returned. The format of these objects is also shown in Table 1. Note that in principle, this is a separate transaction and could take place in a separate TCP connection to the Administration Server. In particular, once the User has registered and logged in, he/she can request the Channel Guide Object again since it may have been updated since the previous request. At this point the TCP connection to the Administration server is closed.

The process of User registration only needs to take place once for each User. However anyone can re-register at any time, even after the software has been installed. In particular, it is expected that if multiple persons use a computer, each person will register and obtain his/her own User name and password. If the registration process is not completed successfully, the User software saves the registration information and ask the User if they would like to try again the next time the software is invoked.

Since the security token is not permanently saved by the User software, it is lost when the User software is closed, and the security token must again be retrieved from the Administration Server the next time the User wants to use the system. This process is the purpose of the login sequence illustrated in FIG. 7. This sequence is used if a User has already registered and needs only to retrieve a valid security token. In this case the sequence consists of the User's sending a Login Information Object to the Administration Server. The Administration Server then queries the User database to validate the login name and password. If login name and password are correct, then a security token is returned to the User. Normally the receipt of the security token will immediately be followed by a channel information request sequence, just as in the registration sequence described previously.

The control sequence that takes place when a User initiates a channel play operation is illustrated in FIGS. 8A, 8B and 8C. First the User software requests a Control Server List from the Administration Server. Note that the Server List Request Object, illustrated in Table 1 contains a channel identifier. The Administration Server generates a sorted list of Control Servers based on overall system load and the location of the User on the network and returns this list to the User using a Protocol List Object. Once the Control Server List is returned to the User, the Administration Server is no longer needed and the TCP connection is closed.

The User software then searches the list of Control Servers and opens a TCP connection to the first host listed. If that host computer does not respond, then the next Control Server on the list is tested and so forth in succession. Upon obtaining a response from a Control Server, the User software uses a Server List Request Object to requests a Media Server List from the Control Server. If the Control Server is

5,983,005

15

too busy to service the User, it returns a Result Message Object so indicating and the User software tries the next Control Server on the list. However, in the likely scenario that the Control Server is able to handle the User's request, a sorted list of Media Servers is generated and returned to the User computer using a Protocol List Object. The TCP connection to the Control Server is then closed by the User software.

At this point the User software initiates a TCP connection to the first Media Server on the list provided by the Control Server. As in the previous case, it attempts to connect to the first host on the list and if unsuccessful tries the next hosts in succession. Once the Version Objects are exchanged, the User software sends an MCI Request Object to the Media Server. An MCI Request Object can be used for four basic commands: OPEN, PLAY, STOP and CLOSE. The User software must first send an OPEN command for the desired channel. If the returned Result Message Object indicates success, the User software then sends a PLAY command.

When the Media Server receives a valid PLAY command, it initiates the delivery of audio information to the User as described in the previous section. Note that this could be in the form of broadcast, multicast or unicast packets to a specific UDP port. The TCP connection through which the MCI Request Objects were sent stays open during the audio play operation. In addition, Ping Objects are sent to the User on a periodic basis to verify that the computer is still working and active. When the User software receives a Ping Object, it simply returns it. The Media Server uses the Ping Objects to measure round trip time and also to determine when a User's computer has terminated abnormally. In that case the audio stream is terminated.

In the case of normal termination of the audio stream, the User makes an explicit selection to stop and this causes a STOP command to be sent to the Media Server in an MCI Request Object. The Media Server then terminates the audio stream to that User. When the User closes the application software or selects another channel to play, the User software will send a CLOSE command to the Media Server in an MCI Request Object and the TCP connection is closed.

The initiation of the audio stream by the Media Server causes a log entry to be generated and sent to the Administration Server. This information is important so that the Administration Server can update its database to indicate which Users are listening to which channels. The security token is used to identify the User initiating the audio stream. Additionally, when the audio stream is terminated to any User, another log message is generated and sent to the Administration Server.

FIG. 9A illustrates the process by which security tokens are validated. The Administration Server is the only server that can validate a security token. Thus, when a User requests services from a Control Server or from a Media Server, that server must go back to the Administration Server with a token validation sequence. However, Control Servers and Media Servers are allowed to cache validations of security tokens so that they do not have to validate tokens repeatedly once they have validated it the first time. In the case where a Media Server receives a request, the token will be validated with the Control Server that is managing that Media Server. FIG. 9B identifies the various token validation scenarios.

FIG. 10 illustrates the process by which a new Server is registered. This process is similar to new User registration. It is expected, however, that the server installation will be through a Web interface rather than a Wizard. The Admin-

16

istration Server, upon receiving a User Object from a Media Server or Control Server validates the User name and password and generate a security token just as in the case of User registration. Normally the Server then immediately sends back a Server Activation Object indicating that it is ready to be used as a system resource. Once this process has been completed, the TCP connection to the Administration Server is closed.

If a Media Server or Control Server that has sent a Server Activation Object to the Administration Server becomes inactive, it will send another Server Activation Object indicating this condition. In the case of a Media Server, this object is sent to the managing Control Server. In the case of a Control Server, this object sent to the Administration Server. As in the case of User registration, Media Server and Control Server registration needs only take place once per computer. However, if the computer is restarted, the server must login and again retrieve a security token. This is the server login and activation sequence shown in FIG. 11.

Once a Control Server has indicated to the Administration Server that it is ready, the Administration Server can activate that Control Server by sending the Control Server a Server Activation Object as illustrated in FIG. 12. This is a separate transaction and is used to tell the Control Server which Media Servers it is supposed to manage. Recall that a Control Server and a number of Media Servers form a cluster of Media Servers. The single Control Server that manages that cluster must be given a list of host computers corresponding to the Media Servers in that cluster.

The process by which a Control Server activates the Media Servers that it manages is illustrated in FIG. 13. The Control Server sends a Server Activation Object to the Media Server indicating that it is responsible for channel management. This TCP connection between the Control Server and the Media Server stays open during the time that both servers are active. The Control Server periodically sends Ping Objects to the Media Server across this open TCP connection to verify that the Media Server is still running.

FIG. 14 illustrates the process by which a given channel is activated by the Administration Server. The Administration Server opens a connection to a Control Server that its wishes to have carry a given channel and provide a Channel Activation Object. This object indicates to the Control Server which Media or Primary Server the Control Server should direct its Media Servers to get the feed from. At this point the Control Server is said to be carrying that channel and it will be a valid host on a list of Control Servers requested by a Channel Play sequence.

FIG. 15 illustrates what happens when a Control Server needs to provide a channel. First it sends a Channel Activation Object to one of the Media Servers that it manages across the open TCP connection described previously. This object indicates to the Media Server that it should start receiving the channel identified and from where it should receive it.

In FIGS. 16A and 16B depict how the Media Server requests distribution of an audio channel from another Media Server or from a Primary Server. This sequence is much the same as that in which a User requests the distribution of audio information from a Media Server. Note that a Media Server receives a single incoming stream for each channel that it is carrying and will then redistributes this stream to all Users or other Media Servers that request it.

Finally, FIG. 17 illustrates the statistics request sequence. This sequence is used by the Administration Server to gather information from the Media Servers and Control Servers in

5,983,005

**17**

order to manage the overall system. It can use this information to detect failures and to balance load as the dynamic conditions change. As indicated above, it can also use this information to monitor which Users are listening to which channel or whether Users stop listening to a channel at any time, such as during the play of a particular song. It can also use this information to control the advertising content that is downloaded to a particular User in advance of receipt of regular audio programming and/or monitor the delivery of advertising to the Users.

The control architecture described in this section is scalable to handle any number of Users. Note that the User registration process only happens once for each subscriber and the login process only happens once per session. These interactions, which require the Administration Server are expected to constitute a very small percentage of the overall system bandwidth. If the Administration Server were to become a bottleneck, however, it would be possible to duplicate it and to have the database it maintains distributed and automatically updated to guarantee consistency.

The Control Servers are distributed throughout the network and can handle the lower level interactions with the Users and the Media Servers. A single Control Server can handle preferably on the order of ten Media Servers up to several hundred Users. The bitrate among the Users, the Control Servers and the Media Servers is expected to be small in comparison to the audio transmission bitrate. The Ping Objects normally only involve the User and the nearest Media Server. They are also low in overhead since they are small and only get transmitted infrequently.

### User Interface

The User interface is provided by the client application running on an individual computer and its associated graphical interface. In the preferred embodiment the User interface is available for 32-bit Windows (95 and NT), Macintosh and UNIX platforms. Preferably anyone on the Internet can freely download a copy of the client software and install it in their computer.

FIG. **18** illustrates the main User screen in the preferred embodiment. The screen is composed of three sections: channel guide (upper left frame), program guide (upper right frame), and multimedia frame (lower half of screen). The channel guide lists, as a tree hierarchy, the channels that are available from the server. The User selects a channel from the list of those displayed on the channel guide. The program guide provides information pertaining to the channel selected. This information can be a detailed schedule of the programming that has played or will be playing on the channel selected. Additionally, other relevant information will be displayed in this frame, for example, a notice regarding an upcoming special event on another channel. The multimedia frame provides an integrated web browser that displays information via a series of tabbed sections.

The information contained in the channel guide, program guide, and the tabs of the multimedia frame is dynamically transmitted to the client. For example, if a new channel begins operation, the client application can immediately display it as being utilized. Furthermore, the tabs displayed can be specifically relevant depending on what song is playing. For example, tabs displaying the album cover, information on the artist, song lyrics, tour dates can be displayed. Additionally, as shown in the example in FIG. **18**, a tab can be available allowing the User to place an order for the CD or allowing the User to participate in a chat session related to the channel.

**18**

FIG. **19** illustrates the key pull-down menus available in the main User screen in the preferred embodiment. Table 3 provides a description of each of the functions available through the pull down menus, as shown in FIG. **19**.

As will be apparent to those skilled in the art, numerous modifications may be made within the spirit and scope of the invention.

TABLE 3

| Pull-Down Menu Functions | | |
| --- | --- | --- |
| Menu Choice | Menu Sub-Choice | Description |
| File | Login | Allows the User to login to the system. |
| | Logout | Allows the User to logout from the system. |
| | Register | Brings up a dialog so that the user can register with the system for the first time. |
| | Close | Minimizes the screen. |
| Edit | Copy | Allows the User to copy the selection on to the clipboard. |
| | Properties | Allows the User to set various properties. |
| Audio | Play | Begins playing the selected channel. |
| | Stop | Stops playing the selected channel. |
| | Mute | Stops the playing of audio |
| View | Tool Bar | Display or hide the tool bar (providing access to pull-down menu functions). |
| | Status Bar | Display or hide the status bar normally situated at bottom of the screen. |
| | Web Bar | Display or hide the tool bar section that provides access to the web browser functions. |
| Help | Help Topics | Brings up a list of available online help topics. |
| | About . . . | Displays summary information regarding this application, such as version number, copyright information, and so on. |

What is claimed is:

**1**. A method for transmitting message packets over a communications network comprising the steps of:

converting at least one stream of audio and/or visual information into at least one stream of addressed digital packets complying with the specifications of a network communication protocol,

for each stream, routing such stream to one or more users, controlling the routing of the stream of packets in response to selection signals received from the users, and

monitoring the reception of packets by the users and accumulating records that indicate which streams of packets ware received by which users, wherein at least one stream of packets comprises an audio and/or visual selection and the records that are accumulated indicate the time that a user starts receiving the audio and/or visual selection.

**2**. The method of claim **1** further comprising the stop of varying the information content of at least one stream of packets with the identity of the user to whom the at least one stream of packets are delivered.

**3**. The method of claim **2** wherein the varied information content is inserted into the stream of audio and/or visual information before such stream is converted into a stream of packets.

5,983,005

19

**4**. The method of claim **2** wherein the varied information contains advertising information.

**5**. The method of claim **4** wherein the records that are accumulated indicate how many users received specific advertising information.

**6**. The method of claim **1** further comprising the step of generating an audio output and/or a visual display from the stream of packets received by the user.

**7**. The method of claim **1** further comprising the stops of:

storing a first stream of packets received by the user at a first time and

at a later time, inserting the first stream of packets into a second stream of packets received by the user.

**8**. The method of claim **7** wherein the content of the first stream of packets is varied depending on the identity of the users to whom the first stream of packets are delivered.

**9**. The method of claim **7** further comprising the step of converting the combined first and second streams of packets into an audio output and/or visual display.

**10**. The method of claim **7** wherein the content of the first stream of packets is varied depending on the identity of the user.

**11**. The method of claim **10** wherein the first stream of packets contains advertising information.

**12**. The method of claim **1** further comprising the steps of:

storing a first stream of packets at an intermediate point in the distribution architecture at a first time and

at a later time, inserting the first stream of packets into a second stream of packets.

**13**. The method of claim **12** wherein the content of the first stream of packets is varied depending on the identity of one or more users.

**14**. The method of claim **13** wherein the first stream of packets contains advertising information.

**15**. The method of claim **1** wherein at least one stream of packets comprises copyrighted selections and the records that are accumulated indicate which users received specific copyrighted selections.

**16**. The method of claim **1** wherein at least one stream of packets comprises audio and/or visual selections and the records that are accumulated indicate which users did or did not listen to and/or view the entire selection.

**17**. The method of claim **1** further comprising the steps of:

compressing the stream of packets in their passage from source to user, and

decompressing the stream of packets near the user.

**18**. The method of claim **17** wherein the compressing step uses a compression algorithm that is selected in accordance with the content of the information being communicated in the stream of packets.

**19**. The method of claim **18** wherein the compressing step inserts into each packet an identification of the compression algorithm used and the decompressing step monitors each packet to read such identification and to vary its decompression algorithm in response thereto.

**20**. The method of claim **17** wherein the compressing step uses a compression algorithm and the decompression step uses a decompression algorithm that varies with the user to whom the stream of packets are delivered.

**21**. The method of claim **17** wherein the compressing step uses a compression algorithm that varies with the characteristics of the communications network.

**22**. The method of claim **17** wherein the decompressing step uses a decompression algorithm that varies with the characteristics of the communications network.

**23**. The method of claim **1**, further comprising the step of varying the information content of at least one stream of

20

packets with the identity of the users to whom the at least one stream of packets are delivered.

**24**. The method of claim **1**, wherein the records that are accumulated include user information and system-related information.

**25**. A method for transmitting at least one stream of audio and/or visual information over a communications network to one or more users comprising the steps of:

controlling the routing of the stream of information through the network in response to selection signals received from the users, and

monitoring the reception of the stream of information by the users and accumulating records relating to the reception of the stream of information by the users, wherein at least one stream of information comprises an audio and/or visual selection and the records that are accumulated indicate the time that a user starts receiving the audio and/or visual selection.

**26**. The method of claim **25** further comprising the step of varying the information content of at least one stream of information with the identity of the user to whom the at least one stream of information is delivered.

**27**. The method of claim **26** wherein the varied information content is inserted into the stream of audio and/or visual information.

**28**. The method of claim **25** further comprising the steps of:

storing a first stream of information received by the user at a first time and

at a later time, inserting the first stream of information into a second stream of information received by the user, wherein the content of the first stream of information is varied depending on the identity of the user.

**29**. The method of claim **28** wherein the first stream of information contains advertising information.

**30**. The method of claim **25** further comprising the steps of:

storing a first stream of information at an intermediate point in the distribution architecture at a first time and

at a later time, inserting the first stream of information into a second stream of information, wherein the content of the first stream of information is varied depending on the identity of one or more users.

**31**. The method of claim **30** wherein the first stream of information contains advertising information.

**32**. The method of claim **25** further comprising the steps of:

storing a first stream of information received by the user at a first time and

at a later time, inserting the first stream of information into a second stream of information received by the user, wherein the content of the first stream of information is varied depending on the identity of the users to whom the first stream of information is delivered.

**33**. The method of claim **25**, further comprising the step of varying the information content of at least one stream of information with the identity of the users to whom the at least one stream of information is delivered.

**34**. The method of claim **25** further comprising the steps of:

compressing the stream of information in its passage from source to user, and

decompressing the stream of information near the user.

**35**. The method of claim **34** wherein the compressing step uses a compression algorithm that is selected in accordance

5,983,005

**21**

with the content of the information being communicated in the stream of information.

**36**. The method of claim **34** wherein the compressing step uses a compression algorithm and the decompression step uses a decompression algorithm that varies with the user to whom the stream of packets are delivered.

**37**. The method of claim **34** wherein the compressing step uses a compression algorithm that varies with the characteristics of the communications network.

**38**. The method of claim **34** wherein the decompressing step uses a decompression algorithm that varies with the characteristics of the communications network.

**39**. The method of claim **25** wherein multiple streams of audio and/or visual information are transmitted over the communications network and the user can select which stream to receive.

**40**. The method of claim **25**, wherein the records that are accumulated include user information and system-related information.

**41**. The method of claim **26** wherein the records that are accumulated indicate how many users received specific advertising information.

**42**. The method of claim **26** wherein at least one stream of information comprises copyrighted selections and the records that are accumulated indicate which users received specific selections.

**43**. The method or claim **26** wherein at least one stream of information comprises audio and/or visual selections and the records that are accumulated indicate which users did or did not listen to and/or view the entire selection.

**44**. A communication system comprising:

means for converting at least one stream of audio and/or visual information into a stream of addressed digital packets complying with the specifications of a network communication protocol,

means for routing such stream via a communication network to selected users,

means for controlling the routing of the stream of packets in response to selection signals received from the users, and

means for monitoring the reception of packets by the user and for accumulating records that indicate which streams of packets were received by which users, wherein at least one stream of packets comprises an audio and/or visual selection, and the means for monitoring further includes means for accumulating records that indicate the time that a user starts receiving the audio and/or visual selection.

**45**. The method of claim **44** further comprising means for varying the information content of at least one stream of packets with the identity of the user to whom the at least one stream of packets are delivered.

**46**. The method of claim **45** wherein the varied information content is inserted into the stream of audio and/or visual information before such stream is converted into a stream of packets.

**47**. The method of claim **45**, wherein the varied information contains advertising information.

**48**. The communication system of claim **44** further comprising means for generating from the stream of packets received at the user an audio output and/or a visual display.

**49**. The communication system of claim **44** further comprising means for storing packets received at the user during a first time period and means for inserting such packets into other packets received at the user at a later time period.

**50**. The communication system of claim **49** wherein the content of the stream of packets received during the first time period is varied depending on the identity of the user.

**22**

**51**. The communication system of claim **50** wherein the stream of packets received during the first time period contains advertising information.

**52**. The communication system of claim **44** further comprising means for storing packets at an intermediate point in the distribution architecture at a first time and means for inserting such packets into other packets to be received by one or more users at a later time period.

**53**. The communication system of claim **52** wherein the content of the stream of packets received during the first time period is varied depending on the identity of the one or more users.

**54**. The communication system of claim **53** wherein the stream of packets received during the first time period contains advertising information.

**55**. The communication system of claim **52** wherein the content of the stream of packets received during the first time period is varied depending on the identity of the users to whom the stream of packets are delivered.

**56**. The communication system of claim **44** further comprising:

means for compressing the stream of packets in their passage from source to user, and

downstream of the compressing means, means for decompressing the stream of packets.

**57**. The communication system of claim **56** wherein the compressing means is located near the converting means and the decompressing means is located at the user.

**58**. The communication system of claim **56** wherein the compressing means uses a compression algorithm that is selected in accordance with the content of the information being communicated in the stream of packets.

**59**. The communication system of claim **56** wherein the compressing means inserts into each packet an identification of the compression algorithm used and the decompressing means monitors each packet to read such identification and to vary its decompression algorithm in response thereto.

**60**. The method of claim **56** wherein the compressing means uses a compression algorithm and the decompression means uses a decompression algorithm that varies with the user to whom the stream of packets are delivered.

**61**. The method of claim **56** wherein the compressing means uses a compression algorithm that varies with the characteristics of the communications network.

**62**. The method of claim **56** wherein the decompressing means uses a decompression algorithm that varies with the characteristics of the communications network.

**63**. The method of claim **44** further comprising means for varying the information content of at least one stream of packets with the identity of the users to whom the at least one stream of packets are delivered.

**64**. The method of claim **44**, wherein the records that are accumulated include user information and system-related information.

**65**. A method for transmitting message packets over a communications network comprising the steps of:

converting at least one stream of audio and/or visual information into at least stream of addressed digital packets complying with the specifications of a network communication protocol,

for each stream, routing such stream to one or more users,

controlling the routing of the stream of packets in response to selection signals received from the users, and

monitoring the reception of packets by the users and accumulating records that indicate which streams of

5,983,005

## 23

packets were received by which users, wherein at least one stream of packets comprises audio and/or visual selections and the records that are accumulated indicate how many users did or did not listen to and/or view the entire selection.

**66**. A method for transmitting at least one stream of audio and/or visual information over a communications network to a plurality of users comprising the steps of:

controlling the routing of the stream of information through the network in response to selection signals received from the users, and

monitoring the reception of the stream of information by the users and accumulating records relating to the reception of the stream of information by the users, wherein at least one stream of information comprises audio and/or visual selections and the records that are accumulated indicate how many users did or did not listen to and/or view the entire selection.

**67**. A method for transmitting message packets over a communications network comprising the steps of:

converting at least one stream of audio and/or visual information into at least stream of addressed digital packets complying with the specifications of a network communication protocol,

for each stream, routing such stream to one or more users,

## 24

controlling the routing of the stream of packets in response to selection signals received from the users, and

monitoring the reception of packets by the users and accumulating records that indicate which streams of packets were received by which users, wherein at least one stream of packets comprises audio and/or visual selections and the records that are accumulated indicate which users did or did not listen to and/or view the entire selection.

**68**. A method for transmitting at least one stream of audio and/or visual information over a communications network to a plurality of users comprising the steps of:

controlling the routing of the stream of information through the network in response to selection signals received from the users, and

monitoring the reception of the stream of information by the users and accumulating records relating to the reception of the stream of information by the users, wherein at least one stream of information comprises audio and/or visual selections and the records that are accumulated indicate which users did or did not listen to and/or view the entire selection.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 5,983,005                                    Page 1 of  2
DATED         : November 9, 1999
INVENTOR(S)   : Monteiro et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 1,
Lines 23, 26, 27 and 46, "which", each occurrence, should read -- that --;
Line 35, "capability analogous" should read -- capability, analogous --;
Line 37, "nodes are" should read -- nodes, is --;
Line 62, "1458 which" should read -- 1458, which --.

Column 2,
Line 36, "which" should read -- which: --;
Line 49, "which" should read -- that --.

Column 3,
Lines 15, 23, 27, 28 and 29, "which", each occurrence, should read -- that --;
Lines 17 and 18, "Media Server which" should read -- Media Server that --;
Line 24, "at a major points" should read -- at major points --.

Column 4,
Line 12, "which" should read -- that --.

Column 5,
Lines 40 and 45, "which", each occurrence, should read -- that --;
Line 66, "dynamic, Users" should read -- dynamic; Users --.

Column 6,
Lines 5 and 54, "which", each occurrence, should read -- that --;
Line 42, "to a multicast" should read -- to multicast --.

Column 7,
Lines 2 and 21, "which", each occurrence, should read -- that --;
Line 22, "monitor" should read -- monitors --;
Line 30, "audiostream" should read -- audio stream --.

Column 8,
Line 9, "36 which" should read -- 36, which --.

Column 13,
Line 50, "invoke it which" should read -- invoke it, which --.

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 5,983,005                            Page 2 of  2
DATED        : November 9, 1999
INVENTOR(S) : Monteiro et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 14,
Line 32, "ask" should read -- asks --.

Column 16,
Line 2, "Server validates" should read -- Server, validates --;
Line 3, "generate" should read -- generates --;
Line 63, "and will then" should read -- and then --.

Column 17,
Line 15, "Server are" should read -- Server, are --.

Column 18,
Line 38 (Table 3), "infirmation" should read -- information --.

Column 19,
Line 16, "packets are" should read -- packets is --.

Signed and Sealed this

Tenth Day of June, 2003

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.      : 5,983,005                                      Page 1 of  1
DATED           : November 9, 1999
INVENTOR(S)  : Monteiro and Butterworth

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Title page,
Item [56], **References Cited**, OTHER PUBLICATIONS, fifth cited reference, after
"RealAudio Administrator's Guide", delete "Release 1.1" and insert -- Release 1.01 --.

Signed and Sealed this

Twenty-second Day of March, 2005



JON W. DUDAS
*Director of the United States Patent and Trademark Office*

US005983005C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (5401st)

# United States Patent

Monteiro et al.

(10) **Number:** US 5,983,005 C1

(45) **Certificate Issued:** *Jun. 13, 2006

(54) **MULTICASTING METHOD AND APPARATUS**

(75) Inventors: **Antonio M. Monteiro**, New York, NY (US); **James F Butterworth**, New York, NY (US)

(73) Assignee: **Netcast Innovations Ltd.**, Boulder, CO (US)

Reexamination Request:
No. 90/007,055, May 28, 2004
No. 90/007,447, Mar. 4, 2005

Reexamination Certificate for:
Patent No.: **5,983,005**
Issued: **Nov. 9, 1999**
Appl. No.: **09/110,369**
Filed: **Jul. 6, 1998**

( * ) Notice: This patent is subject to a terminal disclaimer.

Certificate of Correction issued Jun. 10, 2003.

Certificate of Correction issued Mar. 22, 2005.

**Related U.S. Application Data**

(63) Continuation of application No. 08/644,072, filed on May 9, 1996, now Pat. No. 5,778,187.

(51) **Int. Cl.**
*G06F 15/16* (2006.01)

(52) **U.S. Cl.** ...................................... **709/231**; 370/351

(58) **Field of Classification Search** ...................... None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,674,512 A | 4/1954 | Bogert et al. | |
| 2,957,046 A | 10/1960 | Freeman et al. | |
| 3,126,513 A | 3/1964 | Kamen | |
| 3,230,302 A | 1/1966 | Bruck et al. | |

| | | | |
|---|---|---|---|
| 3,368,031 A | 2/1968 | Eisele et al. | |
| 3,733,430 A | 5/1973 | Thompson et al. | |
| 3,849,729 A | 11/1974 | Baggen | |
| 4,245,245 A | 1/1981 | Matsumoto et al. | |
| 4,264,924 A | 4/1981 | Freeman | |
| RE31,639 E | 7/1984 | Nicholson | |
| 4,546,382 A | 10/1985 | McKenna et al. | |
| 4,558,358 A | 12/1985 | Onda | |
| 4,602,279 A | 7/1986 | Freeman | |
| 4,816,904 A | 3/1989 | McKenna et al. | |
| 4,829,569 A | 5/1989 | Seth-Smith et al. | |
| 4,850,007 A | 7/1989 | Marino et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

WO     WO 95/15658     8/1995

OTHER PUBLICATIONS

Vashaspathi et al., "Multicast Routing for Multimedia Communication", IEEE/ACM Transactions on Networking vol. 1. No. 3 Jun., 1993, pp. 286–292.*

(Continued)

*Primary Examiner*—Bunjob Jaroenchonwanit

(57) **ABSTRACT**

A scalable architecture is disclosed for delivery of real-time information over a communications network. Embedded into the architecture is a control mechanism that provides for the management and administration of users who are to receive the real-time information. In the preferred embodiment, the information being delivered is high-quality audio. However, it could also be video, graphics, text or any other type of information that can be transmitted over a digital network. Preferably, there are multiple channels of information available simultaneously to be delivered to users, each channel consisting of an independent stream of information. A user chooses to tune in or tune out a particular channel, but does not choose the time at which the channel distributes its information. Advantageously, interactive (two-way) information can be incorporated into the system, multiple streams of information can be integrated for delivery to a user, and certain portions of the information being delivered can be tailored to the individual user.



# US 5,983,005 C1
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,027,400 A | | 6/1991 | Baji et al. |
| 5,081,680 A | | 1/1992 | Bennett |
| 5,132,992 A | | 7/1992 | Yurt et al. |
| 5,155,591 A | | 10/1992 | Wachob |
| 5,155,762 A | | 10/1992 | Croquet et al. |
| 5,195,086 A | | 3/1993 | Baumgartner et al. |
| 5,220,420 A | | 6/1993 | Hoarty et al. |
| 5,231,494 A | | 7/1993 | Wachob |
| 5,245,429 A | | 9/1993 | Virginio et al. |
| 5,251,324 A | | 10/1993 | McMullan, Jr. |
| 5,267,032 A | | 11/1993 | Van Cang |
| 5,283,639 A | | 2/1994 | Esch et al. |
| 5,289,271 A | | 2/1994 | Watson |
| 5,309,433 A | | 5/1994 | Cidon et al. |
| 5,347,304 A | | 9/1994 | Moura et al. |
| 5,353,218 A | | 10/1994 | De Lapa et al. |
| 5,355,371 A | | 10/1994 | Auerback et al. |
| 5,361,091 A | | 11/1994 | Hoarty et al. |
| 5,361,256 A | | 11/1994 | Doeringer et al. |
| 5,371,532 A | | 12/1994 | Gelman et al. |
| 5,387,927 A | | 2/1995 | Look et al. |
| 5,410,698 A | | 4/1995 | Danneels et al. |
| 5,412,416 A | | 5/1995 | Nemirofsky |
| 5,414,773 A | | 5/1995 | Handelman |
| 5,418,559 A | | 5/1995 | Blahut |
| 5,421,024 A | | 5/1995 | Faulk, Jr. et al. |
| 5,422,674 A | * | 6/1995 | Hooper et al. ......... 375/240.15 |
| 5,424,770 A | | 6/1995 | Schmelzer et al. |
| 5,426,637 A | | 6/1995 | Derby et al. |
| 5,428,606 A | | 6/1995 | Moskowitz |
| 5,430,716 A | | 7/1995 | Pawelski |
| 5,432,542 A | | 7/1995 | Thibadeau et al. |
| 5,440,548 A | | 8/1995 | Denissen |
| 5,442,390 A | * | 8/1995 | Hooper et al. .............. 725/90 |
| 5,446,489 A | | 8/1995 | Egendorf |
| 5,446,490 A | | 8/1995 | Blahut et al. |
| 5,453,779 A | * | 9/1995 | Dan et al. ................. 725/88 |
| 5,455,619 A | | 10/1995 | Truckenmiller et al. |
| 5,459,725 A | | 10/1995 | Bodner et al. |
| 5,481,297 A | * | 1/1996 | Cash et al. ............. 348/14.12 |
| 5,485,464 A | | 1/1996 | Strodtbeck et al. |
| 5,488,408 A | | 1/1996 | Maduzia et al. |
| 5,493,514 A | * | 2/1996 | Keith et al. ........... 364/514 R |
| 5,497,502 A | | 3/1996 | Castille |
| 5,508,732 A | * | 4/1996 | Bottomley et al. ......... 725/93 |
| 5,515,098 A | | 5/1996 | Carles |
| 5,517,494 A | * | 5/1996 | Green ...................... 370/408 |
| 5,521,927 A | * | 5/1996 | Kim et al. ............... 370/474 |
| 5,555,244 A | * | 9/1996 | Gupta et al. ............ 370/397 |
| 5,559,549 A | | 9/1996 | Hendricks et al. |
| 5,559,999 A | * | 9/1996 | Maturi et al. ........... 713/400 |
| 5,588,029 A | * | 12/1996 | Maturi et al. ........... 375/364 |
| 5,592,486 A | * | 1/1997 | Lo et al. ................. 370/389 |
| 5,594,732 A | * | 1/1997 | Bell et al. ............... 370/401 |
| 5,600,364 A | | 2/1997 | Hendricks et al. |
| 5,604,542 A | * | 2/1997 | Dedrick ................... 348/552 |
| 5,610,920 A | * | 3/1997 | Doll et al. ............... 370/389 |
| 5,634,334 A | * | 6/1997 | Hehl ......................... 60/328 |
| 5,636,346 A | | 6/1997 | Saxe |
| 5,649,013 A | | 7/1997 | Stuckey et al. |
| 5,652,615 A | * | 7/1997 | Bryant et al. ............. 725/35 |
| 5,652,749 A | * | 7/1997 | Davenport et al. ....... 370/466 |
| 5,666,487 A | * | 9/1997 | Goodman et al. ........ 709/246 |
| 5,671,226 A | * | 9/1997 | Murakami et al. ....... 370/474 |
| 5,673,254 A | * | 9/1997 | Crayford ................. 370/231 |
| 5,675,510 A | | 10/1997 | Coffey et al. |
| 5,694,334 A | | 12/1997 | Donahue et al. |
| 5,706,290 A | | 1/1998 | Shaw et al. |
| 5,715,336 A | * | 2/1998 | Tanaka ................... 382/301 |
| 5,717,923 A | | 2/1998 | Dedrick |

| | | | |
|---|---|---|---|
| 5,727,002 A | * | 3/1998 | Miller et al. ............... 714/748 |
| 5,734,719 A | | 3/1998 | Tsevdos et al. |
| 5,745,837 A | * | 4/1998 | Fuhrmann ................. 725/114 |
| 5,751,336 A | | 5/1998 | Aggarwal et al. |
| 5,760,838 A | * | 6/1998 | Adams et al. ............. 348/460 |
| 5,771,073 A | * | 6/1998 | Lim ..................... 348/390.1 |
| 5,774,664 A | * | 6/1998 | Hidary et al. ............. 725/110 |
| 5,778,182 A | * | 7/1998 | Cathey et al. |
| 5,778,187 A | | 7/1998 | Monteiro |
| 5,790,541 A | * | 8/1998 | Patrick et al. ............. 370/392 |
| 5,793,980 A | | 8/1998 | Glaser et al. |
| 5,812,545 A | * | 9/1998 | Liebowitz et al. ........ 370/337 |
| 5,838,683 A | * | 11/1998 | Corley et al. ............. 370/408 |
| 5,848,396 A | | 12/1998 | Gerace |
| 5,862,329 A | | 1/1999 | Aras et al. |
| 5,872,588 A | | 2/1999 | Aras et al. |
| 5,878,384 A | | 3/1999 | Johnson et al. |
| 5,892,535 A | * | 4/1999 | Allen et al. ................... 725/36 |
| 5,894,480 A | * | 4/1999 | Hoffert et al. ............. 370/389 |
| 5,923,853 A | * | 7/1999 | Danneels ................... 709/238 |
| 5,928,331 A | | 7/1999 | Bushmitch |
| 5,930,254 A | | 7/1999 | Liron et al. |
| 5,930,493 A | | 7/1999 | Ottesen et al. |
| 5,931,961 A | | 8/1999 | Ranganathan et al. |
| 5,936,940 A | | 8/1999 | Marin et al. |
| 5,953,350 A | * | 9/1999 | Higgins ..................... 370/524 |
| 5,960,006 A | * | 9/1999 | Maturi et al. ............. 370/509 |
| 5,983,005 A | | 11/1999 | Monteiro et al. |
| 6,002,393 A | | 12/1999 | Hite et al. |
| 6,005,560 A | * | 12/1999 | Gill et al. ............... 715/500.1 |
| 6,009,096 A | * | 12/1999 | Jaisingh et al. ......... 370/310.1 |
| 6,115,750 A | * | 9/2000 | Dillon et al. ............. 709/235 |
| 6,119,163 A | * | 9/2000 | Monteiro et al. |
| 6,122,668 A | * | 9/2000 | Teng et al. ............... 709/231 |
| 6,208,656 B1 | * | 3/2001 | Hrastar et al. ............. 370/401 |
| 6,434,622 B1 | | 8/2002 | Monteiro |
| 6,539,022 B1 | * | 3/2003 | Virgile .................... 370/401 |
| 6,560,707 B1 | * | 5/2003 | Curtis et al. ............. 713/163 |
| 2003/0140159 A1 | * | 7/2003 | Campbell et al. ........ 709/231 |
| 2004/0255148 A1 | | 12/2004 | Monteiro et al. |

## OTHER PUBLICATIONS

Almeroth et al., "Collecting and Modeling the Join/Leave Behavior of Multicast Group Members in the MBONE", IEEE Preceedings of HPDC–5'96, May 1996, pp. 209–216.*

Park et al., "Fault–tolerant Real–Time Synchronous collaboration environment using WWW*", IEEE, 1996, pp. 226–231.*

Pullen, "Sychronous Distance Education Via the Internat", FIE'96 Preceedings, IEEE, 1996, pp. 285–288.*

Munzner. "Visualining the global Topology og the MBONE", IEEE, 1996, pp. 85–92, and 129.*

Shin, "Internet Multimedia Application Technologies Practice and Future Directions", IEEE, 1996, pp. 225.*

Chaddha et al, "A Frame–Work forLive Multicast of Video Streams Over the Internet", IEEE 1996, pp. 1–4.*

Mavedonia et al., "MBONE Provides Audio and Video Across the Internet", computer, Apr. 1994, pp. 30–35.*

Two–Way Media LLC v America Online, Inc., Civil Action No. C–04–089, S.D. Texas, Complaint, Mar. 9, 2004.

Two–Way Media LLC v America Online, Inc., America Online, Inc;'s Answer to the Complaint and Counterclaim, Civil Action No. C–04–089, S.D. Texas, May 20, 2004.

Two–Way Media LLC v America Online, Inc., Order, Civil Action No. C–04–089, S.D. Texas, Jun. 9, 2004.

**US 5,983,005 C1**

Page 3

"Framework for Interactive Video–on–Demand Service", Singru A., et al., *Computers and Communications 1995, Conference Proceedings of the 1995 IEEE Fourteenth Annual International Phoenix Conference on Scottsdale, AZ,* Mar. 28, 1995, pp. 636–642.

Application No. 90/007,056, Order Granting/Denying Request for Ex Parte Reexamination, U.S. Patent and Trademark Office, mailed Jun. 24, 2004.

Application No. 90/007,054, Order Granting/Denying Request for Ex Parte Reexamination, U.S. Patent and Trademark Office, mailed Jun. 23, 2004.

U.S. Appl. No. 10/180,590, filed Jun. 26, 2002, Monteiro et al.

U.S. Appl. No. 90/007,054, filed May 28, 2004, Ex Parte Reexamination of Monteiro et al. U.S. Pat. No. 5,778,187.

U.S. App. No. 90/007,056, May 28, 2004, Ex Parte Reexamination of Monteiro et al. U.S. Pat. No. 6,434,622.

Netradio Corp. to offer customized broadcasts with ads, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

News to the desktop: Vendors deliver personalized news to users via the Net, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

Netcast Pairs Audio with Advertising, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

Xing Takes on Progressive Networks in Internet Audio, Video Transmission with Streamworks, Tries Radio First, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

S. Casner & S. Deering, "First IETF Internet Audiocast," ACM SIGCOMM Computer Communications Review, vol. 22, No. 3 (Jul. 1992).

S. Casner, "Getting on the MBone, Videoconferencing Over the Internet," University of Southern California, Information Sciences Institute, NLUUG Spring Conference (Apr. 13, 1995).

S. Deering, "IP Multicast and the MBone: Enabling Live, Multiparty, Multimedia Communication on the Internet," Xerox Palo Alto Research Center (Dec. 1995).

H. Ericksson, "MBONE: The Multicast Backbone," Communications of the ACM, vol. 37, No. 8, pp. 54–60 (Aug. 1994).

V. Jacobson, "The MBone—Interactive Multimedia on the Internet," University of California at Berkeley Seminar (Feb. 17, 1995).

K. Jonas & R. Wetekam, "Multicast Protocols for Multimedia Applications," 3rd International Workshop on Protocols for Multimedia Systems (PROMS'96), Madrid, Spain (Oct. 15–18, 1996).

J. Pasqual et al., "The multimedia multicast channel," Internetworking: Research and Experience, Wiley Publishers, vol. 5, No. 4, pp. 151–162 (Dec. 1994).

H. Schulzrinne et al., "RTP: A Transport Protocol for Real-Time Applications," Network Working Group, Audio–Video Transport Working Group, Request for Comments (Proposed Standard) 1889, Internet Engineering Task Force (Jan. 1996).

H. Schulzrinne, "When can we unplug the radio and telephone?," Network and Operating System Support for Digital Audio and Video, 5th International Workshop, NOSSDAV '95, Durham, New Hampshire, USA, Proceedings, Session V: Audio and Video Systems, pp. 174–177 (Apr. 19–21, 1995).

Robinson and Hooper, "A MIB for Video Server System Management," Proceedings of the 2nd International Workshop on Community Networkin Integrated Multipmedia Services in the Home (Cat. No. TH8097; pp. 109–115) IEEE. Princeton, N.J., Jun. 20–22, 1995.

Stevens, R., "TCP/IP Illustrated, vol. 1: The Protocols," *SNMP,* pp. 309, 360–361, 385–386.

RealAudio, Administrator's Guide, Release 1.01.

Peter H. Lewis, "Peering out a 'Real Time' Window", *New York Times,* Feb. 8, 1995, pp. D1, D7.

David Lawrence, "Real–Time Audio, Hi–Fi, it Ain't", *Web Developer,* vol. 1, No. 1, Oct. 1995.

Harry A. Jessell, "EZ sees money in the Net", *Broadcasting & Cable,* Jul. 31, 1995, p. 31.

Brett Atwood, "Global 'Desktop B' casting' Catches On", *Billboard,* Jun. 10, 1995.

Brett Atwood, "KPIG First 24–Hour Online Radio", *Billboard,* Sep. 2, 1995.

Donna Petrazzella, "ABC Radio enters WWW", *Broadcasting & Cable,* Aug. 21, 1995, p. 38.

P. Grillo et al., "Host Resources MIB", Network Working Group, RFC 1514, Sep. 1993.

S. Kille et al., "Network Services Monitoring MIB", Networking Working Group RFC 1565, Jan. 1994.

K. McCloghrie et al., "Management Information Base for Networking Management of TCP/IP–based Internets", Network Working Group, RFC 1156, May 1990.

J. Case et al., "A Simple Network Management Protocol (SNMP)", Network Working Group RFC 1157, May 1990.

"DA VIC 1.0 Specification Part 1: Description of DA VIC Functionalities", Digital Audio–Visual Council (DAVIC), Rev. 3.1. The face of this document lists the following date: Jun. 22, 1995.

"DA VIC 1.0 Specification Part 02: System reference models and scenarios", Digital Audio–Visual Council (DA VIC), Rev. 3. The face of this document lists the following dates: Jun. 20, 1995 and Aug. 29, 1995.

"DA VIC 1.0 Specification Part 3: Server Architecture and APIs", Digital Audio–Visual Council (DAVIC), Rev. 3.0. The face of this document lists the following dates: Jun. 7, 1995 and Aug. 29, 1995.

"DA VIC 1.0 Specification Part 04: Delivery system architectures and APIs", Digital Audio–Visual Council (DA VIC), Rev. 3.1. The face of this document lists the following dates: Jun. 8, 1995 and Aug. 29, 1995.

"DA VIC 1.0 Specification Part 5: STU Architecture and API", Digital Audio–Visual Council (DA VIC), Rev. 3.1. The face of this documents lists the following date: Jun. 26, 1995.

"DA VIC 1.0 Specification Part 6: High Layer Protocol", Digital Audio–Visual Council (DA VIC), Rev. 2.1. The face of this document lists the following dates: Jun. 8, 1995 and Aug. 29, 1995.

"DA VIC 1.0 Specification Part 7: Mid–Layer Protocols", Digital Audio–Visual Council (DA VIC), Rev. 3.0. The face of this document lists the following dates: Jun. 8, 1995, Jun. 19, 1995, Jun. 26, 1995, and Aug. 29, 1995.

"DA VIC 1.0 Specification Part 8: Lower Layer Protocols and Physical Interfaces", Digital Audio–Visual Council (DA VIC), Rev. 3.1, 1995. No other date is listed on the face of this document.

"DA VIC 1.0 Specification Part 9: Information Representation", Digital Audio–Visual Council (DA VIC), Rev. 3.2. The face of this document lists the following date: Jul. 6, 1995.

"DA VIC 1.0 Specification Part 10: Security", Digital Audio–Visual Council (DA VIC), Rev. 3.0. The face of this document lists the following dates: Jun. 8, 1995 and Aug. 29, 1995.

"DA VIC 1.0 Specification Part 11: Usage Information Protocols", Digital Audio–Visual Council (DA VIC), Rev. 3.1, 1995. No other date is listed on the face of the document.

"DA VIC 1.0 Specification Part 12: Reference Points, Interfaces and Dynamics", Digital Audio–Visual Council (DA VIC), Rev. 3.1, 1995. No other date is listed on the face of the document.

U.S. Appl. No. 90/007,447, filed Mar. 4, 2005, Request for Exparte Reexamination of U.S. Patent No. 5,983,005.

U.S. Appl. No. 90/007,446, filed Mar. 4, 2005, Request for Exparte Reexamination of U.S. Patent No. 6,434,622.

U.S. Appl. No. 90/007,445, filed Mar. 4, 2005, Request for Exparte Reexamination of U.S. Patent No. 5,778,187.

"Structured Video", GCL's Proposal for DA VIC, Graphics Communications Laboratories, Dec. 1994.

"Multimedia Retrieval Services: Teletel Architecture as an example and a basis for future evolutions", Joint Proposal for the First DA VIC CFP, The Digital Audio–Visual Council, DA VIC Meeting, Tokyo, Japan, Dec. 4–7, 1994.

CableLabs® Response to DA VIC's CFP, Nov. 23, 2994.

Fong, Dr. Chung–Bin, et al., "Karaoke–On–Demand Service & System to DA VIC", Dec. 4, 1994.

Robinson, David, et al., "Network Management Video Server System MIB", The Digital Audio–Visual Council (DA VIC), Dec. 8, 1994.

Thompson, John et al., "Response from British Telecommunications Plc to: DA VIC's First Call for Proposals", BT Response to DA VIC/100, Issue 2.0, Oct. 14, 1994.

A MIB For Video Server System Management("DA VIC MIB").

RealAudio Server Administrator's Guide Release 1.01 and press releases establishing availability as of Apr. 10, 1995("Real 1.01").

RealAudio Server Administrator's Guide Release 2.0 and press release announcing Real 2.0 on Oct. 30, 1995("Real 2.0").

TCP/IP Illustrated, vol. 1—The Protocols.

Office Action dated Jul. 15, 1997 for the '072 Application.

Invalidity Claim Chart for U.S. Patent Nos. 5,778,187; 5,983,005; and 6,434,622.

Appendix A: U.S. Patent No. 5,778,187.

Appendix B: U.S. Patent No. 5,983,005.

Appendix C: U.S. Patent No. 6,434,622.

Appendix D: Network Management Video Server System MIB, Response to Call for Proposals, Dec. 8, 1994, David Robinson and Donald Hooper ("Robinson II"), prepared for DA VIC ("Digital Audio–Visual Council").

Appendix E: Karaoke–On–Demand Service & System to DA VIC, Dec. 4, 1994, Dr. Chung–Bin Fong et al. ("Fong"), prepared for DA VIC.

Appendix F: Structured Video, Dec. 1994, Graphics Communications Laboratory ("GCL"), prepared for DA VIC.

Appendix G: RealAudio Server Administrator's Guide Release 1.01 and press releases establishing availability as of Apr. 10, 1995 ("Real 1.01").

Appendix H: Response From British Telecommunications PLC to: DA VIC's First Call For Proposal, Oct. 14, 1994, John Thompson et al. ("Thompson"), prepared for DA VIC.

Appendix I: TCP/IP Illustrated vol. 1, (1994 19th Printing 2001) ("TCP/IP").

Appendix J: Multimedia Retrieval Services: Teletel Architecture as an example and a basis for future evolutions, France Telecom ("France"), prepared for DA VIC's meeting in Tokyo, Dec. 4–7, 1994.

Appendix K: Response to DA VIC's CFP ("Call for Proposals"), Nov. 23, 1994, CableLabs ("CableLabs").

Appendix L: PTO–1449.

Appendix M: Office Action dated Jul. 15, 1997.

Appendix N: RFC 1155 (Structure of Management Information Base (1990)) and RFC 1157 (Simple Network Management Protocol (1990)).

* cited by examiner

US 5,983,005 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1**–**68** is confirmed.

\* \* \* \* \*

US006434622B1

| (12) **United States Patent** | (10) Patent No.: | **US 6,434,622 B1** |
|---|---|---|
| Monteiro et al. | (45) Date of Patent: | **Aug. 13, 2002** |

(54) **MULTICASTING METHOD AND APPARATUS**

(75) Inventors: **Antonio M Monteiro; James F Butterworth**, both of New York, NY (US)

(73) Assignee: **Netcast Innovations Ltd.**, Boulder, CO (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/617,647**

(22) Filed: **Jul. 17, 2000**

**Related U.S. Application Data**

(63) Continuation of application No. 09/435,732, filed on Nov. 8, 1999, now Pat. No. 6,119,163, which is a continuation of application No. 09/110,369, filed on Jul. 6, 1998, now Pat. No. 5,983,005, which is a continuation of application No. 08/644,072, filed on May 9, 1996, now Pat. No. 5,778,187.

(51) Int. Cl.[7] ............................................. G06F 17/00

(52) U.S. Cl. ................................. 709/231; 709/200.66

(58) Field of Search ...................... 395/200.61, 200.66, 395/200.72

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,546,382 A | 10/1985 | McKenna et al. | 384/84 |
|---|---|---|---|
| 5,105,184 A | 4/1992 | Pirani et al. | 345/115 |
| 5,132,992 A | 7/1992 | Yurt et al. | 375/122 |
| 5,155,591 A | 10/1992 | Wachob | 358/86 |
| 5,220,501 A | 6/1993 | Lawlor et al. | 364/408 |
| 5,283,731 A | 2/1994 | Lalonde et al. | 364/401 |
| 5,305,195 A | 4/1994 | Murphy | 364/401 |
| 5,319,455 A | 6/1994 | Hoarty et al. | 348/7 |
| 5,347,632 A | 9/1994 | Filepp et al. | 395/200 |
| 5,361,256 A | 11/1994 | Doeringer et al. | 370/60 |
| 5,414,773 A | 5/1995 | Handelman | 380/49 |
| 5,446,919 A | 8/1995 | Wilkins | 455/52 |
| 5,493,514 A | 2/1996 | Keith et al. | 364/514 R |
| 5,604,562 A | 2/1997 | Dedrisk | 348/552 |
| 5,617,565 A | 4/1997 | Augenbraun et al. | 395/604 |
| 5,649,013 A | 7/1997 | Stuckey et al. | 380/4 |
| 5,675,510 A | 10/1997 | Coffey et al. | 364/564 |
| 5,706,290 A | 1/1998 | Shaw et al. | 370/465 |
| 5,778,187 A | 7/1998 | Monteiro et al. | 395/200.61 |
| 5,862,329 A | 1/1999 | Aras et al. | 395/200.34 |
| 5,878,384 A | 3/1999 | Johnson et al. | 702/187 |
| 5,928,331 A | 7/1999 | Bushmitch | 709/231 |
| 5,930,254 A | 7/1999 | Liron et al. | 370/395 |
| 5,930,493 A | 7/1999 | Ottesen et al. | 348/7 |
| 5,931,961 A | 8/1999 | Ranganathan et al. | 714/712 |
| 5,936,940 A | 8/1999 | Marin et al. | 370/232 |
| 5,983,005 A | 11/1999 | Monteiro et al. | 395/200.61 |

OTHER PUBLICATIONS

K. Sanetz et al. MBONE Multicasting Tomorrow's Internet (IDG Books worldwide Inc., 1996).

D.P. Brutzman et al., "MBONE Provides Audio and Video Across the Internet," IEEE Computer, vol. 27, No. 4, pp. 30–36 (Apr. 1994).

(List continued on next page.)

*Primary Examiner*—Thomas R. Peeso

(74) *Attorney, Agent, or Firm*—Pennie & Edmonds LLP

(57) **ABSTRACT**

A scalable architecture is disclosed for delivery of real-time information over a communications network. Embedded into the architecture is a control mechanism that provides for the management and administration of users who are to receive the real-time information. In the preferred embodiment, the information being delivered is high-quality audio. However, it could also be video, graphics, text or any other type of information that can be transmitted over a digital network. Preferably, there are multiple channels of information available simultaneously to be delivered to users, each channel consisting of an independent stream of information. A user chooses to tune in or tune out a particular channel, but does not choose the time at which the channel distributes its information. Advantageously, interactive (two-way) information can be incorporated into the system, multiple streams of information can be integrated for delivery to a user, and certain portions of the information being delivered can be tailored to the individual user.

**56 Claims, 23 Drawing Sheets**



US 6,434,622 B1
Page 2

## OTHER PUBLICATIONS

PCT International Search Report, International Application No. PCT/US97/07893.

RealAudio Server, Adminstrator's Guide, Release 2.0. Progressive Networks, Inc.

RealAudio, Administrator's Guide, Release 1.1.

RealAudio Signs Deal with Netscape—Apr. 12, 1995.

Progressive Networks ships RealAudio—Jul. 25, 1995.

Microsoft, Spry and Spryglass to Include RealAudio—Apr. 12, 1995.

April Bundles Real Audio Player—Aug. 7, 1995.

24–Hour ABC News on the Net—Aug. 15, 1995.

Ziff–Davis Adds RealAudio to ZD Net—Aug. 16, 1995.

Progressive Networks' Real Audio Player has exclusive with Microsoft's Internet Explorer—Aug. 17, 1995.

Progressive Networks Announces "Live RealAudio" System—Aug. 30, 1995.

ABC RadioNet first to fully integrate live RealAudio—Sep. 7, 1995.

RTHK pioneers the use of Live RealAudio technology, Sep. 14, 1995.

Progressive Networks Announces RealAudio Personal Server—Oct. 9, 1995.

Progressive networks Receives Second Round of External Financing $5.7 Million Led by Accel partners—Oct. 30, 1995.

CheckPoint Software Breaks the Sound Barrier with Integrated Support for RealAudio—Dec. 5, 1995.

Progressive Networks Introduces Version 2.0 of the RealAudio System—Oct. 30, 1995.

Atlantic Records, CDnow, Electra Records, InTouch Group Inc., MCA Records, Muzak and Warner Bros. Records among first users of Progressive Networks' Real Audio version 2.0—Dec. 4, 1995.

Progressive Netorks to broadcast the Live and In Concert—Jan. 4, 1996.

Microsoft and Progressive Networks demonstrate first OLE–enabled Internet browser to incorporate RealAudio—Dec. 7, 1995.

Progressive Networks Announces RealAudio Server Products for Macintosh—Jan. 10, 1996.

Trusted Information Systems Enhances Industry Leading Gauntlet Internet Firewall—Jan. 23, 1996.

Border Network Technologies Provides Secure Support for RealAudio—Jan. 24, 1996.

Progressive Networks Announces Open RealAudio Architecture—Jan. 31, 1996.

RealAudio™ Server Software to be Bundled with newest Line of Apple Internet Servers—Feb. 27, 1996.

Bruce Jacobsen named President and Chief Operating Officer of Progressive Networks—Feb. 21, 1996.

GTA Announces RealAudio Support for the GFX Internet Firewall System—Mar. 1, 1996.

Morning Star's SecureConnect Technology Provides Internet Users of Real Audio With Sound Security—Mar. 4, 1996.

Progressive Networks and Microsoft Announce Streaming Media Agreement—Mar. 12, 1996.

Progressive Networks Announces RealAudio Firewall Proxy Kit—Apr. 2, 1996.

Progressive Networks Launches RealAudio 2.0 Intranet Offerings with Corporate Licensing Program and Intranet Server Pricing—Apr. 2, 1996.

Progressive Networks Ships Final Version of RealAudio System 2.0 with Open Architecture Enhancements and Ability to Deliver Synchronized Multimedia Capabilities—Apr. 2, 1996.

Progressive Networks Launches Timecast: The RealAudio Guide—Apr. 29, 1996.

RealAudio Wins Internet World magazine Outstanding Software Product of the Year Aware—Apr. 30, 1996.



FIG. 1



FIG. 2

Appx171



FIG. 3



FIG. 4



# FIG. 5



FIG. 6



# FIG. 7



USER
ADMINISTRATION SERVER
SELECT CHANNEL TO PLAY
OPEN TCP CONNECTION
VERSION OBJECT
VERSION OBJECT
CHECK VERSION NUMBER
CHECK VERSION NUMBER
RETRIEVE SECURITY TOKEN
SERVER LIST REQUEST OBJECT
VALIDATE SECURITY TOKEN
GENERATE SERVER LIST
(ACTIVATE CHANNEL)
PROTOCOL LIST OBJECT
SAVE CONTROL SERVER LIST
CLOSE TCP CONNECTION
CONTROL SERVER
GET FIRST CONTROL SERVER
OPEN TCP CONNECTION
VERSION OBJECT
VERSION OBJECT
CHECK VERSION NUMBER
CHECK VERSION NUMBER
RETRIEVE SECURITY TOKEN
SERVER LIST REQUEST OBJECT
VALIDATE SECURITY TOKEN
GENERATE SERVER LIST
(ACTIVATE CHANNEL)
PROTOCOL LIST OBJECT
SAVE MEDIA SERVER LIST
CLOSE TCP CONNECTION
(CONTINUED)

FIG. 8A



USER
MEDIA SERVER
(CONTINUED)
GET FIRST MEDIA SERVER
OPEN TCP CONNECTION
VERSION OBJECT
VERSION OBJECT
CHECK VERSION NUMBER
CHECK VERSION NUMBER
RETRIEVE SECURITY TOKEN
MCI REQUEST OBJECT (OPEN)
VALIDATE SECURITY TOKEN
ALLOCATE RESOURCES
RESULT MESSAGE OBJECT
MCI REQUEST OBJECT (PLAY)
RESULT MESSAGE OBJECT
SEND LOG MESSAGE
START AUDIO PACKETS
PLAY AUDIO
UDP PORT
AUDIO PACKETS
PING OBJECT
PING OBJECT
UDP PORT
AUDIO PACKETS
PING OBJECT
PING OBJECT
(CONTINUED)
(CONTINUED)

FIG. 8B



FIG. 8C



FIG. 9A

(SHOWN ABOVE)

| REQUEST FROM | REQUEST TO | VALIDATION WITH |
|---|---|---|
| USER | CONTROL SERVER | ADMINISTRATION SERVER |
| USER | MEDIA SERVER | CONTROL SERVER |
| MEDIA SERVER | MEDIA SERVER | CONTROL SERVER |
| MEDIA SERVER | PRIMARY SERVER | ADMINISTRATION SERVER |
| MEDIA SERVER | CONTROL SERVER | ADMINISTRATION SERVER |
| CONTROL SERVER | MEDIA SERVER | ADMINISTRATION SERVER |

# FIG. 9B



FIG. 10



**FIG. 11**

Appx183



FIG. 12

Appx184



**FIG. 13**



FIG. 14

Appx186



**FIG. 15**

Appx187



MEDIA SERVER
MEDIA OR PRIMARY SERVER
(INCOMING PLAY RECEIVED)
GET APPROPRIATE MEDIA OR PRIMARY SERVER
OPEN TCP CONNECTION
VERSION OBJECT
VERSION OBJECT
CHECK VERSION NUMBER
CHECK VERSION NUMBER
RETRIEVE SECURITY TOKEN
MCI REQUEST OBJECT (OPEN)
VALIDATE SECURITY TOKEN
ALLOCATE RESOURCES
RESULT MESSAGE OBJECT
MCI REQUEST OBJECT (PLAY)
START AUDIO PACKETS
RESULT MESSAGE OBJECT
FORWARD AUDIO PACKETS TO OTHER SERVER(S) OR USER(S)
UDP PORT
AUDIO PACKETS
PING OBJECT
PING OBJECT
UDP PORT
AUDIO PACKETS
PING OBJECT
PING OBJECT
(CONTINUED)
(CONTINUED)

FIG. 16A



FIG. 16B

Appx189



FIG. 17

Appx190



FIG. 18

| File |
|---|
| Login |
| Logout |
| Register |
| Close |
| Exit |

| Edit |
|---|
| Copy |
| Properties |

| Audio |
|---|
| Play |
| Stop |
| Mute |

| View |
|---|
| Tool Bar |
| Status Bar |
| Web Bar |

| Help |
|---|
| Help Topics |
| About... |

Key Pull-Down Menus on Main User Screen

# FIG. 19

Appx192

US 6,434,622 B1

1

## MULTICASTING METHOD AND APPARATUS

This is a continuation, of application Ser. No. 09/435,732, filed Nov. 8, 1999, now U.S. Pat. No. 6,119,163 which is a continuation of application Ser. No.09/110,369, filed Jul. 6, 1998 (now U.S. Pat. No. 5,983,005), which is a continuation of application Ser. No. 08/644,072, filed May 9, 1996 (now U.S. Pat. No. 5,778,187), and such applications are hereby incorporated by reference.

### FIELD OF THE INVENTION

This relates to a method and apparatus for providing audio and/or visual communication services, in real-time to a multiplicity of identifiable users on a communications network, such as the Internet. In a preferred embodiment, the invention monitors which users are receiving signals on which one of a plurality of channels and modifies the content of at least some signals in response thereto. A particular application is to provide services akin to multi-channel radio or television with commercial programming content adjusted in accordance with the identity of the individual user.

### BACKGROUND OF THE INVENTION

Systems such as the Internet typically are point-to-point (or unicast) systems in which a message is converted into a series of addressed packets which are routed from a source node through a plurality of routers to a destination node. In most communication protocols the packet includes a header which contains the addresses of the source and the destination nodes as well as a sequence number which specifies the packet's order in the message.

In general, these systems do not have the capability of broadcasting a message from a source node to all the other nodes in the network because such a capability is rarely of much use and could easily overload the network. However, there are situations where it is desirable for one node to communicate with some subset of all the nodes. For example, multi-party conferencing capability analogous to that found in the public telephone system and broadcasting to a limited number of nodes are of considerable interest to users of packet-switched networks. To satisfy such demands, packets destined for several recipients have been encapsulated in a unicast packet and forwarded from a source to a point in a network where the packets have been replicated and forwarded on to all desired recipients. This technique is known as IP Multicasting and the network over which such packets are routed is referred to as the Multicast Backbone or MBONE. More recently, routers have become available which can route the multicast addresses (class D addresses) provided for in communication protocols such as TCP/IP and UDP/IP. A multicast address is essentially an address for a group of host computers who have indicated their desire to participate in that group. Thus, a multicast packet can be routed from a source node through a plurality of multicast routers (or mrouters) to one or more devices receiving the multicast packets. From there the packet is distributed to all the host computers that are members of the multicast group.

These techniques have been used to provide on the Internet audio and video conferencing as well as radio-like broadcasting to groups of interested parties. See, for example, K. Savetz et al. *MBONE Multicasting Tomorrow's Internet (IDG Books WorldWide Inc.,* 1996).

Further details concerning technical aspects of multicasting may be found in the Internet documents Request for

2

Comments (RFC) 1112 and 1458 which are reproduced at Appendices A and B of the Savetz book and in D. P. Brutaman et al., "MBONE provides Audio and Video Across the Internet," *IEEE Computer,* Vol. 27, No. 4, pp. 30–36 (April 1994), all of which are incorporated herein by reference.

Citation of the foregoing documents is not to be construed as an admission that any of such documents is a prior art publication relative to the present invention.

### SUMMARY OF THE INVENTION

The present invention is a scalable architecture for delivery of real-time information over a communications network. Embedded into the architecture is a control mechanism that provides for the management and administration of users who are to receive the real-time information.

In the preferred embodiment, the information being delivered is high-quality audio. However, it could also be video, graphics, text or any other type of information that can be transmitted over a digital network. This information is delivered in real-time to any number of widely distributed users. It is real-time in that for a given channel of information, approximately the same information is being sent at approximately the same time to everyone who is enabled to receive the information.

Preferably, there are multiple channels of information available simultaneously to be delivered to users, each channel consisting of an independent stream of information. A user chooses to tune in or tune out a particular channel, but does not choose the time at which the channel distributes its information. Advantageously, interactive (two-way) information can be incorporated into the system, multiple streams of information can be integrated for delivery to a user, and certain portions of the information being delivered can be tailored to the individual user.

### BRIEF DESCRIPTION OF THE DRAWING

These and other objects, features and advantages of our invention will be more readily apparent from the following Detailed Description of a Preferred Embodiment of our invention in which

FIG. **1** is a schematic diagram depicting an overview of the system of the present invention;

FIG. **2** is a schematic diagram depicting the network control center for the system of FIG. **1**;

FIG. **3** is a schematic diagram depicting a unicast distribution structure;

FIG. **4** is a schematic diagram depicting a multicast distribution structure;

FIG. **5** is a schematic diagram depicting the connection between the media server and the user in the system of FIG. **1**;

FIGS. **6–17** are timing diagrams which depict various aspects of the operation of the system of FIG. **1**; and

FIGS. **18** and **19** depict the user interface for control of the system of FIG. **1**.

Where the same reference numerals appear in multiple drawings, the numerals refer to the same or corresponding structure in such drawings.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. **1**, the system of the present invention comprises a Network Control Center **10**, a plurality of

US 6,434,622 B1

| 3 | 4 |

Primary Servers **20**, Media Servers **30**, Users **40** and Control Servers **50** and an Administration Server **60**. The servers are interconnected by a communications network, which in the preferred embodiment is the global connected internetwork known as the Internet. The Network Control Center **10** is the source of the information being distributed. It receives audio feeds from satellite, over the air broadcast or in other ways and processes this information for delivery over the network on multiple channels of information. This processing consists of optionally recording the information for future broadcast and dynamically inserting paid commercial advertisements.

For each channel of information, there is a Primary Server **20** that receives the stream of information from the Network Control Center **10** and compresses the information stream to allow for more efficient transmission. The Primary Servers **20** are directly connected to the network.

The Primary Servers forward information via the network to a number of Media Servers **30**. There may be a large number of Media Servers and in fact there may be many levels of Media Servers. For example, a Media Server which receives a stream of information from a Primary Server may forward that stream via the network to another Media Server **35** which then forwards it to a User **40**. This multilevel hierarchical structure is described in more detail below.

The topology of the Internet dictates the ideal placement of Media Servers, the fan-out of each Media Server and the number of levels of Media Servers between the Primary Server and Users. For example, the Media Servers which feed from a Primary Server might be placed at a major points of presence (POPs) of each of the large Internet service providers. These Media Servers might also be placed near clouds which serve as high bandwidth exchange points between the major carriers. Similarly, Media Servers which feed to Users might be placed on or close to networks which have a large number of subscribers to minimize the distance and number of data streams being transmitted.

Control Servers **50** are responsible for keeping track of which Users are listening to which channels and for directing the Media Servers to start and stop streams of information to those Users. The Control Servers are also responsible for handling other interactions among the various components of the system as will be described in more detail below. Each Control Server is responsible for managing a cluster of Media Servers; and each Media Server is managed by a single Control Server at any given time. As a result, the Control Servers are distributed throughout the Internet, preferably located close to the Media Servers.

The Administration Server **60** is responsible for registering new Users, authenticating Users who want to log onto the system, and maintaining audit logs for how many Users are listening to which channels and at which times. Maintaining audit logs and gathering statistics are features critical to monitoring the delivery of paid commercial messages as well as for other purposes. For example, for purposes of assessing copyright royalties, the audit logs can record the number of listeners for each musical or video selection that is distributed by the system. Another application is to determine the percentage of listeners who are interested in listening to a particular musical selection by determining how many listen to the entire selection and how many turn it off.

The system of the present invention can be considered a distribution architecture integrated with a control architecture. The distribution architecture handles scalable real-time delivery of information to any number of Users on a packet switched network, such as the Internet. The control architecture represents a second scalable system integrated with the distribution architecture for managing and administering the delivery of that information.

The remainder of this description is divided into three sections. In the next section the distribution architecture will be described in more detail. Following that, the control architecture will be described. In the third section the User interface will be illustrated.

### I. Distribution Architecture

The distribution architecture provides for the delivery of real-time information to any number of Users distributed throughout a network. As will be described in detail below, the distribution architecture is scalable to allow for efficient delivery of multiple simultaneous information channels in real-time to a large number of Users.

In the preferred embodiment, the information which is being distributed consists of high-quality audio in addition to other information. It should be appreciated that the basic architecture and other general principles set forth herein would also apply to the delivery of video, graphics, text or any other type of information that can be delivered over a digital network. In addition, it should be appreciated that an information stream can consist of audio with supplemental information such as text and graphic images and commands to control software running on the User's computer.

The source of information in the preferred embodiment is the Network Control Center **10**, depicted in the schematic diagram of FIG. **2**. Control Centers of this type of design are available from Broadcast Electronics, Inc. and are similar to what would be found in a conventional radio station serving multiple frequencies.

Referring to FIG. **2**, the incoming signal can be received in a variety of ways such as from a satellite, over-the-air broadcast, cable or hard disk. It is then processed by Receiver/Decoder **110**, which decodes the signal and provides an incoming audio stream. Routing Switcher **120** is responsible for routing the incoming audio feed from the Receiver to either Delay Recording Workstation **140** or to one of the Playback/Control Workstations **130**. Real-time insertion of paid commercial advertising takes place at the Playback/Control Workstations and the resulting integrated audio stream is delivered to the Primary Servers. The Delay Recording Workstation is responsible for recording an incoming broadcast so that it can be played back at a later time.

Supervisory Workstation **150** is responsible for managing and controlling the Playback/Control Workstations, Delay Recording Workstations and other computers as may be connected to the local area network within the Network Control Center. Production Workstation **160** and AudioVAULT-NFS Server **170** are used to manipulate audio samples, such as commercial messages for use by the Playback/Control Workstations. The audio being delivered can consist of syndicated TV or radio programs, such as would be received over satellite or cable and delivered as described above. These can be delivered live and/or played back at a later time. It is also possible for the delivery of information, such as music, to take place from information that is all stored locally such as on a hard disk. A new play list and its associated music data can then be downloaded periodically to update the channel. Additionally, it is possible to deliver commercial-free programming, for example public service announcements or label-specific music.

In the preferred embodiment the Primary Servers are responsible for compressing the audio stream using an

5

advanced perceptual technique developed and licensed by AT&T Corp. and Lucent Technologies, Inc. This highly sophisticated algorithm is used to maximize the benefit of the bandwidth available. Advantageously, two bitrates are available, a first rate of approximately 20 Kbps and a second rate of approximately 56 Kbps. Using the perceptual technique, the quality of the first rate is similar to FM monaural (with a sampling rate of approximately 22,000 16-bit samples per second) and the second rate is close to CD quality stereo (with a sampling rate of approximately 32,000 16-bit samples in stereo each second). The signals at the two different bitrates comprise two different audio channels and thus require two different compression processes.

The computational requirements of compressing an audio stream in real time using techniques such as the advanced perceptual technique are approximately 100% of a Pentium-Pro 200 Mhz computer and the computational requirements of decompressing an audio stream in real time are approximately 30% of a Pentium 75 Mhz computer. Future improvements and/or changes to the algorithm could significantly change these requirements. For the present, a dedicated computer is required within the Primary Server to compress the audio stream. The decompression process takes place on end Users' computers and preferably would use only a portion of the computers' computational requirements, allowing the computers to be used for other tasks while they are processing the audio stream.

It is important to appreciate that the compression and decompression techniques employed by the present invention are not critical to the overall operation of the system and the advantages obtained therefrom could be obtained with other compression methodologies. Advantageously, the identity of the compression technique used can be encoded into the audio stream in the packet header. This makes it possible to identify to the receiver the nature of the decompression algorithm to use; and thereby make it possible for the computer within the Primary Server to select an optimum compression algorithm depending on the nature of the audio stream to be compressed.

The remainder of the distribution architecture comprises the multilevel hierarchy of data transmission originating at the Primary Server 20 and terminating at the Users 40 as shown in FIG. 3. In the preferred embodiment, the network is the global connected Internet. It can also include private networks which are connected to the Internet and it could be implemented on any packet switched network, cable-modem-based or satellite-based cable system. It is possible that certain links within the overall system, for example, the link between the Primary Server and the first level of Media Servers, are private data links which carry only data associated with this system. This could also be true of other data transmission paths in the distribution architecture. The User receiving the information preferably can be anyone who has access to the Internet with sufficient bandwidth to receive the resulting audio data.

It should be appreciated that the distribution architecture of the present invention provides for scalability. Using such a structure, any number of Users, and as widely distributed as necessary, can be accommodated. In the preferred embodiment, the fan-out at each level of Media Server (given the state of technology today) is on the order of ten, but the same structure could be applied with other fan-outs. The location and fan-out of the Media Servers is chosen to minimize overall network bandwidth consumed.

The flow of information from Primary Server 20 through network to User 40 is based on the delivery of a continuous

6

sequence of individual pieces of information, or packets. Thus the distribution architecture implements a form of multicast packet delivery to a group. The group in this case is the set of all Users who are listening to a given channel at a given time. Group membership is dynamic, Users can start and stop listening to a channel at any time.

Multicasting can be implemented in a variety of ways, any or all of which can be used in the present invention. In the preferred embodiment, the Media Servers receive unicast packet streams and they then duplicate these streams into more unicast streams to other Media Servers which are in the membership group for that stream. The lowest level Media Servers use hardware broadcast, multicast and/or unicast to reach all Users served by that Media Server.

If the Media Server is directly connected to the same physical network as the User, hardware broadcast or multicast can be used to transmit the packet stream to all Users listening at that time on that network. In this case the Media Servers can translate the incoming packets into broadcast or multicast packets for transmission on the local network. Only a single packet is transmitted at-a-time on the local network and any computer directly connected to the local network can receive that packet. Hardware multicast is built into most networks and it is lower in overall overhead than hardware broadcast since computers not interested in a transmission do not have to process the packets. In the case that a Media Server is serving a User who is not on the same physical network, a unicast transmission is used to reach that User, which requires a separate packet transmission for each User so connected. In the preferred embodiment, the assignment of Users to Media Servers is done using control transactions among the User 40, Control Servers 50, and Administration Server 60. This system will be described more fully in the following section.

Multicasting can also be implemented within the Internet at the IP level using IP class D addresses and the IGMP group control protocol. FIG. 4 illustrates how the multilevel hierarchical distribution architecture would operate using IP multicast delivery. Under this system, a packet is transmitted with a multicast address for a destination and each router maintains group membership lists for each interface that it is connected to and will forward packets across the Internet to other routers such that all Users within the global group eventually receive a copy of the packet. Unless and until all routers within the Internet understand multicasting in this way, it is necessary to supplement it with IP tunneling in which multicast packets are encapsulated in unicast packets and routed by unicast routers to a multicast routers. The present invention can and will be able to take advantage of IP multicasting as it becomes widely available. Each channel of information would be given its own class D address and the Media Server would then simply transmit packets using the appropriate IP destination address. In this case no Media Servers would be used as this function would be accomplished by the routers in use to store and forward other IP packets.

Thus it can be appreciated that the implementation of the multicast delivery structure can be implemented using a combination of IP unicast, IP multicast and hardware multicast or any other system which provides for distributed delivery of information to a specific group of destinations. It is expected that special relationships with Internet providers will be established so that delivery of the audio steams can take place with a guaranteed bandwidth and in the most efficient way possible.

In the preferred embodiment, packets of information for distribution use the UDP protocol under IP rather than the

US 6,434,622 B1

**7**

TCP protocol. TCP provides for reliable stream delivery but at the cost of retransmission and delays. For real-time information, it is usually more appropriate to use UDP since the information is time critical and low latency is more important that reliability. Since TCP is a point-to-point protocol, it is incompatible with IP multicasting. However, TCP could be used on the IP unicast links between Media Servers which are expected to have very low packet loss. In order to handle out of order, lost, duplicate and corrupted packets, the UDP packets are serialized.

In the preferred embodiment the size of the audio packets being transmitted is variable and can change on a packet by packet basis. It is expected that when using compression schemes that have a fixed bit rate, such as ADPCM, all packets for that stream would be the same size. Alternatively when using a variable bit rate compression algorithm, it is expected that packet size would vary so as to establish approximately the same amount of time for each sample. For example, if each packet corresponds to a 20 millisecond segment of speech, this could correspond to 100 bytes during one time period and 200 bytes during another. Additionally, the Media Server may choose to dynamically vary the packet size to accommodate changes in network conditions.

Since the resulting playback of audio information is sensitive to packet loss and network congestion, software running on the various computers which make up this system monitor the ongoing situation and adapt to it in the best possible way. This may involve using different Media Servers and/or lowering the data rate to the User. For example, similar to analog dynamic signal quality negotiation present in many analog radio receivers, the User software may request a lower bitrate until the situation is improved. Also, note that the audio information being delivered to the User is preferably interleaved so that a contiguous segment of the audiostream is distributed for transmission over several packets. As a result, the loss of one packet is spread out over multiple audio samples and causes minimal degradation in audio. Advantageously, a small degree of redundancy may be incorporated within the audio stream to further guard against packet loss.

Preferably, there are two bitrate options available to the User for audio delivery. These are approximately 20 Kbps for standard audio and approximately 56 Kbps for high quality audio. Thus, a 28.8 Kbps modem connection over an analog phone line is sufficient to listen to standard audio broadcasts. To listen to high quality audio, an ISDN connection to the Internet is required, or some other connection with greater than 56 Kbps bandwidth. It should be appreciated that higher bandwidths are currently becoming available to end Users. In particular the use of cable modems and residential fiber networks are enhancing the bandwidths available to Users and thus making broadcasts of higher bitrates more practical.

In addition to the content of the audio channel being delivered, it is also possible to deliver out of band of side-bar information such as graphics, images and text. This side-bar information is synchronized with the audio channel. This may only involve small increases in bandwidth requirements, such as 1–2 Kbps. For example a music program could deliver images of an album cover, the text of song lyrics, or URLs for use by a Web browser. The User can preferably choose to have the side-bar information show up automatically or be hidden. It is also possible to incorporate two-way interaction into the system, such that for example Users can participate in a global chat session during the audio broadcast. These and other details are explained in more detail below under the description of the User interface.

The delivery of paid commercial advertising information is an important aspect of the present invention. Advertising

**8**

may be incorporated into the audio stream within the Network Control Center as described above. It may also be incorporated into the audio stream at the User level, or at some intermediate point in the distribution architecture.

In addition, the side-bar information discussed above can also include advertising content. FIG. 5 illustrates the provision to the User of two separate streams **32, 34** of packets, one of which may be used for advertising. In this case the insertion of the stream of commercial advertising into the non-commercial stream occurs on the User's computer. FIG. 5 also illustrates packet stream **36** which identifies the User to the system. This enables the system to monitor which Users are listening to which channels and also allows the system to vary, for example, the advertising content delivered to a User.

One advantage of this alternative is to allow targeted commercial delivery based on the individual User. That is, an individual User would receive the main audio feed plus a particular advertising stream unique to his demographic group. Note that the advertising stream typically is lower in overall bitrate and generally does not require real-time delivery, thus lowering the overall load on the network. For example, the advertising stream could be delivered to the User in advance of the regular programming, stored in a buffer in the User's computer and inserted into the stream of regular programming upon receipt of a cueing signal embedded in the stream of regular programming. Thus, a substantial number of targeted groups, perhaps 10 or 100 or even more could be accommodated without an impractical increase in network load.

II. Control Architecture

The control architecture described in this section is responsible for managing and administering the Users who are receiving the information being delivered by the distribution architecture described in the previous section. The control architecture handles new User registration, User login, the starting and stopping of audio streams and the monitoring of ongoing transmissions. The control architecture is scalable just as is the distribution architecture so that any number of Users can be managed.

This section describes the control protocol, which consists of the format and sequence of control messages that are exchanged among Users, Control Servers, Media Servers, Primary Servers and the Administration Server. These messages are in the form of objects, which have specific data formats. Objects are exchanged preferably using the TCP protocol although other options are possible. Below we describe the sequence of objects passed among the various computers and detail the internal structure of each object.

The major objects used in the present embodiment of the invention are set forth in Table 1. For each object, Table 1 provides a brief description of its function, identification of the names of the fields in the object, their types and a brief description of their function.

TABLE 1

| Field Name | Field Type | Remarks |
| --- | --- | --- |
| Channel Activation Object | | |
| Contains information used for channel activation/deactivation. It is sent to Media and Primary Servers to tell them to carry or stop carrying a specific channel. Media Servers get the channel from another server in the system hierarchy and Primary Servers get and encode the feed from the actual input source. | | |
| Token | Security Token Object | |
| Moniker | Moniker Object | unique channel identifier |

US 6,434,622 B1

**9**

TABLE 1-continued

| Field Name | Field Type | Remarks |
|---|---|---|
| Activate | Int | action flag (activate/deactivate) |
| CompressType | Int | type of compression to use |
| Host | Host Object | host carrying the channel |

Channel Guide Object
Contains analytical and descriptive information for an item requested that is uniquely identified by a moniker. It is usually the reply to a Channel Guide Request object.

| Token | Security Token Object | |
| Type | Int | type of content |
| Result | | the content data itself |

Channel Guide Request Object
Conveys a request for analytical and descriptive information about an item uniquely identified by the contained moniker. The reply is in the form of a Channel Guide object

| Token | Security Token Object | inherited from base class |
| Type | Int | type of content |
| Moniker | Moniker Object | unique identifier |

Host Object
Encapsulates the attributes of a networked computer related to the operation or services it offers or requests.

| Token | Security Token Object | |
| HostName | String | computer name and domain |
| PortNumber | Int | port number for service |
| DisplayName | String | descriptive computer name |

Login Information Object
Encapsulates the name and password by which a User is known to the system.

| Token | Security Token Object | |
| Login | String | User's system login name |
| Password | String | User's system password (possibly encrypted) |

Media Control Interface (MCI) Request Object
Encapsulates a multimedia control command, such as play and stop, and any extra information that may be necessary to perform the requested service.

| Token | Security Token Object | |
| Command | Int | multimedia command |
| String | String | command-specific extra info |

Moniker Object
A moniker encapsulates the name of an object or process with the intelligence necessary to work with that name. In other words, it provides naming and binding services. The Moniker Object is used in the system for unique identification of various components, parts or features, such as a channel, a directory, or a computer list.

| Token | Security Token Object | |
| ID | String | unique string identifier |
| DisplayName | String | User-readable name |

Ping Object
Ping is the name given to the "Are-you-Alive?" operation useful in determining if a specific computer is up and running. This object is used in the system when a server has to be queried for its operation status. It can also provide timing information for statistical purposes and quality of service evaluations.

| Token | Security Token Object | |
| Date | Date | system date |
| Time | Time | system time |

**10**

TABLE 1-continued

| Field Name | Field Type | Remarks |
|---|---|---|
| Protocol List Object | | |
| Encapsulates a general purpose collection object | | |
| Token | Security Token Object | |
| Type | Int | type of object list |

Result Message Object
Acts as the acknowledgment for a requested service successfully carried that out or reports errors that occur in the system during a client/server transaction.

| Token | Security Token Object | |
| Code | Int | result code |
| Message | String | message corresponding to code |

Security Token Object
Contains the authorization key for a transaction. The key must be validated before any service is performed.

| ID | String | authorization key/transaction ID. |

Server Activation Object
Contains information used in the server activation/deactivation process. Used for announcement as well as command purposes (e.g., a server can notify the administration database that is now activated or a server can be instructed to manage someone else).

| Token | Security Token Object | |
| Active | Int | action flag (activate/deactivate) |
| Manage | Int | control flag (manage/associate) |
| Type | Int | server type |
| Host | Host Object | host to be controlled |

Server List Request Object
Encapsulates a request for a list of available server resources for an identified service (e.g., a request for a list of Control Servers for a specified channel).

| Token | Security Token Object | |
| Type | Int | type of service |
| Moniker | Moniker Object | content/channel unique identifier |
| Host | Host Object | local host information |

Statistics Object
Contains system-related information that can be used by load-balancing algorithms and for statistical purposes.

| Token | Security Token Object | |
| Load | Int | load on the system |
| Threads | Int | number of threads running |
| Users | Int | number of Users being serviced |
| Uptime | Int | amount of time running |
| NumberManaged | Int | number of managed servers |
| NumberAssociated | Int | number of associated servers |

Statistics Request Object
Encapsulates a request for system-related information that can be used by load-balancing algorithms and statistical purposes.

| Token | Security Token Object | |
| Load | Int | request flag (on/off) |
| Threads | Int | request flag (on/off) |
| Users | Int | request flag (on/off) |
| Uptime | Int | request flag (on/off) |

US 6,434,622 B1

**11**                                                      **12**

TABLE 1-continued

| Field Name | Field Type | Remarks |
|---|---|---|
| NumberManaged | Int | request flag (on/off) |
| NumberAssociated | Int | request flag (on/off) |

User Object

Users and Servers use this object to register themselves with the administration database. They provide the information for subsequent logins (name, password) and other system-related info. The end-Users provide personal, demographic, and system-related information.

| Token | Security Token Object | |
|---|---|---|
| Login | Login Information Object | login information (name, password) |
| FirstName | String | User's first name |
| LastName | String | User's last name |
| Title | String | User's job title |
| Company | String | User's employer |
| Address1 | String | User's home street address |
| Address2 | String | User's address extra |
| City | String | city, village |
| State | String | state, province or foreign country |
| ZipCode | String | zip or postal code |
| Age | String | User's age |
| Gender | String | User's gender |
| PhoneNumber | String | telephone number |
| FaxNumber | String | fax number |
| Email | String | email address |
| Demographics | Dictionary | market targeting extra User info |
| SystemInfo | Dictionary | system-related information |

Version Object

All components of the system use this object to report their versioning information to the party they transact with in order to use a protocol they both understand. They are also given the chance to update themselves if a newer version exists.

| Token | Security Token Object | |
|---|---|---|
| Major | Int | major protocol version number |
| Minor | Int | minor protocol version number |
| Type | Int | sender type |
| Client | Version | client version information |

Unlike traditional protocols based on state computers, the control protocol of the present invention is a light-weight, stateless protocol comprising simple sequences objects. It is light-weight in that in most sequences only two objects are involved in the transaction and after a sequence is completed the connection can be reused. It is also stateless in that the server maintains no information about the client. Every transaction is handled independently of the previous ones. States exist in the lower levels, for example within the TCP layer, to express logical states of a network connection but they are not actually part of the control protocol.

In the preferred embodiment, the software-running on the Control Servers, Media Servers and Primary Servers is programmed for Windows NT and UNIX environment using the OLE environment. In addition, COM interfaces are used between components. The Rogue Wave system is used to transfer objects between the applications running on the various computers. The software running on the User computer is preferably programmed for a Windows 32-bit environment, so it will run on a Windows 95 or Windows NT computer. Alternatively, Macintosh and UNIX environments can be accommodated by other User software.

The basic process of a control transaction consists of a version sequence followed by one or more protocol

sequences. The version sequence starts after the computer initiating the transaction, the client, has established a connection with the computer completing the transaction, the server. The client sends a Version Object (defined in Table 1) and in response the server then sends back its own Version Object. This version sequence is used so that both client and server are aware of the version numbers of the software they are using. If a version number is older than expected, either client or server can choose to conform to the previous version or abort the transaction, depending on its needs and capabilities. If a version number is newer than expected, in most cases the current transaction can be completed since the software systems are designed to be fully backward compatible with previous versions. Additionally, in the case that the server of the transaction is the Administration Server, the client receives information about what the latest version number is and thus the client can be informed that a software update is needed. The process of handling automatic updating of User software is described more fully below.

After the version sequence, one or more protocol sequences occur in which objects are exchanged between client and server. When a particular protocol sequence is completed, another independent protocol sequence can be serviced. The protocol sequences that are part of the control architecture of the present invention are summarized in Table 2 and described below in conjunction with FIGS. **6–17**.

TABLE 2

Summary of Protocol Sequences

| Control Sequence | Client | Server | Main Objects Exchanged |
|---|---|---|---|
| User Registration and Login (see FIG. 6) | User | Administration | Version Object User Object Channel Guide Object |
| User Login (see FIG. 7) | User | Administration | Version Object Login Information Object Channel Guide Object |
| Channel Play (see FIGS. 8a, 8B, 8C) | User | Administration | Version Object Server List Object |
| | | Control | Version Object Server List Object |
| | | Media | Version Object MCI Objects-OPEN/PLAY/STOP/CLOSE Ping Objects (TCP Connection stays open) |
| Token Validation (see FIGS. 9A, 9B) | Control or Media or Primary | Administration or Control | Version Object Security Token Object |
| Server Registration and Login (see FIG. 10) | Media or Control | Administration | Version Object User Object Server Activation Object |
| Server Login (see FIG. 11) | Media or Control | Administration | Version Object Login Object Server Activation Object |
| Control Server Activation (see FIG. 12) | Administration | Control | Version Object Server Activation Object |

US 6,434,622 B1

**13**                                                                    **14**

TABLE 2-continued

Summary of Protocol Sequences

| Control Sequence | Client | Server | Main Objects Exchanged |
|---|---|---|---|
| Media Server Activation (see FIG. 13) | Control | Media Server Activation Object | Version Object |
| | | | (TCP connection stays open) |
| Control Channel Activation (see FIG. 14) | Administration | Control | Version Object Channel Activation Object |
| Media Channel Activation (see FIG. 15) | Control | Media | (open TCP connection) Channel Activation Objects |
| Distribution Activation (see FIG. 16) | Media | Media or Primary | Version Object MCI Objects- OPEN/PLAY/ STOP/CLOSE Ping Objects |
| | | | (TCP connection stays open) |
| Statistics Request (see FIG. 17) | Administration | Control or Media | Version Object Statistics Object |

The User registration and login sequences are the processes by which a new User registers with the system, logs in and retrieves programming information. The channel play sequence takes place when a User asks to listen to a particular channel. The token validation sequence is used to verify that a computer requesting a service is authorized to do so. The Server registration, login and activation sequences are used by Control and Media Servers when they become active. The Control Server and Media Server activation sequences are used to manage the Control and Media Servers. The control channel, media channel and distribution activation sequences are used to cause a channel to be distributed to a Media Server. Finally, the statistics request is used for administrative purposes.

FIG. **6** illustrates the User registration and login sequence in more detail. This sequence takes place after the User has installed the User software on his/her computer. It is expected that the User will download the software from the Internet and then invoke it which in the preferred embodiment will use the Windows Wizard interface. This will guide the User through the installation process including filling out the registration form, which we will describe more fully in the next section. After the User has selected a name and password and selected the option to register, the User computer opens a TCP connection to the Administration Server. Advantageously, the full domain name of the Administration Server is embedded into the User software, although it could be discovered in other ways. The User and Administration Server then exchange version objects with the Administration Server as described above. If the version numbers meet expectations, the User sends a User Object to the Administration Server. The format of the User Object is shown in Table 1. Once the Administration Server receives the User Object, it verifies that the information is filled in properly and that the selected User name is unique. If the User Object is invalid for any reason, the Administration Server returns a Result Message Object with a code indicating the reason. The format of the Result Message Object is shown in Table 1. If the User information is valid, the Administration Server updates the global database of User names and passwords and then generates a security token for that User. This security token is then returned to the User in a Result Message Object.

Upon receiving the Result Message Object, the User saves the security token for future use. This token is an identifier that allows the User to request services from the Administration Server and other computers within the overall system. The security token is not saved permanently or registered on the User computer. Normally, the User software then immediately sends a Channel Guide Request Object to the Administration Server and a Channel Guide Object is returned.

The format of these objects is also shown in Table 1. Note that in principle, this is a separate transaction and could take place in a separate TCP connection to the Administration Server. In particular, once the User has registered and logged in, he/she can request the Channel Guide Object again since it may have been updated since the previous request. At this point the TCP connection to the Administration server is closed.

The process of User registration only needs to take place once for each User. However, anyone can re-register at any time, even after the software has been installed. In particular, it is expected that if multiple persons use a computer, each person will register and obtain his/her own User name and password. If the registration process is not completed successfully, the User software saves the registration information and asks the User if they would like to try again the next time the software is invoked.

Since the security token is not permanently saved by the User software, it is lost when the User software is closed, and the security token must again be retrieved from the Administration Server the next time the User wants to use the system. This process is the purpose of the login sequence illustrated in FIG. **7**. This sequence is used if a User has already registered and needs only to retrieve a valid security token. In this case the sequence consists of the User's sending a Login Information Object to the Administration Server. The Administration Server then queries the User database to validate the login name and password. If the login name and password are correct, then a security token is returned to the User. Normally the receipt of the security token will immediately be followed by a channel information request sequence, just as in the registration sequence described previously.

The control sequence that takes place when a User initiates a channel play operation is illustrated in FIGS. **8A**, **8B** and **8C**. First the User software requests a Control Server List from the Administration Server. Note that the Server List Request Object, illustrated in Table 1 contains a channel identifier. The Administration Server generates a sorted list of Control Servers based on overall system load and the location of the User on the network and returns this list to the User using a Protocol List Object. Once the Control Server List is returned to the User, the Administration Server is no longer needed and the TCP connection is closed.

The User software then searches the list of Control Servers and opens a TCP connection to the first host listed. If that host computer does not respond, then the next Control Server on the list is tested and so forth in succession. Upon obtaining a response from a Control Server, the User software uses a Server List Request Object to request a Media Server List from the Control Server. If the Control Server is too busy to service the User, it returns a Result Message Object so indicating and the User software tries the next Control Server on the list. However, in the likely scenario that the Control Server is able to handle the User's request, a sorted list of Media Servers is generated and returned to the User computer using a Protocol List Object. The TCP connection to the Control Server is then closed by the User software.

US 6,434,622 B1

15

At this point the User software initiates a TCP connection to the first Media Server on the list provided by the Control Server. As in the previous case, it attempts to connect to the first host on the list and if unsuccessful tries the next hosts in succession. Once the Version Objects are exchanged, the User software sends an MCI Request Object to the Media Server. An MCI Request Object can be used for four basic commands: OPEN, PLAY, STOP and CLOSE. The User software must first send an OPEN command for the desired channel. If the returned Result Message Object indicates success, the User software then sends a PLAY command.

When the Media Server receives a valid PLAY command, it initiates the delivery of audio information to the User as described in the previous section. Note that this could be in the form of broadcast, multicast or unicast packets to a specific UDP port. The TCP connection through which the MCI Request Objects were sent stays open during the audio play operation. In addition, Ping Objects are sent to the User on a periodic basis to verify that the computer is still working and active. When the User software receives a Ping Object, it simply returns it. The Media Server uses the Ping Objects to measure round trip time and also to determine when a User's computer has terminated abnormally. In that case the audio stream is terminated.

In the case of normal termination of the audio stream, the User makes an explicit selection to stop and this causes a STOP command to be sent to the Media Server in an MCI Request Object. The Media Server then terminates the audio stream to that User. When the User closes the application software or selects another channel to play, the User software will send a CLOSE command to the Media Server in an MCI Request Object and the TCP connection is closed.

The initiation of the audio stream by the Media Server causes a log entry to be generated and sent to the Administration Server. This information is important so that the Administration Server can update its database to indicate which Users are listening to which channels. The security token is used to identify the User initiating the audio stream. Additionally, when the audio stream is terminated to any User, another log message is generated and sent to the Administration Server.

FIG. 9A illustrates the process by which security tokens are validated. The Administration Server is the only server that can validate a security token. Thus, when a User requests services from a Control Server or from a Media Server, that server must go back to the Administration Server with a token validation sequence. However, Control Servers and Media Servers are allowed to cache validations of security tokens so that they do not have to validate tokens repeatedly once they have validated the first time. In the case where a Media Server receives a request, the token will be validated with the Control Server that is managing that Media Server. FIG. 9B identifies the various token validation scenarios.

FIG. 10 illustrates the process by which a new Server is registered. This process is similar to new User registration. It is expected, however, that the server installation will be through a Web interface rather than a Wizard. The Administration Server, upon receiving a User Object from a Media Server or Control Server validates the User name and password and generate a security token just as in the case of User registration. Normally the Server then immediately sends back a Server Activation Object indicating that it is ready to be used as a system resource. Once this process has been completed, the TCP connection to the Administration Server is closed.

16

If a Media Server or Control Server that has sent a Server Activation Object to the Administration Server becomes inactive, it will send another Server Activation Object indicating this condition. In the case of a Media Server, this object is sent to the managing Control Server. In the case of a Control Server, this object sent to the Administration Server. As in the case of User registration, Media Server and Control Server registration needs only take place once per computer. However, if the computer is restarted, the server must login and again retrieve a security token. This is the server login and activation sequence shown in FIG. 11.

Once a Control Server has indicated to the Administration Server that it is ready, the Administration Server can activate that Control Server by sending the Control Server a Server Activation Object as illustrated in FIG. 12. This is a separate transaction and is used to tell the Control Server which Media Servers it is supposed to manage. Recall that a Control Server and a number of Media Servers form a cluster of Media Servers. The single Control Server that manages that cluster must be given a list -of host computers corresponding to the Media Servers in that cluster.

The process by which a Control Server activates the Media Servers that it manages is illustrated in FIG. 13. The Control Server sends a Server Activation Object to the Media Server indicating that it is responsible for channel management. This TCP connection between the Control Server and the Media Server stays open during the time that both servers are active. The Control Server periodically sends Ping Objects to the Media Server across this open TCP connection to verify that the Media Server is still running.

FIG. 14 illustrates the process by which a given channel is activated by the Administration Server. The Administration Server opens a connection to a Control Server that its wishes to have carry a given channel and provide a Channel Activation Object. This object indicates to the Control Server which Media or Primary Server the Control Server should direct its Media Servers to get the feed from. At this point the Control Server is said to be carrying that channel and it will be a valid host on a list of Control Servers requested by a Channel Play sequence.

FIG. 15 illustrates what happens when a Control Server needs to provide a channel. First it sends a Channel Activation Object to one of the Media Servers that it manages across the open TCP connection described previously. This object indicates to the Media Server that it should start receiving the channel identified and from where it should receive it.

In FIGS. 16A and 16B depict how the Media Server requests distribution of an audio channel from another Media Server or from a Primary Server. This sequence is much the same as that in which a User requests the distribution of audio information from a Media Server. Note that a Media Server receives a single incoming stream for each channel that it is carrying and will then redistributes this stream to all Users or other Media Servers that request it.

Finally, FIG. 17 illustrates the statistics request sequence. This sequence is used by the Administration Server to gather information from the Media Servers and Control Servers in order to manage the overall system. It can use this information to detect failures and to balance load as the dynamic conditions change. As indicated above, it can also use this information to monitor which Users are listening to which channel or whether Users stop listening to a channel at any time, such as during the play of a particular song. It can also use this information to control the advertising content that is downloaded to a particular User in advance of receipt of

US 6,434,622 B1

17

regular audio programming and/or monitor the delivery of advertising to the Users.

The control architecture described in this section is scalable to handle any number of Users. Note that the User registration process only happens once for each subscriber and the login process only happens once per session. These interactions, which require the Administration Server are expected to constitute a very small percentage of the overall system bandwidth. If the Administration Server were to become a bottleneck, however, it would be possible to duplicate it and to have the database it maintains distributed and automatically updated to guarantee consistency.

The Control Servers are distributed throughout the network and can handle the lower level interactions with the Users and the Media Servers. A single Control Server can handle preferably on the order of ten Media Servers up to several hundred Users. The bitrate among the Users, the Control Servers and the Media Servers is expected to be small in comparison to the audio transmission bitrate. The Ping Objects normally only involve the User and the nearest Media Server. They are also low in overhead since they are small and only get transmitted infrequently.

### III. User Interface

The User interface is provided by the client application running on an individual computer and its associated graphical interface. In the preferred embodiment the User interface is available for 32-bit Windows (95 and NT), Macintosh and UNIX platforms. Preferably anyone on the Internet can freely download a copy of the client software and install it in their computer.

FIG. 18 illustrates the main User screen in the preferred embodiment. The screen is composed of three sections: channel guide (upper left frame), program guide (upper right frame), and multimedia frame (lower half of screen). The channel guide lists, as a tree hierarchy, the channels that are available from the system. The User selects a channel from the list of those displayed on the channel guide. The program guide provides information pertaining to the channel selected. This information can be a detailed schedule of the programming that has played or will be playing on the channel selected. Additionally, other relevant information will be displayed in this frame, for example, a notice regarding an upcoming special event on another channel. The multimedia frame provides an integrated web browser that displays information via a series of tabbed sections.

The information contained in the channel guide, program guide, and the tabs of the multimedia frame is dynamically transmitted to the client. For example, if a new channel begins operation, the client application can immediately display it as being available. Furthermore, the tabs displayed can be specifically relevant depending on what song is playing. For example, tabs displaying the album cover, information on the artist, song lyrics, tour dates can be displayed. Additionally, as shown in the example in FIG. 18, a tab can be available allowing the User to place an order for the CD or allowing the User to participate in a chat session related to the channel.

FIG. 19 illustrates the key pull-down menus available in the main User screen in the preferred embodiment. Table 3 provides a description of each of the functions available through the pull down menus, as shown in FIG. 19.

As will be apparent to those skilled in the art, numerous modifications may be made within the spirit and cope of the invention.

18

TABLE 3

| | Pull-Down Menu Functions | |
|---|---|---|
| Menu Choice | Menu Sub-Choice | Description |
| File | Login | Allows the User to login to the system. |
| | Logout | Allows the User to logout from the system. |
| | Register | Brings up a dialog so that the User can register with the system for the first time. |
| | Close | Minimizes the screen. |
| Edit | Copy | Allows the User to copy the selection on to the clipboard. |
| | Properties | Allows the User to set various properties. |
| Audio | Play | Begins playing the selected channel. |
| | Stop | Stops playing the selected channel. |
| | Mute | Stops the playing of audio |
| View | Tool Bar | Display or hide the tool bar (providing access to pull-down menu functions). |
| | Status Bar | Display or hide the status bar normally situated at bottom of the screen. |
| | Web Bar | Display or hide the tool bar section that provides access to the web browser functions. |
| Help | Help Topics | Display a list of available online help topics. |
| | About . . . | Displays summary information regarding this application, such as version number, copyright information, and so on. |

What is claimed is:

1. A method for monitoring the forwarding of real-time information to at least one user having access to a communications network comprising:

generating delivery-commencement indications of real-time information forwarded to the user by means of the communications network, wherein the real-time information comprises a plurality of packets forwarded over the communications network to the user,

verifying the operational status of the user's access to the communications network during delivery of the real-information, and

generating delivery-termination indications of the real-time information forwarded to the user.

2. The method of claim 1 wherein the verifying step indicates abnormal termination of the user's access to the communications network, and wherein the generated delivery-termination indications then also comprises indications of the abnormal termination.

3. The method of claim 1 further comprising updating a database with information provided by the delivery-commencement and the delivery-termination indications.

4. The method of claim 1 wherein the commencement and termination indications further comprise time information.

5. The method of claim 1 wherein the operational status comprises an active/working status.

6. The method of claim 1 wherein the step of verifying further comprises forwarding over the communications network messages concerning the operational status of the user's access to the communications network.

7. The method of claim 6 wherein the messages concerning the operational status of the user's access to the communications network are initiated by the user.

19

**8**. The method of claim **6** wherein the messages concerning the operational status of the user's access to the communications network are received by the user and responded to by the user.

**9**. The method of claim **6** wherein the communications network further comprises at least one server computer, and wherein the messages concerning the operational status of the user access to the communications network are initiated by the server computer.

**10**. The method of claim **6** wherein the indications of delivery-commencement and of delivery-termination are stored on the server computer.

**11**. The method of claim **1** wherein the indications of delivery-commencement and of delivery-termination are stored at the user.

**12**. The method of claim **11** wherein the indications that are stored at the user are later forwarded over the communications network to the server computer.

**13**. The method of claim **1** further comprising a step of determining the total delivery time of the real-time information to the user from the delivery-commencement and the delivery-termination indications.

**14**. The method of claim **13** further comprising a step of determining the content of the real-time information delivered during the total delivery time.

**15**. The method of claim **13** wherein the total delivery time is determined as the total elapsed time between delivery-commencement and delivery-termination indications during which the user's access to the communications network was also verified to be in an active/working operational status.

**16**. The method of claim **1** wherein the real-time information comprises audio information, or video information, or advertising information.

**17**. The method of claim **1** further comprising generating indications of the content of the real-time information.

**18**. The method of claim **1** wherein an identifier is provided for the user.

**19**. The method of claim **18** wherein commencement and termination indications are associated with the identifier.

**20**. The method of claim **1** wherein the communications network includes the Internet.

**21**. The method of claim **1** wherein the communications network includes a satellite network.

**22**. The method of claim **1** wherein the communications network includes a cable TV network.

**23**. The method of claim **1** wherein the communications network includes a private data network.

**24**. A method for monitoring the forwarding of real-time information to at least one user having access to a communications network comprising:

generating delivery-commencement indications of real-time information to the user, wherein the real-time information comprises a plurality of packets comprising audio information, or video information and is forwarded over the communications network to the user, and wherein the commencement indications further comprise time information,

verifying the operational status of the user's access to the communications network during delivery of the real-information, wherein the operational status includes abnormal termination,

generating delivery-termination indications of the real-time information to the user, wherein the termination indications further comprise time information and indications of any abnormal termination, and

updating a database with information provided by the delivery-commencement and the delivery-termination indications.

20

**25**. The method of claim **24** wherein the step of verifying further comprises forwarding over the communications network messages concerning the operational status of the user's access to the communications network.

**26**. The method of claim **24** further comprising a step of determining the total delivery time of the real-time information to the user from the delivery-commencement and the delivery-termination indications.

**27**. The method of claim **26** wherein the total delivery time is determined as the total elapsed time between delivery-commencement and delivery-termination indications during which the user's access to the communications network was also verified to be in an active/working operational status.

**28**. The method of claim **24** further comprising generating indications of the content of the real-time information, and wherein the database is updated with information provided by the content indications.

**29**. A method for forwarding real-time information to one or more users having access to a communications network comprising:

processing one or more streams of audio or visual information into one or more streams of packets for forwarding over the communications network, wherein at least one stream of packets comprises audio or video information,

forwarding the digital packets to the users in response to information selection signals received from the users,

verifying the operational status of the users' access to the communications network during delivery of the real-time information, and

updating a database with indications of: (i) which streams of packets were received by which users, (ii) the time when delivery of each stream to each user commenced, and (iii) the time when delivery of each stream to each user terminated.

**30**. The method of claim **29** wherein the operational status includes abnormal termination, and wherein the termination time of each data stream further comprises indications of any abnormal termination.

**31**. The method of claim **29** wherein the step of verifying further comprises forwarding over the communications network to the users messages querying the operational status of the users' access to the communications network.

**32**. The method of claim **29** wherein the messages concerning the operational status of the users' access to the communications network are initiated by the users.

**33**. The method of claim **32** wherein the messages concerning the operational status of the users' access to the communications network are received by the user and responded to by the user.

**34**. A method for a user having access to a communications network to obtain real-time information comprising:

forwarding selection signals over the communications network from the user indicating the real-time information desired,

receiving one or more streams of packets forwarded to the user over the communications network in response to the selection signals, wherein at least one stream of packets comprises audio or video information, and

verifying the operational status of the communications network access during delivery of the real-information.

**35**. The method of claim **34** wherein an identifier is provided by the user.

**36**. The method of claim **34** wherein the step of verifying further comprises responding to messages forwarded to the

US 6,434,622 B1

21

user concerning the operational status of the user's access to the communications network.

**37**. The method of claim **34** further comprising the step of forwarding termination signals from the user indicating that termination of the streams of packets is requested.

**38**. The method of claim **37** wherein the termination signals from the user are voluntary.

**39**. The method of claim **37** wherein the termination signals from the user are involuntary.

**40**. A system for a user to obtain real-time information over a communications network information comprising a programmable device,

wherein the programmable device has access to the communications network, and

wherein the programmable device includes user software for causing the computer to forward selection signals from the programmable device indicating the real-time information desired,

receive one or more streams of packets forwarded to the programmable device in response to the selection signals, wherein at least one stream of packets comprises audio or video information, and

verify the operational status of the programmable device during delivery of the real-time information.

**41**. The system of claim **40** wherein the programmable device comprises a personal computer, or a personal digital assistant, or a telephone, or a mobile phone, or a terminal device, or a television set-top box, or a game console.

**42**. The system of claim **40** wherein the user software further causes the programmable device to initiate and forward over the communications network messages concerning the programmable device's operational status.

**43**. The system of claim **40** wherein the user software further causes the programmable device to respond to messages forwarded to the programmable device concerning the programmable device's operational status.

**44**. The system of claim **40** wherein the user software forwards over the communication network a unique identifier.

**45**. The system of claim **44** wherein the identifier is provided by the programmable device.

22

**46**. The system of claim **44** wherein the identifier is provided by the user software.

**47**. The system of claim **40** wherein the user software comprises an Internet browser.

**48**. The system of claim **40** wherein the user software further causes the programmable device to display a channel guide, a program guide, or a multimedia frame.

**49**. The system of claim **40** wherein the programmable device's operational status comprises its access to the communication network.

**50**. A software product comprising user software on a computer readable medium for causing a programmable device having access to a communications network to forward selection signals from a user indicating real-time information desired,

receive one or more streams of packets forwarded to the user in response to the selection signals, wherein at least one stream of packets comprises audio or video information, and

verify the operational status of the computer during delivery of the real-information.

**51**. The product of claim **50** wherein the user software further causes the programmable device to respond to messages forwarded to the programmable device concerning the programmable device's operational status.

**52**. The product of claim **50** wherein the user software further causes the programmable device to initiate and forward over the communications network messages concerning the programmable device's operational status.

**53**. The product of claim **50** wherein the user software forwards over the communication network a unique identifier.

**54**. The product of claim **50** wherein the user software comprises an Internet browser.

**55**. The product of claim **50** wherein the user further causes the programmable device to display a channel guide, a program guide, or a multimedia frame.

**56**. The product of claim **50** wherein the user software is provided in a form that is downloadable over the communications network.

\*    \*    \*    \*    \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,434,622 B1                                    Page 1 of 2
DATED         : August 13, 2002
INVENTOR(S)   : Monteiro et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

<u>Column 1,</u>
Lines 29, 32, 33 and 52, "which", each occurrence, should read -- that --;
Line 41, "capability analogous" should read -- capability, analogous --;
Line 43, "nodes are" should read -- nodes, is --.

<u>Column 2,</u>
Line 1, "1458 which" should read -- 1458, which --;
Line 43, "which" should read -- which: --;
Line 55, "which" should read -- that --.

<u>Column 3,</u>
Lines 21, 24, 29, 33, 34 and 35, "which", each occurrence, should read -- that --;
Line 30, change "at a major points" to -- at major points --.

<u>Column 4,</u>
Line 18, "which" should read -- that --.

<u>Column 5,</u>
Lines 46 and 51, "which", each occurrence, should read -- that --.

<u>Column 6,</u>
Line 5, "dynamic, Users" should read -- dynamic; Users --;
Lines 11 and 60, "which", each occurrence, should read -- that --;
Line 48, "to a multicast" should read --  to multicast --.

<u>Column 7,</u>
Lines 8 and 25, "which", each occurrence, should read -- that --;
Line 26, "monitor" should read -- monitors --;
Line 34, "audiostream" should read -- audio stream --.

<u>Column 8,</u>
Line 11, "36 which" should read -- 36, which --.

<u>Column 13,</u>
Line 43, "invoke it which" should read -- invoke it, which --.

<u>Column 15,</u>
Line 61, "Server validates" should read -- Server, validates --;
Line 62, "generate" should read -- generates --.

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 6,434,622 B1                                             Page 2 of  2
DATED        : August 13, 2002
INVENTOR(S)  : Monteiro et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

<u>Column 16,</u>
Line 55, "and will then" should read -- and then --.

<u>Column 17,</u>
Line 7, "Server are" should read -- Server, are --.

<u>Column 18,</u>
Line 53, "comprises" should read -- comprise --.

<u>Column 19,</u>
Line 9, "claim 6" should read -- claim 9 --.
Line 22, "a the step" should read -- a step --.

<u>Column 21,</u>
Line 11, change "network information comprising" to -- network comprising --.

Signed and Sealed this

Twentieth Day of May, 2003

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.      : 6,434,622 B1                                            Page 1 of  1
DATED           : August 13, 2002
INVENTOR(S)     : Monteiro and Butterworth

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Title page,
Item [56], **References Cited**, OTHER PUBLICATIONS, third reference, after
"RealAudio Administrator's Guide", delete "Release 1.1" and insert -- Release 1.01 --.

Signed and Sealed this

Twenty-second Day of February, 2005

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

US006434622C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (5510th)
# United States Patent
### Monteiro et al.

(10) **Number:**  **US 6,434,622 C1**
(45) **Certificate Issued:**  **Sep. 12, 2006**

(54) **MULTICASTING METHOD AND APPARATUS**

(75) Inventors: **Antonio M Monteiro**, New York, NY (US); **James F Butterworth**, New York, NY (US)

(73) Assignee: **Netcast Innovations Ltd.**, Boulder, CO (US)

**Reexamination Request:**
No. 90/007,056, May 28, 2004
No. 90/007,446, Mar. 4, 2005

**Reexamination Certificate for:**
Patent No.: **6,434,622**
Issued: **Aug. 13, 2002**
Appl. No.: **09/617,647**
Filed: **Jul. 17, 2000**

Certificate of Correction issued May 20, 2003.

Certificate of Correction issued Feb. 22, 2005.

**Related U.S. Application Data**

(63) Continuation of application No. 09/435,732, filed on Nov. 8, 1999, now Pat. No. 6,119,163, which is a continuation of application No. 09/110,369, filed on Jul. 6, 1998, now Pat. No. 5,983,005, which is a continuation of application No. 08/644,072, filed on May 9, 1996, now Pat. No. 5,778,187.

(51) **Int. Cl.**
*G06F 15/16* (2006.01)

(52) **U.S. Cl.** ........................................ 709/231; 709/236

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,674,512 | A | 4/1954 | Bogert et al. |
| 2,957,046 | A | 10/1960 | Freeman et al. |
| 3,126,513 | A | 3/1964 | Kamen |
| 3,230,302 | A | 1/1966 | Bruck et al. |
| 3,368,031 | A | 2/1968 | Eisele et al. |
| 3,733,430 | A | 5/1973 | Thompson et al. |
| 3,849,729 | A | 11/1974 | Baggen |
| 4,245,245 | A | 1/1981 | Matsumoto et al. |
| 4,264,924 | A | 4/1981 | Freeman |
| 4,558,358 | A | 12/1985 | Onda |
| 4,602,279 | A | 7/1986 | Freeman |
| 4,816,904 | A | 3/1989 | McKenna et al. |
| 4,829,569 | A | 5/1989 | Seth-Smith et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 97 92 4648 | 6/2004 |
| WO | WO 95/15658 | 8/1995 |

OTHER PUBLICATIONS

A MIB For Video Server System Management("DAVIC MIB").

(Continued)

*Primary Examiner*—Bunjob Jaroenchonwanit

(57) **ABSTRACT**

A scalable architecture is disclosed for delivery of real-time information over a communications network. Embedded into the architecture is a control mechanism that provides for the management and administration of users who are to receive the real-time information. In the preferred embodiment, the information being delivered is high-quality audio. However, it could also be video, graphics, text or any other type of information that can be transmitted over a digital network. Preferably, there are multiple channels of information available simultaneously to be delivered to users, each channel consisting of an independent stream of information. A user chooses to tune in or tune out a particular channel, but does not choose the time at which the channel distributes its information. Advantageously, interactive (two-way) information can be incorporated into the system, multiple streams of information can be integrated for delivery to a user, and certain portions of the information being delivered can be tailored to the individual user.



US 6,434,622 C1

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,850,007 | A | 7/1989 | Marino et al. |
| 5,027,400 | A | 6/1991 | Baji et al. |
| 5,081,680 | A | 1/1992 | Bennett |
| 5,155,762 | A | 10/1992 | Croquet et al. |
| 5,231,494 | A | 7/1993 | Wachob |
| 5,251,324 | A | 10/1993 | McMullan, Jr. |
| 5,267,032 | A | 11/1993 | Van Cang |
| 5,283,639 | A | 2/1994 | Esch et al. |
| 5,289,271 | A | 2/1994 | Watson |
| 5,361,256 | A | 11/1994 | Doeringer et al. |
| 5,446,489 | A | 8/1995 | Egendorf |
| 5,455,619 | A | 10/1995 | Truckenmiller et al. |
| 5,488,408 | A | 1/1996 | Maduzia et al. |
| 5,515,098 | A | 5/1996 | Carles |
| 5,559,549 | A | 9/1996 | Hendricks et al. |
| 5,600,364 | A | 2/1997 | Hendricks et al. |
| 5,636,346 | A | 6/1997 | Saxe |
| 5,717,923 | A | 2/1998 | Dedrick |
| 5,778,182 | A | 7/1998 | Cathey et al. |
| 5,778,187 | A | 7/1998 | Monteiro et al. |
| 5,793,980 | A | 8/1998 | Glaser et al. |
| 5,848,396 | A | 12/1998 | Gerace |
| 5,872,588 | A | 2/1999 | Aras et al. |
| 5,983,005 | A | 11/1999 | Monteiro et al. |
| 6,002,393 | A | 12/1999 | Hite et al. |
| 6,119,163 | A | 9/2000 | Monteiro et al. |
| 6,434,622 | B1 | 8/2002 | Monteiro et al. |

OTHER PUBLICATIONS

RealAudio Server Administrator's Guide Release 1.01 and press releases establishing availability as of Apr. 10, 1995("Real 1.01").

RealAudio Server Administrator's Guide Release 2.0 and press release announcing Real 2.0 on Oct. 30, 1995("Real 2.0").

TCP/IP Illustrated, vol. 1—The Protocols.

Office Action dated Jul. 15, 1997 for the '072 Application.

Invalidity Claim Chart for U.S. Pat. Nos. 5,778,187; 5,983,005; and 6,434,622.

Peter H. Lewis, "Peering out a 'Real Time' Window", *New York Times*, Feb. 8, 1995, pp. D1, D7.

David Lawrence, "Real–Time Audio, Hi–Fi, it Ain't", *Web Developer*, vol. 1, No. 1, Oct. 1995.

Harry A. Jessell, "EZ sees money in the Net", *Broadcasting & Cable*, Jul. 31, 1995, p. 31.

Brett Atwood, "Global 'Desktop B'casting' Catches On", *Billboard*, Jun. 10, 1995.

Brett Atwood, "KPIG First 24–Hour Online Radio", *Billboard*, Sep. 2, 1995.

Donna Petrazzella, "ABC Radio enters WWW", *Broadcasting & Cable*, Aug. 21, 1995, p. 38.

P. Grillo et al., "Host Resources MIB", Network Working Group, RFC 1514, Sep. 1993.

S. Kille et al., "Network Services Monitoring MIB", Network Working Group RFC 1565, Jan. 1994.

K. McCloghrie et al., "Management Information Base for Network Management of TCP/IP–based Internets", Network Working Group, RFC 1156, May 1990.

J. Case et al., "A Simple Network Management Protocol (SNMP)", Network Working Group RFC 1157, May 1990.

"DAVIC 1.0 Specification Part 1: Description of DAVIC Functionalities", Digital Audio–Visual Council (DAVIC), Rev. 3.1. The face of this document lists the following date: Jun. 22, 1995.

"DAVIC 1.0 Specification Part 02: System reference models and scenarios", Digital Audio–Visual Council (DAVIC), Rev. 3. The face of this document lists the following dates: Jun. 20, 1995 and Aug. 29, 1995.

"DAVIC 1.0 Specification Part 3: Server Architecture and APIs", Digital Audio–Visual Council (DAVIC), Rev. 3.0. The face of this document lists the following date: Jun. 7, 1995 and Aug. 29, 1995.

"DAVIC 1.0 Specification Part 04: Delivery system architectures and APIs", Digital Audio–Visual Council (DAVIC), Rev. 3.1. The face of this document lists the following dates: Jun. 8, 1995 and Aug. 29, 1995.

"DAVIC 1.0 Specification Part 5: STU Architecture and API", Digital Audio–Visual Council (DAVIC), Rev. 3.1. The face of this documents lists the following date: Jun. 26, 1995.

"DAVIC 1.0 Specification Part 6: High Layer Protocol", Digital Audio–Visual Council (DAVIC)Rev. 2.1. The face of this document lists the following dates: Jun. 8, 1995 and Aug. 29, 1995.

"DAVIC 1.0 Specification Part 7: Mid–Layer Protocols", Digital Audio–Visual Council (DAVIC)Rev. 3.0. The face of this document lists the following dates: Jun. 8, 1995, Jun. 19, 1995, Jun. 26, 1995, and Aug. 29, 1995.

"DAVIC 1.0 Specification Part 8: Lower Layer Protocols and Physical Interfaces", Digital Audio–Visual Council (DAVIC), Rev. 3.1, 1995. No other date is listed on the face of this document.

"Davic 1.0 Specification Part 9: Information Representation", Digital Audio–Visual Council (DAVIC), Rev. 3.2. The face of this document lists the following date: Jul. 6, 1995.

"DAVIC 1.0 Specification Part 10: Security", Digital Audio–Visual Council (DAVIC), Rev. 3.0 The face of this document lists the following dates. Jun. 8, 1995 and Aug. 29, 1995.

"DAVIC 1.0 Specification Part 11: Usage Information Protocols", Digital Audio–Visual Council (DAVIC), Rev. 3.1, 1995. No other date is listed on the face of the document.

"DAVIC 1.0 Specification Part 12: Reference Points, Interfaces and Dynamics", Digital Audio–Visual Council (DAVIC), Rev. 3.1, 1995. No other date is listed on the face of the document.

U.S. Appl. No. 90/007,447, filed Mar. 4, 2005, Request for Exparte Reexamination of U.S. Pat. No. 5,983,005.

U.S. Appl. No. 90/007,446, filed Mar. 4, 2005, Request for Exparte Reexamination of U.S. Pat. No. 6,434,622.

U.S. Appl. No. 90/007,445, filed Mar. 4, 2005, Request for Exparte Reexamination of U.S. Pat. No. 5,778,187.

"Structured Video", GCL's Proposal for DAVIC, Graphics Communications Laboratories, Dec. 1994.

"Multimedia Retrieval Services: Teletel Architecture as an example and a basis for future evolutions", Joint Proposal for the First DAVIC CFP, The Digital Audio–Visual Council, DAVIC Meeting, Tokyo, Japan, Dec. 4–7, 1994.

CableLabs® Response to DAVIC's CFP, Nov. 23, 2994.

Fong, Dr. Chung–Bin, et al., "Karaoke–On–Demand Service & System to DAVIC", Dec. 4, 1994.

Robinson, David, et al., "Network Management Video Server System MIB", The Digital Audio–Visual Council (DAVIC), Dec. 8, 1994.

Thompson, John et al., "Response from British Telecommunications Plc to: DAVIC's First Call for Proposals", BT Response to DAVIC/100, Issue 2.0, Oct. 14, 1994.

Appendix D: Network Management Video Server System MIB, Response to Call for Proposals, Dec. 8, 1994, David Robinson and Donald Hooper ("Robinson II"), prepared for DAVIC ("Digital Audio–Visual Council").

Appendix E: Karaoke–On–Demand Service & System to DAVIC, Dec. 4, 1994, Dr. Chung–Bin Fong et al. ("Fong"), prepared for DAVIC.

Appendix F: Structured Video, Dec. 1994, Graphics Communications Laboratory ("GCL"), prepared for DAVIC.

Appendix G: RealAudio Server Administrator's Guide Release 1.01 and press releases establishing availability as of Apr. 10, 1995 ("Real 1.01").

Appendix H: Response From British Telecommunications PLC to: DAVIC's First Call For Proposal, Oct. 14, 1994, John Thompson et al. ("Thompson"), prepared for DAVIC.

Appendix I: TCP/IP Illustrated vol. 1, (1994 19th Printing 2001) ("TCP/IP").

Appendix J: Multimedia Retrieval Services: Teletel Architecture as an example and a basis for future evolutions, France Telecom ("France"), prepared for DAVIC's meeting in Tokyo, Dec. 4–7, 1994.

Appendix K: Response to DAVIC's CFP ("Call for Proposals"), Nov. 23, 1994, CableLabs ("CableLabs").

Appendix L: PTO–1449.

Appendix M: Office Action dated Jul. 15, 1997.

Appendix N: RFC 1155 (Structure of Management Information Base (1990) and RFC 1157 (Simple Network Management Protocol (1990)).

European Search Report for EP 97 92 4648 Jun. 4, 2004 Europe.

*Two–Way Media LLC* v. *America Online, Inc.*, Civil Action No. C–04–089, S.D. Texas, Complaint, Mar. 9, 2004.

*Two–Way Media LLC* v *America Online, Inc.*, America Online, Inc.'s Answer to the Complaint and Counterclaim, Civil Action No. C–04–089, S.D. Texas, May 20, 2004.

*Two–Way Media LLC* v *America Online, Inc.*, Order, Civil Action No. C–04–089, S.D. Texas, Jun. 9, 2004.

"Framework for Interactive Video–on–Demand Service", Singru, A., et al., *Computers and Communications 1995, Conference Proceedings of the 1995 IEEE Fourteenth Annual International Phoenix Conference on Scottsdale, AZ*, Mar. 28, 1995, pp. 636–642.

U.S. Appl. No. 90/007,055, Order Granting/Denying Request for Ex Parte Reexamination, U.S. Patent and Trademark Office, mailed Jun. 23, 2004.

U.S. Appl. No. 90/007,054, Order Granting/Denying Request for Ex Parte Reexamination, U.S. Patent and Trademark Office, mailed Jun. 23, 2004.

U.S. Appl. No. 10/180,590, filed Jun. 26, 2002, Monteiro et al.

U.S. Appl. No. 90/007,054, filed May 28, 2004, Ex Parte Reexamination of Monteiro et al. U.S. Pat. No. 5,778,187.

U.S. Appl. No. 90/007,055, filed May 28, 2004, Ex Parte Reexamination of Monteiro et al. U.S. Pat. No. 5,983,005.

Netradio Corp. to offer customized broadcasts with ads, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

News to the desktop: Vendors deliver personalized news to users via the Net, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

Netcast Pairs Audio with Advertising, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

Xing Takes on Progressive Networks in Internet Audio, Video Transmission with Streamworks, Tries Radio First, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

S. Casner & S. Deering, "First IETF Internet Audiocast," ACM SIGCOMM Computer Communications Review, vol. 22, No. 3 (Jul. 1992).

S. Casner, "Getting on the MBone, Videoconferencing Over the Internet," University of Southern California, Information Sciences Institute, NLUUG Spring Conference (Apr. 13, 1995).

S. Deering, "IP Multicast and the MBone: Enabling Live, Multiparty, Multimedia Communication on the Internet," Xerox Palo Alto Research Center (Dec. 1995).

H. Eriksson, "MBONE: The Multicast Backbone," Communications of the ACM, vol. 37, No. 8, pp. 54–60 (Aug. 1994).

V. Jacobson, "The MBone—Interactive Multimedia on the Internet," University of California at Berkeley Seminar (Feb. 17, 1995).

K. Jonas & R. Wetekam, "Multicast Protocols for Multimedia Applications," 3rd International Workshop on Protocols for Multimedia Systems (PROMS'96), Madrid, Spain (Oct. 15–18, 1996).

J. Pasqual et al., "The multimedia multicast channel," Internetworking: Research and Experience, Wiley Publishers, vol. 5, No. 4, pp. 151–162 (Dec. 1994).

H. Schulzrinne et al., "RTP: A Transport Protocol for Real–Time Applications," Network Working Group, Audio–Video Transport Working Group, Request for Comments (Proposed Standard) 1889, Internet Engineering Task Force (Jan. 1996).

H. Schulzrinne, "When can we unplug the radio and telephone?," Network and Operating System Support for Digital Audio and Video, 5th International Workshop, NOSSDAV '95, Durham, New Hampshire, USA, Proceedings, Session V: Audio and Video Systems, pp. 174–177 (Apr. 19–21, 1995).

Robinson and Hooper, "A MIB for Video Server System Management," Proceedings of the 2nd International Workshop on Community Networkin Integrated Multipmedia Services in the Home (Cat. No. TH8097; pp. 109–115) IEEE. Princeton, N.J., Jun. 20–22, 1995.

Stevens, R., "TCP/IP Illustrated, vol. 1: The Protocols," *SNMP*, pp. 309, 360–361, 385–386.

RealAudio, Administrator's Guide, Release 1.01.

US 6,434,622 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims 29–33 and 40–49 is confirmed.

Claims **1**, **24**, **34** and **50** are determined to be patentable as amended.

Claims **2–23**, **25–28**, **35–39** and **51–56**, dependent on an amended claim, are determined to be patentable.

**1**. A method for monitoring the forwarding of real-time information to at least one user having access to a communications network comprising:

generating delivery-commencement indications of real-time information forwarded to the user by means of the communications network, wherein the real-time information comprises a plurality of packets forwarded over the communications network to the user,

verifying the operational status of the user's access to the communications network during delivery of the [real-information,] *real-time information* and

generating delivery-termination indications of the real-time information forwarded to the user.

**24**. A method for monitoring the forwarding of real-time information to at least one user having access to a communications network comprising:

generating delivery-commencement indications of real-time information to the user, wherein the real-time

**2**

information comprises a plurality of packets comprising audio information, or video information and is forwarded over the communications network to the user, and wherein the commencement indications further comprise time information,

verifying the operational status of the user's access to the communications network during delivery of the [real-information] *real-time information*, wherein the operational status includes abnormal termination,

generating delivery-termination indications of the real-time information to the user, wherein the termination indications further comprise time information and indications of any abnormal termination, and

updating a database with information provided by the delivery-commencement and the delivery-termination indications.

**34**. A method for a user having access to a communications network to obtain real-time information comprising:

forwarding selection signals over the communications network from the user indicating the real-time information desired,

receiving one or more streams of packets forwarded to the user over the communications network in response to the selection signals, wherein at least one stream of packets comprises audio or video information, and

verifying the operational status of the communications network access during delivery of the [real-information] *real-time information*.

**50**. A software product comprising user software on a computer readable medium for causing a programmable device having access to a communications network to forward selection signals from a user indicating real-time information desired,

receive one or more streams of packets forwarded to the user in response to the selection signals, wherein at least one stream of packets comprises audio or video information, and

verify the operational status of the computer during delivery of the [real-information] *real-time information*.

\* \* \* \* \*



US007266686B1

(12) **United States Patent**
Monteiro et al.

(10) Patent No.: **US 7,266,686 B1**
(45) **Date of Patent:** **Sep. 4, 2007**

(54) **MULTICASTING METHOD AND APPARATUS**

(75) Inventors: **Antonio M Monteiro**, New York, NY (US); **James F Butterworth**, New York, NY (US)

(73) Assignee: **Two-Way Media LLC**, Boulder, CO (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/180,590**

(22) Filed: **Jun. 26, 2002**

**Related U.S. Application Data**

(63) Continuation of application No. 09/617,647, filed on Jul. 17, 2000, now Pat. No. 6,434,622, which is a continuation of application No. 09/435,732, filed on Nov. 8, 1999, now Pat. No. 6,119,163, which is a continuation of application No. 09/110,369, filed on Jul. 6, 1998, now Pat. No. 5,983,005, which is a continuation of application No. 08/644,072, filed on May 9, 1996, now Pat. No. 5,778,187.

(51) Int. Cl.
*G06F 9/24* (2006.01)

(52) **U.S. Cl.** ...................... **713/161**; 713/168; 713/172; 380/37

(58) **Field of Classification Search** ................. 713/160, 713/168, 163, 165, 166, 167, 161, 182; 380/37
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,674,512 A | 4/1954 | Bogert et al. |
| 2,957,046 A | 10/1960 | Freeman et al. |
| 3,126,513 A | 3/1964 | Kamen |
| 3,230,302 A | 1/1966 | Bruck et al. |
| 3,368,031 A | 2/1968 | Eisele et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 9792464 | 6/2004 |
| EP | 97924648 | 6/2004 |
| WO | WO 95/10911 | 4/1995 |
| WO | WO 95/15658 | 6/1995 |

OTHER PUBLICATIONS

K. Savetz et al. MBONE Multicasting Tomorrow's Internet (IDG Books worldwide Inc., 1996).—Complete Copy Submitted Herewith—.

D.P. Brutzman et al., "MBONE Provides Audio and Video Across the Internet," IEEE Computer, vol. 27, No. 4, pp. 30–36 (Apr. 1994).

PCT International Search Report, International Application No. PCT/US97/07893.

(Continued)

*Primary Examiner*—Thomas R. Peeso
(74) *Attorney, Agent, or Firm*—Morgan, Lewis & Bockius LLP

(57) **ABSTRACT**

A scalable architecture is disclosed for delivery of real-time information over a communications network. Embedded into the architecture is a control mechanism that provides for the management and administration of users who are to receive the real-time information. In the preferred embodiment, the information being delivered is high-quality audio. However, it could also be video, graphics, text or any other type of information that can be transmitted over a digital network. Preferably, there are multiple channels of information available simultaneously to be delivered to users, each channel consisting of an independent stream of information. A user chooses to tune in or tune out a particular channel, but does not choose the time at which the channel distributes its information. Advantageously, interactive (two-way) information can be incorporated into the system, multiple streams of information can be integrated for delivery to a user, and certain portions of the information being delivered can be tailored to the individual user.

**48 Claims, 23 Drawing Sheets**



Appx211

US 7,266,686 B1

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,733,430 A | 5/1973 | Thompson et al. | |
| 3,849,729 A | 11/1974 | Baggen | |
| 4,245,245 A | 1/1981 | Matsumoto et al. | |
| 4,258,386 A | 3/1981 | Cheung | 358/84 |
| 4,264,924 A | 4/1981 | Freeman | |
| 4,361,851 A | 11/1982 | Asip et al. | 358/84 |
| RE31,639 E | 7/1984 | Nicholson | |
| 4,546,382 A | 10/1985 | McKenna et al. | 384/84 |
| 4,558,358 A | 12/1985 | Onda | |
| 4,602,279 A | 7/1986 | Freeman | |
| 4,618,995 A | 10/1986 | Kemp | 455/2 |
| 4,816,904 A | 3/1989 | McKenna et al. | |
| 4,829,569 A | 5/1989 | Seth-Smith et al. | |
| 4,850,007 A | 7/1989 | Marino et al. | 379/67 |
| 4,949,187 A * | 8/1990 | Cohen | 386/69 |
| 5,014,267 A | 5/1991 | Tompkins et al. | 370/62 |
| 5,027,400 A | 6/1991 | Baji et al. | |
| 5,081,680 A | 1/1992 | Bennett | |
| 5,105,184 A | 4/1992 | Pirani et al. | 345/115 |
| 5,130,792 A * | 7/1992 | Tindell et al. | 725/93 |
| 5,132,992 A | 7/1992 | Yurt et al. | 375/122 |
| 5,155,591 A | 10/1992 | Wachob | 358/86 |
| 5,155,762 A | 10/1992 | Croquet et al. | |
| 5,195,086 A | 3/1993 | Baumgartner et al. | |
| 5,220,420 A | 6/1993 | Hoarty et al. | |
| 5,220,501 A | 6/1993 | Lawlor et al. | 364/408 |
| 5,231,494 A | 7/1993 | Wachob | |
| 5,245,429 A | 9/1993 | Virginio et al. | |
| 5,247,347 A * | 9/1993 | Litteral et al. | 725/114 |
| 5,251,324 A | 10/1993 | McMullan, Jr. | |
| 5,267,032 A | 11/1993 | Van Cang | |
| 5,283,639 A | 2/1994 | Esch et al. | |
| 5,283,731 A | 2/1994 | Lalonde et al. | 364/401 |
| 5,289,271 A | 2/1994 | Watson | |
| 5,305,195 A | 4/1994 | Murphy | 364/401 |
| 5,305,438 A * | 4/1994 | MacKay et al. | 345/555 |
| 5,309,433 A | 5/1994 | Cidon et al. | |
| 5,319,455 A | 6/1994 | Hoarty et al. | 348/7 |
| 5,347,304 A | 9/1994 | Moura et al. | |
| 5,347,632 A | 9/1994 | Filepp et al. | 395/200 |
| 5,353,218 A | 10/1994 | De Lapa et al. | |
| 5,355,371 A | 10/1994 | Auerbach et al. | |
| 5,361,091 A | 11/1994 | Hoarty et al. | |
| 5,361,256 A | 11/1994 | Doeringer et al. | 370/60 |
| 5,371,532 A | 12/1994 | Gelman et al. | |
| 5,387,927 A | 2/1995 | Look et al. | |
| 5,410,698 A | 4/1995 | Dammeels et al. | |
| 5,412,416 A | 5/1995 | Nemirofsky | |
| 5,414,773 A | 5/1995 | Handelman | 380/49 |
| 5,418,559 A | 5/1995 | Blahut | |
| 5,421,024 A | 5/1995 | Faulk, Jr. et al. | |
| 5,422,674 A | 6/1995 | Hooper et al. | |
| 5,424,770 A | 6/1995 | Schmelzer et al. | |
| 5,426,637 A | 6/1995 | Derby et al. | |
| 5,428,606 A | 6/1995 | Moskowitz | |
| 5,430,716 A | 7/1995 | Pawelski | |
| 5,432,542 A | 7/1995 | Thibadeau et al. | |
| 5,440,548 A | 8/1995 | Denissen | |
| 5,442,390 A | 8/1995 | Hooper et al. | |
| 5,446,489 A | 8/1995 | Egendorf | |
| 5,446,490 A | 8/1995 | Blahut et al. | |
| 5,446,919 E | 8/1995 | Wilkins | 455/52 |
| 5,453,779 A | 9/1995 | Dan et al. | |
| 5,455,619 A | 10/1995 | Truckenmiller et al. | |
| 5,459,725 A | 10/1995 | Bodner et al. | |
| 5,481,297 A | 1/1996 | Cash et al. | |
| 5,481,542 A | 1/1996 | Logston et al. | 370/94.2 |
| 5,488,408 A | 1/1996 | Maduzia et al. | |
| 5,485,464 A | 2/1996 | Strodtbeck et al. | |
| 5,493,514 A | 2/1996 | Keith et al. | 364/514 R |
| 5,497,502 A | 3/1996 | Castille | |
| 5,508,732 A | 4/1996 | Bottomley et al. | |
| 5,515,098 A | 5/1996 | Carles | |
| 5,517,494 A | 5/1996 | Green | |
| 5,521,927 A | 5/1996 | Kim et al. | |
| 5,553,083 A | 9/1996 | Miller | 371/32 |
| 5,555,244 A | 9/1996 | Gupta et al. | |
| 5,559,549 A | 9/1996 | Hendricks et al. | 348/6 |
| 5,559,999 A | 9/1996 | Maturi et al. | |
| 5,572,442 A | 11/1996 | Schulhof et al. | 364/514 |
| 5,583,561 A * | 12/1996 | Baker et al. | 725/93 |
| 5,588,029 A | 12/1996 | Maturi et al. | |
| 5,589,892 A | 12/1996 | Knee et al. | 348/731 |
| 5,592,486 A | 1/1997 | Lo et al. | |
| 5,594,732 A | 1/1997 | Bell et al. | |
| 5,600,364 A | 2/1997 | Hendricks et al. | |
| 5,604,562 A | 2/1997 | Aoyama | 348/552 |
| 5,610,920 A | 3/1997 | Doll et al. | |
| 5,617,565 A | 4/1997 | Augenbraun et al. | 395/604 |
| 5,619,249 A | 4/1997 | Billock et al. | 348/7 |
| 5,629,732 A | 5/1997 | Moskowitz et al. | 348/7 |
| 5,636,346 A | 6/1997 | Saxe | |
| 5,649,013 A | 7/1997 | Stuckey et al. | 380/4 |
| 5,652,615 A | 7/1997 | Bryant et al. | |
| 5,652,749 A | 7/1997 | Davenport et al. | |
| 4,048,562 A | 9/1997 | Haselwood et al. | 325/31 |
| 5,663,757 A | 9/1997 | Morales | 348/13 |
| 5,666,487 A | 9/1997 | Goodman et al. | |
| 5,671,226 A | 9/1997 | Murakami et al. | |
| 5,673,254 A | 9/1997 | Crayford | |
| 5,675,510 A | 10/1997 | Coffey et al. | 364/564 |
| 5,677,905 A | 10/1997 | Bigham et al. | 370/94.2 |
| 5,694,334 A | 12/1997 | Donahue et al. | |
| 5,706,290 A | 1/1998 | Shaw et al. | 370/465 |
| 5,717,923 A | 2/1998 | Dedrick | |
| 5,727,002 A | 3/1998 | Miller et al. | |
| 5,733,430 A | 3/1998 | Ashida et al. | 205/337 |
| 5,734,719 A | 3/1998 | Tsevdos et al. | |
| 5,740,075 A | 4/1998 | Bigham et al. | 364/514 |
| 5,740,549 A | 4/1998 | Reilly et al. | 705/14 |
| 5,745,837 A | 4/1998 | Fuhrmann | |
| 5,751,282 A | 5/1998 | Girard et al. | 345/327 |
| 5,751,336 A | 5/1998 | Aggarwal et al. | |
| 5,760,838 A | 6/1998 | Adams et al. | |
| 5,771,073 A | 6/1998 | Lim | |
| 5,774,664 A | 6/1998 | Hidary et al. | |
| 5,778,182 A | 7/1998 | Cathey et al. | |
| 5,778,187 A | 7/1998 | Monteiro et al. | 395/200.61 |
| 5,790,541 A | 8/1998 | Patrick et al. | |
| 5,793,410 A | 8/1998 | Rao | 348/7 |
| 5,793,980 A | 8/1998 | Glaser et al. | 395/200.61 |
| 5,812,545 A | 9/1998 | Liebowitz et al. | |
| 5,838,683 A | 11/1998 | Corley et al. | |
| 5,848,396 A | 12/1998 | Gerace | |
| 5,862,324 A | 1/1999 | Collins | 395/200.5 |
| 5,862,329 A | 1/1999 | Aras et al. | 395/200.34 |
| 5,872,588 A | 2/1999 | Aras et al. | |
| 5,878,384 A | 3/1999 | Johnson et al. | 702/187 |
| 5,892,535 A | 4/1999 | Allen et al. | |
| 5,894,480 A | 4/1999 | Hoffert et al. | |
| 5,905,521 A | 5/1999 | Gatto et al. | 348/6 |
| 5,923,853 A | 7/1999 | Danneels | |
| 5,928,331 A | 7/1999 | Bushmitch | 709/231 |
| 5,930,254 A | 7/1999 | Liron et al. | 370/395 |
| 5,930,493 A | 7/1999 | Ottesen et al. | 348/7 |
| 5,931,961 A | 8/1999 | Ranganathan et al. | 714/712 |
| 5,936,940 A | 8/1999 | Marin et al. | 370/232 |
| 5,953,350 A | 9/1999 | Higgins | |
| 5,960,006 A | 9/1999 | Maturi | |
| 5,983,005 A | 11/1999 | Monteiro et al. | 395/200.61 |
| 6,002,393 A | 12/1999 | Hite et al. | |

US 7,266,686 B1

Page 3

| | | | |
|---|---|---|---|
| 6,005,560 | A | 12/1999 | Gill et al. |
| 6,009,096 | A | 12/1999 | Jaisingh et al. |
| 6,018,771 | A | 1/2000 | Hayden .................. 709/231 |
| 6,026,368 | A | 2/2000 | Brown et al. ............... 705/14 |
| 6,115,750 | A | 9/2000 | Dillon et al. |
| 6,122,668 | A | 9/2000 | Teng et al. |
| 6,208,656 | B1 | 3/2001 | Hrastar et al. |
| 6,434,622 | B1 | 8/2002 | Monteiro et al. |
| 6,539,022 | B1 | 3/2003 | Virgile |
| 6,553,178 | B2 | 4/2003 | Abecassis .................. 386/83 |
| 6,560,707 | B2 | 5/2003 | Curtis et al. |
| 2003/0140159 | A1 | 7/2003 | Campbell et al. |
| 2004/0255148 | A1 | 12/2004 | Monteiro et al. |

OTHER PUBLICATIONS

RealAudio Server, Admintstrator's Guide, Release 2.0. Progressive Networks, Inc.

RealAudio, Administrator's Guide, Release 1.1.

RealAudio Signs Deal with Netscape—Apr. 12, 1995.

Progressive Networks ships RealAudio—Jul. 25, 1995.

Microsoft, Spry and Spryglass to Include RealAudio—Apr. 12, 1995.

April Bundles Real Audio Player—Aug. 7, 1995.

24–Hour ABC News on the Net—Aug. 15, 1995.

Ziff–Davis Adds RealAudio to ZD Net—Aug. 16, 1995.

Progressive Networks' Real Audio Player has exclusive with Microsoft's Internet Explorer—Aug. 17, 1995.

Progressive Networks Announces "Live RealAudio" System—Aug. 30, 1995.

ABC RadioNet first to fully integrate live RealAudio—Sep. 7, 1995.

RTHK pioneers the use of LIVE RealAudio technology, Sep. 14, 1995.

Progressive Networks Announces RealAudio Personal Server—Oct. 9, 1995.

Progressive networks Receives Second Round of External Financing $5.7 Million Led by Accel partners—Oct. 30, 1995.

CheckPoint Software Breaks the Sound Barrier with Integrated Support for RealAudio—Dec. 5, 1995.

Progressive Networks Introduces Version 2.0 of the RealAudio System—Oct. 30, 1995.

Atlantic Records, CDnow, Electra Records, InTouch Group Inc., MCA Records, Muzak and Warner Bros. Records among first users of Progressive Networks' Real Audio version 2.0—Dec. 4, 1995.

Progressive Netoks to broadcast the Live and In Concert—Jan. 4, 1996.

Microsoft and Progressive Networks demonstrate first OLE–enabled Internet browser to incorporate RealAudio—Dec. 7, 1995.

Progressive Networks Announces RealAudio Server Products for Macintosh—Jan. 10, 1996.

Trusted Information Systems Enhances Industry Leading Gauntlet Internet Firewall—Jan. 23, 1996.

Border Network Technologies Provides Secure Support for RealAudio—Jan. 24, 1996.

Progressive Networks Announces Open RealAudio Architecture—Jan. 31, 1996.

RealAudio™ Server Software to be Bundled with newest Line of Apple Internet Servers—Feb. 27, 1996.

Bruce Jacobsen named President and Chief Operating Officer of Progressive Networks—Feb. 21, 1996.

GTA Announces RealAudio Support for the GFX Internet Firewall System—Mar. 1, 1996.

Morning Star's SecureConnect Technology Provides Internet Users of Real Audio With Sound Security—Mar. 4, 1996.

Progressive Networks and Microsoft Announce Streaming Media Agreement—Mar. 12, 1996.

Progressive Networks Announces RealAudio Firewall Proxy Kit—Apr. 2, 1996.

Progressive Networks Launches RealAudio 2.0 Intranet Offerings with Corporate Licensing Program and Intranet Server Pricing—Apr. 2, 1996.

Progressive Networks Ships Final Version of RealAudio System 2.0 with Open Architecture Enhancements and Ability to Deliver Synchronized Multimedia Capabilities—Apr. 2, 1996.

Progressive Networks Launches Timecast: The RealAudio Guide—Apr. 29, 1996.

RealAudio Wins Internet World magazine Outstanding Software Product of the Year Aware—Apr. 30, 1996.

S. Casner & S. Deering, "First IETF Internet Audiocast," ACM SIGCOMM Computer Communications Review, vol. 22, No. 3, (Jul. 1992).

S. Casner, "Getting on the MBone, Videoconferencing Over the Internet," University of Southern California, Information Sciences Institute, NLUUG Spring Conference (Apr. 13, 1995).

S. Deering, "IP Multicast and the MBone: Enabling Live, Multiparty, Multimedia Communication on the Internet," Xerox Palo Alto Research Center (Dec. 1995).

H. Eriksson, "MBONE: The Multicast Backbone," Communications of the ACM, vol. 37, No. 8, pp. 54–60 (Aug. 1994).

V. Jacobson, "The MBone—Interactive Multimedia on the Internet," University of California at Berkeley Seminar (Feb. 17, 1995).

K. Jonas & R. Wetekam, "Multicast Protocols for Multimedia Applications," 3rd International Workshop on Protocols for Multimedia Systems (PROMS'96), Madrid, Spain (Oct. 15–18, 1996).

J. Pasqual et al., "The multimedia multicast channel," Internetworking: Research and Experience, Wiley Publishers, vol. 5, No. 4, pp. 151–162 (Dec. 1994).

H. Schulzrinne et al., "RTP: A Transport Protocol for Real–Time Applications," Network Working Group, Audio–Video Transport Working Group, Request for Comments (Proposed Standard) 1889, Internet Engineering Task Force (Jan. 1996).

H. Schulzrinne, "When can we unplug the radio and telephone?," Network and Operating System Support for Digital Audio and Video, 5th International Workshop, NOSSDAV '95, Durham, New Hampshire, USA, Proceedings, Session V: Audio and Video Systems, pp. 174–177 (Apr. 19–21, 1995).

Singru, et al., "Framework for Interactive Video–on–Demand Service," Computers and Communications, Conference and Proceedings of the IEEE 14ᵗʰ Annual International Phoenix Conference on Scottsdale, AZ (Mar. 28–31, 1995), pp. 636–642.

Osler, Hoskin & Harcourt LLP, Requisition by the Examiner in Accordance with Subsection 30(2) of the Patent Rules, Jul. 27, 2006, p. 5.

Hodge, Winston William, Video Demand: Architecture, Systems, and Applications, Chapter 3, Interactive television guide for multimedia technologists 1994, pp. 29–55.

D. Gelman et al., A Store–And–Forward Architecture for Video–On–Demand Service, 1991, IEEE, pp. 842–846.

US 7,266,686 B1

Page 4

Andrew Laursen et al, Oracle Media Server: Providing Consumer Based Interactive Access to Multimedia Data, SIGMOD 94–May 1994 Minneapolis, Minnesota, USA, pp. 470–477.

Joint Chart Of Proposed Claim Constructions By America Online, Inc. And Two–Way Media LLC, Sep, 8, 2006, pp. 8.

America Online, Inc's Prior Art Invalidity Contentions, Jun. 30, 2006, pp. 1–103.

Two–Way Media LLC v. AOL Inc., Civil Action No. C–04–089 (SDTX), Two–Way Media's Pre–Tutorial Tutorial, May 1, 2006, DVD.

Pre–Tutorial Tutorial Two–Way Meida LLC v. America Online, Inc., Civil Action No. C–04–089, May 1, 2006, DVD.

Two–Way Media, LLC v. AOL Inc., Civil Action No. C–04–089 (SDTX), Two–Way Media's Markman Tutorial, Sep. 8, 2006, DVD.

AOL Technology Tutorial Two Way Media LLC v. America, Civil Action No. C–04–089, Sep. 8, 2006, DVD.

Two–Way Media LLC v. AOL LLC, Civil Case No. 2:06–cv–00310, Document 1, COMPLAINT, Filed Jul. 18, 2006, pp. 1–13.

Two–Way Media LLC v. AOL LLC, Civil Case No. 2:06–cv–00310, Document 7, Defendant AOL LLC's Answer To The Complaint And Counterclaim, Filed Aug. 14, 2006, pp. 1–11.

Two–Way Media, LLC v. America Online, Inc. Civil Case No. C–04–089, Jury Trial Demand, Filed Aug. 8, 2006, pp. Cover, Table of Contents, Table of Authorities, List of Exhibits, and 1–33.

Two–Way Media, LLC v. America Online, Inc. Civil Case No. C–04–089, Plaintiff Two–Way Media LLC's Opening Brief On Claim Construction, Filed Aug. 8, 2006, pp, Cover, Table of Contents, 1–35, Certificate of Service.

Exhibit E, Claims Terms p. 1.

Second College Edition, The American Heritage Dictionary, pp. 5, 73, 78, 378, 871, 1034, 1035 & 1343.

A Merriam–Webster, "Webster's Ninth New Collegiate Dictionary" Copyright 1991, pp. 767 & 1064.

Response to Office Action mailed Jul. 18, 1997, U.S. Appl. No. 08/644,072, Filed May 9, 1996, pp. 1–8.

Response to Office Action Mailed Jun. 9, 2005, U.S. Appl. No. 90/007,054, filed May 8, 2004, pp. 6.

Two–Way Media, LLC v. America Online, Inc. Civil Case No. 2:04–cv–00089, Document 57, filed Aug. 3, 2006 & 56 filed Jul. 21, 2006, Amended Agreed Scheduling Order, pp. 1–7.

Two–Way Media, LLC v. America Online, Inc. Civil Case No. C–04–089, Plaintiff Two–Way Media LLC's Prior Art Statement, Aug. 21, 2006, pp. 1–115.

Two–Way Media, LLC v. America Online, Inc, Civil Action No. 2:06–CV–00310, Plaintiff's Answer To Defendant's Counterclaim, Aug. 31, 2006, pp. 1–4.

Two–Way Media, LLC v. America Online, Inc. Civil Case No. C–04–089, Reply Brief In Support Of America Online's Proposed Claim Construction, Sep. 1, 2006, pp. 1–27 Exhibit 13, 4 pages.

Two–Way Media, LLC v. America Online, Inc. Civil Case No. C–04–089, Plaintiff Two–Way Media's Reply Brief On Claim Construction, Sep. 6, 2006, pp. 1–27.

Two–Way Media, LLC v. America Online, Inc. Civil Case No. C–04–089, Plaintiff Two–Way Media's Reply Brief On Claim Construction, Exhibit M, Sep. 6, 2006, 6 pages.

Two–Way Media, LLC v. America Online, Inc. Civil Case No. C–04–089, Plaintiff Two–Way Media's Reply Brief On Claim Construction, Exhibit J, Sep. 6, 2006, 4 pages.

Two–Way Media, LLC v. America Online, Inc. Civil Case No. C–04–089, Plaintiff Two–Way Media's Reply Brief On Claim Construction, Exhibit K, Sep. 6, 2006, 3 pages.

Two–Way Media, LLC v. America Online, Inc. Civil Case No. C–04–089, Plaintiff Two–Way Media's Reply Brief On Claim Construction, Exhibit L, Sep. 6, 2006, 9 pages.

Two–Way Media, LLC v. America Online, Inc., Civil Action No. C–04–089, Two–Way Media LLC v. AOL LLC, Civil Action No. C–06–00310, Defendant AOL LLC's Opposition To Plaintiff's Motion To Consolidate And Amend Schedule, Sep. 7, 2006, pp. 15.

Two–Way Media LLC v. America Online, Inc., Civil Action No. C–04–089, S.D. Texas, Complaint, Mar. 9, 2004.

U.S. Appl. No. 90/007,773, Request for Exparte Reexamination of U.S. Patent No. 5,983,005.

U.S. Appl. No. 90/007,774, Request for Exparte Reexamination of U.S. Patent No. 6,434,622.

U.S. Appl. No. 90/007,673, filed Sep. 30, 2005, Order Granting Request for ex parte Reexamination.

U.S. Appl. No. 90/007,054, filed May 28, 2004, Ex Parte Reexamination of Monteiro et al. U.S. Pat. No. 5,778,187.

U.S. Appl. No. 90/007,055, filed May 28, 2005, Ex Parte Reexamination of Monteiro et al. U.S. Pat. No. 5,983,005.

U.S. Appl. No. 90/007,056, filed May 28, 2005, Ex Parte Reexamination of Monteiro et al. U.S. Pat. No. 6,434,622.

Robinson and Hooper, "A MIB for Video Server System Management," Proceedings of the 2nd International Workshop on Community Networkin Integrated Multipmedia Services in the Home (Cat. No. TH8097; pp. 109–115) IEEE. Princeton, N.J., Jun. 20–22, 1995.

Stevens, R., "TCP/IP Illustrated, vol. 1: The Protocols," SNMP, pp. 309, 306–361, 385–386.

RealAudio, Administrator's Guide, Release 1.01.

"Structured Video", GCL's Proposal for DAVIC, Graphics Communications Laboratories, Dec. 1994.

"Multimedia Retrieval Services: Teletel Architecture as a example and a basis for future evolutions", Joint Proposal for the First DAVIC CFP, The Digital Audio–Visual Council, DAVIC Meeting, Tokyo, Japan, Dec. 4–7, 1994.

CableLabs® Response to DA VIC's CFP, Nov. 23, 2994.

Fong, Dr. Chung–Bin, et al., "Karaoke–On–Demand Service & System to DA VIC", Dec. 4, 1994.

Robinson, David, et al., "Network Management Video Server System MIB", The Digital Audio–Visual Council (DAVIC), Dec. 8, 1994.

Thompson, John et al., "Response from British Telecommunications Plc to : DA VIC's First Call for Proposals", BT Response to DA VIC/100, Issue 2.0, Oct. 14, 1994.

Netradio Corp. to offer customized broadcasts with ads, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

News to the desktop: Vendors deliver personalized new to users via the Net, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

Netcast Pairs Audio with Advertising, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

Xing Takes on Progressive Networks in Internet Audio, Video Transmission with Streamworks, Tries Radio First, http://global.factiva.com/en/arch/print_results.asp, last visited Oct. 10, 2003.

**US 7,266,686 B1**

Page 5

Singru, et al., "Framework for Interactive Video–on–Demand Service", Computers and Communications, Conference and Proceedings of the IEEE 14th Annual International Phoenix, Conference on Scottsdale, AZ (Mar. 28–31, 1995), pp. 636–642.

Two–Way Media v. America Online, Defendant America Online, Inc.'s Answer to the Complaint and Counterclaim, Civil Action No. C–04–089, S.D. Texas, May 20, 2004.

Two–Way Media v. America Online, Order, Civil Action No. C–04–089, S.C. Texas, Jun. 9, 2004.

U.S. Appl. No. 90/007,054, Order Grating/Denying Request for Ex Parte Reexamination, U.S. Patent and Trademark Office, mailed Jun. 23, 2004.

U.S. Appl. No. 90/007,055, Order Grating/Denying Request for Ex Parte Reexamination, U.S. Patent and Trademark Office, mailed Jun. 23, 2004.

U.S. Appl. No. 90/007,056, Order Grating/Denying Request for Ex Parte Reexamination, U.S. Patent and Trademark Office, mailed Jun. 24, 2004.

"DA VIC 1.0 Specification Part 1: Description of DA VIC Functionalities", Digital Audio–Visual Council (DA VIC), Rev. 3.1 The face of this document lists the following date: Jun. 22, 1995.

"DA VIC 1.0 Specification Part 02: System reference models and scenarios", Digital Audio–Visual Council (DA VIC), Rev. 3. The face of this document lists the following dates: Jun. 20, 1995 and Aug. 29, 1995.

"DA VIC 1.0 Specification Part 3: Server Architecture and APIs", Digital Audio–Visual Council (DA VIC), Rev. 3.0 The face of this document lists the following dates: Jun. 7, 1995 and Aug. 29, 1995.

"DA VIC 1.0 Specification Part 04: Delivery system architectures and APIs", Digital Audio–Visual Council (DA VIC), Rev. 3.1. The face of this document lists the following dates: Jun. 8, 1995 and Aug. 29, 1995.

"DA VIC 1.0 Specification Part 5: STU Architecture and API", Digital Audio–Visual Council (DA VIC), Rev. 3.1. The face of this documents lists the following date: Jun. 26, 1995.

"DA VIC 1.0 Specification Part 6: High Layer Protocol", Digital Audio–Visual Council (DA VIC)Rev. 2.1. The face of this document lists the following dates: Jun. 8, 1995 and Aug. 29, 1995.

"DA VIC 1.0 Specification Part 7: Mid–Layer Protocols", Digital Audio–Visual Council (DA VIC)Rev. 3.0. The face of this document lists the following dates: Jun. 8, 1995, Jun. 19, 1995, Jun. 26, 1995, and Aug. 29, 1995.

"DA VIC 1.0 Specification Part 8: Lower Layer Protocols and Physical Interfaces", Digital Audio–Visual Council (DA VIC), Rev. 3.1, 1995. No other date is listed on the face of this document.

"DA VIC 1.0 Specification Part 9: Information Representation", Digital Audio–Visual Council (DA VIC), Rev. 3.2. The face of this document lists the following date: Jul. 6, 1995.

"DA VIC 1.0 Specification Part 10: Security", Digital Audio–Visual Council (DA VIC), Rev. 3.0 The face of this document lists the following dates. Jun. 8, 1995 and Aug. 29, 1995.

"DA VIC 1.0 Specification Part 11: Usage Information Protocols", Digital Audio–Visual Council (DA VIC), Rev. 3.1, 1995. No other date is listed on the face of the document.

"DA VIC 1.0 Specification Part 12: Reference Points, Interfaces and Dynamics", Digital Audio–Visual Council (DA VIC), Rev. 3.1, 1995. No other date is listed on the face of the document.

U.S. Appl. No. 90/007,054 & 90/007,445, filed Sep. 2, 2005, Notice of Intent to Issue Ex Parte Reexamination Certificate.

U.S. Appl. No. 90/077,055 & 90/007,447, filed Sep. 2, 2005, Notice of Intent to Issue Ex Parte Reexamination Certificate.

U.S. Appl. No. 90/007,056 & 90/007,446, filed Sep. 2, 2005, Notice of Intent to Issue Ex Parte Reexamination Certificate.

U.S. Appl. No. 90/007,673, Request for Ex Parte Reexamination of U.S. Patent No. 5,778,187.

P. Grillo et al., "Host Resources MIB", Network Working Group, RFC 1514, Sep. 1993.

S. Kille et al., "Network Services Monitoring MIB", Network Working Group RFC 1565, Jan. 1994.

K. McCloghrie et al., "Management Information Base for Network Management of TCP/IP–based Internets", Network Working Group, RFC 1156, May 1990.

J. Case et al., "A Simple Network Management Protocol (SNMP)", Network Working Group RFC 1157, May 1990.

Peter H. Lewis, "Peering out a 'Real Time' Window", *New York Times*, Feb. 8, 1995, pp. D1, D7.

David Lawrence, "Real–Time Audio, Hi–Fi, it Ain't", *Web Developer*, vol. 1, No. 1, Oct. 1995.

Harry A. Jessell, "EZ sees money in the Net", *Broadcasting & Cable*, Jul. 31, 1995, p. 31.

Brett Atwood, "Global 'Desktop B casting ' Catches On", *Billboard*Jun. 10, 1995.

Brett Atwood, "KPIG First 24–Hour Online Radio", *Billboard*, Sep. 2, 1995.

Donna Petrazzella, "ABC Radio enters WWW", *Broadcasting & Cable*, Aug. 21, 1995, p. 38.

"Multicast Routing for Multimedia Communication", Vachaspathi P. Kompella et al, *IEEE/ACM Transactions on Networking*, vol. 1, No. 3, Jun. 1993, pp. 286–292.

"Collecting and Modeling the Join/Leave Behavior of Multicast Group Members in the MBone", Kevin C. Almeroth, et al., *Proceedings of HPDC–5 '96*, Aug. 1996, pp. 209–216.

"Synchronous Distance Education Via the Internet", J. Mark Pullen, *IEEE FIE '96 Proceedings*, pp. 285–288.

"Fault–Tolerant Real–Time Synchronous Collaboration Environment using WWW", Soomyung Park, et al., *IEEE 2nd Workshop on Object–Oriented Real–Time Dependable Systems*, Feb. 1996, pp. 226–231.

"Visualizing the Global Topology of the MBone", Tamara Munzner et al., *1996 IEEE Symposium on Information Visualization*, Oct. 1996, pp. 85–92.

"Internet Multimedia Application Technologies Current Practice and Future Directions", Shin Miyakawa, *Proceedings of the COMPSAC '96 –20th Computer Software and Applications Conference*, Aug. 1996, p. 225.

"MBone Provides Audio and Video Across the Internet", Michael R. Macedonia et al., *IEEE COMPUTER Magazine*, Apr. 1994, pp. 30–36.

"A Frame–work for Live Multicast of video Streams over the Internet", Navin Chuddha et al., *Proceedings of the International. Conference on Image Processing*, 1996, pp. 1.4

\* cited by examiner



FIG. 1

Appx216



FIG. 2

Appx217



FIG. 3



FIG. 4



# FIG. 5

Appx220



FIG. 6



FIG. 7



USER
ADMINISTRATION SERVER
SELECT CHANNEL TO PLAY
OPEN TCP CONNECTION
VERSION OBJECT
VERSION OBJECT
CHECK VERSION NUMBER
CHECK VERSION NUMBER
RETRIEVE SECURITY TOKEN
SERVER LIST REQUEST OBJECT
VALIDATE SECURITY TOKEN
GENERATE SERVER LIST
(ACTIVATE CHANNEL)
PROTOCOL LIST OBJECT
SAVE CONTROL SERVER LIST
CLOSE TCP CONNECTION
CONTROL SERVER
GET FIRST CONTROL SERVER
OPEN TCP CONNECTION
VERSION OBJECT
VERSION OBJECT
CHECK VERSION NUMBER
CHECK VERSION NUMBER
RETRIEVE SECURITY TOKEN
SERVER LIST REQUEST OBJECT
VALIDATE SECURITY TOKEN
GENERATE SERVER LIST
(ACTIVATE CHANNEL)
PROTOCOL LIST OBJECT
SAVE MEDIA SERVER LIST
CLOSE TCP CONNECTION
(CONTINUED)

FIG. 8A



USER
MEDIA SERVER
(CONTINUED)
GET FIRST MEDIA SERVER
OPEN TCP CONNECTION
VERSION OBJECT
VERSION OBJECT
CHECK VERSION NUMBER
CHECK VERSION NUMBER
RETRIEVE SECURITY TOKEN
MCI REQUEST OBJECT (OPEN)
VALIDATE SECURITY TOKEN
ALLOCATE RESOURCES
RESULT MESSAGE OBJECT
MCI REQUEST OBJECT (PLAY)
RESULT MESSAGE OBJECT
SEND LOG MESSAGE
START AUDIO PACKETS
PLAY AUDIO
UDP PORT
AUDIO PACKETS
PING OBJECT
PING OBJECT
UDP PORT
AUDIO PACKETS
PING OBJECT
PING OBJECT
(CONTINUED)
(CONTINUED)

FIG. 8B



FIG. 8C

Appx225



FIG. 9A

Appx226

(SHOWN ABOVE)

| REQUEST FROM | REQUEST TO | VALIDATION WITH |
|---|---|---|
| USER | CONTROL SERVER | ADMINISTRATION SERVER |
| USER | MEDIA SERVER | CONTROL SERVER |
| MEDIA SERVER | MEDIA SERVER | CONTROL SERVER |
| MEDIA SERVER | PRIMARY SERVER | ADMINISTRATION SERVER |
| MEDIA SERVER | CONTROL SERVER | ADMINISTRATION SERVER |
| CONTROL SERVER | MEDIA SERVER | ADMINISTRATION SERVER |

FIG. 9B

Appx227



## FIG. 10



FIG. 11

Appx229



FIG. 12

Appx230



FIG. 13

Appx231



FIG. 14

CONTROL SERVER
(ESTABLISHED TCP CONNECTION)
PREPARE INFORMATION ON WHICH MEDIA OR PRIMARY SERVER FEEDS CHANNEL
(ESTABLISHED TCP CONNECTION)
MEDIA SERVER
(ESTABLISHED TCP CONNECTION)
SAVE CHANNEL INFORMATION
(ESTABLISHED TCP CONNECTION)
CHANNEL ACTIVATION OBJECT
RESULT MESSAGE OBJECT

FIG. 15



MEDIA SERVER
MEDIA OR PRIMARY SERVER
(INCOMING PLAY RECEIVED)
GET APPROPRIATE MEDIA OR PRIMARY SERVER
OPEN TCP CONNECTION
VERSION OBJECT
VERSION OBJECT
CHECK VERSION NUMBER
CHECK VERSION NUMBER RETRIEVE SECURITY TOKEN
MCI REQUEST OBJECT (OPEN)
VALIDATE SECURITY TOKEN ALLOCATE RESOURCES
RESULT MESSAGE OBJECT
MCI REQUEST OBJECT (PLAY)
RESULT MESSAGE OBJECT
START AUDIO PACKETS
FORWARD AUDIO PACKETS TO OTHER SERVER(S) OR USER(S)
UDP PORT
AUDIO PACKETS
PING OBJECT
PING OBJECT
UDP PORT
AUDIO PACKETS
PING OBJECT
PING OBJECT
(CONTINUED)
(CONTINUED)

FIG. 16A



## FIG. 16B



FIG. 17

MAIN USER SCREEN
Netcast - Alternative Rock
File Edit Audio Content View Help
Netcast Channel Guide
Music
Alternative Rock
Classic Rock
College Rock
Cool Jazz
Hot Country
New Sounds
Today's Hits
Talk
One-on-One Sports
Entertainment & Issues
Politics '96
News
World Events
Business
Special Events
Live!Concert
Football-USC vs UM
Corporate Announcements
Coming Up on Alternative Rock...
In the next hour, you'll experience:Oasis; Gin Blossoms;Alanis Morrisette; Jeff Buckley;Natalie Merchant
Today on Special Events...
Smashing Pumpkins Live! From La Cigale in Paris at 4pm EST.
After the concert you'll get to meet the band backstage and chat with them about the tour and their upcoming album. Only on Netcast!
Netcast
Artist
Lyrics
Tour Dates
Order CD
Chat
Netcast Home Page
the old way
NETCAST
what ①
who ②
FAQs ③
media kit ④
a whole new medium
WHAT IS NETCAST|FAQs|WHO IS NETCAST|MEDIA KIT
http://www.ncc.net
For Help,press F1
05/01/96
06:25 PM

FIG. 18

```
┌─────────────────┐   ┌─────────────────┐   ┌─────────────────┐
│ File            │   │ Edit            │   │ Audio           │
├─────────────────┤   ├─────────────────┤   ├─────────────────┤
│ Login           │   │ Copy            │   │ Play            │
│ Logout          │   │                 │   │                 │
│                 │   │ Properties      │   │ Stop            │
│ Register        │   └─────────────────┘   │                 │
│                 │                         │ Mute            │
│ Close           │                         └─────────────────┘
│                 │
│ Exit            │
└─────────────────┘

         ┌─────────────────┐   ┌─────────────────┐
         │ View            │   │ Help            │
         ├─────────────────┤   ├─────────────────┤
         │ Tool Bar        │   │ Help Topics     │
         │                 │   │                 │
         │ Status Bar      │   │ About...        │
         │                 │   └─────────────────┘
         │ Web Bar         │
         └─────────────────┘
```

Key Pull-Down Menus on Main User Screen

## FIG. 19

US 7,266,686 B1

1

## MULTICASTING METHOD AND APPARATUS

This is a continuation of application Ser. No. 09/617,647 filed Jul. 17, 2000, now U.S. Pat. No. 6,434,622 which is a continuation of application Ser. No. 09/435,732, filed Nov. 8, 1999 (now U.S. Pat. No. 6,119,163), which is a continuation of application Ser. No. 09/110,369, filed Jul. 6, 1998 (now U.S. Pat. No. 5,983,005), which is a continuation of application Ser. No. 08/644,072, filed May 9, 1996 (now U.S. Pat. No. 5,778,187), and such applications are hereby incorporated by reference in their entireties for all purposes.

### FIELD OF THE INVENTION

This relates to a method and apparatus for providing audio and/or visual communication services, in real-time to a multiplicity of identifiable users on a communication on network, such as the Internet. In a preferred embodiment, the invention monitors which users are receiving signals on which one of a plurality of channels and modifies the content of at least some signals in response thereto. A particular application is to provide services akin to multi-channel radio or television with commercial programming content adjusted in accordance with the identity of the individual user.

### BACKGROUND OF THE INVENTION

Systems such as the Internet typically are point-to-point (or unicast) systems in which a message is converted into a series of addressed packets which are routed from a source node through a plurality of routers to a destination node. In most communication protocols the packet includes a header which contains the addresses of the source and the destination nodes as well a s a sequence number which specifies the packets order in the message.

In general, these systems do not have the capability of broadcasting a message from a source node to all the other nodes in the network because such a capability is rarely of much use and could easily overload the network. However, there are situations where it is desirable for one node to communicate with some subset of all the nodes. For example, multi-party conferencing capability analogous to that found in the public telephone system and broadcasting to a limited number of nodes are of considerable interest to users of packet-switched networks. To satisfy such demands, packets destined for several recipients have been encapsulated in a unicast packet and forwarded from a source to a point in a network where the packets have been replicated and forwarded on to all desired recipients. This technique is known as IP Multicasting and the network over which such packets are routed is referred to as the Multicast Backbone or MBONE. More recently, routers have become available which can route the multicast addresses (class D addresses) provided for in communication protocols such as TCP/IP and UDP/IP. A multicast address is essentially an address for a group of host computers who have indicated their desire to participate in that group. Thus, a multicast packet can be routed from a source node through a plurality of multicast routers (or mrouters) to one or more devices receiving the multicast packets. From there the packet is distributed to all the host computers that are members of the multicast group.

These techniques have been used to provide on the Internet audio and video conferencing as well as radio-like broadcasting to groups of interested parties. See, for example, K. Savetz et al. *MBONE Multicasting Tomorrow's Internet* (IDG Books WorldWide Inc., 1996).

2

Further details concerning technical aspects of multicasting may be found in the Internet documents Request for Comments (RFC) 1112 and 1458 which are reproduced at Appendices A and B of the Savetz book and in D. P. Brutaman et al., "MBONE provides Audio and Video Across the Internet," *IEEE Computer*, Vol. 27, No. 4, pp. 30–36 (April 1994), all of which are incorporated herein by reference.

Citation of the foregoing documents is not to be construed as an admission that any of such documents is a prior art publication relative to the present invention.

### SUMMARY OF THE INVENTION

The present invention is a scalable architecture for delivery of real-time information over a communications network. Embedded into the architecture is a control mechanism that provides for the management and administration of users who are to receive the real-time information.

In the preferred embodiment, the information being delivered is high-quality audio. However, it could also be video, graphics, text or any other type of information that can be transmitted over a digital network. This information is delivered in real-time to any number of widely distributed users. It is real-time in that for a given channel of information, approximately the same information is being sent at approximately the same time to everyone who is enabled to receive the information.

Preferably, there are multiple channels of information available simultaneously to be delivered to users, each channel consisting of an independent stream of information. A user chooses to tune in or tune out a particular channel, but does not choose the time at which the channel distributes its information. Advantageously, interactive (two-way) information can be incorporated into the system, multiple streams of information can be integrated for delivery to a user, and certain portions of the information being delivered can be tailored to the individual user.

### BRIEF DESCRIPTION OF THE DRAWINGS

These and other objects, features and advantages of our invention will be more readily apparent from the following Detailed Description of a Preferred Embodiment of our invention in which

FIG. **1** is a schematic diagram depicting an overview of the system of the present invention;

FIG. **2** is a schematic diagram depicting the network control center for the system of FIG. **1**;

FIG. **3** is a schematic diagram depicting a unicast distribution structure;

FIG. **4** is a schematic diagram depicting a multicast distribution structure;

FIG. **5** is a schematic diagram depicting the connection between the media server and the user in the system of FIG. **1**;

FIGS. **6**–**17** are timing diagrams which depict various aspects of the operation of the system of FIG. **1**; and

FIGS. **18** and **19** depict the user interface for control of the system of FIG. **1**.

Where the same reference numerals appear in multiple drawings, the numerals refer to the same or corresponding structure in such drawings.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. **1**, the system of the present invention comprises a Network Control Center **10**, a plurality Of

US 7,266,686 B1

3

Primary Servers **20**, Media Servers **30**, Users **40** and Control Servers **50** and an Administration Server **60**. The servers are interconnected by a communications network, which in the preferred embodiment is the global connected internetwork known as the Internet. The Network Control Center **10** is the source of the information being distributed. It receives audio feeds from satellite, over the air broadcast or in other ways and processes this information for delivery over the network on multiple channels of information. This processing consists of optionally recording the information for future broadcast and dynamically inserting paid commercial advertisements.

For each channel of information, there is a Primary Server **20** that receives the stream of information from the Network Control Center **10** and compresses the information stream to allow for more efficient transmission. The Primary Servers **20** are directly connected to the network.

The Primary Servers forward information via the network to a number of Media Servers **30**. There may be a large number of Media Servers and in fact there may be many levels of Media Servers. For example, a Media Server which receives a stream of information from a Primary Server may forward that stream via the network to another Media Server which then forwards it to a User **40**. This multilevel hierarchical structure is described in more detail below.

The topology of the Internet dictates the ideal placement of Media Servers, the fan-out of each Media Server and the number of levels of Media Servers between the Primary Server and Users. For example, the Media Servers which feed from a Primary Server might be placed at a major points of presence (POPs) of each of the large Internet service providers. These Media Servers might also be placed near clouds which serve as high bandwidth exchange points between the major carriers. Similarly, Media Servers which feed to Users might be placed on or close to networks which have a large number of subscribers to minimize the distance and number of data streams being transmitted.

Control Servers **50** are responsible for keeping track of which Users are listening to which channels and for directing the Media Servers to start and stop streams of information to those Users. The Control Servers are also responsible for handling other interactions among the various components of the system as will be described in more detail below. Each Control Server is responsible for managing a cluster of Media Servers; and each Media Server is managed by a single Control Server at any given time. As a result, the Control Servers are distributed throughout the Internet, preferably located close to the Media Servers.

The Administration Server **60** is responsible for registering new Users, authenticating Users who want to log onto the system, and maintaining audit logs for how many Users are listening to which channels and at which times. Maintaining audit logs and gathering statistics are features critical to monitoring the delivery of paid commercial messages as well as for other purposes. For example, for purposes of assessing copyright royalties, the audit logs can record the number of listeners for each musical or video selection that is distributed by the system. Another application is to determine the percentage of listeners who are interested in listening to a particular musical selection by determining how many listen to the entire selection and how many turn it off.

The system of the present invention can be considered a distribution architecture integrated with a control architecture. The distribution architecture handles scalable real-time delivery of information to any number of Users on a packet

4

switched network, such as the Internet. The control architecture represents a second scalable system integrated with the distribution architecture for managing and administering the delivery of that information.

The remainder of this description is divided into three sections. In the next section the distribution architecture will be described in more detail. Following that, the control architecture will be described. In the third section the User interface will be illustrated.

## I. Distribution Architecture

The distribution architecture provides for the delivery of real-time information to any number of Users distributed throughout a network. As will be described in detail below, the distribution architecture is scalable to allow for efficient delivery of multiple simultaneous information channels in real-time to a large number of Users.

In the preferred embodiment, the information which is being distributed consists of high-quality audio in addition to other information. It should be appreciated that the basic architecture and other general principles set forth herein would also apply to the delivery of video, graphics, text or any other type of information that can be delivered over a digital network. In addition, it should be appreciated that an information stream can consist of audio with supplemental information such as text and graphic images and commands to control software running on the User's computer.

The source of information in the preferred embodiment is the Network Control Center **10**, depicted in the schematic diagram of FIG. **2**. Control Centers of this type of design are available from Broadcast Electronics, Inc. and are similar to what would be found in a conventional radio station serving multiple frequencies.

Referring to FIG. **2**, the incoming signal can be received in a variety of ways such as from a satellite, over-the-air broadcast, cable or hard disk. It is then processed by Receiver/Decoder **110**, which decodes the signal and provides an incoming audio stream. Routing Switcher **120** is responsible for routing the incoming audio feed from the Receiver to either Delay Recording Workstation **140** or to one of the Playback/Control Workstations **130**. Real-time insertion of paid commercial advertising takes place at the Playback/Control Workstations and the resulting integrated audio stream is delivered to the Primary Servers. The Delay Recording Workstation is responsible for recording an incoming broadcast so that it can be played back at a later time.

Supervisory Workstation **150** is responsible for managing and controlling the Playback/Control Workstations, Delay Recording Workstations and other computers as may be connected to the local area network within the Network Control Center. Production Workstation **160** and AudioVAULT-NFS Server **170** are used to manipulate audio samples, such as commercial messages for use by the Playback/Control Workstations. The audio being delivered can consist of syndicated TV or radio programs, such as would be received over satellite or cable and delivered as described above. These can be delivered live and/or played back at a later time. It is also possible for the delivery of information, such as music, to take place from information that is all stored locally such as on a hard disk. A new play list and its associated music data can then be downloaded periodically to update the channel. Additionally, it is possible to deliver commercial-free programming, for example public service announcements or label-specific music.

In the preferred embodiment the Primary Servers are responsible for compressing the audio stream using an

Appx240

US 7,266,686 B1

5

advanced perceptual technique developed and licensed by AT&T Corp. and Lucent Technologies, Inc. This highly sophisticated algorithm is used to maximize the benefit of the bandwidth available. Advantageously, two bitrates are available, a first rate of approximately 20 Kbps and a second rate of approximately 56 Kbps. Using the perceptual technique, the quality of the first rate is similar to FM monaural (with a sampling rate of approximately 22,000 16-bit samples per second) and the second rate is close to CD quality stereo (with a sampling rate of approximately 32,000 16-bit samples in stereo each second). The signals at the two different bitrates comprise two different audio channels and thus require two different compression processes.

The computational requirements of compressing an audio stream in real time using techniques such as the advanced perceptual technique are approximately 100% of a Pentium-Pro 200 Mhz computer and the computational requirements of decompressing an audio stream in real time are approximately 30% of a Pentium 75 Mhz computer. Future improvements and/or changes to the algorithm could significantly change these requirements. For the present, a dedicated computer is required within the Primary Server to compress the audio stream. The decompression process takes place on end Users' computers and preferably would use only a portion of the computers' computational requirements, allowing the computers to be used for other tasks while they are processing the audio stream.

It is important to appreciate that the compression and decompression techniques employed by the present invention are not critical to the overall operation of the system and the advantages obtained therefrom could be obtained with other compression methodologies. Advantageously, the identity of the compression technique used can be encoded into the audio stream in the packet header. This makes it possible to identify to the receiver the nature of the decompression algorithm to use; and thereby make it possible for the computer within the Primary Server to select an optimum compression algorithm depending on the nature of the audio stream to be compressed.

The remainder of the distribution architecture comprises the multilevel hierarchy of data transmission originating at the Primary Server 20 and terminating at the Users 40 as shown in FIG. 3. In the preferred embodiment, the network is the global connected Internet. It can also include private networks which are connected to the Internet and it could be implemented on any packet switched network, cable-modem-based or satellite-based cable system. It is possible that certain links within the overall system, for example, the link between the Primary Server and the first level of Media Servers, are private data links which carry only data associated with this system. This could also be true of other data transmission paths in the distribution architecture. The User receiving the information preferably can be anyone who has access to the Internet with sufficient bandwidth to receive the resulting audio data.

It should be appreciated that the distribution architecture of the present invention provides for scalability. Using such a structure, any number of Users, and as widely distributed as necessary, can be accommodated. In the preferred embodiment, the fan-out at each level of Media Server (given the state of technology today) is on the order of ten, but the same structure could be applied with other fan-outs. The location and fan-out of the Media Servers is chosen to minimize overall network bandwidth consumed.

The flow of information from Primary Server 20 through network to User 40 is based on the delivery of a continuous

6

sequence of individual pieces of information, or packets. Thus the distribution architecture implements a form of multicast packet delivery to a group. The group in this case is the set of all Users who are listening to a given channel at a given time. Group membership is dynamic, Users can start and stop listening to a channel at any time.

Multicasting can be implemented in a variety of ways, any or all of which can be used in the present invention. In the preferred embodiment, the Media Servers receive unicast packet streams and they then duplicate these streams into more unicast streams to other Media Servers which are in the membership group for that stream. The lowest level Media Servers use hardware broadcast, multicast and/or unicast to reach all Users served by that Media Server.

If the Media Server is directly connected to the same physical network as the User, hardware broadcast or multicast can be used to transmit the packet stream to all Users listening at that time on that network. In this case the Media Servers can translate the incoming packets into broadcast or multicast packets for transmission on the local network. Only a single packet is transmitted at-a-time on the local network and any computer directly connected to the local network can receive that packet. Hardware multicast is built into most networks and it is lower in overall overhead than hardware broadcast since computers not interested in a transmission do not have to process the packets. In the case that a Media Server is serving a User who is not on the same physical network, a unicast transmission is used to reach that User, which requires a separate packet transmission for each User so connected. In the preferred embodiment, the assignment of Users to Media Servers is done using control transactions among the User 40, Control Servers 50, and Administration Server 60. This system will be described more fully in the following section.

Multicasting can also be implemented within the Internet at the IP level using IP class D addresses and the IGMP group control protocol. FIG. 4 illustrates how the multilevel hierarchical distribution architecture would operate using IP multicast delivery. Under this system, a packet is transmitted with a multicast address for a destination and each router maintains group membership lists for each interface that it is connected to and will forward packets across the Internet to other routers such that all Users within the global group eventually receive a copy of the packet. Unless and until all routers within the Internet understand multicasting in this way, it is necessary to supplement it with IP tunneling in which multicast packets are encapsulated in unicast packets and routed by unicast routers to a multicast routers. The present invention can and will be able to take advantage of IP multicasting as it becomes widely available. Each channel of information would be given its own class D address and the Media Server would then simply transmit packets using the appropriate IP destination address. In this case no Media Servers would be used as this function would be accomplished by the routers in use to store and forward other IP packets.

Thus it can be appreciated that the implementation of the multicast delivery structure can be implemented using a combination of IP unicast, IP multicast and hardware multicast or any other system which provides for distributed delivery of information to a specific group of destinations. It is expected that special relationships with Internet providers will be established so that delivery of the audio steams can take place with a guaranteed bandwidth and in the most efficient way possible.

In the preferred embodiment, packets of information for distribution use the UDP protocol under IP rather than the

US 7,266,686 B1

**7**

TCP protocol. TCP provides for reliable stream delivery but at the cost of retransmission and delays. For real-time information, it is usually more appropriate to use UDP since the information is time critical and low latency is more important that reliability. Since TCP is a point-to-point protocol, it is incompatible with IP multicasting. However, TCP could be used on the IP unicast links between Media Servers which are expected to have very low packet loss. In order to handle out of order, lost, duplicate and corrupted packets, the UDP packets are serialized.

In the preferred embodiment the size of the audio packets being transmitted is variable and can change on a packet by packet basis. It is expected that when using compression schemes that have a fixed bit rate, such as ADPCM, all packets for that stream would be the same size. Alternatively when using a variable bit rate compression algorithm, it is expected that packet size would vary so as to establish approximately the same amount of time for each sample. For example, if each packet corresponds to a 20 millisecond segment of speech, this could correspond to 100 bytes during one time period and 200 bytes during another. Additionally, the Media Server may choose to dynamically vary the packet size to accommodate changes in network conditions.

Since the resulting playback of audio information is sensitive to packet loss and network congestion, software running on the various computers which make up this system monitor the ongoing situation and adapt to it in the best possible way. This may involve using different Media Servers and/or lowering the data rate to the User. For example, similar to analog dynamic signal quality negotiation present in many analog radio receivers, the User software may request a lower bitrate until the situation is improved. Also, note that the audio information being delivered to the User is preferably interleaved so that a contiguous segment of the audiostream is distributed for transmission over several packets. As a result, the loss of one packet is spread out over multiple audio samples and causes minimal degradation in audio. Advantageously, a small degree of redundancy may be incorporated within the audio stream to further guard against packet loss.

Preferably, there are two bitrate options available to the User for audio delivery. These are approximately 20 Kbps for standard audio and approximately 56 Kbps for high quality audio. Thus, a 28.8 Kbps modem connection over an analog phone line is sufficient to listen to standard audio broadcasts. To listen to high quality audio, an ISDN connection to the Internet is required, or some other connection with greater than 56 Kbps bandwidth. It should be appreciated that higher bandwidths are currently becoming available to end Users. In particular the use of cable modems and residential fiber networks are enhancing the bandwidths available to Users and thus making broadcasts of higher bitrates more practical.

In addition to the content of the audio channel being delivered, it is also possible to deliver out of band of side-bar information such as graphics, images and text. This side-bar information is synchronized with the audio channel. This may only involve small increases in bandwidth requirements, such as 1–2 Kbps. For example a music program could deliver images of an album cover, the text of song lyrics, or URLs for use by a Web browser. The User can preferably choose to have the side-bar information show up automatically or be hidden. It is also possible to incorporate two-way interaction into the system, such that for example Users can participate in a global chat session during the audio broadcast. These and other details are explained in more detail below under the description of the User interface.

The delivery of paid commercial advertising information is an important aspect of the present invention. Advertising

**8**

may be incorporated into the audio stream within the Network Control Center as described above. It may also be incorporated into the audio stream at the User level, or at some intermediate point in the distribution architecture. In addition, the side-bar information discussed above can also include advertising content. FIG. 5 illustrates the provision to the User of two separate streams **32, 34** of packets, one of which may be used for advertising. In this case the insertion of the stream of commercial advertising into the non-commercial stream occurs on the User's computer. FIG. **5** also illustrates packet stream **36** which identifies the User to the system. This enables the system to monitor which Users are listening to which channels and also allows the system to vary, for example, the advertising content delivered to a User.

One advantage of this alternative is to allow targeted commercial delivery based on the individual User. That is, an individual User would receive the main audio feed plus a particular advertising stream unique to his demographic group. Note that the advertising stream typically is lower in overall bitrate and generally does not require real-time delivery, thus lowering the overall load on the network. For example, the advertising stream could be delivered to the User in advance of the regular programming, stored in a buffer in the User's computer and inserted into the stream of regular programming upon receipt of a cueing signal embedded in the stream of regular programming. Thus, a substantial number of targeted groups, perhaps 10 or 100 or even more could be accommodated without an impractical increase in network load.

## II. Control Architecture

The control architecture described in this section is responsible for managing and administering the Users who are receiving the information being delivered by the distribution architecture described in the previous section. The control architecture handles new User registration, User login, the starting and stopping of audio streams and the monitoring of ongoing transmissions. The control architecture is scalable just as is the distribution architecture so that any number of Users can be managed.

This section describes the control protocol, which consists of the format and sequence of control messages that are exchanged among Users, Control Servers, Media Servers, Primary Servers and the Administration Server. These messages are in the form of objects, which have specific data formats. Objects are exchanged preferably using the TCP protocol although other options are possible. Below we describe the sequence of objects passed among the various computers and detail the internal structure of each object.

The major objects used in the present embodiment of the invention are set forth in Table 1. For each object, Table 1 provides a brief description of its function, identification of the names of the fields in the object, their types and a brief description of their function.

TABLE 1

| Field Name | Field Type | Remarks |
|---|---|---|
| | | Channel Activation Object |
| | | Contains information used for channel activation/deactivation. It is sent to Media and Primary Servers to tell them to carry or stop carrying a specific channel. Media Servers get the channel from another server in the system hierarchy and Primary Servers get and encode the feed from the actual input source. |
| Token | Security Token Object | |
| Moniker | Moniker Object | unique channel identifier |

US 7,266,686 B1

**9**

### TABLE 1-continued

| Field Name | Field Type | Remarks |
|---|---|---|
| Activate | Int | action flag (activate/deactivate) |
| CompressType | Int | type of compression to use |
| Host | Host Object | host carrying the channel |

**Channel Guide Object**
Contains analytical and descriptive information for an item requested that is uniquely identified by a moniker. It is usually the reply to a Channel Guide Request object.

| Token | Security Token Object | |
|---|---|---|
| Type | Int | type of content |
| Result | String | the content data itself |

**Channel Guide Request Object**
Conveys a request for analytical and descriptive information about an item uniquely identified by the contained moniker. The reply is in the form of a Channel Guide Object.

| Token | Security Token Object | inherited from base class |
|---|---|---|
| Type | Int | type of content |
| Moniker | Moniker Object | unique identifier |

**Host Object**
Encapsulates the attributes of a networked computer related to the operation or services it offers or requests.

| Token | Security Token Object | |
|---|---|---|
| HostName | String | computer name and domain |
| PortNumber | Int | port number for service |
| DisplayName | String | descriptive computer name |

**Login Information Object**
Encapsulates the name and password by which a User is known to the system.

| Token | Security Token Object | |
|---|---|---|
| Login | String | User's system login name |
| Password | String | User's system password (possibly encrypted) |

**Media Control Interface (MCI) Request Object**
Encapsulates a multimedia control command, such as play and stop, and any extra information that may be necessary to perform the requested service.

| Token | Security Token Object | |
|---|---|---|
| Command | Int | multimedia command |
| String | String | command-specific extra info |

**Moniker Object**
A moniker encapsulates the name of an object or process with the intelligence necessary to work with that name. In other words, it provides naming and binding services. The Moniker Object is used in the system for unique identification of various components, parts or features, such as a channel, a directory, or a computer list.

| Token | Security Token Object | |
|---|---|---|
| ID | String | unique string identifier |
| DisplayName | String | User-readable name |

**Ping Object**
Ping is the name given to the "Are-You-Alive?" operation useful in determining if a specific computer is up and running. This object is used in the system when a server has to be queried for its operational status. It can also provide timing information for statistical purposes and quality of service evaluations.

| Token | Security Token Object | |
|---|---|---|
| Date | Date | system date |
| Time | Time | system time |

**Protocol List Object**
Encapsulates a general purpose collection object.

| Token | Security Token Object | |
|---|---|---|
| Type | Int | type of object list |

**10**

### TABLE 1-continued

| Field Name | Field Type | Remarks |
|---|---|---|
| | | **Result Message Object** |

Acts as the acknowledgment for a requested service successfully carried that out or reports errors that occur in the system during a client/server transaction.

| Token | Security Token Object | |
|---|---|---|
| Code | Int | result code |
| Message | String | message corresponding to code |

**Security Token Object**
Contains the authorization key for a transaction. The key must be validated before any service is performed.

| ID | String | authorization key/transaction ID. |
|---|---|---|

**Server Activation Object**
Contains information used in the server activation/deactivation process. Used for announcement as well as command purposes (e.g., a server can notify the administration database that is now activated or a server can be instructed to manage someone else).

| Token | Security Token Object | |
|---|---|---|
| Active | Int | action flag (activate/deactivate) |
| Manage | Int | control flag (manage/associate) |
| Type | Int | server type |
| Host | Host Object | host to be controlled |

**Server List Request Object**
Encapsulates a request for a list of available server resources for an identified service (e.g., a request for a list of Control Servers for a specified channel).

| Token | Security Token Object | |
|---|---|---|
| Type | Int | type of service |
| Moniker | Moniker Object | content/channel unique identifier |
| Host | Host Object | local host information |

**Statistics Object**
Contains system-related information that can be used by load-balancing algorithms and for statistical purposes.

| Token | Security Token Object | |
|---|---|---|
| Load | Int | load on the system |
| Threads | Int | number of threads running |
| Users | Int | number of Users being serviced |
| Uptime | Int | amount of time running |
| NumberManaged | Int | number of managed servers |
| NumberAssociated | Int | number of associated servers |

**Statistics Request Object**
Encapsulates a request for system-related information that can be used by load-balancing algorithms and statistical purposes.

| Token | Security Token Object | |
|---|---|---|
| Load | Int | request flag (on/off) |
| Threads | Int | request flag (on/off) |
| Users | Int | request flag (on/off) |
| Uptime | Int | request flag (on/off) |
| NumberManaged | Int | request flag (on/off) |
| NumberAssociated | Int | request flag (on/off) |

**User Object**
Users and Servers use this object to register themselves with the administration database. They provide the information for subsequent logins (name, password) and other system-related info. The end-Users provide personal, demographic, and system-related information.

| Token | Security Token Object | |
|---|---|---|
| Login | Login Information Object | login information(name, password) |
| FirstName | String | User's first name |
| LastName | String | User's last name |
| Title | String | User's job title |
| Company | String | User's employer |

US 7,266,686 B1

11

## TABLE 1-continued

| Field Name | Field Type | Remarks |
|---|---|---|
| Address1 | String | User's home street address |
| Address2 | String | User's address extra |
| City | String | city, village |
| State | String | state, province or foreign country |
| ZipCode | String | zip or postal code |
| Age | String | User's age |
| Gender | String | User's gender |
| PhoneNumber | String | telephone number |
| FaxNumber | String | fax number |
| Email | String | email address |
| Demographics | Dictionary | market-targeting extra User info |
| SystemInfo | Dictionary | system-related information |

Version Object

All components of the system use this object to report their versioning information to the party they transact with in order to use a protocol they both understand. They are also given the chance to update themselves if a newer version exists.

| Token | Security Token Object | |
|---|---|---|
| Major | Int | major protocol version number |
| Minor | Int | minor protocol version number |
| Type | Int | sender type |
| Client | Version | client version information |

Unlike traditional protocols based on state computers, the control protocol of the present invention is a light-weight, stateless protocol comprising simple sequences of objects. It is light-weight in that in most sequences only two objects are involved in the transaction and after a sequence is completed the connection can be reused. It is also stateless in that the server maintains no information about the client. Every transaction is handled independently of the previous ones. States exist in the lower levels, for example within the TCP layer, to express logical states of a network connection but they are not actually part of the control protocol.

In the preferred embodiment, the software running on the Control Servers, Media Servers and Primary Servers is programmed for Windows NT and UNIX environment using the OLE environment. In addition, COM interfaces are used between components. The Rogue Wave system is used to transfer objects between the applications running on the various computers. The software running on the User computer is preferably programmed for a Windows 32-bit environment, so it will run on a Windows 95 or Windows NT computer. Alternatively, Macintosh and UNIX environments can be accommodated by other User software.

The basic process of a control transaction consists of a version sequence followed by one or more protocol sequences. The version sequence starts after the computer initiating the transaction, the client, has established a connection with the computer completing the transaction, the server. The client sends a Version Object (defined in Table 1) and in response the server then sends back its own Version Object. This version sequence is used so that both client and server are aware of the version numbers of the software they are using. If a version number is older than expected, either client or server can choose to conform to the previous version or abort the transaction, depending on its needs and capabilities. If a version number is newer than expected, in most cases the current transaction can be completed since the software systems are designed to be fully backward compatible with previous versions. Additionally, in the case that the server of the transaction is the Administration Server, the client receives information about what the latest version number is and thus the client can be informed that a software update is needed. The process of handling automatic updating of User software is described more fully below.

12

After the version sequence, one or more protocol sequences occur in which other objects are exchanged between client and server. When a particular protocol sequence is completed, another independent protocol sequence can be serviced. The protocol sequences that are part of the control architecture of the present invention are summarized in Table 2 and described below in conjunction with FIGS. **6–17**.

## TABLE 2

Summary of Protocol Sequences

| Control Sequence | Client | Server | Main Objects Exchanged |
|---|---|---|---|
| User Registration and Login (see FIG. 6) | User | Administration | Version Object User Object Channel Guide Object |
| User Login (see FIG. 7) | User | Administration | Version Object Login Information Object Channel Guide Object |
| Channel Play (see FIGS. 8a, 8B, 8C) | User | Administration Control Media | Version Object Server List Object Version Object Server List Object Version Object MCI Objects — OPEN/PLAY/ STOP/CLOSE Ping Objects (TCP connection stays open) |
| Token Validation (see FIGS. 9A, 9B) | Control or Media or Primary | Administration or Control | Version Object Security Token Object |
| Server Registration and Login (see FIG. 10) | Media or Control | Administration | Version Object User Object Server Activation Object |
| Server Login (see FIG. 11) | Media or Control | Administration | Version Object Login Object Server Activation Object |
| Control Server Activation (see FIG. 12) | Administration | Control | Version Object Server Activation Object |
| Media Server Activation (see FIG. 13) | Control | Media | Version Object Server Activation Object Ping Objects (TCP connection stays open) |
| Control Channel Activation (see FIG. 14) | Administration | Control | Version Object Channel Activation Object |
| Media Channel Activation (see FIG. 15) | Control | Media | (open TCP connection) Channel Activation Objects |
| Distribution Activation (see FIG. 16) | Media | Media or Primary | Version Object MCI Objects — OPEN/PLAY/ STOP/CLOSE Ping Objects (TCP connection stays open) |
| Statistics Request (see FIG. 17) | Administration | Control or Media | Version Object Statistics Object |

The User registration and login sequences are the processes by which a new User registers with the system, logs in and retrieves programming information. The channel play sequence takes place when a User asks to listen to a particular channel. The token validation sequence is used to verify that a computer requesting a service is authorized to

US 7,266,686 B1

13

do so. The Server registration, login and activation sequences are used by Control and Media Servers when they become active. The Control Server and Media Server activation sequences are used to manage the Control and Media Servers. The control channel, media channel and distribution activation sequences are used to cause a channel to be distributed to a Media Server. Finally, the statistics request is used for administrative purposes.

FIG. **6** illustrates the User registration and login sequence in more detail. This sequence takes place after the User has installed the User software on his/her computer. It is expected that the User will download the software from the Internet and then invoke it which in the preferred embodiment will use the Windows Wizard interface. This will guide the User through the installation process including filling out the registration form, which we will describe more fully in the next section. After the User has selected a name and password and selected the option to register, the User computer opens a TCP connection to the Administration Server. Advantageously, the full domain name of the Administration Server is embedded into the User software, although it could be discovered in other ways. The User and Administration Server then exchange version objects with the Administration Server as described above. If the version numbers meet expectations, the User sends a User Object to the Administration Server. The format of the User Object is shown in Table 1. Once the Administration Server receives the User Object, it verifies that the information is filled in properly and that the selected User name is unique. If the User Object is invalid for any reason, the Administration Server returns a Result Message Object with a code indicating the reason. The format of the Result Message Object is shown in Table 1. If the User information is valid, the Administration Server updates the global database of User names and passwords and then generates a security token for that User. This security token is then returned to the User in a Result Message Object.

Upon receiving the Result Message Object, the User saves the security token for future use. This token is an identifier that allows the User to request services from the Administration Server and other computers within the overall system. The security token is not saved permanently or registered on the User computer. Normally, the User software then immediately sends a Channel Guide Request Object to the Administration Server and a Channel Guide Object is returned. The format of these objects is also shown in Table 1. Note that in principle, this is a separate transaction and could take place in a separate TCP connection to the Administration Server. In particular, once the User has registered and logged in, he/she can request the Channel Guide Object again since it may have been updated since the previous request. At this point the TCP connection to the Administration server is closed.

The process of User registration only needs to take place once for each User. However anyone can re-register at any time, even after the software has been installed. In particular, it is expected that if multiple persons use a computer, each person will register and obtain his/her own User name and password. If the registration process is not completed successfully, the User software saves the registration information and ask the User if they would like to try again the next time the software is invoked.

Since the security token is not permanently saved by the User software, it is lost when the User software is closed, and the security token must again be retrieved from the Administration Server the next time the User wants to use the system. This process is the purpose of the login sequence

14

illustrated in FIG. **7**. This sequence is used if a User has already registered and needs only to retrieve a valid security token. In this case the sequence consists of the User's sending a Login Information Object to the Administration Server. The Administration Server then queries the User database to validate the login name and password. If the login name and password are correct, then a security token is returned to the User. Normally the receipt of the security token will immediately be followed by a channel information request sequence, just as in the registration sequence described previously.

The control sequence that takes place when a User initiates a channel play operation is illustrated in FIGS. **8**A, **8**B and **8**C. First the User software requests a Control Server List from the Administration Server. Note that the Server List Request Object, illustrated in Table 1 contains a channel identifier. The Administration Server generates a sorted list of Control Servers based on overall system load and the location of the User on the network and returns this list to the User using a Protocol List Object. Once the Control Server List is returned to the User, the Administration Server is no longer needed and the TCP connection is closed.

The User software then searches the list of Control Servers and opens a TCP connection to the first host listed. If that host computer does not respond, then the next Control Server on the list is tested and so forth in succession. Upon obtaining a response from a Control Server, the User software uses a Server List Request Object to requests a Media Server List from the Control Server. If the Control Server is too busy to service the User, it returns a Result Message Object so indicating and the User software tries the next Control Server on the list. However, in the likely scenario that the Control Server is able to handle the User's request, a sorted list of Media Servers is generated and returned to the User computer using a Protocol List Object. The TCP connection to the Control Server is then closed by the User software.

At this point the User software initiates a TCP connection to the first Media Server on the list provided by the Control Server. As in the previous case, it attempts to connect to the first host on the list and if unsuccessful tries the next hosts in succession. Once the Version Objects are exchanged, the User software sends an MCI Request Object to the Media Server. An MCI Request Object can be used for four basic commands: OPEN, PLAY, STOP and CLOSE. The User software must first send an OPEN command for the desired channel. If the returned Result Message Object indicates success, the User software then sends a PLAY command.

When the Media Server receives a valid PLAY command, it initiates the delivery of audio information to the User as described in the previous section. Note that this could be in the form of broadcast, multicast or unicast packets to a specific UDP port. The TCP connection through which the MCI Request Objects were sent stays open during the audio play operation. In addition, Ping Objects are sent to the User on a periodic basis to verify that the computer is still working and active. When the User software receives a Ping Object, it simply returns it. The Media Server uses the Ping Objects to measure round trip time and also to determine when a User's computer has terminated abnormally. In that case the audio stream is terminated.

In the case of normal termination of the audio stream, the User makes an explicit selection to stop and this causes a STOP command to be sent to the Media Server in an MCI Request Object. The Media Server then terminates the audio stream to that User. When the User closes the application

US 7,266,686 B1

15

software or selects another channel to play, the User software will send a CLOSE command to the Media Server in an MCI Request Object and the TCP connection is closed.

The initiation of the audio stream by the Media Server causes a log entry to be generated and sent to the Administration Server. This information is important so that the Administration Server can update its database to indicate which Users are listening to which channels. The security token is used to identify the User initiating the audio stream. Additionally, when the audio stream is terminated to any User, another log message is generated and sent to the Administration Server.

FIG. 9A illustrates the process by which security tokens are validated. The Administration Server is the only server that can validate a security token. Thus, when a User requests services from a Control Server or from a Media Server, that server must go back to the Administration Server with a token validation sequence. However, Control Servers and Media Servers are allowed to cache validations of security tokens so that they do not have to validate tokens repeatedly once they have validated it the first time. In the case where a Media Server receives a request, the token will be validated with the Control Server that is managing that Media Server. FIG. 9B identifies the various token validation scenarios.

FIG. 10 illustrates the process by which a new Server is registered. This process is similar to new User registration. It is expected, however, that the server installation will be through a Web interface rather than a Wizard. The Administration Server, upon receiving a User Object from a Media Server or Control Server validates the User name and password and generate a security token just as in the case of User registration. Normally the Server then immediately sends back a Server Activation Object indicating that it is ready to be used as a system resource. Once this process has been completed, the TCP connection to the Administration Server is closed.

If a Media Server or Control Server that has sent a Server Activation Object to the Administration Server becomes inactive, it will send another Server Activation Object indicating this condition. In the case of a Media Server, this object is sent to the managing Control Server. In the case of a Control Server, this object sent to the Administration Server. As in the case of User registration, Media Server and Control Server registration needs only take place once per computer. However, if the computer is restarted, the server must login and again retrieve a security token. This is the server login and activation sequence shown in FIG. 11.

Once a Control Server has indicated to the Administration Server that it is ready, the Administration Server can activate that Control Server by sending the Control Server a Server Activation Object as illustrated in FIG. 12. This is a separate transaction and is used to tell the Control Server which Media Servers it is supposed to manage. Recall that a Control Server and a number of Media Servers form a cluster of Media Servers. The single Control Server that manages that cluster must be given a list of host computers corresponding to the Media Servers in that cluster.

The process by which a Control Server activates the Media Servers that it manages is illustrated in FIG. 13. The Control Server sends a Server Activation Object to the Media Server indicating that it is responsible for channel management. This TCP connection between the Control Server and the Media Server stays open during the time that both servers are active. The Control Server periodically sends Ping Objects to the Media Server across this open TCP connection to verify that the Media Server is still running.

16

FIG. 14 illustrates the process by which a given channel is activated by the Administration Server. The Administration Server opens a connection to a Control Server that its wishes to have carry a given channel and provide a Channel Activation Object. This object indicates to the Control Server which Media or Primary Server the Control Server should direct its Media Servers to get the feed from. At this point the Control Server is said to be carrying that channel and it will be a valid host on a list of Control Servers requested by a Channel Play sequence.

FIG. 15 illustrates what happens when a Control Server needs to provide a channel. First it sends a Channel Activation Object to one of the Media Servers that it manages across the open TCP connection described previously. This object indicates to the Media Server that it should start receiving the channel identified and from where it should receive it.

In FIGS. 16A and 16B depict how the Media Server requests distribution of an audio channel from another Media Server or from a Primary Server. This sequence is much the same as that in which a User requests the distribution of audio information from a Media Server. Note that a Media Server receives a single incoming stream for each channel that it is carrying and will then redistributes this stream to all Users or other Media Servers that request it.

Finally, FIG. 17 illustrates the statistics request sequence. This sequence is used by the Administration Server to gather information from the Media Servers and Control Servers in order to manage the overall system. It can use this information to detect failures and to balance load as the dynamic conditions change. As indicated above, it can also use this information to monitor which Users are listening to which channel or whether Users stop listening to a channel at any time, such as during the play of a particular song. It can also use this information to control the advertising content that is downloaded to a particular User in advance of receipt of regular audio programming and/or monitor the delivery of advertising to the Users.

The control architecture described in this section is scalable to handle any number of Users. Note that the User registration process only happens once for each subscriber and the login process only happens once per session. These interactions, which require the Administration Server are expected to constitute a very small percentage of the overall system bandwidth. If the Administration Server were to become a bottleneck, however, it would be possible to duplicate it and to have the database it maintains distributed and automatically updated to guarantee consistency.

The Control Servers are distributed throughout the network and can handle the lower level interactions with the Users and the Media Servers. A single Control Server can handle preferably on the order of ten Media Servers up to several hundred Users. The bitrate among the Users, the Control Servers and the Media Servers is expected to be small in comparison to the audio transmission bitrate. The Ping Objects normally only involve the User and the nearest Media Server. They are also low in overhead since they are small and only get transmitted infrequently.

III. User Interface

The User interface is provided by the client application running on an individual computer and its associated graphical interface. In the preferred embodiment the User interface is available for 32-bit Windows (95 and NT), Macintosh and UNIX platforms. Preferably anyone on the Internet can freely download a copy of the client software and install it in their computer.

US 7,266,686 B1

17

FIG. **18** illustrates the main User screen in the preferred embodiment. The screen is composed of three sections: channel guide (upper left frame), program guide (upper right frame), and multimedia frame (lower half of screen). The channel guide lists, as a tree hierarchy, the channels that are available from the system. The User selects a channel from the list of those displayed on the channel guide. The program guide provides information pertaining to the channel selected. This information can be a detailed schedule of the programming that has played or will be playing on the channel selected. Additionally, other relevant information will be displayed in this frame, for example, a notice regarding an upcoming special event on another channel. The multimedia frame provides an integrated web browser that displays information via a series of tabbed sections.

The information contained in the channel guide, program guide, and the tabs of the multimedia frame is dynamically transmitted to the client. For example, if a new channel begins operation, the client application can immediately display it as being available. Furthermore, the tabs displayed can be specifically relevant depending on what song is playing. For example, tabs displaying the album cover, information on the artist, song lyrics, tour dates can be displayed. Additionally, as shown in the example in FIG. **18**, a tab can be available allowing the User to place an order for the CD or allowing the User to participate in a chat session related to the channel.

FIG. **19** illustrates the key pull-down menus available in the main User screen in the preferred embodiment. Table 3 provides a description of each of the functions available through the pull down menus, as shown in FIG. **19**.

As will be apparent to those skilled in the art, numerous modifications may be made within the spirit and scope of the invention.

TABLE 3

Pull-Down Menu Functions

| Menu Choice | Menu Sub-Choice | Description |
|---|---|---|
| File | Login | Allows the User to login to the system. |
| | Logout | Allows the User to logout from the system. |
| | Register | Brings up a dialog so that the User can register with the system for the first time. |
| | Close | Minimizes the screen. |
| Edit | Copy | Allows the User to copy the selection on to the clipboard. |
| | Properties | Allows the User to set various properties. |
| Audio | Play | Begins playing the selected channel. |
| | Stop | Stops playing the selected channel. |
| | Mute | Stops the playing of audio |
| View | Tool Bar | Display or hide the tool bar (providing access to pull-down menu functions). |
| | Status Bar | Display or hide the status bar normally situated at bottom of the screen. |
| | Web Bar | Display or hide the tool bar section that provides access to the web browser functions. |

18

TABLE 3-continued

Pull-Down Menu Functions

| Menu Choice | Menu Sub-Choice | Description |
|---|---|---|
| Help | Help Topics | Brings up a list of available online help topics. |
| | About . . . | Displays summary information regarding this application, such as version number, copyright information, and so on. |

What is claimed is:

**1**. A method for metering real-time streaming media for commercial purposes, said method comprising:

forwarding a real-time media stream from an intermediate server toward a user device, wherein said forwarding of said real-time media stream from said intermediate server to said user device is via unicast, multicast, or any combination of the aforementioned;

detecting a termination of said forwarding;

determining an extent of said real-time media stream forwarded toward said user device after said termination; and

logging said extent for commercial purposes.

**2**. The method of claim **1**, wherein said forwarding is via the Internet, a private data network, a satellite network, a cable network, an over-the-air broadcast, or any combination of the aforementioned.

**3**. The method of claim **1**, further comprising, before said forwarding, authenticating said user device.

**4**. The method of claim **1**, wherein said commercial purposes include monitoring delivery of commercial messages.

**5**. The method of claim **1**, wherein said determining further comprises ascertaining a duration of said real-time media stream forwarded toward said user device.

**6**. The method of claim **5**, wherein said ascertaining monitors commencement and termination of said forwarding.

**7**. The method of claim **1**, wherein said determining further comprises ascertaining the size of said real-time media stream forwarded toward said user device.

**8**. The method of claim **7**, wherein said ascertaining further comprises determining total bytes of said real-time media stream forwarded toward said user device.

**9**. The method of claim **7**, wherein said ascertaining further comprises determining a time period during which said real-time media stream was forwarded toward said user device.

**10**. The method of claim **1**, wherein said real-time media stream comprises an audio stream, a video stream, or an audio and video stream.

**11**. The method of claim **1**, wherein said real-time media stream further comprises side-bar information, graphics, images, text, or any combination of the aforementioned.

**12**. The method of claim **1**, further comprising monitoring the status of said user device.

**13**. The method of claim **12**, wherein said monitoring further comprises periodically pinging said user device to determine the operational status of said user device.

**14**. The method of claim **13**, wherein said termination is caused by the operational status of said user device.

**15**. The method of claim **1**, wherein said termination is caused by said user device terminating reception of said real-time media stream.

19

**16.** The method of claim **1,** wherein said intermediate server is instructed to commence said forwarding of said real-time media stream toward said user device.

**17.** The method of claim **1,** wherein said intermediate server is instructed to terminate said forwarding of said real-time media stream toward said user device.

**18.** The method of claim **1,** further comprising transmitting said stream from said user device to at least one other user device.

**19.** The method of claim **18,** further comprising monitoring said transmitting.

**20.** The method of claim **1,** wherein said real-time media stream is an audio transmission, a video transmission, a radio transmission, a television transmission, a satellite transmission, a cable transmission, an advertisement, or any combination of the aforementioned.

**21.** The method of claim **1,** further comprising, before said forwarding, recording the real-time media stream to a storage medium.

**22.** The method of claim **1,** further comprising, before said forwarding, receiving a request for said real-time media from said user device.

**23.** A method for metering real-time streaming media for commercial purposes, said method comprising:

   forwarding copies of a real-time media stream from an intermediate server toward each of multiple user devices;

   detecting a termination of said forwarding to at least one of said user devices;

   determining an extent of said real-time media stream forwarded toward said at least one user device after said termination; and

   logging said extent for commercial purposes.

**24.** The method of claim **23,** wherein an extent of each of said copies forwarded to said multiple user devices is logged.

**25.** The method of claim **24,** further comprising aggregating each said extent over a predetermined time period.

**26.** A method for metering real-time streaming media for commercial purposes, said method comprising:

   encoding a media source feed into a real time media stream;

   transmitting said real-time media stream toward said intermediate server;

   forwarding said real-time media stream from an intermediate server toward a user device;

   detecting a termination of said forwarding;

   determining an extent of said real-time media stream forwarded toward said user device after said termination; and

   logging said extent for commercial purposes.

**27.** The method of claim **26** wherein said media source feed is received via the Internet, satellite, over-the-air broadcast, cable, hard disk, or any combination of the aforementioned.

**28.** The method of claim **26,** wherein said transmitting comprises forwarding more than one real-time media stream to said intermediate server, which then combines the more than one stream into a single stream to be forwarded toward said user device.

**29.** A method for metering real-time streaming media for commercial purposes, said method comprising:

   forwarding more than one real-time media stream from an intermediate server toward a user device, which user device then combines the more than one stream into a single stream;

20

   detecting a termination of said forwarding;

   determining an extent of said real-time media stream forwarded toward said user device after said termination; and

   logging said extent for commercial purposes.

**30.** A method for metering real-time streaming media for commercial purposes, said method comprising:

   selecting an intermediate server from multiple intermediate servers;

   forwarding at least one copy of a real-time media stream from said intermediate server toward a user device;

   detecting a termination of said forwarding;

   determining an extent of said real-time media stream forwarded toward said user device after said termination; and

   logging said extent for commercial purposes.

**31.** The method of claim **30,** wherein said selecting is based at least partially on: a type of said user device, an ability of said user device to receive and playback said real-time media stream, an ability of said intermediate server to forward said real-time media stream, a prevailing load of said intermediate server, performance characteristics of the communications network, or any combination of the aforementioned.

**32.** The method of claim **30,** wherein said selecting is at least partially based on a prevailing load of said intermediate server.

**33.** A method for metering real-time streaming media for commercial purposes, said method comprising:

   forwarding at least one copy of a real-time media stream from an intermediate server toward a user device;

   adjusting said forwarding based on: a type of said user device, an ability of said user device to receive and playback said real-time media stream, an ability of said intermediate server to forward said real-time media stream, a prevailing load of said intermediate server, performance characteristics of the communications network, or any combination of the aforementioned;

   detecting a termination of said forwarding;

   determining an extent of said real-time media stream forwarded toward said user device after said termination; and

   logging said extent for commercial purposes.

**34.** A method for metering real-time streaming media for commercial purposes, said method comprising:

   forwarding at least one copy of a real-time media stream from an intermediate server toward a user device;

   detecting a termination of said forwarding;

   determining an extent of said real-time media stream forwarded toward said user device after said termination; and

   logging said extent for commercial purposes, wherein said commercial purposes include assessing copyright royalties.

**35.** A method for metering real-time streaming media for commercial purposes, said method comprising:

   forwarding at least one copy of a real-time media stream from an intermediate server toward a user device, wherein a user of said user device must register prior to the forwarding of said real-time media stream toward said user device;

   detecting a termination of said forwarding;

   determining an extent of said real-time media stream forwarded toward said user device after said termination; and

   logging said extent for commercial purposes.

US 7,266,686 B1

21

**36**. A method for metering real-time streaming media for commercial purposes, said method comprising:

forwarding at least one copy of a real-time media stream from an intermediate server toward a user device;

detecting a termination of said forwarding;

after said termination determining an extent of said real-time media stream forwarded toward said user device, wherein said determining further comprises identifying said user device and identifying the composition of said real-time media stream; and

logging said extent for commercial purposes.

**37**. The method of claim **36**, wherein a security token or an Internet Protocol (IP) address is used to identify a user of said device.

**38**. A system for metering real-time streaming media for commercial purposes, said system comprising:

a user device coupled to a network;

an intermediate server coupled to said network, said intermediate server comprising instructions for forwarding at least one copy of a real-time media stream toward said user device;

at least one other server coupled to said intermediate server, wherein said at least one other server includes instructions for:

detecting a termination of said forwarding;

determining an extent of said real-time media stream forwarded toward said user device after said termination; and

logging said extent for commercial purposes.

**39**. The system of claim **38**, wherein said termination is caused by said user device termination reception of said real-time media stream.

**40**. The system of claim **38**, wherein said commercial purposes include monitoring delivery of commercial messages or assessing copyright royalties.

**41**. The system of claim **38**, wherein said instructions for determining further comprise instructions for ascertaining a duration of said real-time media stream forwarded toward said user device.

**42**. The system of claim **38**, further comprising multiple user devices coupled to said network, wherein said inter-

22

mediate server is configured to forward a copy of said real-time media stream to each of said multiple user devices.

**43**. The system of claim **38**, further comprising a network control center coupled to said intermediate server, wherein said network control center contains instructions for:

encoding a media source feed into said real time media stream; and

transmitting said real-time media stream toward said intermediate server.

**44**. The system of claim **38**, wherein said at least one other server further includes instructions for authenticating users.

**45**. The system of claim **38**, wherein said at least one other server further includes procedures for instructing said intermediate server to commence and terminate said forwarding.

**46**. A computer program product for metering real-time streaming media for commercial purposes, the computer program product comprising computer readable storage and a computer program stored therein, the computer program comprising:

instructions for forwarding at least one copy of a real-time media stream from an intermediate server toward a user device;

instructions for detecting a termination of said forwarding;

instructions for determining an extent of said real-time media stream forwarded toward said user device after said termination; and

instructions for logging said extent for commercial purposes.

**47**. The method of claim **46**, wherein said instructions for forwarding further comprise instructions for forwarding a copy of said real-time media stream to each of multiple user devices.

**48**. The method of claim **46**, further comprising instructions for:

encoding a media source feed into said real time media stream; and

transmitting said real-time media stream toward said intermediate server.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,266,686 B1                                   Page 1 of  1
APPLICATION NO. : 10/180590
DATED               : September 4, 2007
INVENTOR(S)         : Antonio M. Monteiro et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 19, Claim 26, line 49, after termination delete ";" and insert a comma --,--;

Signed and Sealed this

Eighth Day of April, 2008

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 7,266,686 B1       Page 1 of 2
APPLICATION NO. : 10/180590
DATED   : September 4, 2007
INVENTOR(S) : Antonio M. Monteiro et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 18, Claim 1, line 21, after "multicast," insert --broadcast--;

Column 18, Claim 1, line 24, before "determining" insert --after said termination,--;

Column 18, Claim 1, line 25-26, delete "after said termination";

Column 18, Claim 15, line 66, "device" should read --device's--;

Column 19, Claim 22, line 21, after "media" insert --stream--;

Column 19, Claim 23, line 30, before "determining" insert --after said termination,--;

Column 19, Claim 23, lines 31-32, delete "after said termination";

Column 19, Claim 26, line 41, "real time" should read --real-time--;

Column 19, Claim 26, line 43, delete "said" and insert --an--;

Column 19, Claim 26, line 45, delete "an" and insert --said--;

Column 19, Claim 26, line 49, before "determining" insert --after said termination;--;

Column 19, Claim 26, lines 50-51, delete "after said termination";

Column 20, Claim 29, line 2, before "determining" insert --after said termination,--;

Column 20, Claim 29, lines 3-4, delete "after said termination";

Column 20, Claim 30, line 13 before "determining" insert --after said termination,--;

Column 20, Claim 30, lines 14-15, delete "after said termination";

Column 20, Claim 33, line 40, before "determining" insert --after said termination,--;

Column 20, Claim 33, lines 41-42, delete "after said termination";

Column 20, Claim 34, line 49, before "determining" insert --after said termination,--;

Column 20, Claim 34, lines 50-51, delete "after said termination";

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.            : 7,266,686 B1                                    Page 2 of  2
APPLICATION NO.  : 10/180590
DATED                   : September 4, 2007
INVENTOR(S)        : Antonio M. Monteiro et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 20, Claim 35, line 64, before "determining" insert --after said termination,--;

Column 20, Claim 35, lines 65-66, delete "after said termination";

Column 21, Claim 36, line 6, after "termination" insert a comma --,--;

Column 21, Claim 38, line 22, after the semi-colon insert --and--;

Column 21, Claim 38, line 27, before "determining" insert --after said termination,--;

Column 21, Claim 38, lines 28-29, delete "after said termination";

Column 21, Claim 39, line 32, "termination" should read --terminating--;

Column 22, Claim 43, line 6, "real time" should read --real-time--;

Column 22, Claim 46, line 25, before "determining" insert --after said termination,--;

Column 22, Claim 46, lines 26-27, delete "after said termination";

Column 22, Claim 48, line 36, "real time" should read --real-time--.

Signed and Sealed this

Sixth Day of May, 2008

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
# 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

*Two-Way Media Ltd v. Comcast Cable Communications,* 2016-2531, -2532

## CERTIFICATE OF SERVICE

I, Elissa Matias being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by HEIM, PAYNE & CHORUSH, LLP, counsel for Appellant to print this document. I am an employee of Counsel Press.

On **November 4, 2016,** counsel has authorized me to electronically file the foregoing **Brief for Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel for the parties registered as CM/ECF users, including the following principal counsel:

Brian Lee Ferrall
Keker & Van Nest, LLP
633 Battery Street
San Francisco, CA 94111
415-391-5400
bferrall@kvn.com
*Counsel for Appellees Combat Cable*
*and Comcast Interactive Media LLC*

Thomas M. Dunham
Winston & Strawn LLP
1700 K Street, NW
Washington, DC 20006
202-282-5852
tdunham@winston.com
*Counsel for Appellees Verizon Services*
*Corp. and Verizon Online LLC*

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

November 4, 2016

/s/ Elissa Matias
Counsel Press

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e)

   X   The brief contains <u>13,839</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

\_\_\_\_ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

   X   The brief has been prepared in a proportionally spaced typeface using <u>M.S. Word 2013</u> in a <u>14</u> point <u>Garmond</u> font or

\_\_\_\_ The brief has been prepared in a monospaced typeface using _____ _____in a \_\_\_ characters per inch_____ font.

<u>November 4, 2016</u>              <u>(s)/s/ Michael F. Heim</u>        
Date                                   Michael F. Heim
                                       Counsel for Appellant